**No. 2025-1580**

# United States Court of Appeals
# For the Federal Circuit

**INTERNATIONAL MEDICAL DEVICES, INC.,**
**MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC,**
**CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS,**
**HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE LLC,**
**RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER**
*Defendants-Appellants*

**v.**

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendants*

2025-1580, 2025-1605

Appeals from the United States Court for the Central District of California
in No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall.

## BRIEF OF APPELLANT RICHARD B. FINGER

KING & SPALDING LLP
Jonathan Weinberg
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
(202) 737-0500

MORGAN, LEWIS BOCKIUS LLP
William R. Peterson
1000 Louisiana St., Suite. 4000
Houston, TX 77005
(713) 890-5188
(713) 890-5001 (Fax)

BECK REDDEN LLP
Russell S. Post
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

*Principal Counsel*

**COUNSEL FOR APPELLANT RICHARD B. FINGER**

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant certifies the following:

**1. The full name of each party represented by me is:**

Richard B. Finger

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of each party represented by me are:**

N/A

**4. The name of all law firms and the partners or associates that appeared for each party now represented by me in the trial court or are expected to appear in this Court is:**

| | | |
|---|---|---|
| William Peterson<br>MORGAN LEWIS | Jonathan Weinberg<br>KING & SPALDING | James Martin<br>REED SMITH |
| Shayna Jackson<br>REED SMITH | Shahmeer Halepota<br>Jason McManis<br>Weining Bai<br>Foster C. Johnson<br>John Zavitsanos<br>Karen B. Peck<br>AHMAD, ZAVITSANOS & MENSING PLLC | Kevin F. Ruf<br>Natalie S. Pang<br>GLANCEY PRONGAY AND MURRAY LLP |
| | Barbara B. DePena (formerly with AHMAD, ZAVITSANOS & MENSING PLLC | |

**5. Related cases:**

No. 25-1605; *International Medical Devices, Inc., et al. v. Robert Cornell, et al.*; In the United States Court of Appeals for the Federal Circuit

No. 2:20-cv-03503-CBM-RAO; *International Medical Devices, Inc., et al. v. Robert Cornell M.D., et al.*; In the United States District Court for the Central District of California - Western Division

**6. Organizational Victims and Bankruptcy Cases:**

None

*/s/ Russell S. Post*
Russell S. Post
*Principal Attorney for Appellant,*
*Richard B. Finger*

# TABLE OF CONTENTS

**PAGE**

Certificate of Interest .......... ii

Table of Contents .......... iv

Table of Authorities .......... vi

Introduction .......... 1

Statement of the Issues .......... 2

Statement of the Case .......... 3

Summary of Argument .......... 13

Standard of Review .......... 14

Argument .......... 15

I. There Is No Substantial Evidence of Misappropriation by Richard Finger. .......... 15

A. There is no substantial evidence that Finger acquired, disclosed, or used the alleged secrets .......... 15

B. There is no substantial evidence that Finger acted with knowledge of the trade secrets or knew they had been acquired wrongfully. .......... 16

1. There is no evidence that Finger had knowledge of any secret. .......... 16

2. There is no evidence that Finger knew or had reason to know that any alleged secret was derived wrongfully. .......... 17

3. The district court's reasoning regarding Finger is unsound and violates trade secrets law. .......... 18

II. There Is No Legal or Factual Basis for the Award of Exemplary Damages....24

A. By omitting exemplary damages and the willful and malicious issue from the pretrial order, Plaintiffs waived the claim. ....24

B. Exemplary damages cannot be awarded without a jury finding of willful and malicious conduct, which Plaintiffs failed to secure. ....26

1. The willful and malicious issue is for the jury. ....27

2. The district court's reasoning was legally incorrect. ....28

C. The finding of willful and malicious misappropriation by Finger was clearly erroneous. ....30

1. "Willful and malicious" misappropriation is a very high bar. ....30

2. There is no evidence that Finger was willful and malicious....32

D. The joint and several award of exemplary damages is unlawful. ....34

III. The District Court Clearly Erred in the Reasonable Royalty Calculation....35

Conclusion ....35

Certificate of Service ....36

Certificate of Compliance ....36

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*,
226 Cal. App. 4th 26 (2014) ....................16

*Applied Med. Distrib. Corp. v. Jarrells*,
100 Cal. App. 5th 556 (Cal. App. 2024)....................29, 31

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996)....................32

*Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*,
356 U.S. 525 (1958)....................25

*Cappa v. CrossTest, Inc.*,
2008 WL 821637 (Cal. Ct. App. Mar. 28, 2008) ....................18

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)....................12

*Curtis v. Loether*,
415 U.S. 189 (1974)....................26

*Gibson-Homans Co. v. Wall-Tite, Inc.*,
1992 WL 512411 (C.D. Cal. 1992) ....................19

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016)....................28, 31

*Hooked Media Grp., Inc. v. Apple Inc.*,
55 Cal. App. 5th 323 (2020) ....................18

*Imax Corp. v. Cinema Techs., Inc.*,
152 F.3d 1161 (9th Cir. 1998) ....................16, 17

*Magallanes v. Superior Court*,
167 Cal. App. 3d 878 (1985) ....................32

*Neal v. Farmers Ins. Exch.*,
21 Cal. 3d 910 (1978) ....................32

*Pierce Cnty. Hotel Empls. & Rest. Emps. Health Tr. v. Elks Lodge*,
827 F.2d 1324 (9th Cir. 1987) ....................................................................27

*Reeves v. Sanderson Plumbing Prods.*,
530 U.S. 133 (2000)...............................................................................12

*Richardson v. Suzuki Motor Co., Ltd.*,
868 F.2d 1226 (Fed. Cir. 1989) ................................................................25

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)...........................................................................22, 27

*Roton Barrier, Inc. v. Stanley Works*,
79 F.3d 1112 (Fed. Cir. 1996) ..................................................................31

*S. Cal. Retail Clerks Union & Food Emps. Joint Pension Tr. Fund v. Bjorklund*,
728 F.2d 1262 (9th Cir. 1984) ...............................................................22, 27

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (Cal Ct. App. 2010),
*disapproved on other grounds by Kwikset Corp. v. Sup. Court*,
52 Cal. 4th 310 (Cal. 2011).....................................................13, 14, 15, 16

*Simler v. Conner*,
372 U.S. 221 (1963)...............................................................................25

*State Farm Mut. Auto Ins. Co. v. Campbell*,
538 U.S. 408 (2003)...............................................................................32

*Stutz Motor Car of Am., Inc. v. Reebok Intern., Ltd.*,
909 F. Supp. 1353 (C.D. Cal. 1995), *aff'd*, 113 F.3d 1258
(Fed. Cir. 1997)......................................................................................11

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ..................................................................12

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) ..................................................................12

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016) ...............................................................26, 27

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948) ... 12, 28

*Verizon Comm. Inc. v. Law Off. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ... 17

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ... 25

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) ... 28

*Zucco Partners v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ... 21

**STATUTES AND REGULATIONS**

18 U.S.C. § 1836(c) ... x

28 U.S.C.
§ 1295(a)(1) ... x
§ 1331 ... x
§ 1338(b) ... x
§ 1367(a) ... x

17 C.F.R.
§ 240.10b-5(b) ... 20
§ 299.105(a) ... 20

Cal. Civ. Code
§ 3426.1(b)(1)-(2) ... 13
§ 3426.1(b)(2)(B)(i) ... 14, 15
§ 3426.1(b)(2)(B)(iii) ... 14, 15
§ 3426.3(c) ... 25, 28

**RULES**

Fed. R. Civ. P.
16(d) ... 22
28(i) ... 35

**OTHER AUTHORITIES**

Unif. Trade Secrets Act § 3 .......... 25

Restatement (Third) of Unfair Competition § 40 cmt. d .......... 15

2 Trade Secrets Law § 22.2 .......... 19

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction over numerous claims, Appx227, including patent validity, Appx249-251, and supplemental jurisdiction over state-law claims. 18 U.S.C. § 1836(c); 28 U.S.C. §§ 1331, 1367(a), 1338(b).

The district court entered a final judgment, Appx10476, and then amended it. Appx10. Defendants' post-judgment motions, Appx10503, 10526, were all denied. Appx16, 29. Defendant-Appellant Richard Finger filed a timely notice of appeal. Appx12380. The district court entered a corrected amended final judgment, Appx1, and Finger amended his notice of appeal. Appx12414.

Because the case involves issues of patent validity, this Court has jurisdiction. 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

Richard Finger is a 70-year-old investor in the twilight of his career. If the Court affirms, he will lose everything and be forced into bankruptcy.

Finger never imagined standing at this precipice in 2018, when he agreed to make a modest investment in an acquaintance's medical device startup (Augmenta). He invested $300,000 and helped raise a few hundred thousand more. The company never made a sale or a dollar.

Nevertheless, Finger now faces over *$20M in personal liability* because the Augmenta's never-released product was supposedly designed using a competitor's trade secrets. To be clear, Finger took no part in the product's design. He was not an engineer or a doctor. He never designed a medical device or even invested in a medical device company before. He was simply the financier.

The entire case against Finger is this: when he learned Augmenta's founder (Dr. Robert Cornell) had visited the competitor under NDA, Finger (1) was assured that Augmenta's product used no trade secrets, (2) assisted Cornell in raising funds, and (3) disclosed the risk of litigation to investors (as the SEC requires). That is it.

That is not substantial evidence of misappropriation. And it is certainly not the type of willful and malicious misconduct needed to justify an award of $11.5M in exemplary damages—an award that was made in defiance of the pretrial order and without a required jury finding. The judgment against Finger should be reversed.

## STATEMENT OF THE ISSUES

1. Whether there is substantial evidence that Finger used any trade secret with knowledge of the secret and the fact it had been wrongfully acquired.

2. Whether the district court erred in awarding exemplary damages despite the omission of such a claim from the pretrial order, the lack of a jury finding of willful and malicious misappropriation, and the lack of evidence to support such a finding against Finger.

3. Whether the alleged trade secrets are entitled to trade secret protection.

4. Whether the district court erred in calculating a reasonable royalty.

## STATEMENT OF THE CASE

### *Dr. Robert Cornell approaches Richard Finger with a business opportunity*

In mid-summer 2018, Dr. Robert Cornell called an acquaintance of 25 years, Richard Finger, with a business idea. Appx13926-13927. Cornell was a urologist who had begun developing a cosmetic penile implant. Finger was an options trader nearing retirement whose professional expertise was in finance. Appx13926, 13930. He was not a doctor, a lawyer, an engineer, or a patent expert, and he was unfamiliar with medical devices. Appx13929-13930. Although Finger had never invested in a medical device company, Appx13927, he was intrigued by the opportunity to make an early investment in innovative technology.

Cornell told Finger that there was potentially a "big market" for the device, so Finger invested $300,000 (through a corporate entity he created for the purpose to protect against the risk of individual liability). Appx13927, 13930-13931, 16438. He became the largest investor in Cornell's implant, known as the "Augmenta," Appx13944, and thus the deepest pocket in this litigation.

In exchange for his $300,000, Finger received an interest in Augmenta LLC, which ultimately obtained two patents for the Augmenta. Appx13924-13926, 13941. Finger also helped raise funds from other investors, ultimately raising about $1M (including his own capital). Appx13928-13929, 13941. The ownership structure for Augmenta LLC illustrates Finger's limited role in the venture:




Appx16438; *see also* Appx16444, 13930-13931, 13961-13963.

Having agreed to invest his own funds and provide limited business assistance to Cornell, Finger took steps to assist Cornell with the business side of the venture. He located Hunton Andrews Kurth LLP to draft a Private Placement Memorandum ("PPM") for investors, paid bills for a few months, and drafted financial projections based on input received from Cornell. Appx13943-13947, 13957. He also identified engineers to assist Cornell in developing his idea, Appx13946-13947, 13972-13973, and patent counsel, who determined that Cornell's idea would not infringe any existing patents. Appx13965. Because he lacked any expertise in medical devices, Finger had no role in the technical work, patent applications, or Augmenta's design. Appx13964-13965.

***Dr. Cornell assures Finger that he learned nothing from Dr. Elist and proceeds with the engineers to develop the Augmenta***

Back on March 30, 2018—months before Cornell had approached Finger—Cornell had observed a training session with Dr. James Elist, who currently has the only FDA-approved cosmetic penile implant available for purchase (the "Penuma"). Appx13516, 13932-13933, 14337, 14620. Finger knew that training session was covered by a nondisclosure agreement ("NDA"), but Cornell assured Finger that "nothing" or "very little" had been discussed. Appx13952-13953. He told Finger—just as he later testified at trial—that the Augmenta was based on his long experience as a penile implant surgeon and his own ideas about ways to improve the Penuma. Appx14181-14186, 14243-14244, 14246-14249, 14261-14262, 14269-14270.

Shortly after Cornell attended the Penuma training session on March 30, 2018, and several months *before* he contacted Finger, Cornell had contacted an engineer named Hans Mische to seek assistance in designing an implant. Appx13852-13854. After receiving a copy of the NDA, Appx13860-13861, Mische advised Cornell that he could not use confidential information. Appx13863. With input from Cornell, Mische prepared preliminary technical drawings for the device. Appx13905, 16926. Their collaboration lasted just three months, Appx13914, and Mische did not believe he received or used any confidential information. Appx13912-13913. Regardless, these discussions all predated Cornell's overture to Finger in mid-summer 2018, Appx1043, 1048, and Finger had no involvement in them.

Once Finger became involved, he identified David Nichols as an engineer to assist Cornell in developing the new device. Appx13971-13973. Nichols worked with Cornell (not Finger) on the designs. Appx13973. It was no secret that the new implant sought to improve on the Penuma, as the original design meeting included discussion of the existing Penuma—which did not include the features that Elist would later claim to be his trade secrets. Appx13974-13988, 14189-14190, 16069; *see also* Appx13143-13144, 13199, 14283-14284, 14948. Nichols started work.

***The Private Placement Memorandum seeks additional investors***

Meanwhile, in October 2018, a Private Placement Memorandum ("PPM") was issued to solicit investors. Appx16300. A PPM is a document regulated by the SEC for investments that are not traded on public markets. Pursuant to SEC rules, a PPM must disclose all potential risks to investors. Appx13950, 13967.

As SEC regulations require, the PPM disclosed all conceivable "risk factors," a list that ran more than 10 pages. Appx16312-16324. Among those risks was the possibility that Elist, who had several patents and a record of aggressive litigation, could file litigation relating to intellectual property rights and/or an alleged violation of Cornell's NDA. Appx13947-13951. But the PPM also said such claims would be unfounded, Appx16313, and that patent counsel had concluded there was no basis for a claim of patent infringement. *Id.* The national law firm that prepared the PPM approved all these statements. Appx13948-13949, 13967-13968.

***The lawsuit***

Eventually, work on the Augmenta resulted in the issuance of two patents, which included improvements over the existing Penuma. Appx14190, 15892, 15977. These features included a honeycomb design of internal pockets for more flexibility, use of mesh tabs that allow natural tissue to grow and affix the implant to the body, and use of absorbable sutures. Appx14012-14014, 14194-14196. These features were all well-known in the medical field, Appx13993, 14032-14034, 14243-14249, and in fact, the initial patent application was rejected on grounds of obviousness. Appx14056-14060, 14272-14275, 14534-14542. The patents were only issued after an amendment to the independent claim required that the hardness of the implant vary over its length—a feature Elist never considered and which proved decisive to the patent office. Appx14058-14060, 14549-14551, 15055-15067, 15219-15220.

When Elist learned of the patents, he claimed the design had been stolen from him during the Penuma training session. As the PPM predicted, Elist and companies he had created, International Medical Devices, Inc. and Menova International, Inc. (collectively "Plaintiffs") sued Cornell and Augmenta LLC. Appx216-252. Later, they added everyone who had been involved with the Augmenta, including Finger. Appx1290-1349. The litigation regarding their trade secrets claim—the only claim against Finger—focused on whether the alleged secrets were protected trade secrets, notwithstanding that they had been disclosed in patents and elsewhere.

The district court granted a preliminary injunction preventing development and commercialization of the Augmenta. Appx1707-1709. Because the injunction prevented the Augmenta from being commercialized, the Plaintiffs stipulated that "they cannot prove any damages or prove unjust enrichment as a result of the alleged misappropriation." Appx7115. Thus, the parties agreed that "[t]he jury will make a determination whether Plaintiffs have proven liability under CUTSA and the NDA. If the jury finds liability under CUTSA or the NDA claims, the Court will consider whether a reasonable royalty should be awarded." Appx7115-7116.

That stipulation did not address any other issue as to the trade secrets claim. Although Plaintiffs had pleaded a claim for exemplary damages based on allegations of willful and malicious misappropriation, that theory of relief was omitted from the final pretrial order. Appx6807-6870. The stipulation did not refer to the issue of willful and malicious misappropriation or revive the exemplary damages claim.

***Trial and verdict***

At trial, Finger was virtually unseen. He was not even mentioned during the opening statements. Appx13037-13055, 13055-13069. When Elist took the stand, he did not blame Finger for misappropriation. Appx13086-13088. To the contrary, he admitted that he had no idea why Finger had even been sued. Appx13308-13310. Elist testified that he never met Finger, did not know who he was, and never shared any secrets with him. *Id.*

The trial centered on a swearing match between Elist and Cornell over what occurred during the Penuma training session, Appx13164-13165, and whether the ideas allegedly shared by Elist constituted trade secrets.

Elist testified that he had revealed ideas for future improvements to Cornell, Appx13138-13145, referring vaguely to a feature "to make it softer by having void or empty spaces inside," Appx13138, and expressing his desire to use mesh tabs (small pieces of mesh) and absorbable sutures to affix the implant to the body. Appx13139-13140, 13143-13145, 13616. Over 11 years of visits by other doctors, Elist had never shared these "secrets" with anyone else. Appx14900. Elist claimed he had these ideas since 2008, but he never acted on them. Appx13195, 13198.

By contrast, Cornell testified that he did not ask any questions about future improvements to the Penuma, but asked only about the materials (sutures and mesh) used in the current procedure, the use of antimicrobial coating, and marketing issues. App.14155-14167, 14280-14282. He repeatedly insisted that he did not receive any confidential information regarding Elist's future plans during the training session. Appx14249-14262, 14268, 14276, 14283-14284, 14294-14295.

Nobody contended that Finger ever spoke with Elist or had any inkling of Elist's account of the training session when Cornell encouraged him to invest in the summer of 2018. Finger had no way to get any other information; he was caught in the middle of a swearing match after having heard only one side of the story.

And Finger's own testimony made it clear that he knew nothing about the alleged trade secrets. Without contradiction, he explained that during his discussion with Cornell regarding the Penuma training session, there had been no mention of internal pockets, mesh tabs, or absorbable sutures (three of the alleged trade secrets). Finger never even saw Elist's instrument list (the fourth alleged secret) until trial. Appx13964-13965. Moreover, Finger lacked the technical expertise to recognize the alleged trade secrets even if he had seen them: "I couldn't tell a piece of mesh from a piece of cardboard." *Id*.

During closing argument, Plaintiffs could not point to any evidence proving that Finger had acquired, disclosed, or used any of the four alleged trade secrets—much less that he did so knowingly. Instead, Plaintiffs' counsel faulted Finger for investing his own capital and soliciting other investors. Appx15247, 15251, 15293. Lacking any proof of scienter, he could only say "Richard Finger is a sophisticated—he's an options trader. He knows what an NDA is." Appx15253. That is all.

The jury returned a verdict for Plaintiffs—including against Finger on the trade secret claims. Appx7461-7464, 15330-15335.

***Post-trial proceedings***

After the verdict, Plaintiffs filed their motion for an evidentiary hearing on the reasonable royalty issue. But surprisingly, they also requested exemplary damages. Appx7644-7646. That request came as a complete surprise to the Defendants.

Although Plaintiffs had initially pleaded for exemplary damages, that claim was omitted from the pretrial order, Appx6815-6870, and there was no reference to it in the stipulation regarding a post-trial hearing. Appx7115-7116. When questions about remedies arose during trial, Plaintiffs *never* mentioned exemplary damages. *See* Appx13828-13829, 14387-14390, 14405-14406, 15093-15094, 15098-15099. Thus, Defendants objected that Plaintiffs' failure to secure a jury finding of willful and malicious misappropriation foreclosed exemplary damages. Appx9241-9242.

At the post-trial hearing, the parties presented evidence on the value of a reasonable royalty. Notwithstanding that Augmenta had developed no product and made no sales, Plaintiffs' damages expert opined that, in a hypothetical negotiation between Cornell and Plaintiffs in March of 2018 (long before Finger was involved), Cornell would have agreed to pay a $14.7M lump sum royalty. Appx15462.

In closing, Plaintiffs' counsel also sought exemplary damages based only on evidence related to Cornell. Appx.15643. Defendants reiterated their objection that Plaintiffs had not secured a jury finding of willful and malicious misappropriation, so exemplary damages were unavailable. Appx15660.

The district court was unmoved. It entered judgment for Plaintiffs and held all Defendants jointly and severally liable for a royalty of $5,772,044 (for a *five*-year license to the four trade secrets) and $11,544,088 in exemplary damages. Appx1-6. With interest, that judgment is currently worth more than $21 million.

Defendants' post-judgment motions were denied. Appx16-43, 10503-10557. Finger now appeals—and files his own appellate brief to focus on the unique facts of his individual case. If this judgment is upheld, he will be forced into bankruptcy. App19445-19473.

## SUMMARY OF ARGUMENT

The four concepts supposedly shared by Elist with Cornell were so generic and commonly known in the medical field that they cannot qualify as "trade secrets" under California law. In addition, the concepts had been disclosed by prior patents. Under CUTSA (and the Supremacy Clause) "disclosure of a trade secret in a patent places the information comprising the secret into the public domain" and bars a claim of trade secret misappropriation. *Stutz Motor Car of Am., Inc. v. Reebok Intern., Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995), *aff'd*, 113 F.3d 1258 (Fed. Cir. 1997).

Regardless, the judgment plainly cannot stand with respect to Finger, who had had no role in designing the Augmenta and was unfamiliar with its constituent parts. Appx13964-13965. He was simply a businessman and investor without knowledge of the alleged trade secrets or reason to suspect they had been stolen. Cornell told Finger he had learned nothing from Elist, and Finger understandably believed him. No reasonable jury could find Finger liable based on this scanty record.

Shockingly, the district court then imposed exemplary damages on Finger, ignoring the omission of such a claim from the pretrial order and the lack of a jury finding of willful and malicious conduct as required by the Seventh Amendment—and without a shred of evidence of willful and malicious conduct by Finger.

Finally, the district court clearly erred in its reasonable royalty calculation, violating this Court's guiding principles and producing a grossly excessive result.

## STANDARD OF REVIEW

The Ninth Circuit reviews orders denying judgment as a matter of law *de novo* and determines whether the jury's verdict was supported by substantial evidence. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 783 (Fed. Cir. 2019). Under that standard, courts cannot disregard "'evidence supporting the moving party that is uncontradicted and unimpeached.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000) (citation omitted).

The Ninth Circuit reviews orders declining to alter or amend a judgment for abuse of discretion. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## ARGUMENT

### I. There Is No Substantial Evidence of Misappropriation by Richard Finger.

The vague ideas allegedly disclosed by Elist to Cornell are not trade secrets, as a matter of law. Finger incorporates the other Appellants' argument on that issue. *See* Cornell Br. at 27-35. But if any of those ideas were trade secrets, the judgment against Finger would nonetheless fail because there is no substantial evidence that he acquired, disclosed, or used the secrets—much less that he did so with knowledge, or reason to know, that they were protected secrets and had been misappropriated. Rather, Finger was simply a business advisor and investor without any knowledge about the product designs or involvement in the alleged acts of misappropriation.

#### A. There is no substantial evidence that Finger acquired, disclosed, or used the alleged secrets.

To impose liability on Finger, Plaintiffs were required to prove that he either acquired, disclosed, or used the alleged secrets. Cal. Civ. Code § 3426.1(b)(1)-(2). The district court cited evidence that other individual defendants acquired, disclosed, and used information obtained by Cornell in developing the Augmenta, Appx35-38, but it cited no such evidence with respect to Finger. Appx37-38. Under the logic of *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 226 (Cal Ct. App. 2010), *disapproved on other grounds by Kwikset Corp. v. Sup. Court*, 52 Cal. 4th 310, 337 (Cal. 2011), Finger's role as an investor and business advisor should not constitute "use" of any feature of the Augmenta—especially not of Elist's instrument list.

### B. There is no substantial evidence that Finger acted with knowledge of the trade secrets or knew they had been acquired wrongfully.

Even if there were evidence that Finger acquired, disclosed, or used any of the alleged secrets, there is no evidence that he ever had knowledge of any trade secret, much less that he knew or had reason to know it had been stolen from Plaintiffs.

The judgment against Finger rests on just two provisions of CUTSA. Appx36. Those provisions impose liability for "[d]isclosure or use of a trade secret of another without express or implied consent by a person who ... knew or had reason to know that his or her knowledge of the trade secret" was derived from or through one who "utilized improper means to acquire it" or "owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(B)(i), (iii).

#### 1. There is no evidence that Finger had knowledge of any secret.

By its express terms, liability under either part of § 3426.1(b)(2)(B) requires "knowledge of the trade secret," which means having information about a trade secret "at one's command, in one's possession, subject to study, disclosure, and exploitation." *Silvaco*, 184 Cal. App. 4th at 226. No testimony linked Finger to any "knowledge" of internal pockets, mesh tabs, use of absorbable sutures, or the Penuma instrument list. Cornell used Finger as a conduit to convey a preliminary drawing and a description of the Augmenta to Nichols, but there is no evidence that Finger knew about the concepts in the attachments—especially not internal voids or the instrument list, neither of which was even mentioned. Appx13989-13992, 14023-14027, 16049, 16067.

The district court dismissed this problem with the observation that a party may be liable for misappropriation even if he does not "comprehend" the trade secret. Appx38 n.13. That is a straw man. The problem is not a matter of "comprehension"; it is that Finger "did not know" the information constituting the alleged trade secrets. *Silvaco*, 184 Cal. App. 4th at 229. This evidentiary failure is dispositive.

### 2. There is no evidence that Finger knew or had reason to know that any alleged secret was derived wrongfully.

Not only is there no evidence that Finger had "knowledge of the trade secret," but there is also no evidence that Finger knew or had reason to know that any aspect of the Augmenta was derived from or through "a person who had utilized improper means to acquire it" or "a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(B)(i), (iii). These subsections require proof that a defendant knew or had reason to know his possession of the alleged secret was "wrongful." *Silvaco*, 184 Cal. App. 4th at 226; Restatement (Third) of Unfair Competition § 40 cmt. d. There is no such evidence.

Finger knew only what he was told by Cornell, who denied acquiring any confidential information from Elist. Finger spoke with Cornell and was told that "nothing" or "[v]ery little" was discussed during the training session. Appx13953. The jury disbelieved Cornell after hearing Plaintiffs' witnesses at trial—but Finger did not know Plaintiffs' side of the story until this lawsuit was filed, and had no way to learn it.

Finger is a businessman and investor, not a doctor, surgeon, or an engineer. He neither knew nor had reason to know that any features of the Augmenta device were Plaintiffs' trade secrets and had been stolen; he only knew Cornell's story. California courts do not allow an inference of wrongdoing from mere knowledge about a plaintiff's "claims" of misappropriation before they are proven; "such a rule would make it far too easy to suppress competition" with litigation threats. *Silvaco*, 184 Cal. App. 4th at 230. This case is a perfect example of such overreaching.

#### 3. The district court's reasoning regarding Finger is unsound and violates trade secrets law.

The district court did not cite a single item of evidence regarding Finger that relates to any of the four alleged trade secrets, violating the rule in California that trade secrets must be identified with specificity. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). That rule helps identify "meritless claims." *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 44 (2014). Here, it shows that the claim against Finger is meritless.

The Court can search the district court's Rule 50(b) order for references to internal pockets, mesh tabs, the use of mesh with absorbable sutures, and the Penuma instrument list; it will not find one passage linking those specific features to Finger. Without evidence showing that Finger knew or had reason to know those features were trade secrets that had been stolen from Plaintiffs, reversal is straightforward.

The district court's reasoning also fails on its own terms. As in other areas of the law that regulate competition, courts should not permit speculative inferences in trade secret cases based on conduct that is equally compatible with fair competition; doing so invites "false positives" and "mistaken inferences" that chill competition. *Verizon Comm. Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004). As the Ninth Circuit has recognized, "[c]apitalism requires that both property rights and vigorous competition, each within the limits fixed by law, coexist." *Imax Corp.*, 152 F.3d at 1162. It is the responsibility of courts—not juries—to draw lines that prevent routine business activities in a capitalist free market from being twisted into false inferences of misappropriation. The district court ignored those lines.

*First*, the district court relied on evidence that Finger knew Cornell had signed an NDA. Appx37 & n.12 (citing Appx13932-13933, 13981). But the evidence cited by the district court proves only that Finger knew Cornell had entered into an NDA and attended a Penuma training session covered by the NDA. Appx13932-13933. He spoke with Cornell about the training session and was told that "nothing" or "[v]ery little" was discussed between Elist and Cornell during the training session. Appx13953. Finger never saw the NDA; he relied on Cornell's assurances and had no other realistic access to information. *Id*. The district court ignored that testimony, which was uncontroverted. This evidence cannot support a reasonable inference that Finger knew or had reason to know the NDA was violated.

CUTSA rejects any inference of disclosure from the existence of an NDA. The fact that one person possessed confidential information is not evidence that another improperly acquired or used it. *See Hooked Media Grp., Inc. v. Apple Inc.*, 55 Cal. App. 5th 323, 332 (2020). Finger's knowledge that Cornell *signed* an NDA does not prove that Finger knew or had reason to know he *violated* the NDA.

Such an inference is especially flawed here because Finger had only been told Cornell's side of the story. Although the jury chose to believe Plaintiffs' witnesses instead of Cornell's story, *Finger never heard those accounts of the training session*. He knew only what Cornell told him, and there is no evidence that Finger knew Cornell's account was false. Thus, even if there was a "lack of candor" by Cornell, it would not prove that Finger *knew* Cornell was lying and *knew* Cornell improperly acquired or used Plaintiffs' trade secrets. *Hooked Media*, 55 Cal. App. 5th at 332. Rather, Cornell was "asserting a legal claim to ownership" of the ideas in question, which is not misappropriation. *Cappa v. CrossTest, Inc.*, 2008 WL 821637, at *12 (Cal. Ct. App. Mar. 28, 2008) (unpublished).

Moreover, the district court's reliance on the NDA proves nothing about the four specific alleged secrets. Finger did not recall any mention of internal pockets, mesh tabs, or absorbable sutures during Cornell's discussion of the training session. Appx13964. There is no contrary evidence and thus no basis to infer that Finger's knowledge of the NDA warned him about the theft of any specific secret.

*Second*, the district court cited evidence that Finger assisted in raising funds. Appx37 & n.12 (citing Appx13928-13929, 16439, 16541). But that argument could be made with respect to *any* innocent venture capitalist and *any* new product. Fundraising activities are necessary to almost *every* development of a new product. They do not allow a reasonable inference that an investor like Finger—whose only role with Augmenta was to invest capital, raise funds, and provide financial advice—knew or had reason to know that the Augmenta was derived from stolen trade secrets. If fundraising is sufficient to impose liability, every Silicon Valley investor is at risk.

Without more, investing and fundraising cannot be legally sufficient proof of misappropriation of trade secrets. Indeed, California courts hold the mere fact that a former employee possessed confidential information and entered into competition with the owner of a trade secret does not support an inference of misappropriation. A leading case is *Gibson-Homans Co. v. Wall-Tite, Inc.,* 1992 WL 512411, at *4-5 (C.D. Cal. 1992). This case is even more tenuous; Finger was "an untrained person" who simply raised capital for the business. *Id.* at *5. If a competing business started by a former employee with knowledge of a former employer's trade secrets cannot support an inference of misappropriation under California law, it necessarily follows that merely fundraising for a potential competitor by an "untrained person" who does not know the trade secrets cannot either. *Id.*; *see also* 2 Trade Secrets Law § 22.2 (discussing *Gibson-Homans* and the *Silvaco* analysis of scienter under CUTSA).

*Third*, the district court cited the Private Placement Memorandum ("PPM"), which disclosed the risk that Elist might sue. Appx37 & n.12 (citing Appx16300). But PPMs are *legally required* to disclose *all* risks regardless of their potential merit. As Finger put it: "A private placement memorandum is a Securities and Exchange Commission document that is designed to disclose all risks to investors no matter … whether there's a 1 percent chance of it happening or 50 percent of it happening…. it's a full disclosure document, you know, designed so investors are fully informed of what they are investing in." Appx13967. "A PPM is a risk disclosure document. It is a disclosure document that discloses everything, all possible risks." Appx13950.

Finger's explanation was inarguably correct. A PPM is a standard document required by the SEC to raise funds from investors in non-public securities offerings. SEC regulations require memoranda soliciting investments in unregistered securities to disclose all potential risks; failure to disclose a known risk, whether valid or not, invites a securities fraud lawsuit. *See* 17 C.F.R. § 299.105(a) (disclosure obligation); *id*. § 240.10b-5(b) (omission of a material risk is "unlawful"). For that very reason, PPMs *always* disclose litigation risks. Silicon Valley PPMs disclose litigation risks in every offering, and some lawsuits invariably emerge, yet we have found no case in which a PPM resulted in a venture capitalist facing personal liability for fulfilling the legally-required mandate of making full disclosure of all potential risks.

As required by the SEC rules, the PPM listed over 10 pages of "Risk Factors," including that "Dr. Elist may threaten or commence litigation relating to intellectual property rights." Appx16312-16313, 13947-13950. It did so because "[a] cursory glance on the Internet will disclose that Dr. Elist has been in many, many disputes." Appx13948-13949. But the PPM also explained that "Dr. Cornell believes that he independently designed the Product without use of any confidential information" and "we do not believe that any such claim would be meritorious." Appx16313, 13967-13968. The law firm that prepared the PPM approved that language. *Id*. There is no evidence that Finger had any reason to doubt its accuracy.

Treating such legally-required risk disclosures as evidence that trade secrets were misappropriated would turn a PPM into a Catch-22: if an author knows of a risk of litigation, he must disclose it *even if he believes the suit would be invalid*—but under the district court's logic, the disclosure could be used to infer that he *knew* the suit would be valid. That makes no sense. Just as merely proving the falsity of "required certifications" under federal securities law cannot support an inference of scienter in SEC filings, *Zucco Partners v. Digimarc Corp*., 552 F.3d 981, 1003–04 (9th Cir. 2009), the mere fact that a disclosed risk ultimately came to pass cannot support an inference of scienter. We are not aware of any precedent holding that legally-required risk disclosures can prove misappropriation, which is unsurprising. This sort of "false positive" would deter full disclosure and chill future investments.

## II. There Is No Legal or Factual Basis for the Award of Exemplary Damages.

At a minimum, this Court should reverse the award of exemplary damages, which is not supported by the joint pretrial order, the jury's verdict, or the evidence.

### A. By omitting exemplary damages and the willful and malicious issue from the pretrial order, Plaintiffs waived the claim.

It is black-letter law that a pretrial order "controls the course of the action unless the court modifies it" (which did not happen here). Fed. R. Civ. P. 16(d). The pretrial order "supersede[s] all prior pleadings and 'control[s] the subsequent course of the action,'" meaning that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) (citations omitted). Under the regional circuit precedent, "issues not preserved in the pretrial order have been eliminated from the action." *S. Cal. Retail Clerks Union & Food Emps. Joint Pension Tr. Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984).

Here, the pretrial order listed the parties' claims and defenses and said nothing about willful and malicious misappropriation or any claim for exemplary damages. Appx6815-6816. It listed the elements required to establish the CUTSA claims, Appx6817-6819, and issues to be tried, Appx6832-6836, but did not list the issue of willful and malicious misappropriation or a claim for exemplary damages. The order "supersede[d] the pleadings," and Plaintiffs approved it "as to form and content." Appx6869. Thus, the claim for exemplary damages was waived.

Surprisingly, when this waiver was identified in the post-judgment motions, the district court dismissed it as "not credible" because Defendants did not cite the pretrial order during the post-trial hearing and supposedly "acknowledged that the Court may make an award of exemplary damages against Defendants." Appx21-22. Defendants did *not* consent to a decision of this issue—they objected. Appx15660. The court cited no authority for reviving a waived claim after trial over an objection, and we are aware of none. This unprecedented ruling was a pure error of law.

First, the parties only stipulated to present the issue of a reasonable royalty to the Court after verdict: "If the jury finds liability under CUTSA or the NDA claims, the Court will consider whether a reasonable royalty should be awarded." Appx7116. They did *not* stipulate that the court would consider exemplary damages or the willful and malicious issue, which had been eliminated by the pretrial order.

Second, Defendants did not "acknowledge" that the district court could award exemplary damages or try this issue by consent. In the passage cited by the court, the parties stipulated that they "dispute whether any award of exemplary damages is justified based on the evidence at trial and the jury's verdict." Appx15618. Defendants simply agreed not to complain about the lack of evidence of net worth. Appx15618-15619. Otherwise, there was no "acknowledgement." On the contrary, Defendants made clear that "[n]o party is waiving any other rights to challenge or support an exemplary damages award." Appx15619.

Defendants were careful to preserve their right to challenge an award on any other ground because, in response to Plaintiffs' request for exemplary damages, Defendants had argued that a jury finding of willful and malicious misappropriation "must first occur" and Plaintiffs had failed to secure one at trial. Appx9241. Thus, they contended, "[t]he Court cannot award exemplary damages." Appx9242.

At the post-trial hearing, Defendants again objected to exemplary damages on the grounds that "plaintiffs did not seek and the jury did not enter a finding of willful or malicious misappropriation. And this favorable jury finding must occur before a Court can calculate an award of exemplary damages." Appx15660.

In short, Defendants did not agree to a bench trial on exemplary damages or forfeit the right to rely on the pretrial order, which had eliminated the claim. Further, Defendants raised the issue again in a post-judgment motion at a time when the court could have corrected its legal error. Appx10514-10515, 11997-11999.

### B. Exemplary damages cannot be awarded without a jury finding of willful and malicious conduct, which Plaintiffs failed to secure.

Plaintiffs doubly waived any claim to exemplary damages by failing to secure (or even request) a jury finding that any misappropriation was willful and malicious. And because the pretrial order did not identify it as one of the "Issues to be Tried," Appx6832-6836, Defendants did not have an opportunity to insist on a jury finding. They were ambushed by Plaintiffs' post-trial request for a bench trial on the issue—to which they properly objected. Appx9241-9242, 15660.

### 1. The willful and malicious issue is for the jury.

The CUTSA provision authorizing exemplary damages tracks the UTSA, which was based on patent law. *See* Cal. Civ. Code § 3426.3(c) ("If willful and malicious misappropriation exists, the court may award exemplary damages…"). The commissioners' comments to the uniform act explain that UTSA is intended to follow federal patent law by having the jury decide willfulness; if the jury finds willful and malicious conduct, then the court may award exemplary damages:

> If willful and malicious misappropriation is found to exist, Section 3(b) authorizes the court to award a complainant exemplary damages in addition to the actual recovery under Section 3(a) an amount not exceeding twice that recovery. *This provision follows federal patent law* in leaving discretionary trebling to the judge even though there may be a jury, *compare* 35 U.S.C. Section 284 (1976).

§ 3. Damages., Unif. Trade Secrets Act § 3 (emphasis added).

Under Section 284, there is "a right to a jury trial on the willfulness question." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 n.13 (Fed. Cir. 2016); *see also Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989) (same). Likewise, the willful and malicious issue under UTSA is to be decided by the jury.

In state-law cases, moreover, the right to a jury is a matter of federal law governed by the Seventh Amendment. *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 537 (1958); *see also Simler v. Conner*, 372 U.S. 221, 222 (1963) (explaining that "the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions").

Whether the facts support a legal claim for exemplary damages (as opposed to the amount) is a jury issue under the Seventh Amendment. *See Curtis v. Loether*, 415 U.S. 189, 196 (1974); *Teutscher v. Woodson*, 835 F.3d 936, 943 (9th Cir. 2016). The district court erred by allowing Plaintiffs to ambush Defendants by seeking such relief from the court after a jury trial.

**2. The district court's reasoning was legally incorrect.**

The district court did not grapple with either the foundation of the UTSA exemplary damages rule in patent law or the Seventh Amendment right to jury trial. Instead, it relied on an irrelevant stipulation regarding the reasonable royalty issue, a mischaracterization of the record, and a distinguishable Ninth Circuit decision. None of these justifications supports its post-trial award of exemplary damages.

First, the district court said there was a "stipulation prior to trial that the Court, not the jury, would consider harm and appropriate damages for trade secret liability." Appx23. That statement was spectacularly incorrect. In fact, Plaintiffs agreed that they could not prove damages or unjust enrichment, so the parties stipulated that "[i]f the jury finds liability under CUTSA or the NDA claims, the Court will consider whether a reasonable royalty should be awarded." Appx7116. There was no broad stipulation to a bench trial of "harm and appropriate damages," as the court implied, but just a narrow stipulation to a bench trial on reasonable royalty. Appx7115-7116. One will search the stipulation in vain for any reference to exemplary damages.

Second, the district court cited an alleged stipulation at the post-trial hearing "that acknowledged that the Court may award exemplary damages." Appx23. False. Defendants objected to the lack of a jury finding both in advance, Appx9241-9242, and during the hearing. Appx15660. They preserved their objection to an award of exemplary damages by the court. *See* Appx15618-15619; *see also* pp. 25-26, *supra*.

Indeed, the district court's own reasoning reveals the legal error in its ruling that Defendants knowingly forfeited their right to a jury trial. According to the court, "[i]f Defendants wished for the jury to determine whether conduct was willful and malicious, they could have raised the issue before the Court excused the jury." Appx23. *But the willful and malicious issue was omitted from the pretrial order.* Defendants justifiably concluded that it had been "waived," *Rockwell Int'l Corp.*, 549 U.S. at 474, and "eliminated from the action." *Bjorklund*, 728 F.2d at 1264. They had no duty to "raise[] the issue before the Court excused the jury," Appx23, because they "had the right to rely on the pretrial order" and "no opportunity to argue the merits" before the jury was excused. *Pierce Cnty. Hotel Empls. & Rest. Emps. Health Tr. v. Elks Lodge*, 827 F.2d 1324, 1329 (9th Cir. 1987).

Finally, the district court mistakenly suggested that Ninth Circuit precedent "appears to allow district courts" to decide the willful and malicious issue. Appx23. Actually, the Ninth Circuit recognizes that exemplary damages are "legal remedies" and such claims must be "tried to a jury." *Teutscher*, 835 F.3d at 943.

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), which the district court cited, decided a very different question under Montana law. *Id*. at 1111. It does not support the suggestion that the Ninth Circuit would allow a bench trial on the willful and malicious issue when a party asserts its right to a jury and invokes the Seventh Amendment. *Teutscher* controls that issue.

### C. The finding of willful and malicious misappropriation by Finger was clearly erroneous.

The foregoing arguments demonstrate that the district court erred by awarding exemplary damages against any defendant. But even if its procedural errors could be overlooked, there would be no basis to award exemplary damages against Finger. The evidence against Finger comes nowhere close to the level of culpability required for exemplary damages; the record reveals a "definite and firm conviction" that the district court committed clear error. *U.S. Gypsum*, 333 U.S. at 395.

#### 1. "Willful and malicious" misappropriation is a very high bar.

CUTSA allows exemplary damages only when a defendant has engaged in "willful and malicious" misconduct. Cal. Civil Code § 3426.3(c). This rule is based on the test for enhanced damages under the Patent Act, and the Supreme Court holds it is reserved for outrageous conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016). "[S]uch damages are generally reserved for egregious cases of culpable behavior." *Id*. at 104.

The California courts agree. Because CUTSA requires evidence of both "willful *and* malicious misappropriation in the conjunctive," California courts hold "a plaintiff must prove by clear and convincing evidence that the defendant's acquisition, use, or disclosure of the plaintiff's trade secret was accomplished by an act implying a purpose or willingness to commit the act *and* by conduct intended to cause injury or conduct that is despicable and carried on with a willful and conscious disregard of the rights or safety of others." *Applied Med. Distrib. Corp. v. Jarrells*, 100 Cal. App. 5th 556, 594 (Cal. App. 2024) (emphasis in original).

"'Despicable conduct' is conduct that is 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' Such conduct has been described as having the character of outrage frequently associated with crime.'" *Id*. (citation omitted).

"'Conscious disregard' means 'that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences.'" *Id*. at 595 (citation omitted).

In short, even intentional misappropriation is not "willful and malicious." There must be evidence establishing "'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.'" *Id*. at 596 (emphasis in original; citation omitted). As to Finger, the evidence in this record comes nowhere close to meeting these demanding standards.

### 2. There is no evidence that Finger was willful and malicious.

When Plaintiffs filed their post-trial motion requesting exemplary damages, they argued only that Cornell was guilty of willful and malicious misappropriation. Appx7644-7646. Again, at the post-trial hearing, Plaintiffs' counsel simply pointed to evidence regarding Cornell. Appx15643. They did not even pretend there was evidence of willful and malicious conduct by anyone else. Unsurprisingly, therefore, when the district court awarded exemplary damages, it relied on conduct by Cornell. Appx10462-10463. But inexplicably, it imposed exemplary damages on everyone. Appx10479-10480.

Defendants' post-judgment motions contended that the court could not punish a party that did not engage in willful and malicious conduct. Rather than correct its first mistake, the court purported to find of willful and malicious misappropriation by each defendant. Appx24-26; *see also* Appx4-5. That will not do.

With respect to Finger, the district court simply recited the same evidence it had used for its liability findings: Finger knew that Cornell had signed an NDA, invested in Augmenta Investors, and once referred to the "invaluable design input" provided by Wang. *See* Appx25 n.7 (discussing Finger). That sparse evidence is not even sufficient to hold Finger liable for misappropriation. *See* pp. 15-23, *supra*. It plainly does not rise to the level of "willful" and "malicious" conduct.

Where is the evidence that Finger was not acting in "good faith"? Appx25. Where is the evidence that he intended to "cause injury" or conducted his business with "willful and knowing disregard for the rights of others"? *Id*. There is none. Put another way, where is the evidence that Finger was a "pirate," who stole secrets from Elist "with no doubts" about Cornell's honesty "or any notion of a defense—for no purpose other than to steal the [Plaintiffs'] business"? *Halo*, 579 U.S. at 104. There is no factual support for such findings against Finger.

At most, the cited evidence proves only that Finger knew Plaintiffs claimed to have confidential information and mistakenly relied on assurances from Cornell that the Augmenta was not derived from that information. *See* pp. 16-23, *supra*. That is not nearly enough. As Justice Breyer emphasized in his *Halo* concurrence, punishment is not permitted "simply because the evidence shows that the infringer knew about the [intellectual property] *and nothing more*." *Halo*, 579 U.S. at 110 (Breyer, J., concurring) (emphasis in original). Otherwise, the threat of punishment would stifle innovation and competition. *Id*. at 112-14. A unanimous Court agreed, warning that the balance between the rights of inventors and the rights of competitors "can indeed be disrupted if enhanced damages are awarded in garden-variety cases." *Id*. at 109. As this Court has held, competition is not proof of "malice" under UTSA. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120 (Fed. Cir. 1996). In short, by imposing exemplary damages on Finger, the district court clearly erred.

### D. The joint and several award of exemplary damages is unlawful.

Once the award of exemplary damages against Finger is reversed because the evidence against him does not satisfy the exceedingly high threshold for punishment, the award of joint and several liability for exemplary damages must also be reversed. Finger cannot be punished for the conduct of anyone else.

Under California law, exemplary damages must constitute "an individualized punishment and deterrent imposed upon a particular and identified defendant." *Magallanes v. Superior Court*, 167 Cal. App. 3d 878, 887 (1985). Punishment must focus on "the particular nature of the defendant's acts." *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 (1978). That rule is also compelled by the Due Process Clause, which requires punishment to be proportionate to "the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *accord State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The district court recognized "the general proposition that punitive damages must be tied to the egregiousness of a defendant's conduct." Appx26. Inexplicably, however, it held that "the statute does not prohibit" joint and several liability. *Id*. That was error. California law requires "individualized punishment," *Magallanes*, 167 Cal. App. 3d at 887, and the court was not free to ignore that rule simply because CUTSA does not reiterate it explicitly. The district court cited no case upholding joint and several liability for exemplary damages; this case should not be the first.

## III. The District Court Clearly Erred in the Reasonable Royalty Calculation.

If any alleged trade secret survives the foregoing matter-of-law challenges, the Court must confront the numerous errors afflicting the reasonable royalty award. Finger incorporates the other Appellants' arguments on the reasonable royalty issue. *See* Cornell Br. at 35-52; Fed. R. App. P. 28(i).

## CONCLUSION

The judgment against Finger should be reversed and the Court should enter a take-nothing judgment in his favor. Alternatively, the judgment should be reversed and remanded for further proceedings.

Date: June 17, 2025

Respectfully submitted,

**BECK REDDEN LLP**

*/s/ Russell S. Post*
Russell S. Post (Principal Counsel)
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

**KING & SPALDING LLP**
Jonathan Weinberg
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
(202) 737-0500

**MORGAN, LEWIS BOCKIUS LLP**
William R. Peterson
1000 Louisiana St., Suite. 4000
Houston, TX 77005
(713) 890-5188
(713) 890-5001 (Fax)

*Attorneys for Appellant, Richard B. Finger*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, a copy of the foregoing brief was filed electronically with the Clerk of the Court using the Court's CM/ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record.

*/s/ Russell S. Post*
Russell S. Post
*Principal Counsel for Appellant,*
*Richard B. Finger*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because it contains 13,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2) and including parts incorporated from the brief of the other Appellants.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.

Dated: June 17, 2025

*/s/ Russell S. Post*
Russell S. Post
*Principal Counsel for Appellant,*
*Richard B. Finger*

**No. 2025-1580**

---

# United States Court of Appeals
# For the Federal Circuit

---

**INTERNATIONAL MEDICAL DEVICES, INC.,**
**MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC,**
**CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS,**
**HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE LLC,**
**RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER**
*Defendants-Appellants*

**v.**

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendants*

---

2025-1580, 2025-1605

---

Appeals from the United States Court for the Central District of California
in No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall.

---

## ADDENDUM

---

**TAB**


**1** Corrected Amended Final Judgment (Doc. 771, Appx1-6)

**2** Verdict (Doc. 649, Appx7460-7467)

**3** Order Denying Motion to Strike (Doc. 539, Appx6387-6393)

**4** Order Granting Reasonable Royalty (Doc. 698, Appx10450-10465)

**5** Order Overruling Motion for JMOL or New Trial (Doc. 765, Appx29-43)

**6** Order Overruling Motion to Alter or Amend (Doc. 766, Appx16-28)

**7** Patent No.: US 10,413,413 B1 (J.Ex. 29, Appx15892-15912)

**8** Patent No.: US 10,980,639 B2 (J.Ex. 78, Appx15977-15999)

# TAB 1

Corrected Amended Final Judgment (Doc. 771, Appx1-6)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

INTERNATIONAL MEDICAL DEVICES, INC. et al,

Plaintiffs,

v.

ROBERT CORNELL, M.D. ; ROBERT J. CORNELL, M.D., P.A. ; AUGMENTA, LLC ; AUGMENTA INVESTORS, LLC ; CORNELL COSMETIC UROLOGY, LLC ; DAVID LOUIS NICHOLS ; HUCK MEDICAL TECHNOLOGIES, INC. ; HANS MISCHE ; HANS MISCHE, LLC ; RUN WANG, M.D. ; and RICHARD B. FINGER,

Defendants.

Case No. 2:20-cv-03503-CBM (RAOx)

**CORRECTED AMENDED FINAL JUDGMENT**

Judge: Hon. Consuelo B. Marshall
Trial Date: June 6, 2023

In accordance with the jury's verdict in this matter (Dkt. 649) and the Court's Orders on Plaintiffs International Medical Devices, Inc. ("IMD"); Menova International, Inc. ("Menova"); and James Elist, M.D.'s (collectively, "Plaintiffs'") Post-Trial Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages (Dkt. 698) and Plaintiffs' Motion for Injunctive Relief and Patent Invalidation (Dkt. 699), the Court, pursuant to Federal Rule of Civil Procedure 58, enters this Corrected Amended Final Judgment in favor of Plaintiffs and against Defendants Robert Cornell, M.D., Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger (collectively, "Defendants") as follows:

It is hereby **ORDERED AND ADJUDGED** that:

1. Judgment is hereby entered in favor of Plaintiffs and against Defendants.

2. Defendants are jointly and severally liable to Plaintiff IMD for Misappropriation of Trade Secrets under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 1836, *et seq*., for a reasonable royalty as follows:

   a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $3,037,917.90 for misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

   b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic

Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $1,215,167.16 for misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $911,375.36 for misappropriation of the incorporation a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $607,583.58 for misappropriation of the incorporation a trade secret consisting of a particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

e. Defendants are liable for prejudgment interest at a rate of 7% pursuant to Cal. Civ. Code § 3287(c) accruing from March 30, 2018—the date

the trade secrets were misappropriated—until the date of entry of this Final Judgment.

3. Defendants are liable to Plaintiff IMD for exemplary damages for willful and malicious trade secret misappropriation under CUTSA § 3426.3(c) as follows:

a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell CosmeticUrology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $6,075,835.79 for willful and malicious misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $2,430,334.32 for the willful and malicious misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of

$1,822,750.74 for the willful and malicious misappropriation of a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $1,215,167.15 for the willful and malicious misappropriation of a trade secret consisting of particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

4. Defendant Robert Cornell is liable to Plaintiffs for breach of the Non-Disclosure Agreement. This finding supports an alternative basis for a reasonable royalty award to Plaintiffs in the amount of $5,772,044 and against Defendant Robert Cornell only.

5. Defendants Robert Cornell and Robert J. Cornell M.D., P.A. are liable to Plaintiff Menova for $1,000,000 in statutory damages for use of a counterfeit mark under 15 U.S.C. § 1117(c)(2), plus prejudgment interest in accordance with 26 U.S.C. § 6621(a)(2), accruing from April 22, 2020—the date Defendants were served with the original Complaint in this action—until the date of entry of this Final Judgment.

6. Defendants Robert Cornell, Hans Mische, and David Louis Nichols are liable to Plaintiffs in the amount of $1,650 for copyright infringement under 17 U.S.C. § 501.

7. Defendant Run Wang is liable to Plaintiffs for nominal damages in the amount of $1 for breach of contract.

8. Defendants shall pay post judgment interest on any amounts due after 30 days of the entry of the Amended Final Judgment (Dkt. No. 708) pursuant to 28 U.S.C. § 1961.

9. The Court entered a Permanent Injunction at Dkt. No. 700.

10. Violation of the Permanent Injunction shall expose Defendants and all other persons bound by such permanent injunction to all applicable penalties, including sanctions and contempt of Court.

11. The lifting of the Permanent Injunction is conditioned upon full payment of the royalty and damages ordered in paragraphs 2-7 above.

12. This Court shall retain continuing jurisdiction to modify and/or enforce the Permanent Injunction, which may also be enforced by any other court of competent jurisdiction.

13. Pursuant to CUTSA § 3426.4 and 15 U.S.C. § 1117(a), Defendants may be liable for attorneys' fees and costs in an amount to be determined by motion or stipulation. The Court retains jurisdiction to adjudicate any motion for reasonable attorneys' fees and costs. To the extent the Parties are unable to stipulate to an award of attorneys' fees and costs, Plaintiffs' motion shall be brought within 28 days of entry of this Final Judgment.

14. The jury found by clear and convincing evidence that Defendants' '413 and '639 Patents are invalid.

**IT IS SO ORDERED.**

Dated: March 19, 2025

By: [signature]
Honorable Consuelo B. Marshall
United States District Judge

# TAB 2

Verdict (Doc. 649, Appx7460-7467)

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
JUN 16 2023
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTERNATIONAL MEDICAL DEVICES, INC. et al.,<br><br>Plaintiffs,<br>v.<br><br>ROBERT CORNELL, MD, an individual, et al.,<br><br>Defendants. | Case No.: 2:20-cv-3503-CBM-(RAOx)<br><br>**COURT'S VERDICT FORM**<br><br>***REDACTED AS TO FOREPERSON SIGNATURE*** |

WE, THE JURY, unanimously find as follows:

**TRADE SECRET MISSAPPROPRIATION**

1. Did Plaintiff International Medical Devices, Inc. prove by a preponderance of the evidence that any of the Defendants below are liable for misappropriating the following alleged trade secret: *The incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity.*

| | Yes | No |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |
| c. Augmenta, LLC | ✓ | |
| d. Augmenta Investors, LLC | ✓ | |
| e. Cornell Cosmetic Urology, LLC | ✓ | |
| f. David Louis Nichols | ✓ | |
| g. Huck Medical Technologies, Inc. | ✓ | |
| h. Hans Mische | | ✓ |
| i. Hans Mische, LLC | | ✓ |
| j. Run Wang, M.D. | ✓ | |
| k. Richard B. Finger | ✓ | |

*Proceed to Question No. 2.*

2. Did Plaintiff International Medical Devices, Inc. prove by a preponderance of the evidence that any of the Defendants below are liable for misappropriating the following alleged trade secret: *The incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth.*

| | Yes | No |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |
| c. Augmenta, LLC | ✓ | |
| d. Augmenta Investors, LLC | ✓ | |
| e. Cornell Cosmetic Urology, LLC | ✓ | |
| f. David Louis Nichols | ✓ | |
| g. Huck Medical Technologies, Inc. | ✓ | |
| h. Hans Mische | ✓ | |
| i. Hans Mische, LLC | ✓ | |
| j. Run Wang, M.D. | ✓ | |
| k. Richard B. Finger | ✓ | |

*Proceed to Question No. 3.*

3. Did Plaintiff International Medical Devices, Inc. prove by a preponderance of the evidence that any of the Defendants below are liable for misappropriating the following alleged trade secret: *The use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant.*

| | Yes | No |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |
| c. Augmenta, LLC | ✓ | |
| d. Augmenta Investors, LLC | ✓ | |
| e. Cornell Cosmetic Urology, LLC | ✓ | |
| f. David Louis Nichols | ✓ | |
| g. Huck Medical Technologies, Inc. | ✓ | |
| h. Hans Mische | ✓ | |
| i. Hans Mische, LLC | ✓ | |
| j. Run Wang, M.D. | ✓ | |
| k. Richard B. Finger | ✓ | |

*Proceed to Question No. 4.*

4. Did Plaintiff International Medical Devices, Inc. prove by a preponderance of the evidence that any of the Defendants below are liable for misappropriating the following alleged trade secret: *A particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.*

| | **Yes** | **No** |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |
| c. Augmenta, LLC | ✓ | |
| d. Augmenta Investors, LLC | ✓ | |
| e. Cornell Cosmetic Urology, LLC | ✓ | |
| f. David Louis Nichols | | ✓ |
| g. Huck Medical Technologies, Inc. | | ✓ |
| h. Hans Mische | ✓ | |
| i. Hans Mische, LLC | ✓ | |
| j. Run Wang, M.D. | ✓ | |
| k. Richard B. Finger | ✓ | |

*Proceed to Question No. 5.*

**TRADEMARK INFRINGEMENT**

5. Did Plaintiff Menova International, Inc. prove by a preponderance of the evidence that any of the Defendants below are liable for trademark infringement?

| | Yes | No |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |

*Proceed to Question No. 6.*

**USE OF A COUNTERFEIT MARK**

6. Did Plaintiffs prove by a preponderance of the evidence that any of the Defendants listed below are liable for counterfeiting?

| | Yes | No |
|---|---|---|
| a. Robert Cornell, M.D. | ✓ | |
| b. Robert J. Cornell, M.D., P.A. | ✓ | |

*Proceed to Question No. 7.*

**COPYRIGHT INFRINGEMENT**

7. Did Plaintiffs prove by a preponderance of the evidence that they suffered damages as a result of Defendants Robert J. Cornell, Hans Mische and David Louis Nichols' copyright infringement? If the answer is "yes," enter the amount of damages, if any.

| Yes | No | If "Yes", enter amount: |
|---|---|---|
| ✓ | | $1,650.00 |

*Proceed to Question No. 8.*

One thousand six hundred fifty dollars and no cents.

**BREACH OF CONTRACT AGAINST DR. CORNELL**

8. Did Plaintiff International Medical Devices, Inc. prove by a preponderance of the evidence that Defendant Robert J. Cornell breached the Non-Disclosure Agreement?

**Yes** ✓ **No** ______

*Proceed to Question No. 9.*

**BREACH OF CONTRACT AGAINST DR. WANG**

9. Enter the amount of nominal damages, if any, you award for Defendant Run Wang's breach of Section 7.3 of the Consulting Services Agreement.

$ 1.00 one dollar and no cents.

*Proceed to Question No. 10.*

## PATENT INVENTORSHIP

10. Did Plaintiffs prove by clear and convincing evidence that Defendants' United States Patent 10,413,413 is invalid?

**Yes** ✓ **No** ____

11. Did Plaintiffs prove by clear and convincing evidence that Defendants' United States Patent 10,980,639 is invalid?

**Yes** ✓ **No** ____

*Please date and sign below, and return this verdict form to the Court.*

DATED: 6/16/2023

/s/
FOREPERSON

# TAB 3

Order Denying Motion to Strike (Doc. 539, Appx6387-6393)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 20-cv-3503-CBM-(RAOx) | Date | February 13, 2023 |
| Title | *International Medical Devices, Inc. et al v. Robert Cornell et al* | | |

| | |
|---|---|
| Present: The Honorable | CONSUELO B. MARSHALL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| YOLANDA SKIPPER | NOT REPORTED |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| NONE PRESENT | NONE PRESENT |

**Proceedings:** **IN CHAMBERS- ORDER RE: DEFENDANTS' MOTION TO STRIKE EXPERT REPORT OF MR ARST. [DKT. NO. 323]**

The matter before the Court is Defendants' Motion to Strike the Expert Report of Kevin Arst. (Dkt. No. 323.) The motion is fully briefed. (Dkt. Nos. 339, 365.)

Mr. Arst is an intellectual property, valuation, licensing, and damages expert, whom Plaintiffs designated as their damages expert. (Opp'n – Dkt. No. 339 at 6.) Defendants move to exclude Mr. Arst's expert report and preclude him from testifying in this case under *Daubert v. Merrell Dowell Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

Defendants do not challenge Mr. Arst's qualifications as an expert. Instead, they move to strike his opinions and report on the grounds that they are unreliable. (Mot. – Dkt. No. 323 at 10.) As part of his evaluation of damages, Mr. Arst used a "reasonable royalty and hypothetical negotiation framework." (Opp'n – Dkt. No. 339 at 6.) Plaintiffs identify numerous flaws in Mr. Arst's royalty calculation and methodology that they contend fail the *Daubert* test. The Court addresses each issue in turn.

Under *Daubert* and Federal Rule of Evidence 702, the court is charged with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 590 U.S. 579, 597 (1993). The expert's opinion must rest on "facts or data in the case that the expert has been made aware of or personally observed," not merely assumptions and speculation. Fed. R. Evid. 703; *Guidroz-Brault v. Mo. Pac. R.R. Co*., 254 F.3d 825, 830–31 (9th Cir. 2001). Further, "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, the proponent of the testimony bears the burden of proving admissibility by a preponderance of the evidence. *See Daubert*, 590 U.S. at 592 n.10. "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v.*

*Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The court functions as a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury and that the evidence is appropriate for the jury's consideration. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (the trial court is "a gatekeeper, not a factfinder.")

**1. Apportionment of Trade Secret Damages**

Defendants move to strike Mr. Arst's opinion on the grounds that his royalty opinions fail to properly apportion damages to the asserted trade secrets because (1) he relied on the "ipse dixit" of Plaintiffs Dr. Elist and Mr. Elist and (2) he failed to apportion value to features of Augmenta not at issue in this case.

**1.1. Reliance on Statements of Dr. Elist and Mr. Elist**

Defendants contend that Mr. Arst failed to disclose a reliable methodology supporting his apportionment of damages, and instead "simply regurgitates the conclusory say-so" of Dr. Elist and Mr. Elist, who are not experts in this case. (Mot. – Dkt. No. 323 at 15.) *See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (excluding testimony from plaintiff's damages expert because his "complete lack of economic analysis as to quantitatively support the one-third apportionment echoes the kind of arbitrariness . . . that we recently and emphatically rejected from damages experts."); *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *2 (N.D. Cal. Mar. 17, 2020) ("[e]xperts must follow some discernable methodology [when apportioning damages], and may not be a black box into which data is fed at one end and from which an answer emerges at the other.") (citation omitted).

In his report, Mr. Arst states that he partially relied on information provided to him by Dr. Elist and Mr. Elist:

> According to Dr. Elist and Mr. Elist, the alleged misappropriated trade secret related to internal pockets of space was most important (comprising 50% of the value), followed by mesh tabs (comprising 20% of the value), followed by absorbable sutures (comprising 15% of the value), followed by the instrument list (comprising 10% of the value), followed by antibacterial agents (comprising 5% of the value).

(Arst Report at ¶ 154.)

First, expert witnesses are permitted to rely on discussions with fact witnesses in forming their opinions. *See In re Arris Cable Modem Consumer Litig*., 327 F.R.D. 334, 363 (N.D. Cal. 2018) ("The U.S. Supreme Court recognized in *Daubert* that '[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.'"); *In re NJOY, Inc. Consumer Class Action Litig*., 120 F. Supp. 3d 1050, 1071 (C.D. Cal. 2015) (admitting an expert witness's opinion that was based on information "handed to rather than developed by him.").

Second, Mr. Arst did not rely solely on his discussions with Dr. Elist and Mr. Elist in forming his opinions on apportionment: he also relied on the testimony of Huck Medical's witness (*id*. at ¶ 153) and the Court's Findings of Fact and Conclusions of Law (*id*. at ¶ 155.), both of which serve as sufficient foundation for Mr. Arst's methodology.

Accordingly, the Court finds that Mr. Arst relied on sufficient facts and methodology in forming his apportionment opinions.

**1.2. Consideration of Augmenta's Features for Apportionment of Damages**

Defendants contend that Mr. Arst's apportionment of damages is flawed because "he assumes that 100%

of the value of the Augmenta device" is attributed to Plaintiffs' four alleged trade secrets, while Augmenta's value is derived from additional features that are not at issue in this case. (Mot. – Dkt. No. 323 at 17.) Defendants further contend that Mr. Arst "makes no effort to 'separate or apportion damages' between the features of Augmenta accused of misappropriation, and the ones that are not.'" (*Id*. at 18.)

"When the accused technology does not make up the whole of the accused product, apportionment is required." *See Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d 1299, 1309 (Fed. Cir. 2018); *see also Mgmt. & Eng'g Techs. Int'l, Inc. v. Info. Sys. Support, Inc*., 490 F. App'x 30, 34 (9th Cir. 2012) (holding that "evidence was insufficient to support the amount of the jury's damages award" because a plaintiff's expert "did not apportion value among the legally valid and legally invalid alleged trade secrets.").

Mr. Arst's report dedicates substantial analysis to the apportionment of damages. (*See* Arst Report at ¶¶ 126–149.) In his report, he discusses a 15% apportionment for profits derived from "preliminary designs, provisional patent application, and another intellectual property" (*id*. at ¶ 128), royalty rates implied by the Penuma Term Sheet for licensing Penuma IP in 2016 (*id*. at ¶ 134), a 20% price discount that Augmenta anticipated relative to Penuma (*id*. at ¶ 135), a 40% profit premium that Augmenta anticipated over industry benchmarks (*id*. at ¶ 136), a 50% profit margin that Plaintiffs would risk foregoing on Penuma sales if it granted license to Defendant Dr. Cornell (*id*. at ¶ 137), and other factors that strengthened Plaintiffs' bargaining position against Dr. Cornell (*id*. at 138).

Accordingly, the Court finds that Mr. Arst properly apportioned the value attributable to Plaintiffs' alleged trade secrets.

**2. Revenue Projection**

In formulating the revenue base he used for his royalty calculations, Mr. Arst relied on a revenue projection that was generated for the time period of June 2018 through October 2018. Defendants move to strike his opinion on the grounds that (1) the 2018 revenue projection did not exist at the time of the hypothetical negotiation he used, (2) Mr. Arst improperly increased the projection from five years to ten years which is improperly speculative, and (3) he improperly relied on information from a lay witness regarding regulatory uncertainty. (Mot. – Dkt. No. 323 at 24.)

**2.1. The 2018 Revenue Projection**

The hypothetical negotiation Mr. Arst relies upon occurred between March 30, 2018 and early April 2018, when Dr. Cornell signed the non-disclosure agreement ("NDA") and allegedly obtained access to Plaintiffs' trade secrets, and the day Dr. Cornell allegedly breached the NDA and began developing Augmenta, which occurred within days. Mr. Arst's royalty base, however relies on a sales projection developed in 2018 — after the hypothetical negotiations took place.

Defendants contend that courts have rejected royalty bases that rely on a projection that did not exist at the time of a hypothetical negotiation. *See LinkCo, Inc. v. Fujitsu Ltd*., 232 F. Supp. 2d 182, 188–89 (S.D.N.Y. 2002) ("sales projections are only relevant in a reasonable royalty calculation when they are available before the time of the misappropriation and would have been considered by the parties."). In response, Plaintiffs contend that Dr. Cornell did not begin the process of developing Augmenta until after March 30, 2018, and that by June 2018, he — along with Defendant Finger — had prepared financial projections that substantially mirror the October 2018 projection upon which Mr. Arst relied. (Opp'n – Dkt. No. 339 at 17.)

The Court finds that Mr. Arst's reliance on the October 2018 projection is sufficient because it is lower than the projection Plaintiffs' developed in 2016 for their Penuma implant and the October 2018 projection — forecasting $3,750,000 million of revenue in year one — is comparable to the $3,125,000 million in year one revenue projected in the April 2018 projection that Defendants contend is appropriate. (Arst Report ¶ 121-22.) Moreover, Defendants own damages expert, Dr. Hatch, also relied on the October 2018 projection.

Accordingly, the Court denies the Motion based on Mr. Arst's reliance on the October 2018 projection.

**2.2. Increased Projected Time from Five-Years to Ten-Years**

Dr. Arst's projection is based upon a forecasted ten-year licensing term. Defendants contend that his use of the ten-year term is improper on the grounds that it is not grounded in sound methodology and "ignores the limitations of trade secret law" because his NDA only lasts for five years. *See* 18 U.S.C. § 1836(b)(3) ("payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited."); Cal. Civ. Code §§ 3426.2, 3426.3 ("payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.").

Mr. Arst explains in his report that he used a ten-year term because Plaintiffs accuse Dr. Cornell of using their trade secrets in Augmenta patents (which Plaintiffs seek to obtain or invalidate), which are valid for twenty years under 35 U.S.C. § 154(a)(2). (Arst Report at ¶¶ 55, 74, 123.) Moreover, Mr. Arst considered the Penuma Term Sheet for the potential license of Plaintiffs' intellectual property to a third-party, which contemplated royalty payments for more than ten years. (*Id*. at ¶¶ 71, 123.) The Court thus finds that Dr. Arst relied upon reliable methodology in using a ten-year term, and that the patent terms would prohibit Dr. Cornell from using the alleged trade secrets for a period longer than ten years.

Accordingly, the Court denies the Motion based on Mr. Arst's ten-year projection.

**2.3. Reliance on Information Obtained from a Lay Witness (Ms. Komiyama)**

As part of his forecast of Augmenta sales, Mr. Arst relied on the assumption that the Federal Drug Administration ("FDA") would provide clearance to permit Augmenta to reach the market. Mr. Arst partially based this assumption on conversations he had with Allison Komiyama, an FDA regulatory consultant:

> In parallel, I understand from Allison Komiyama, a regulatory consultant that works with IMD, that that she would expect that a cosmetic penile implant embodying the alleged misappropriated trade secrets to have a 99% chance of obtaining 510(k) clearance.

(Arst Report at ¶ 150.)

Defendants contend that his reliance on his conversations with Ms. Komiyama is improper because his report does not disclose the data or methodology upon which Ms. Komiyama reached her "99% chance" estimate. (Mot. – Dkt. No. 323 at 24.) *See Alpha Grp, Inc. v. Subaru of America Inc*., 2021 WL 1146029, at *11 (C.D. Cal. Feb. 8, 2021) (disallowing an expert's opinion because it failed to provide any "detailed explanation justifying the projections' assumptions."). Defendants also contend that Ms. Komiyama was not previously disclosed as a witness.

An expert witness is permitted to form an expert opinion on the basis of information that is "handed to rather than developed by him." *In re NJOY*, 120 F. Supp. 3d at 1071. Furthermore, expert witnesses "may rely on inadmissible hearsay in forming their opinions, so long as it is of a type reasonably relied upon by experts in their field." *United States v. Cazares*, 788 F.3d 956, 977 (9th Cir. 2015).

The Court finds that Mr. Arst's reliance on his conversations with Ms. Komiyama serves as sufficient methodology. Moreover, Mr. Arst did not solely rely on these conversations when assuming FDA clearance: he also considered evidence showing that Dr. Cornell and Huck Medical expected the Augmenta implant to receive clearance. (*Id*. at ¶ 144.) As to the issue of disclosure of Ms. Komiyama as a fact witness, Plaintiffs disclosed Ms. Komiyama's involvement in this case by filing her declaration in support of their Motion for Preliminary Injunction. (Komiyama Decl. – Dkt. No. 102.)

Accordingly, the Court finds that Mr. Arst's assumption regarding FDA clearance is supported by sound methodology and denies the Motion based on Mr. Arst's reliance on information obtained from a lay witness in determining his sales projection.

**3. Use of Penuma Term Sheet**

To calculate the royalty rate in his royalty damage model, Mr. Arst used two transactions to establish a royalty range: OAM LLC's (the original entity for Augmenta) transfer of "preliminary designs, provisional patent application, and any other intellectual property" toa potential buyer, and the effective royalty rate implied by the Penuma Term Sheet. (Arst Report at ¶ 139.)

Defendants move to strike Mr. Arst's opinion on the grounds that his use of the Penuma Term Sheet was improper because the intellectual property at issue in the Term Sheet did not include any of the asserted trade secrets in this case, nor did Plaintiffs' technical experts perform a comparability assessment of the intellectual property. (Mot – Dkt. No. 323 at 25–26.) *See LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 79 (Fed. Cir. 2012) ("when relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice.").

*University Computing Co v. Lykes-Youngstown Corp.* established factors that a court should use in evaluating a fair licensing price. 504 F.2d 518, 539 (5th Cir. 1974). Mr. Arst considered these factors in his report, including: the resulting and foreseeable changes in the parties' competitive posture (Arst Report at ¶¶ 35–39); the prices past purchasers or licensees may have paid (*id*. at ¶¶ 39–40, 56–61); the value of the trade secrets to the plaintiff, including the plaintiff's development costs and the importance of the trade secrets to the plaintiff's business (*id*. at ¶¶ 40–47); and the nature and extent of use the defendant intended for the trade secret (*id*. at ¶¶ 47–52.).

Moreover, Mr. Arst identified several elements of comparability between the hypothetical and the Term Sheet, including that both would (1) include at least IMD as the licensor, (2) grant rights to technology related to cosmetic penile implant products developed by Dr. Elist, (3) be negotiated against the backdrop of the significant market potential for cosmetic penile implant products, (4) result in the loss of control of Plaintiffs' intellectual property asset, and (5) result in compensation terms that include significant fixed fee license payments. (*Id*. at 113.)

As to the fact that the alleged trade secrets were not subject to the Term Sheet, Mr. Arst acknowledged this discrepancy and factored it into his analysis:

> The Penuma Term Sheet contemplated a grant of rights to a broader portfolio of patented and non-patented assets related to Penuma as it existed at the time, whereas the hypothetical license would be limited to the alleged misappropriated trade secrets. All else equal, I expect that this factor would exert downward influence on the royalty Dr. Cornell would expect to pay relative to the Penuma Term Sheet.

(*Id*. at ¶ 114.)

Accordingly, the Court finds that the Term Sheet is sufficiently comparable to the hypothetical and denies the Motion based on the use of the Penuma Term Sheet.

**4. Lump-Sum Royalty**

In his report, Mr. Arst calculated an overall $15.4 million lump-sum royalty, of which he apportioned percentage values to the four alleged trade secrets in this case. (*Id*. at ¶ 154.) Defendants, however, identify various portions of his report that seemingly suggest that, if a jury found that only one of Plaintiffs' alleged trade secrets has been misappropriated, they should still award the entire lump-sum. (*See id*. at ¶ 156.) Defendants move to strike this opinion on the grounds that the $15.4 million lump-sum must be apportioned for each of the four trade secrets, and that awarding the entire sum for misappropriation of one trade secret would be improper. *See Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d 1299, 1309 (Fed. Cir. 2018) ("[w]hen the accused technology does not make up the whole of the accused product, apportionment is required.").

The Court grants the Motion as this issue and precludes Mr. Arst from testifying that the jury should award the entire $15.4 million lump-sum royalty if the jury found that only one of Plaintiffs' alleged trade secrets has been misappropriated.

**5. Inclusion of Antibacterial and Absorbable Suture Concepts**

Mr. Arst calculated a reasonable royalty apportioned to trade secrets of $15,440,783, including $772,039 for the use of antibacterial agents and $2,316,118 for absorbable sutures.

Plaintiffs withdrew their allegation that Defendants misappropriated the concept of using antibacterial or anti-microbial coating in a cosmetic penile implant. (Joint Stip. – Dkt. No. 249 at 2.) Furthermore, Plaintiffs state in their Opposition to Defendants' Motion for Summary Judgment that they do not claim that the use of absorbable sutures is a trade secret; rather, the trade secret is a combination of the use of absorbable sutures with mesh tabs. (Opp'n – Dkt. No. 278 at 29–30.) Nevertheless, Mr. Arst opines that Defendants owe Plaintiffs $772,039 in damages for the use of antibacterial agents NS $2,316,118 for the use of absorbable sutures. (Ex. 4.1 to Arst Report.)

Under both the DTSA and CUTSA, Plaintiffs may only recover damages for trade secrets that have been misappropriated; they may not recover damages for information that they do not allege to be a trade secret. See 18 U.S.C.A. § 1836(b)(3); Cal. Civ. Code §§ 3426.2, 3426.3; *See also Fed. Express Corp. v. Accu-Sort Sys., Inc*., 2006 WL 8434958, at *7 (W.D. Tenn. Jan. 13, 2006) (excluding an expert's opinion that a defendant owed plaintiff damages for misappropriation of both an alleged trade secret concept and a previously dismissed trade secret concept because it was "a material incorrect assumption.")

The Court finds that Plaintiffs cannot recover damages for misappropriation of the antibacterial agents or the use of absorbable sutures alone, because Plaintiffs do not claim these concepts as trade secrets in this case.

Accordingly, Mr. Arst is precluded from opining on damages for concepts that are not alleged as misappropriated trade secrets in this case.

**6. Combination Trade Secrets**

Defendants move to exclude Mr. Arst from offering opinions about damages "attributable to any 'combination' trade secrets" because he has not identified or assessed damages for the "'added value' of any 'combination' trade secret' that results in 'the whole [being] more than the sum of its parts." Plaintiffs oppose Defendants' argument on the basis that Mr. Arst's royalty analysis assumes that liability would be found for each misappropriated trade secret, and "therefore reflects the value of the combination of the misappropriated trade secrets." In its Order re Defendants' Motion for Summary Judgment, the Court determined that Plaintiffs sufficiently identified the absorbable sutures concept as the use of absorbable sutures in combination with mesh tabs.

Accordingly, the Court denies the Motion as to Mr. Arst's damages opinions regarding combination trade secrets.

**7. Profit Disgorgement**

Defendants move to exclude Mr. Arst from offering speculated profit disgorgement damages based on the statement in his report which states that he understood that Dr. Cornell "obtained at least $325,000 from Augmenta, LLC, which may provide a basis for an award of Defendants' profits." (Arst Report at ¶ 157.) Defendants move to strike Mr. Arst's opinion on the grounds that it is conclusory and speculative. (Mot. – Dkt. No. 323 at 31–32.)

Footnote 213 of Mr. Arst's report cites a document which states that "Dr. Cornell has been and will continue to be devoting significant time away from his urology practice in order to oversee the . . . marketing of the Product." (*See* Arst Report at ¶ 157; Ex. B to Grace Decl. – Dkt. No. 341-2 at ¶ 15.) Plaintiffs' Lanham Act claims against Defendants include allegations of unlawful marketing practices. Furthermore, payments made to Dr. Cornell to compensate him for marketing efforts constitute revenue potentially subject to disgorgement. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 439-40 (9th Cir. 2017).

The Court thus finds that Mr. Arst's opinion on disgorgement is not conclusory or speculative and denies the Motion as to Mr. Arst's opinions regarding profit disgorgement damages.

* * *

Accordingly, the Court **GRANTS** Defendants' Motion with respect to the following opinions:

1. Mr. Arst is precluded from testifying that the jury should award the entire $15.4 million lump-sum royalty if the jury found that only one of Plaintiffs' alleged trade secrets has been misappropriated.
2. Mr. Arst is precluded from opining on damages for concepts that are not alleged as misappropriated trade secrets in this case.

The Court otherwise **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

# TAB 4

Order Granting Reasonable Royalty (Doc. 698, Appx10450-10465)

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

INTERNATIONAL MEDICAL DEVICES, INC.; *et al.*,

Plaintiffs,

v.

ROBERT CORNELL, MD, an individual; *et al.*,

Defendants.

Case No.: 2:20-cv-03503-CBM (RAOx)

**ORDER RE: PLAINTIFFS' POST-TRIAL MOTION FOR AWARD OF REASONABLE ROYALTIES, DISGORGEMENT, STATUTORY DAMAGES, PREJUDGMENT INTEREST, AND EXEMPLARY DAMAGES. (668)**

The matter before the Court is Plaintiffs' Post-Trial Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages. (Dkt. No. 668 (the "Motion").) The Motion is fully briefed. (Dkt. Nos. 772, 777.)

## I. BACKGROUND

### A. The Complaint

On April 15, 2020, Plaintiffs International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova") and James Elist, MD ("Dr. Elist") (collectively, "Plaintiffs") brought this suit against Defendants Robert Cornell, MD ("Dr. Cornell"); Robert J. Cornell M.D., P.A.; Augmenta, LLC; AM Founders, LLC; Augmenta Investors, LLC; Jonathan Clavell Hernandez, MD;

Clavell Urology, LLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Capital Urology Associates, LLC; Richard B. Finger; and LATA Lignum LLC (collectively the "Defendants"). (Dkt. No. 1.) The First Amended Complaint ("FAC") asserts the following claims: (1) Misappropriation of Trade Secrets under Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq. (against all Defendants); (2) Misappropriation of Trade Secrets under Cal. Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426 et seq. (against all Defendants); (3) RICO under 18 U.S.C. § 1962(c) (against all Defendants); (4) RICO under 18 U.S.C. § 1962(d) (against all Defendants); (5) Trademark Infringement under 15 U.S.C. §§ 114, 1125(a) (against. Dr. Cornell, the Cornell PA, Dr. Clavell, and the Clavell PA); (6) Counterfeit Mark under 15 U.S.C. § 1117 (against Dr. Cornell, the Cornell PA, Dr. Clavell, and the Clavell PA); (7) Copyright Infringement under 17 U.S.C. § 501 (against Drs. Cornell, Mische, and Nichols); (8) Breach of Contract (against Dr. Cornell and Dr. Wang); (9) Breach of Contract (against Dr. Wang); (10); Breach of Covenant of Good Faith and Fair Dealing (against Dr. Cornell and Dr. Wang); (11) Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (against all Defendants); (12) Declaratory Relief (against all Defendants); (13) False Advertising under 15 U.S.C. § 1125(a) (against Dr. Cornell and Augmenta, LLC). (Dkt. No. 96.)

**B. The Preliminary Injunction**

On January 1, 2021, the Court issued a preliminary injunction precluding Defendants from (1) using or disclosing Plaintiffs' trade secret information; (2) commercializing, marketing, advertising, promoting, offering for sale, and/or profiting from the Augmenta implant, U.S. Patent No. 10413413 ("'413 Patent"), and Patent Application No. 16/238,821 ("'821 Application"); (3) referencing, mentioning, promoting, advertising, marketing and/or using the Penuma mark in

commerce; and (4) acting in a way likely to cause confusion, mistake, or deception on the part of consumers as to the origin or sponsorship of Penuma. (Dkt. No. 138.) The injunction remains in full force and effect. (*Id.*)

**C. Summary Judgment/Adjudication**

On September 14, 2021, Defendants filed a motion for summary judgment on all of Plaintiffs' claims. (Dkt. No. 253.) The Court granted Defendants' Motion as to Plaintiffs' Tenth Cause of Action for breach of the covenant of good faith and fair dealing and dismissed the claim. (Dkt. No. 527.) The Court also granted Defendants' Motion as to Plaintiffs' Eighth Cause of Action for breach of the nondisclosure agreement against Dr. Run Wang. The Court otherwise denied the Motion. (Dkt. No. 527 at 28.)

On September 14, 2021, Plaintiffs filed a motion for summary adjudication on their trademark (Fifth Cause of Action), counterfeit (Sixth Cause of Action), copyright (seventh cause of action), breach of contract (Eighth and Ninth Causes of Action), and good faith and fair dealing claims (Tenth Cause of Action). (Dkt. No. 254.) The Court granted Plaintiff's Motion as to the Seventh Cause of Action for copyright infringement and held that Plaintiffs are "entitled to damages and permanent injunctive relief" as to that cause of action. (Dkt. No. 528 at 19.) The Court also granted Plaintiffs' motion as to the Ninth Cause of Action for breach of the Consulting Services Agreement[1] against Dr. Wang.[2] (Dkt. 528 at 24-25.) The Court otherwise denied the Motion. (*Id.*)

**D. Damages**

Prior to trial, by stipulation, the parties agreed that the Court, not the jury,

---

[1] On October 6, 2017, Dr. Wang entered into a Consulting Services Agreement with IMD, and served on IMD's board of advisors until August 2020. In February 2020, Dr. Elist discovered that Dr. Wang was listed as a CEO of Augmenta on Augmenta's website. (Dkt. No. 528.)

[2] At trial, Plaintiffs elected to pursue nominal damages on this claim, which the jury awarded in the amount of $1. (Dkt. No. 649 at 7.)

would consider harm and the appropriate compensation of Plaintiffs related to trade secret liability and Dr. Cornell's breach of the non-disclosure agreement. (Dkt. No. 599.) Specifically, the Parties agreed that, as Plaintiffs were unable to prove or quantify damages with particularity as to these claims, the Court would consider a reasonable royalty award if the jury found liability on either of these claims. (*Id.* at 1-3.) The parties also agreed that the Court would determine trademark infringement damages, pursuant to *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015), which held that a disgorgement award is equitable.

**E. Trial and Jury Verdict**

On June 16, 2023, this case proceeded to trial. The jury found in favor of Plaintiffs for: (1) misappropriation of four of Plaintiffs' trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), (2) infringement of Plaintiff Menova's registered trademark (the "Penuma Mark"), (3) use of a counterfeit Penuma Mark, (4) infringement of Plaintiffs' copyrighted video, and (5) breach of the Non-Disclosure Agreement ("NDA") by Dr. Cornell. (Dkt. No. 649.) The jury also found invalid, by clear and convincing evidence, two patents issued to certain Defendants. (*Id.*) The jury awarded Plaintiffs $1,650 for Defendants' copyright infringement of a Penuma informational video based on an invoice for the creation of the video. (*Id.* at 6, Trial Ex. 314.) The jury also awarded nominal damages for Dr. Wang's breach of the Consulting Services Agreement. (Dkt. No. 649.)

**F. Evidentiary Hearing**

On October 25, 2023, the Court held an evidentiary hearing on Plaintiffs' Motion. (Dkt. No. 690.) During the evidentiary hearing, experts for both parties testified, exhibits were received into evidence, and Jonathan Elist testified regarding IMD's damages. (Dkt. No. 671.) Plaintiffs seek the following: (1) reasonable royalties in the amount of $14,668,744 for the Second Cause of Action

for trade secret misappropriation under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426 et seq. (plus exemplary damages up to two times the royalty award for willful and malicious misappropriation); (2) reasonable royalties in the amount of $14,668,744 for the Eighth Cause of Action for breach of contract against Dr. Cornell; (3) disgorgement of profits in the amount of $325,000 under the Fifth Cause of Action for trademark infringement, to be trebled, including prejudgment interest; and (4) $1,000,000 in statutory damages for offering services under a counterfeit mark pursuant to the Sixth Cause of Action. (Dkt. No. 668.)

## II. DISCUSSION

### A. Reasonable Royalty Award for Defendants' Violation of CUTSA and Dr. Cornell's Breach of the NDA

A reasonable royalty award under CUTSA is "a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret." *Ajaxo, Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1308 (2010). "When calculating a monetary remedy for the past use of a misappropriated trade secret, a court 'may order' reasonable royalties '[i]f neither damages [for actual loss] nor unjust enrichment caused by misappropriation are provable.'" *Id.* (quoting Cal. Civ. Code § 3426.3(b)) (alteration in original). Under CUTSA, the relevant time period for calculating a royalty award must be "no longer than the period of time the use [of the trade secret] could have been prohibited." Cal. Civ. Code § 3426.3(b); *see also Univ. Computing Co., v. Lykes-Youngstown Corp.,* 504 F.2d 518, 534 (5th Cir. 1974) ("Unlike a patent which is totally protected for the period of time for which it is granted, the protection afforded a trade secret is limited—for it is protected only so long as competitors fail to duplicate it by legitimate, independent research.").

A reasonable royalty should approximate "the price that would be set by a willing buyer and a willing seller for the use of the trade secret made by the

defendant." *Ajaxo, Inc.,* 48 Cal. App. 5th at 160 (quoting Rest.3d Unfair Competition (1995) § 45, com. G, p. 518.) The proper measure of the royalty, then, is "what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Ajaxo, Inc.*, 48 Cal. App. 5th at 161 (quoting *Univ. Computing Co.*, 504 F.2d at 539. Overall, the hypothetical negotiation inquiry "offers no promise of mathematical precision" but is instead meant to provide "flexibility [that] is consistent with the policies underlying trade secret protection." *Ajaxo, Inc.*, 48 Cal. App. 5th at 161-62. The hypothetical negotiation framework is commonly employed to assess reasonable royalty damages in intellectual property litigation, including matters involving the misappropriation of trade secrets. *Id.*

**1. Mr. Arst's Expert Opinion**

Plaintiff's expert, Kevin Arst, is a senior managing director of Ankura Consulting Group, Inc., which helps its clients including corporations, law firms, government entities, and investors – understand and evaluate financial aspects of intellectual property. (Declaration of Kevin Arst ("Arst Decl."), Dkt. No. 668-1, ¶ 3.)[3] Mr. Arst has been a consultant focused on financial issues pertaining to intellectual property since 1999. (*Id.* at ¶ 4.) Mr. Arst is also a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics ("CFF") by the American Institute of Certified Public Accountants ("AICPA"), and a Certified Licensing Professional ("CLP"). (*Id.* at ¶ 5.) Mr. Arst has been named one of the World's Leading IP Strategists by Intangible Asset Management and served as an Officer of the Licensing Executives Society United States & Canada ("LES"), one of the U.S.'s largest IP trade associations. (*Id.*) He is also a past Chair of the Valuation and Taxation Committee of the LES. (*Id.*)

[3] The Court admitted Mr. Arst's Declaration into evidence at the Evidentiary Hearing on October 25, 2023.

Mr. Arst applied a hypothetical negotiation framework to determine a reasonable royalty for licensing Plaintiffs' trade secrets. Mr. Arst set forth the following in structuring the hypothetical negotiation:

> IMD expected the trade secret and other confidential information that it provided to Cornell under the breached contract would remain confidential and would not be disclosed or used by Cornell and the other Defendants to raise capital and develop a competitive medical implant product. However, IMD's trade secret and confidential information was used to develop the competitive Augmenta implant and was used as the basis for Cornell's patent applications (which resulted in the issuance of two patents), which publicly disclosed Plaintiff IMD's trade secrets. An owner of intellectual property in IMD's position would reasonably expect a third party wishing to use that intellectual property to seek a license to do so, as is typical in matters involving technology transfer.

(Arst. Decl. at ¶ 43.)

Mr. Arst testified that the hypothetical negotiation framework generally assesses the amount that a willing licensor and a willing licensee would have agreed upon for a license of intellectual property. (*Id.*) He stated that parties to the hypothetical negotiation would have reasonably foreseen the risk that the hypothetical license would pose to IMD including licensing a competing business. (*Id.*)

To determine the appropriate reasonable royalty, Mr. Arst considered the following factors: (1) the date of, and parties to, the hypothetical negotiation; (2) the structure of the hypothetical license; (3) the factors set forth in *Univ. Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 539 (5th Cir. 1974)[4] and their influence on the hypothetical negotiation; (4) the cost, market, and

---

[4] *University Computing Co. v. Lykes-Youngstown Corp.* set forth the following factors for calculating a fair licensing price (1) the resulting and foreseeable changes in the parties' competitive posture; (2) what prices past purchasers or licensees may have paid; (3) the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; and (5) finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes. 504 F.2d at 539.

income valuation methodologies; and (5) the bargaining strengths of the licensor and licensee. (*Id.*)

Mr. Arst ultimately applied an Income Approach to calculate the reasonable royalty. (*Id.*) While he considered other accepted valuation methodologies including the Cost Approach and the Market Approach, he ultimately concluded that the evidence does not support using these methodologies. (*Id.*) The Income Approach is a method of determining net present value of anticipated future cash flow. Mr. Arst considered the following in applying the Income Approach: (1) Deendants' expectations of the revenues and profits for Augmenta; (2) Augmenta's anticipated revenues and profits that could be reasonably attributed to the misappropriated trade secrets; and (3) converting the revenues to a present value lump-sum royalty using an appropriate discount rate based on the risk involved in the project. (*Id.* at ¶ 110).

To assess Dr. Cornell's expectations of Augmenta's revenues, Mr. Arst relied on a financial forecast detailing the first five years of the Augmenta implant's commercial launch prepared by Dr. Cornell and Mr. Richard Finger[5] in June 2018. (Arst. Decl. at ¶ 111; Trial Ex. 215.) The June 2018 forecast anticipated approximately $182 million in revenue in the first five years of Augmenta's commercial launch. (*Id.*) Mr. Arst considered additional financial forecasts for Augmenta circulated in October and December 2018 which projected similar revenue amounts. (Trial Ex. 6-41.) In October 2020, another forecast indicated approximately $347 million in revenue for Augmenta over a ten-year period. (Trial Ex. 76-046.)

To assess a royalty rate that would capture the portion of the Augmenta implant's anticipated revenues and profits that could be reasonably attributed to

---

[5] Mr. Richard Finger is the owner of Lata Lingum, which holds an indirect interest in Augmenta LLC, and had a role in developing the financial forecasts included in the Confidential Offering Memoranda of Augmenta Investors LLC.

the misappropriated trade secrets, Mr. Arst considered two transactions. The first was a negotiation between IMD and Fort Washington Pharma in 2016 involving a license. (Trial Ex. 415.) Fort Washington Pharma was to make an upfront cash payment of $5 million and additional cash payments amounting to $25 million over the following four years. (*Id.*) Mr. Arst also considered the royalty rates and payments set forth in the document entitled "Penuma Term Sheet" to calculate a 30% royalty rate. (Arst. Decl. at ¶ 120.) The second transaction was between OAM LLC[6] and Augmenta LLC. (Trial Ex. 206-008-10.) OAM LLC received 15% of the membership units of Augmenta LLC in exchange for its contribution of "preliminary designs, provisional patent application, and any other intellectual property." (*Id.*; Arst Decl. at ¶ 118.) Based on the two transactions, Mr. Arst concluded that 20% of the Augmenta implant's anticipated sales and profits could be reasonably attributed to IMD's trade secrets which served as the basis for the design and anticipated market entry of the Augmenta implant. (*Id.*)

As for the duration of the license, Mr. Arst proposed a ten-year term based on Defendants' expected use of the licensed trade secrets. Mr. Arst also considered Augmenta's October 2020 ten-year forecast of sales, IMD's 2016 Penuma Term Sheet which specified royalty payments for more than ten years, and the 20-year legal life of Defendants' patents. (*Id.* at ¶114.) Mr. Arst applied the 20% royalty rate to Augmenta's June 2018 forecasted revenues which yielded a nominal royalty stream of $187.2 million over a ten-year period. (*Id.* at ¶ 131.) Mr. Arst converted the $187.2 million to a present value, lump-sum royalty by using a 35% discount rate,[7] which he determined to be an appropriate rate for a

---

[6] OAM LLC is a limited liability company formed by Dr. Cornell who is a 60 percent member and Mr. Mische who is a 40 percent member. It was responsible for developing designs and IP for Augmenta LLC and is a five percent member of Augmenta, LLC.

[7] Mr. Arst used a 35% discount rate based on guidance provided by "Valuation and Dealmaking of Technology Based Intellectual Property" which indicates a 35-

project like Augmenta due to its use of new technology. (*Id.* at ¶ 132.) Mr. Arst also applied a 1% risk factor to account for the risk that Augmenta would not get FDA approval. (*Id.* at ¶¶ 135-141.)

Mr. Arst prepared the chart below, entitled "Present Value of Royalties from Augmenta Revenues" which is attached to his declaration as Exhibit C. (Dkt. No. 668-4.) The chart provides a reasonable royalty calculation for years one through ten, after applying the 20% royalty rate and the discount factors. (*Id.*) Mr. Arst calculated a lump-sum, present value royalty of $14,668,744, after applying a $772,039 discount to remove the value of Plaintiffs' withdrawn trade secret related to antibacterial agents.[8] (*Id.* at ¶¶ 135-145.)

| | Year 1 Apr. 22, '20 - Apr. 21, '21 | Year 2 Apr. 22, '21 - Apr. 21, '22 | Year 3 Apr. 22, '22 - Apr. 21, '23 | Year 4 Apr. 22, '23 - Apr. 21, '24 | Year 5 Apr. 22, '24 - Apr. 21, '25 | Year 6 Apr. 22, '25 - Apr. 21, '26 | Year 7 Apr. 22, '26 - Apr. 21, '27 | Year 8 Apr. 22, '27 - Apr. 21, '28 | Year 9 Apr. 22, '28 - Apr. 21, '29 | Year 10 Apr. 22, '29 - Apr. 21, '30 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Augmenta Revenues (1) | $3,750,000 | $10,450,000 | $18,500,000 | $45,600,000 | $103,750,000 | $129,111,111 | $142,944,444 | $154,472,222 | $161,388,889 | $166,000,000 | $935,966,667 |
| Revenue Growth Rate in Years 6-10 (2) | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *24.4%* | *10.7%* | *8.1%* | *4.5%* | *2.9%* | |
| Effective Royalty Rate | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | N/A |
| Royalties | $750,000 | $2,090,000 | $3,700,000 | $9,120,000 | $20,750,000 | $25,822,222 | $28,588,889 | $30,894,444 | $32,277,778 | $33,200,000 | $187,193,333 |
| Discount Factors (3) | 0.4628 | 0.3428 | 0.2540 | 0.1881 | 0.1393 | 0.1032 | 0.0765 | 0.0566 | 0.0420 | 0.0311 | N/A |
| PV of Royalties from Augmenta Revenues | $347,119 | $716,522 | $939,618 | $1,715,579 | $2,891,347 | $2,665,274 | $2,185,807 | $1,749,690 | $1,354,100 | $1,031,695 | $15,596,751 |
| Regulatory Risk Adjustment (5) | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | N/A |
| Adjusted PV of Royalties | $343,648 | $709,357 | $930,222 | $1,698,423 | $2,862,433 | $2,638,622 | $2,163,949 | $1,732,193 | $1,340,559 | $1,021,378 | $15,440,783 |
| | | | | | | | | | | Less: Value of Antibacterial Agents (5) | ($772,039) |
| | | | | | | | | | | **Total Reasonable Royalty Damages** | $14,668,744 |

**2. Dr. Hatch's Expert Opinion**

Defendants' expert, Dr. John Hatch works for Applied Economics Consulting Group. which conducts economic and financial analysis for clients across several industries. (Trial Tr. 174:10-11.) Dr. Hatch works on valuation related to civil litigation damages, including valuations of intellectual property.

---

40% discount rate for "very high risk, such as making a new product with new technology to a new segment." (*Id.* at ¶ 130).

[8] Plaintiffs withdrew their allegation that Defendants misappropriated the concept of using antibacterial or anti-microbial coating in a cosmetic penile implant. (Dkt. No. 249.) Thus, the Court issued an Order precluding Mr. Arst from opining on damages for concepts that are not alleged as misappropriated trade secrets in this case. (Dkt. No. 539.)

(*Id*. at 174:13-17.) He has been involved in eighteen publications pertaining to valuation topics, including valuing businesses, minority interests, intangible assets, and intellectual property. (*Id*. at 174:21-175:1.)

Dr. Hatch opined that Mr. Arst's reasonable royalty suffers from the following flaws: (1) use of a ten-year royalty term; (2) application of the income approach; (3) use of Augmenta's "speculative" forecast; and (4) use of an over-inflated royalty rate calculation. (Trial Tr. 223:23-224:3.) Dr. Hatch opined that ten-years is greater than the period of time during which IMD could have prohibited Dr. Cornell from using the trade secrets, because it exceeds the period of the NDA. (*Id.*) He further opined that during the hypothetical negotiation, the licensor would not require the licensee to pay a royalty to use trade secrets that would expire after an NDA. (*Id.* at 179:9-13.)

Dr. Hatch criticized Mr. Arst's use of the income approach on the basis that there have been no sales of the Augmenta to date due to the preliminary injunction entered in this case. (Trial Tr. 175:21-25.) Since there has been no revenue to which one could apply a royalty rate, Dr. Hatch opined the income approach yields a royalty of zero. (*Id.* at 177:7-12.) Dr. Hatch further criticized Mr. Arst's use of Augmenta's "speculative" forecast because it did not exist at the time of the hypothetical negotiation. He opined that the correct method is to use actual results to replace forecasts or assumptions that were present at the time of the hypothetical negotiation, and under the circumstances presented here, the results would be zero since there have been no sales of Augmenta. (*Id.* at 182:15-19.) Dr. Hatch testified that during the hypothetical negotiation, the parties would have used IMD's operating margin as informative of the royalty agreement. (*Id.* at 184:2-185:12.) He stated that Mr. Arst over inflated the royalty rate calculation by focusing on the unrealized operating margin in Augmenta's forecast. (*Id.* at 187:21-188:1.) He also criticized Mr. Arst's consideration of the Penuma Term Sheet in calculating the royalty rate because the terms of that license were not

agreed upon. (*Id.* at 189:16-190:5.)

Dr. Hatch used the Market Approach to propose a reasonably royalty model based on the following: (1) OAM LLC's transfer of all intellectual property related to the Augmenta design to Augmenta LLC "in exchange for 15% of the membership units" in Augmenta, LLC (Trial Ex. 206); and (2) Lata Lingum's[9] $300,000 contribution to Augmenta LLC in exchange for an indirect 37.4% ownership interest. (Trial Tr. 201:12-203:13.) Based on these two "arm's length" transactions, Dr. Hatch calculated the value of OAM LLC's 15% equity interest in Augmenta LLC to be $136,405. (Trial Tr. 204:23-24.) Dr. Hatch opined that the value of the trade secrets is 60% of OAM's total interest of $136,405, which is $81,843. (*Id.* at 206:21-25.) Dr. Hatch alternatively calculated a lump-sum royalty rate using a running royalty rate of 4.5% for a five-year term, based on IMD's operating margin in 2017. (*Id.* at ¶ 231:10-233:18.) Using the same discount rate and parameters as Mr. Arst, Dr. Hatch proposed a lump-sum royalty of approximately $180,000. (*Id.* at ¶ 217:19-22.)

**3. The Court's Findings re Reasonable Royalty**

It is undisputed that IMD and Defendants are direct competitors of cosmetic penile implants. In October 2018, Defendants prepared and circulated a Confidential Offering Memorandum from Augmenta Investors LLC which informed prospective investors that "the success of our business will depend, in significant part, on . . . preserving our trade secrets." (Trial Ex. 6-020.) The nature and extent of Defendants' use of IMD's trade secrets weighs in favor of a reasonable royalty higher than that proposed by Dr. Hatch. The genesis of the Augmenta Implant was the March 30, 2018 training Dr. Cornell attended with Dr. Elist where he observed Dr. Elist perform four Penuma implant procedures. (Jury

---

[9] AM Founders LLC held the remaining 85% ownership interest in Augmenta LLC. Richard Finger owned Lata Lignum LLC which partly owned AM Founders LLC.

Trial Tr. 1190:21-1191:8.) Dr. Cornell used the trade secrets as a basis for the provisional patent application he filed less than four month later. (Trial Exs. 29, 78.)

The period of time during which the use of the trade secrets could have been prohibited is five years based on the duration of the NDA Dr. Cornell signed on March 30, 2018. (Trial Ex. 14.) Therefore, Plaintiffs are entitled to a royalty award that is limited to a five-year period. The Court calculates the reasonable royalty rate based on Mr. Arst's calculations, after applying the 20% royalty rate and the discount factors as set forth in Exhibit C to his declaration. (Dkt. No. 668-4.) The sum of years one through five is $6,544,083. The Court subtracts $772,039 to account for the withdrawn trade secret related to antibacterial agents. Thus, the Court awards Plaintiffs a reasonable royalty of $5,772,044.

**B. Exemplary Damages**

"If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice" the amount of the reasonable royalty. Cal. Civ. Code § 3426.3(c). Plaintiffs seek exemplary damages on the basis that Defendants' trade secret misappropriation was "willful and malicious." Malice may be proven either expressly by direct evidence probative of the existence of ill-will, or by implication from indirect evidence. *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 923 n.6 (1978); *Ajaxo Inc.*, 135 Cal. App. 4th at 66-67.

To support an award for exemplary damages, Plaintiffs cite to Dr. Cornell's April 23, 2018 email to Mr. Mische asking if there was anything in the NDA requiring that Cornell stay "under the radar on the patent, etc." (Jury Trial Tr. 1254:1-25; Trial Ex. 17.) Plaintiffs contend that this email reveals Dr. Cornell's state of mind that "he needed to go undetected because he was violating the law." Moreover, while raising funds to commercialize Augmenta, Augmenta Investors LLC included the following in its Offering Memorandum: "Dr Elist may threaten

or commence litigation relating to intellectual property rights." (Jury Trial Tr. 1061:20-1065:2; Trial Ex. 6, 206.) Plaintiffs also contend that Dr. Cornell "raced to the USPTO to apply for a patent based on some of the misappropriated trade secrets."

Dr. Cornell attended the training with Dr. Elist on March 30, 2018, and signed the NDA that same day. (Trial Ex. 14.) Within days, Dr. Cornell began working on a provision patent application for a cosmetic penile implant, which was filed on July 23, 2018—less than four month later after the training with Dr. Elist. (Trial Ex. 17.) The Court finds the conduct in which the Defendants engaged amounted to a willful and malicious misappropriation. *See Mattel, Inc. v. MGA Entm't, Inc.,* 801 F. Supp. 2d 950, 954-55 (C.D. Cal. 2011) (granting $85 million exemplary damages award based on counter-defendant toy company's "nefarious tactics," which included using "false pretenses to access competitors' private" information and using stolen "trade secret information to preempt [counter-claimant's] unreleased products[.]"). Accordingly, the Court awards exemplary damages of $11,544,088—twice the reasonable royalty award.

**C. Disgorgement for Trademark Infringement**

Under the remedies provision of the Lanham Act, a court may award (1) the defendant's profits, (2) the damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). "[D]isgorgement of profits is a traditional trademark remedy." *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004-05 (9th Cir. 2004) (describing the remedy in enforcement of trademark injunction cases, as "akin to an award of the infringer's profits under trademark law"). Disgorgement of profits "is intended to award profits only on sales that are attributable to the infringing conduct." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).

Plaintiffs request that the Court order disgorgement of the $325,000 Dr. Cornell received for "design and development" of Augmenta, which included

"development, regulatory clearance and marketing of the Product." (Trial Ex. 206.) In support of this, Plaintiffs contend that Dr. Cornell's "'marketing' consisted of brazenly using the name and goodwill of a competitor to confuse and steal patients and help entice investors." However, the $325,000 received for "design and development" does not amount to profits that are subject to disgorgement. *See Grasshopper House, LLC v. Clean & Sober Media, LLC,* 2021 WL 3702243, at *2 (9th Cir. Aug. 20, 2021) ("Disgorgement is limited to 'the financial benefit [defendant] received because of the advertising.'") (quoting *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986).) Accordingly, the Court **DENIES** Plaintiffs' Motion for disgorgement of $325,000.

**D. Statutory Damages for Use of a Counterfeit Mark**

The jury found that Defendants Cornell and Cornell PA infringed upon and counterfeited the registered Penuma Mark. As a result, Plaintiffs seek statutory damages in the amount of $1 million. In counterfeit mark cases, a plaintiff may elect an award of statutory damages for "any such use in connection with the sale [or] offering for sale. . . of goods or serves." 15 U.S.C. § 1117(c). District courts have discretion in determining statutory damages, subject to the statutory minimum ($1,000) and maximum ($200,000). 15 U.S.C. § 1117(c)(1). A finding of willfulness subjects a defendant to an enhanced statutory maximum of $2,000,000. 15 U.S.C. § 1117(c)(2).

Dr. Cornell advertised himself as a "Penuma penile enhancement specialist" on his website and used the registered Penuma Mark, even though he knew he was not an authorized Penuma specialist. (Trial Ex. 24.) Dr. Cornell continued to use the Penuma trademark even after receiving two cease and desist letters from Jonathan Elist. (Trial Exs. 25, 511.) Dr. Cornell also created a "waiting list" with patient contact information for use once the Augmenta Implant was FDA approved. (Trial Ex. 531.) Plaintiffs compiled a list of calls and website inquires to Dr. Elist asking about Dr. Cornell' availability for surgery, mentioning similar

procedures offered by Dr. Cornell, and inquiring whether Dr. Cornell offered the same procedure as Penuma. (Trial Ex. 94A.) This is evidence that Dr. Cornell's use of the Penuma mark caused confusion among patients who thought Dr. Cornell offered the Penuma implant and may have caused lost opportunities for Plaintiffs. (*Id.*, Jury Trial Tr. 1792:6-17.) Dr. Cornell knew he was not authorized to use the Penuma mark or offer services related to Penuma. Thus, the Court awards Plaintiffs $1 million in statutory damages for Defendants' use of the counterfeit mark.

## III. CONCLUSION

Accordingly, the Court **GRANTS in part** Plaintiffs' Motion as follows:

- for the CUTSA violation and Dr. Cornell's breach of the NDA, a reasonable royalty in the amount of $5,772,044, plus exemplary damages in the amount of $11,544,088;[10]
- for the use of a counterfeit mark claim, statutory damages in the amount of $1,000,000.

The Court **DENIES in part** Plaintiffs' Motion for disgorgement of $325,000. Plaintiffs are ordered to prepare a proposed judgment consistent with this Order and the Order re Motion for Permanent Injunction, and file the same with the Court no later than April 30, 2024.

**IT IS SO ORDERED.**

DATED: March 28, 2024.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

[10] To the extent the parties disagree with the Court's calculation of the reasonable royalty, the parties shall request a hearing **no later than April 5, 2024**. The Court is available for a hearing to and including **April 23, 2024**. If there is no need for a hearing, the parties shall file a stipulation **no later than April 5, 2024** advising the Court that no hearing is necessary.

# TAB 5

Order Overruling Motion for JMOL or New Trial (Doc. 765, Appx29-43)

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

International Medical Devices, et al,

Plaintiffs,

v.

Robert Cornell, MD, an individual, et al,

Defendants.

Case No.: 2:20-cv-03503-CBM (RAOx)

**ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL**

The matter before the Court is Renewed Motion for Judgment as a Matter of Law and Motion for New Trial. (Dkt. No. 716 ("Motion").)

## I. BACKGROUND

This is a trade secrets case filed by Plaintiffs International Medical Devices, Inc., Menova International, Inc., and James Elist, MD against multiple Defendants.[1] (Dkt. No. 578.) The parties are familiar with the factual and procedural background of the case; therefore, the Court does not repeat the relevant facts herein. On June

[1] Defendants are Robert Cornell, MD; Augmenta, LLC; Robert J. Cornell M.D., P.A.; Jonathan Clavell Hernandez, MD; Clavell Urology, PLLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Richard B. Finger; and Lata Lignum LLC. (Dkt. No. 578 at 4.)

13, 2024, Defendants filed the instant Motion, and on June 24, 2024, Defendants filed an amended version of the Motion. (Dkt. Nos. 713, 716.)

## II. STATEMENT OF THE LAW

Federal Rule of Civil Procedure Rule 50(b) states that "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id.* (internal quotations omitted). Relief is proper if "a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves*, 530 U.S. at 149. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* at 150. And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

Rule 59(a) states, "[a] new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Rule 59 authorizes the district courts to grant a motion for new trial "on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Ninth Circuit has applied Rule 59 to permit a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal citation omitted).

## III. DISCUSSION

### A. Trade Secret Misappropriation

#### *1. Secrecy*

The CUTSA defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "The secrecy requirement is generally treated as a relative concept and requires a fact-intensive analysis." *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). "[T]he value of a trade secret arises from its secrecy and the ability to control whether, how and to whom it is disclosed," not from their novelty. *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 452111, at *3 (N.D. Cal. Jan. 17, 2018) (citing *Bunner*).

Defendants contend that Plaintiffs failed to introduce sufficient evidence that the alleged four trade secrets were secret, that they derived "independent economic value from secrecy," and that Plaintiffs "used reasonable efforts to maintain its secrecy." (Mot. at 7.)

a) <u>Not generally known</u>

The four trade secrets at issue here are: (1) the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity; (2) the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth; (3) the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and (4) a particular list of instruments and materials used to perform the surgical method associated with the placement of

a cosmetic penile implant referred to as the Penuma Instrument and Supply List. Plaintiffs introduced evidence that each of the four trade secrets was not generally known in 2018.[2]

b) Reasonable steps to protect trade secrets

"'Reasonable efforts' can include advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995) (citations omitted). In *Religious Tech*, the district court found reasonable steps were taken, including "use of locked cabinets, safes, logging and identification of the materials, availability of the materials at only a handful of sites worldwide . . . and confidentiality agreements for all of those given access to the materials." *Id*. at 1254. Plaintiffs introduced evidence at trial of the reasonable steps they took to protect their trade secrets.[3]

[2] (*See* Trial Tr. at 1182:18-1183:1, 1184:7-10, 820:17-822:24, 1591:3-1592:17, 1596:8-1597:12, 1658:15-24, 1660:1-1661:22 (testimony showing that internal pockets/voids within implant was not generally known); *id*. at 1591:10-25, 1415:14-1418:3, 1419:9-1420:17, 1651:18-1652:7, 1653:5-1655-4, 1657:11-1658:1, 1671:7-1673:14, 1673:15-1674:19, 1655:24-1657:10 (testimony showing that mesh tabs around distal tip of implant was not generally known); *id*. at 1555:9-15, 1419:9-1420:17 (testimony that mesh tabs around distal tip in combination with absorbable sutures was not generally known); *id*. at 1678:3-1679:18, 1709:13-16 (testimony that the Penuma instrument and supply list was not generally known).

[3] (*See* Trial Tr. at 1780:21-1783:21 (testimony from Jonathan Elist describing steps Plaintiffs took to keep information confidential); *id*. at 1778:11-17, 1784:20-1785:5 (testimony regarding why IMD requires visiting surgeons sign an NDA and how IMD conducts its trade secret audits to make sure all measures to protect trade secrets "are in use and that they continue to be effective measures"); Ex. 86 (image of cabinet labeled "CONFIDENTIAL AND SENSITIVE, AUTHORIZED IMD PERSONNEL ONLY").

c) <u>Independent economic value</u>

"To have independent economic value, a trade secret must be 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Calendar Rsch. LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007). "Independent economic value can be shown by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Id.* Moreover, "information can have independent economic value even if there is no actual product on the market utilizing the information. *Id.* "The standard to show that trade secrets derive economic value is not a high standard." *Id.* Plaintiffs introduced evidence establishing the trade secrets had economic value.[4] *See Calendar Rsch.*, 2017 WL 10378336 at *4 (noting that creation and development of products "would be less profitable without the expedited and simplified development processes inherent in these trade secrets").

Accordingly, there was evidence supporting that the four trade secrets were indeed secret, and judgment as a matter of law on this basis is not warranted. Similarly, Defendants have not identified evidence[5] that shows the clear weight of all the evidence was contrary to the jury verdict. Thus, a new trial is not warranted

---

[4] (*See* Trial Tr. at 1787:18-22, 1792:18-1794:13 (testimony from Jonathan Elist regarding value of trade secrets); *id.* at 1677:2-1678:2 (expert testimony that instrument list was valuable); *id.* at 1778:11-17, 1780:21-1783:21, 1784:20-1785:5, Ex 436 (testimony and exhibit describing steps taken to protect trade secrets); *id.* at 1075:1-21, Ex. 76 (Offering Memorandum for Augmenta Investors LLC indicating value of Augmenta product); *id.* at 1271:12-1279:23, Exs. 29 ('413 Patent), 78 ('639 Patent) (testimony and exhibits regarding the two patents Cornell obtained using the trade secrets).

[5] (*See* Trial Tr. at 334:21-335:4, 414:25-415:2 (evidence merely showing that general use of mesh for ingrowth and voids/internal pockets in a medical device is not a trade secret, not that Plaintiffs' contemplated use of those items in a penile implant was not a trade secret); 334:7-9, 1704:21-22 (evidence only indicates that the trade secret alleged is not the absorbable sutures itself).)

on this basis either.

*2. Each Defendant's Misappropriation*

Defendants contend that Plaintiffs "failed to introduce evidence" establishing "that each Defendant, individually, misappropriated any of [Plaintiffs'] four alleged trade secrets" because there was no evidence that each Defendant acquired the trade secrets "by improper means," no evidence that any Defendant other than Cornell "acquired knowledge of a trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use," and no evidence that any Defendants other than Cornell "used or disclosed any trade secret with knowledge that it was derived from or through a person who owed a duty to Plaintiff[s] to maintain its secrecy or limit its use." (Mot. at 12–16.)

The CUTSA defines "misappropriation" to mean:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A) Used improper means to acquire knowledge of the trade secret; or
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> (i) Derived from or through a person who had utilized improper means to acquire it;
> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code 3426.1(b). The CUTSA also states that "improper means":

> "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone

shall not be considered improper means."

Cal. Civ. Code 3426.1(a).

a) Cornell

The evidence at trial demonstrated that Cornell acquired the trade secrets when he attended the Penuma training session, that the NDA gave rise to a duty to maintain the secrecy of the information, that Cornell knew the NDA required him to maintain secrecy, and that he used those trade secrets in developing Augmenta.[6] This is sufficient to establish misappropriation as to Cornell. *See BladeRoom*, 2018 WL 452111 at *4 ("The court reiterates that a violation of CUTSA may occur when trade secrets are disclosed in violation of a contractual duty to maintain confidentiality").[7] Second, the CUTSA explicitly lists breach of a duty to maintain secrecy as "improper means." Even if Cornell did not use his breach of the NDA to *acquire* the information, signing the NDA to acquire the trade secrets only to breach the NDA later can also constitute "improper means." There was circumstantial evidence indicating that when Cornell signed the NDA, he did not intend to keep the trade secrets confidential, but instead was there to learn information he could use to develop a competing implant product.[8] Therefore, there was evidence supporting Cornell's liability under either section 3426.1(b)(2)(A) or 3426.1(b)(2)(B)(ii), and judgment as a matter of law is not warranted. Nor is a new

---

[6] *See* Exs. 29, 78 (trade secrets incorporated into '413 and '639 patents).

[7] It is unclear why Defendants argue that Plaintiffs must show the Defendants each acquired the trade secrets by "improper means" when the statute provides for multiple ways of misappropriation, some referencing "improper means" and some not. Note, however, that in the Final Pretrial Conference Order, the parties agreed that one of the elements necessary to establish a trade secret claim is "Defendants acquired, used, or disclosed Plaintiffs' trade secrets through improper means." The parties adopted this language from CACI 4401. (Dkt. No. 578 at 12.)

[8] *See* Exs. 20 (document incorporating trade secrets into a plan for developing Augmenta weeks after signing NDA); 212 (email from Cornell to Mische asking if the NDA required Cornell to stay "under the radar on the patent"); 1605:2-1607:14 (testimony regarding Cornell's questions and behavior during Penuma training).

trial warranted, as the clear weight of the evidence is not contrary to the jury verdict as to Cornell's misappropriation. (*See* Dkt. No. 649.)

a) <u>Other defendants</u>

Plaintiffs argue that the other Defendants "induced Cornell to breach the NDA and thus themselves acquired the trade secrets by improper means." (Opp. at 17.) This argument is tenuous. "To induce means to 'bring on or about, to affect, cause, to influence to an actor or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on.'" *In re Qualcomm Litig.*, 2019 WL 13159816, at *9 (S.D. Cal. Mar. 14, 2019) (quoting Black's Law Dictionary 775 (6th ed. 1990)). None of the evidence cited by Plaintiffs reflects that these Defendants took any actions to "bring . . . about," cause, influence, or incite Cornell to share the trade secrets he learned from the training. However, there *was* evidence to support that these Defendants knew or had reason to know that some of the trade secrets were "[d]erived from or through a person who had utilized improper means to acquire it" or "derived from . . . a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(B)(i) & (iii).

First, the evidence showed that Defendants Mische and Nichols (and by extension, HMT) knew Cornell signed an NDA with IMD in connection with the Penuma training session.[9] This evidence also showed that Cornell shared certain of the trade secrets with these Defendants to develop a competing product to Penuma.[10] Thus, there was evidence supporting that Mische and Nichols (and HMT) had reason to know that these trade secrets were derived from a person (Cornell) who

---

[9] (*See* Trial Tr. at 972:13-974:22, 979:10-984:8 (testimony that Mische knew about the NDA); 1097:6-15 (testimony that Nichols knew about the NDA).)

[10] (*See* Trial Tr. at 984:4-986:16, 972:13- 974:22, Exs. 20, 213, 308 (testimony and exhibits showing Cornell shared trade secrets with Mische); 1100:2-25, 1113:3-1114:10, 1105:12-1107:11, Exs. 119, 123 (testimony and exhibits showing Cornell shared trade secrets with Nichols and HMT); Exs. 29, 78 (the '413 and '639 patents incorporating internal pockets, mesh tabs, and mesh tabs with absorbable sutures ideas and listing Cornell, Mische, and Nichols as inventors).)

owed a duty to Plaintiffs to maintain the secrecy of those ideas—Mische as to the mesh tabs, mesh tabs with absorbable sutures, and instrument list, and Nichols and HMT as to the internal pockets, mesh tabs, and mesh tabs with absorbable sutures.

Defendants argue that the jury "could not reasonably infer that any of the Defendants knew or had reason to know" that the information Cornell shared was in violation of the NDA from the evidence Plaintiffs cited. (Reply at 5.) But "[b]ecause direct evidence of misappropriation and misuse is not always available, plaintiffs can rely on circumstantial evidence to prove their case. [citation]. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Wisk Aero LLC v. Archer Aviation Inc.*, at *14 (N.D. Cal. June 9, 2023) (internal quotations and citation omitted). As for "disclosure or use" of the trade secrets, there was evidence that Defendants Mische and Nichols used the trade secrets in designing and developing Augmenta and by filing patents that incorporated the trade secrets.[11]

Second, there was evidence to support a reasonable inference that Finger had reason to know aspects of the Augmenta were derived from a person who owed a duty to Plaintiffs to maintain trade secrets.[12] Finger was aware Cornell attended the Penuma training and that Cornell built off what he learned at the training to develop the Augmenta. Evidence also showed that Finger was involved in the development of the implant with HMT. The Offering Memorandum, in which Finger was involved as CFO, showed that Augmenta Investors LLC was aware of the risk of litigation over the trade secrets at issue. A reasonable jury could conclude that (1) Finger was so involved in Augmenta that he would have been familiar with its

---

[11] (*See* Trial Tr. at 1088:1-10 (HMT hired to help develop Augmenta implant); Exs. 20, 29, 78, 119.)

[12] (*See* Trial Tr. at 1048:7-1049:1, 1097:6-15, 1044:22-1045:8; Exs. 206, 261, 324.)

product specifications, including the trade secrets, and (2) Finger knew Cornell observed the Penuma procedure under an NDA and anticipated Elist might sue for trade secret misappropriation, yet proceeded with developing Augmenta with Cornell anyway.[13]

Third, there was evidence to support a reasonable inference that Wang had reason to know aspects of the Augmenta were derived from a person (Cornell) who owed a duty to maintain the secrecy of those ideas. The evidence established that Wang "was a member of IMD's advisory board" and had himself signed an NDA with Plaintiffs.[14] Wang also assisted Cornell in performing two cadaver surgeries testing prototypes of Augmenta that incorporated the trade secrets.[15] Based on this evidence, a reasonable jury could conclude that, having signed an IMD NDA himself, Wang had reason to know during the cadaver surgeries that Cornell was utilizing the same trade secrets in the Augmenta that belonged to IMD.

Accordingly, judgment as a matter of law is not warranted on the basis that there was no evidence of each Defendant's misappropriation. As for a new trial, Defendants have not shown that the clear weight of the evidence is contrary to the jury verdict. (*See* Dkt. No. 649.)

*3. Harm*

Defendants contend that "IMD introduced no evidence" showing that the misappropriation "harmed Plaintiffs or caused Defendants to be unjustly enriched." (Mot. at 21.) Defendants cite to nothing in support of this argument. Jonathan Elist

---

[13] Defendants' argument that Finger could not have acquired the trade secrets because the technical information would be "incomprehensible" to him is unavailing. "Liability under CUTSA is not dependent on the defendant's 'comprehension' of the trade secret"—rather, it requires only "knowledge" of the secret. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 229 (2010), *as modified on denial of reh'g* (May 27, 2010), *disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 210, 229 (2011).

[14] (*See* Trial Tr. at 885:10-888:4; Ex. 339.)

[15] (*See* Trial Tr. at 883:1-884:12, 924:1-6, 925:14-926:4.)

testified that Cornell's breach of the NDA "put our confidential concepts out into the world" such that "they're not protected anymore" and "the value is just destroyed," and that in addition, the concepts are "now in a patent precluding us from using our own ideas." (Trial Tr. at 1792:18-24.) Elist also testified that because of Defendants' "use, unauthorized misappropriation of the plaintiffs' trade secret concepts, and the instrument list," Plaintiffs have been "extremely harmed" because they "lost something that was in development based on [Dr. Elist's] experience" and that "there is no ability to commercialize it at this point and have any modicum of protection around it." (Trial Tr. at 1793:5-14.) Elist elaborated that the trade secrets, use of the Penuma mark "to syphon off patients," use of Plaintiffs' "copyright image to get a patent," "complete disregard" for the NDA, and the "idea of pretending to be one of our customers," particularly "just as we were starting to get going as a company," were instances of harm to Plaintiffs. (*Id.* at 1793:14-22.) Thus, judgment as a matter of law on the basis that there was no evidence of harm is not warranted. Nor is a new trial warranted, as Defendants have not shown that the clear weight of the evidence is contrary to the jury verdict.

* * *

Accordingly, the Court denies the Motion as to the misappropriation claims.

**B. Trademark Infringement**

Defendants argue that Cornell and his medical practice (the "Cornell Defendants") are entitled to judgment as a matter of law or a new trial on the trademark infringement claim because Plaintiffs "offered no evidence of damages caused by" the Cornell Defendants' "use of the Penuma mark or evidence of profits attributable to their use of the Penuma mark." (Mot. at 22.) That no damages stemmed from the infringement does not mean that no harm was suffered. Jonathan Elist's testimony at trial indicated that Plaintiffs suffered harm.[16] On this basis, the

[16] (*See* Trial Tr. at 1792:6-17 (in response to the question of how IMD has been harmed by the Cornell Defendants' unauthorized use of the Penuma mark, Jonathan

Court entered a permanent injunction with respect to the Penuma trademark. (Dkt. No. 700 at 3.)

Defendants also argue that Menova did not introduce sufficient evidence as to likelihood of customer confusion, a factor in the *Sleekcraft* test for trademark infringement. (Mot. at 22–24.) The trial record reflects there was actual confusion due to the trademark.[17] As for Defendants' request for a new trial, Defendants cite to no evidence indicating the jury's finding was clearly wrong. Accordingly, the Court denies the Motion as to the trademark infringement claim.

**C. Counterfeit Mark**

Defendants contend that the Cornell Defendants are entitled to judgment as a matter of law or a new trial on the counterfeit claim because Menova failed to "establish evidence" that the mark used was a counterfeit mark, that the Cornell Defendants knew the mark used was counterfeit, or that the use of the mark was likely to confuse or deceive. (Mot. at 25–26.) Defendants also argue that Plaintiffs fail to show use of the mark "in connection with the sale, offering for sale, or distribution of goods." (Reply at 10.)

Evidence in the record demonstrated that the mark was counterfeit and Cornell knew the mark was counterfeit (Cornell was not authorized to provide Penuma, which he knew, and he used the mark "in anticipation of being credentialed to provide" the implant), and that the use was likely to confuse (patients contacted Plaintiffs and were under the impression Penuma was offered at Cornell's clinic).[18]

---

Elist testified that "[i]t caused a lot of confusion in the marketplace" at a time "when [Plaintiffs were] just starting to establish [themselves]" and "represented lost opportunities with patients.").)

[17] (*See* Trial Tr. at 1792:6-17; Ex. 94A (document logging inquiries received regarding Cornell offering the Penuma procedure and implant).)

[18] (*See* Trial Tr. at 1192:13-1195:16 (testimony by Cornell indicating the website for Robert J. Cornell, M.D., PA displayed the Penuma mark, confirming that Cornell didn't provide the Penuma surgery at the time the website displayed the mark, and confirming Cornell was not authorized to provide Penuma and that the

Contrary to Defendants' contentions, the evidence indicated that Cornell and his medical practice did "offer for sale" the Penuma implant (even if no actual sale or distribution occurred), as Penuma was advertised on the website. Defendants' alternative request for a new trial is unsupported by any evidence that clearly weighs against the jury verdict on this claim. Accordingly, the Court denies the Motion as to the counterfeit mark claim.

**D. Breach of Contract**

Defendants argue that Cornell is entitled to judgment as a matter of law or a new trial on the breach of contract claim because "[e]vidence at trial confirmed that some or all of the trade secrets alleged by Plaintiffs were publicly available, already known by Dr. Cornell, or otherwise generally known," and that therefore the information was not confidential "under the definition in the NDA." (Mot. at 26.)

As explained above, there was evidence in the record that Defendants misappropriated the four trade secrets, which necessarily also showed that the trade secrets were not generally known. The same evidence indicated that Cornell breached the NDA. Judgment as a matter of law on this claim is not warranted. The evidence similarly supports the jury verdict and a new trial is not warranted. Accordingly, the Court denies the Motion as to the breach of contract claim.

**E. Patent Invalidation**

Defendants contend that Plaintiffs failed to prove the elements of their patent invalidity claims "by clear and convincing evidence" because there was no evidence the trade secrets "constituted the 'significant inventive' aspects of" the Augmenta

---

advertisement "was in anticipation of being credentialed to provide this product"); Ex. 24 (image of the website for Robert J. Cornell, M.D., PA advertising Cornell as a "Penuma Penile Enhancement Specialist"); Ex. 25 (June 25, 2018 cease-and-desist email from Jonathan Elist to Cornell); Ex. 511 (August 4-6, 2024 email correspondence between Jonathan Elist and Cornell regarding Elist "receiving some confusing inquiries from potential patients about Penuma being offered at your clinic" and Cornell confirming he would "request that" his marketing team "completely remove" references to Penuma).)

patents. (Reply at 11.) Defendants contend that the significant element in the '413 Patent was varying the pockets along the implant to achieve a gradient of elasticity, as described in Claim 1 of the patent. (*Id*. at 12 (citing to Ex. 29, the '413 Patent).) But evidence in the record indicates that the trade secrets at issue significantly contributed to other claims in the patents.[19] The "clear weight" of this evidence does not indicate that the jury verdict on patent invalidity was wrong. Accordingly, neither judgment as a matter of law nor a new trial are warranted on this basis. The Court denies the Motion as to the patent invalidity claims.

**F. New Trial Based on Claim Construction Question**

Defendants argue that because "[m]uch of the dispute in this case concerned the meaning of the Augmenta patent and various prior-art patents and the Court "never construed the claims," the Court "erroneously treat[ed] the meaning of the claims as a question of fact for the jury (and a subject for expert testimony). (*Id*.) Plaintiffs argue that Defendants waived any claim construction argument because they raised no such objections previously, and in fact "consistently took the position the jury must decide . . . who invented the claims of [the patents]." (Opp. at 25–26.)[20]

Defendants previously did not object to the lack of claim construction, and in fact took the position that these issues should be decided by the jury. They cannot

---

[19] (*See* Trial Tr. at 328:15-23, 334:16-335:4 (Dr. Elist testified that he conceived of the use of internal pockets to make Penuma softer and more flexible); 335:11-337:1 (Dr. Elist planned to incorporate mesh at or around the distal tip to secure the implant in place, which could be used in combination with absorbable sutures); 1789:21-1791:11 (Defendants used the design concept trade secrets Cornell obtained during the Penuma training to obtain the '413 Patent and the '639 Patent); Exs. 29, 78 (Claims 1-10 of the '413 Patent and claims 1, and 13-17 of the '639 Patent based on Plaintiffs' internal pockets concept); Ex. 29 (Claims 11-15 of the '413 Patent based on Plaintiffs' design concepts for mesh tabs and absorbable sutures).)

[20] Plaintiffs also note that "Defendants argued in a bench brief that 'the question of inventorship must be submitted to the jury under the Seventh Amendment.'" (*Id*.)

now argue the opposite. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). In any case, "the determination of secrecy under the UTSA is not the same as the PTO's decision whether an invention is obvious in view of the prior art," and this question of whether patent applications or prior art made information generally known is a "fact-intensive question" for the jury. *SkinMedica, Inc. v. Histogen Inc.,* 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012). Accordingly, the Court denies the Motion for a new trial on this ground.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

DATED: March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

# TAB 6

Order Overruling Motion to Alter or Amend (Doc. 766, Appx16-28)

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

International Medical Devices, et al,

Plaintiffs,

v.

Robert Cornell, MD, an individual, et al,

Defendants.

Case No.: 2:20-cv-03503-CBM (RAOx)

**ORDER RE: DEFENDANTS' MOTION FOR AMENDED OR ADDITIONAL FINDINGS, AND TO ALTER OR AMEND**

The matter before the Court is Motion for Amended or Additional Findings, and to Alter or Amend, under Federal Rules of Civil Procedure 52(a) and 59(e). (Dkt. No. 715 ("Motion").)

## I. BACKGROUND

This is a trade secrets case filed by Plaintiffs International Medical Devices, Inc., Menova International, Inc., and James Elist, MD against multiple Defendants.[1] (Dkt. No. 578.) The parties are familiar with the factual and procedural background of the case; therefore, the Court does not repeat the relevant facts herein. On June 13, 2024, Defendants filed the instant Motion, and on June 24, 2024, Defendants filed an amended version of the Motion. (Dkt. Nos. 712, 715.)

## II. STATEMENT OF THE LAW

Federal Rule of Civil Procedure 52(a) states that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

Federal Rule of Civil Procedure 59(e) states that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." "To alter or amend the judgment requires a substantive change of mind by the court." *Id.* (internal quotations, ellipses, and brackets omitted). *United States ex rel. Hoggett v. Univ. of Phoenix*, 863 F.3d 1105, 1108 (9th Cir. 2017) (internal quotations and brackets omitted). Thus, "amending a judgment after its entry remains an extraordinary remedy which should be used sparingly." *Allstate Ins. Co.*

---

[1] Defendants are Robert Cornell, MD; Augmenta, LLC; Robert J. Cornell M.D., P.A.; Jonathan Clavell Hernandez, MD; Clavell Urology, PLLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Richard B. Finger; and Lata Lignum LLC. (Dkt. No. 578 at 4.)

*v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Id*. "A court considering a Rule 59(e) motion is not limited merely to these four situations, however." *Id*. "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *Id*.

## III. DISCUSSION

### A. Failure to Comply with Rule 52(a)

Defendants argue that the Court "failed to provide the necessary findings of fact to support" the compensatory and exemplary damages and permanent injunction it ordered. (Mot. at 6.)

In the Court's Order re Plaintiffs' Post-Trial Motion for Award, the Court included a section titled "The Court's Findings re Reasonably Royalty" which set forth the facts upon which the Court found a reasonably royalty of $5,772,044. (Dkt. No. 698 at 12–13 (citing Trial Ex. 6-020; Trial Tr. 1190:21-1191:8; Trial Exs. 29, 78).) Based on these facts, the Court found that "the nature and extent of Defendants' use of IMD's trade secrets weighs in favor of a reasonable royalty higher than that proposed by Dr. Hatch [Defendants' expert witness]," and adopted Mr. Arst's approach to finding reasonable royalties instead. (*Id*.) The Court also explained its reasoning in calculating the royalty award using Mr. Arst's calculations. (*Id*. at 13.) Finally, the Court found "the conduct in which the Defendants engaged amounted to a willful and malicious misappropriation," which was the basis for the Court's award of exemplary damages. *See* Cal. Civ. Code § 3426.3(c).

Thus, the Court properly analyzed and made factual findings regarding the nature of the misconduct and the amount of compensatory damages. The Court did not make any findings as to Defendants' financial condition, but, as Plaintiffs explain, this "was not considered by the Court because the Parties stipulated at the October 25, 2023 post-trial hearing that neither side would offer evidence of Defendants' net worth, and that Defendants would not challenge an exemplary damages award for such lack of evidence." (Opp. at 24.) The transcript of the October 25, 2023 evidentiary hearing confirms this:

> The parties agree that neither side will offer or be required to offer any evidence of net worth for Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetic Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC. Defendants agree that, should the Court make an award of any exemplary damages against Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetic Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC, defendants will not challenge such finding on the basis that plaintiffs did not adduce any evidence of net worth for Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetics Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC. Defendants further agree not to challenge on appeal any such exemplary damages award on the basis that there is no evidence of net worth.

(Dkt. No. 733-3 ("Evid. Hearing Tr.") at 247:14-248:8.)

The Court's Order re Plaintiffs' Post-Trial Motion for Award sufficiently details how the Court calculated the award such that an appellate court can "adequately resolve objections raised regarding validity of an award." *Simeonoff v. Hiner*, 249 F.3d 883, 891–92 (9th Cir. 2001) (rejecting appellant's Rule 52(a) challenge because his arguments "are merely observations that the district court's award for past and future economic damages are lump sum awards" and "[l]ump sum damage awards are not per se insufficient under Rule 52(a)"). Accordingly, the Court's ruling complied with Rule 52(a).

**B. Compensatory Damages**

Defendants contend that the Court "offered an inadequate reasoning for" adopting Plaintiffs' expert Mr. Arst's model for calculating reasonable royalties over Defendants' expert Dr. Hatch's model. (Mot. at 9.) Defendants contend that the Court should "reconsider its findings regarding the award of compensatory damages" because '[t]here are several critical deficiencies in Mr. Arst's opinion." (*Id.*) Defendants essentially attempt to re-litigate issues regarding the validity of Arst's expert opinion that the Court has already ruled on multiple times.[2] These arguments are no more convincing on the third try.[3] The fact that there were no sales of the Augmenta product and the preliminary injunction in this case barred Defendants from profiting off Agumenta does not preclude an award of reasonable royalties.[4] *See Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of California, Inc.*, 2015 WL 3825318, at *5 (C.D. Cal. June 18, 2015) ("section 3426.3(b) permits a royalty award even where a defendant was not found as a matter of fact to have profited

---

[2] (*See* Dkt. Nos. 539 (finding Arst's reliance on statements by Dr. Elist and Mr. Elist sufficient, his apportionment of value attributable to the trade secrets proper, and his reliance on the October 2018 projection sufficient); 698 (noting Dr. Hatch's criticisms of Arst's model and finding that the "nature and extent of Defendants' use of IMD's trade secrets weighs in favor" of adopting Arst's model rather than Hatch's).)

[3] Defendants' cites to *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) and *LinkCo, Inc. v. Fujitsu Ltd*, 232 F. Supp. 2d 182, 188–89 (S.D.N.Y. 2002) were already addressed by the Court in an earlier order (Dkt. No. 539 at 2) and are inapposite. Defendants' cite to *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 882 (Fed. Cir. 1995) does not support its position that IMD can only seek damages for "past sales" and not "future sales"—the *Carborundum* court noted that because Metaullics "did not attempt to obtain damages for *future* repair parts sales" because of an injunction, Metaullics "was not fully compensated for the infringement because the damages award did not include future lost sales of repair parts for which Metaullics had established entitlement."

[4] *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, does not state what Defendants contend it states—nothing in the case holds that use of projected sales in determining royalties is improper. 289 U.S. 689, 697 (1933).

from his misappropriation," "allowing misappropriators to gamble with other people's trade secrets would undermine 'important standards of commercial ethics,'" and "even if a defendant does not profit from a misappropriated trade secret, he may nonetheless achieve non-pecuniary benefits from the secret") (discussing *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295 (2010)).

Defendants provide no evidence that there has been a "manifest error of law or fact upon which the judgment rests," "newly discovered or previously unavailable evidence," a "manifest injustice," or an "intervening change in controlling law" that would warrant a "substantive change of mind by the Court" on the compensatory damages awarded. *Allstate*, 634 F.3d at 1111. Accordingly, amendment of findings on this basis is unwarranted.

**C. Exemplary Damages**

Defendants contend that the Court erred in awarding exemplary damages for trade secret misappropriation because (1) Plaintiffs "waived any right to recover exemplary damages by omitting it from the Final Pretrial Order"; (2) whether misappropriation was "willful and malicious" is an issue for the jury, not the Court; (3) exemplary damages requires a finding that a "particular defendant" engaged in willful and malicious appropriation; (4) a finding of willful misappropriation only permits the Court to exercise discretion in awarding damages and does not "automatically lead[]" to exemplary damages; and (5) joint and several liability is inappropriate. (Mot. a 12–18.) Each of these arguments is addressed in turn below.

*1. Waiver of Right to Exemplary Damages*

Defendants contend that Plaintiffs waived their right to recover exemplary damages because they omitted it from the Final Pretrial Order, and that because the Final Pretrial Order "supersedes the pleadings and governs the course of the trial of this cause," Plaintiffs forfeited any claim for exemplary damages. (Mot. at 12 (brackets omitted).) This argument is not credible given the parties' stipulation during the evidentiary hearing, in which Defendants made no mention that they

believed exemplary damages were waived altogether by way of the Final Pretrial Conference Order and in fact acknowledged that the Court may make an award of exemplary damages against Defendants.[5] (*See* Evid. Hearing Tr. at 247:11-248:8 ("Defendants agree that, should the Court make an award of any exemplary damages against [Defendants] . . .").) Therefore, this is not a basis for amending the Court's findings on exemplary damages.

2. *Willful and Malicious Determination*

Defendants contend that Plaintiffs also forfeited exemplary damages "by failing to secure (or even request) a jury finding that any misappropriation was willful and malicious" because this question is "a triable issue by a jury in federal court." (Mot. at 13.) Defendants contend that under federal patent law (section 284), there is a right to a jury trial on the question of willfulness—therefore, there is also a right to jury trial on the question of willful and malicious misappropriation under the CUTSA, and the Court "violate[d] Defendants' rights to a jury trial under the Seventh Amendment" by deciding the issue itself. (*Id.*) Defendants contend that Ninth Circuit precedent is not controlling because "[t]his case will be decided on appeal by the Federal Circuit," which holds that the willfulness question "must

---

[5] The cases cited by Defendants are inapposite, and none held that exemplary damages are forfeited when not included in the final pretrial conference order. *See Rockwell Int'l*, 549 U.S. at 474 (discussing final pretrial order precluding claims); *S. California Retail Clerks Union & Food Emps. Joint Pension Tr. Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984) (finding defendant failed to preserve "the issue of whether Warren was acting as an agent of the plaintiff Trust Funds"); *Eagle v. American Telephone and Telegraph Co.*, 769 F.2d 541, 548 (9th Cir. 1985) (finding pretrial conference order precluded plaintiff from raising a new *theory* of damages); *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1317 (Fed. Cir. 2005) (finding defendant waived affirmative defenses that were not included in the final pretrial order); *Arriaga v. Logix Fed. Credit Union*, 2022 WL 3098495 (C.D. Cal. Apr. 22, 2022) (same); *Asfall v. Los Angeles Unified Sch. Dist.*, 2020 WL 2951920 (C.D. Cal. Feb. 11, 2020) (finding it would prejudice defendant to allow plaintiff to obtain injunctive relief when defendant "was not on notice that the adequacy of its Title IX training program would be at issue").

be decided by the jury." (*Id*. at 8.)

Defendants' argument is belied by the parties' stipulation prior to trial that the Court, not the jury, would consider harm and appropriate damages for trade secret liability (*see* Dkt. No. 599), and the parties' stipulation at the October 25, 2023 evidentiary hearing that acknowledged that the Court may award exemplary damages. If Defendants wished for the jury to determine whether conduct was willful and malicious, they could have raised the issue before the Court excused the jury. They did not—consequently, the issue was not preserved for the jury.

In any case, Ninth Circuit law appears to allow district courts to determine whether misappropriation was willful and malicious. The CUTSA states that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b)." Cal. Civ. Code § 3426.3(c). CACI 4411 commentary states that "[n]o reported California state court case has addressed whether the jury or the court should decide whether any misappropriation was "willful and malicious." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*. involved the Montana Unfair Trade Practices Act, not the CUTSA—but the MUTSA contains the same comment in the CUTSA Defendants rely on to argue that the Court should find "willful and malicious misappropriation" is a question for the jury. 259 F.3d 1101, 1112 (9th Cir. 2001) (noting MUTSA's official commentary states the exemplary damages provision "follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury"). Despite this commentary, the Ninth Circuit still "reverse[d] the district court's refusal to consider plaintiff's motion for exemplary damages and attorney's fees" and remanded to "allow the district court to make an independent judgment about whether [the] misappropriation was 'willful and malicious.'" *Id*.

Defendants' argument that this issue is governed by Federal Circuit law is incorrect. "The Federal Circuit applies its own law with respect to issues of

substantive patent law and certain procedural issues pertaining to patent law, but applies the law of our sister circuits to non-patent issues." *Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255 (Fed. Cir. 2008). In *Uroplasty, Inc. v. Advanced Uroscience, Inc.*, 239 F.3d 1277 (Fed. Cir. 2001), the Federal Circuit held that the plaintiff's "state law trade-secrets claim" was "not governed by federal patent law" because although the relevant "patent may be evidence in support of Uroplasty's allegations, [] the mere presence of the patent does not create a substantial issue of patent law." *Id.* at 1280; *see also Intellisoft, Ltd. v. Acer Am. Corp.*, 955 F.3d 927, 933 (Fed. Cir. 2020) ("We have made clear that a plaintiff's reliance on a patent as evidence to support its state law claims does not necessarily require resolution of a substantial patent question"). Thus, Ninth Circuit law applies here.[6]

Therefore, amendment of the findings on this basis is unwarranted.

*3. Willfulness of Each Defendant*

Defendants contend that the "CUTSA allows for exemplary damages only against a particular defendant that engaged in willful and malicious appropriation," and that Plaintiffs needed but failed to "present evidence of . . . willful and malicious appropriation for each defendant separately for each trade secret." (Mot. at 15.) But nothing in the CUTSA statutory provision states that there must be a finding of willful and malicious misappropriation as to each Defendant separately before imposing exemplary damages. *See* Cal. Civ. Code § 3426.3(c). The only case Defendants cite in support is an out-of-circuit case where the district court found that certain defendants' conduct did not "evince willfulness or malice" because "their motives were purely competitive, in the interest of acquiring a valuable new customer." *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 494 (M.D. Pa. 2018).

---

[6] Defendants' cases from the Federal Circuit involved federal patent claims, not state trade secrets claims.

Under CACI 4411, "willful" conduct is where the defendant "acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith." "Malicious" conduct is where a defendant "acted with an intent to cause injury, or that [defendant's] conduct was despicable and was done with a willful and knowing disregard for the rights of others." CACI 4411; *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016) ("[t]he sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant or . . . characteristic of a pirate."). Malice may be proven either expressly by direct evidence probative of the existence of ill-will, or by implication from indirect evidence. *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 923 n.6 (1978); *Ajaxo Inc. v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 66–67 (2005).

The Court's Order Granting the Motion for Award cites to evidence supporting its finding of willful and malicious misappropriation as to each Defendant. (*See* Dkt. No. 698 at 13–14 (citing Trial Tr. 1254:1-25, 1061:20-1065:2; Trial Exs. 6, 14, 17, 206).) The direct and indirect evidence cited by Plaintiffs also support a finding of willfulness.[7] Based on this record, all Defendants (1) knew that

---

[7] (*See* Trial Tr. at 354:11-357:9, 1088:19-1097:9, 1605:24-1610:12, 1773:16-1779:25, Exs. 123, 308 (testimony and exhibits re Cornell's attendance at Penuma training session, taking notes "to document his theft" of trade secrets, and signing an NDA); 1254:1-25 (testimony regarding Cornell's correspondence with Mische); 1090:18-1091:20, 1100:2-25, Ex. 123 (testimony and exhibits regarding HMT's involvement with Augmenta); 1192:13-1195:16; Exs. 24, 25, 511, 531 (testimony and exhibits regarding Cornell's personal medical practice advertising and using Penuma trademark and maintaining a patient waiting list based on inquiries received from advertising); 1060:18-20, 1040:24-1042:7, 1043:19-22, 1048:21-1049:1, Exs. 206, 324 (testimony and exhibits related to Finger's involvement in Augmenta Investors and that Finger knew Cornell's Penuma training was covered by an NDA); Ex. 280 (email from Finger to Wang noting that Wang provided "invaluable design input" to Augmenta); Ex. 258 (flow chart of Augmenta Investors LLC organization).)

Cornell learned certain information during the Penuma training, and (2) aimed to introduce a competing product into the market. The evidence also indirectly suggests that all Defendants knew the Penuma training was part of how Cornell developed the technology for Augmenta. Therefore, the Court's finding of willful and malicious misappropriation was supported by evidence, and amendment of the findings on this ground is unwarranted.

*4. Discretion in Awarding Damages*

Defendants contend that the Court "erroneously impl[ied] that willful and malicious misappropriation automatically leads to exemplary damages of twice the compensatory damages." (Mot. at 16.) Defendants' argument is unpersuasive for the reasons addressed above. The Court's Order addressed the nature and extent of the misconduct and the amount of compensatory damages. The third factor was not addressed because the parties stipulated that they would not submit evidence related to Defendants' net worth. Further, nothing in the Order indicates that the Court "automatically" applied exemplary damages after finding willful and malicious misappropriation. Therefore, amendment of the findings on this ground is unwarranted.

*5. Joint and Several Liability*

Finally, Defendants argue that joint and several liability for exemplary damages is inappropriate and "has no basis in CUTSA," and that exemplary damages "must be tailored to the specific situation of each individual actor." (Mot. at 18.) Nothing in the text of the CUTSA provision supports this position, and the statute does not prohibit the Court from imposing joint and several liability. Defendants' cited cases do not involve the CUTSA or trade secret misappropriation, but rather stand for the general proposition that punitive damages must be tied to the egregiousness of a defendant's conduct.[8] In contrast, *Brocade Communications*

[8] *See Magallanes v. Superior Ct.*, 167 Cal. App. 3d 878, 888 (Ct. App. 1985) (noting the "measure of that malice or oppression requires the determination of the state of

*Systems., Inc. V. A10 Networks, Inc.* addressed whether joint and several liability is appropriate in the context of CUTSA and concluded that it is. 873 F. Supp. 2d 1192 (N.D. Cal. 2012) *on reconsideration in part*, 2012 WL 12925716 (N.D. Cal. July 8, 2012). Like here, the individual defendants in *Brocade* argued that "Brocade had not established damages as against each of them to support a claim of trade secret misappropriation." 873 F. Supp. 2d at 1217. The district court concluded that "the rule allowing joint and several liability in trade secret misappropriation cases likely survived the adoption of CUTSA." *Id.* at 1218 (noting that "[c]ommentators on trade secret law also suggest that, in general, liability for misappropriation claims is joint and several"). Defendants do not cite any authority holding that liability for exemplary damages should be treated differently than compensatory damages. Therefore, amendment of the findings on this basis is unwarranted.

**D. Permanent Injunction**

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). California Civil Code section 3426.2(a) states that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from

---

mind of the particular defendant while committing the alleged wrongful act"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (holding a $2 million punitive damages award was "grossly excessive" when considering "the degree of reprehensibility of the nondisclosure," that $2 million was "500 times the amount of [] actual harm as determined by the jury," and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (reversing judgment of Utah Supreme Court where "most relevant civil sanction under Utah state law for the wrong done" was a $10,000 fine, "an amount dwarfed by the $145 million punitive damages award").

the misappropriation." Therefore, the Court had discretion to enter an injunction in order to eliminate the commercial advantage Defendants would otherwise derive from their misappropriation. The Court's Order Granting Permanent Injunction stated that the five-year limit is "the period of time during which IMD could have prohibited Dr. Cornell from using the trade secrets based on the duration of the [NDA] . . . signed on March 30, 2018." (Dkt. No. 699 at 6.) This is actually shorter than "it would have taken [the defendant], either by reverse engineering or by independent development, to develop [the product] legitimately without use of [plaintiff's] trade secrets." *Lamb-Weston*, 941 F.2d at 974. The NDA would only have prevented Defendants from using the trade secrets to develop Augmenta for five years; instead, Cornell began developing the product only weeks after the Penuma training. Therefore, the record reflects that the head start Defendants obtained was about five years.

Defendants raise the same arguments they raised in Defendants' Motion to Dissolve Paragraphs 1a-1b of Preliminary Injunction. (*See* Dkt. No. 666.) The Court already considered and found these arguments unpersuasive. (*See* Dkt. No. 699 (granting permanent injunction and denying Defendants' Motion to Dissolve).) Defendants provide no new arguments that warrant a different conclusion. Therefore, the Court finds that amendment of the permanent injunction is unwarranted.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

DATED: March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

# TAB 7

Patent No.: US 10,413,413 B1 (J.Ex. 29, Appx15892-15912)

US010413413B1

(12) **United States Patent**
**Cornell et al.**

(10) **Patent No.: US 10,413,413 B1**
(45) **Date of Patent: Sep. 17, 2019**

(54) **PENILE IMPLANTS THAT FACILITATE TISSUE EXPANSION**

(71) Applicant: **Augmenta, LLC**, Houston, TX (US)

(72) Inventors: **Robert J. Cornell**, Houston, TX (US); **Hans A. Mische**, Grey Eagel, MN (US); **David A. Nichols**, Bullard, TX (US)

(73) Assignee: **Augmenta, LLC**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/238,792**

(22) Filed: **Jan. 3, 2019**

**Related U.S. Application Data**

(60) Provisional application No. 62/702,062, filed on Jul. 23, 2018, provisional application No. 62/779,825, filed on Dec. 14, 2018.

(51) **Int. Cl.**
***A61F 5/00*** (2006.01)
***A61F 2/26*** (2006.01)

(52) **U.S. Cl.**
CPC ........ ***A61F 2/26*** (2013.01); *A61F 2220/0008* (2013.01); *A61F 2250/0025* (2013.01); *A61F 2250/0053* (2013.01); *A61F 2250/0078* (2013.01)

(58) **Field of Classification Search**
CPC ............................ A61F 2/26; A61F 2005/411
USPC ...................................................... 600/38–41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,383,944 A 7/1921 Hart
2,899,957 A 11/1957 Briggs
3,893,456 A 7/1975 Small et al.
3,987,789 A 10/1976 Timm et al.
4,204,530 A 5/1980 Finney
4,483,331 A 11/1984 Trick
4,523,584 A 6/1985 Yachia et al.
4,589,405 A 5/1986 Hemmeter
4,602,625 A 7/1986 Yachia et al.
4,669,456 A 6/1987 Masters
5,088,477 A * 2/1992 Subrini .................... A61F 2/26 600/40
5,445,594 A 8/1995 Elist
5,512,033 A 4/1996 Westrum, Jr. et al.
D376,011 S 11/1996 Nunokawa
5,669,870 A 9/1997 Elist
6,015,380 A * 1/2000 Subrini .................... A61F 2/26 600/38
6,537,204 B1 * 3/2003 Elist ......................... A61F 2/26 600/40
7,806,821 B2 * 10/2010 Kim ......................... A61F 2/26 600/38
8,986,193 B1 * 3/2015 Elist ......................... A61F 2/26 600/38

(Continued)

FOREIGN PATENT DOCUMENTS

WO 1986001398 A1 3/1986

*Primary Examiner* — John P Lacyk

(74) *Attorney, Agent, or Firm* — Gregory L. Porter; Hunton Andrews Kurth LLP

(57) **ABSTRACT**

The invention pertains to penile implants that facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants may be made of different materials or made in different configurations such that such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant.

**16 Claims, 13 Drawing Sheets**




U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:20-cv-03503-CBM (RAOx)
International Medical Devices, Inc., et al.,
VS. Robert Cornell, MD, an individual; et al.,
JOINT EXHIBIT 29
DATE ______ IDEN.
DATE ______ EVID.
BY ______
Deputy Clerk

IMD-0

J029-001

(56) **References Cited**

U.S. PATENT DOCUMENTS

9,504,573 B1 11/2016 Elist

* cited by examiner




Fig.1

IMD-000553

J029-003




Fig. 2




SECTION A-A

Fig. 3




SECTION B-B

Fig. 4




Distal View
Fig. 5




Proximal View

Fig. 6




Fig. 7 Section C-C


14
Skin
Superficial dorsal vein
22
Deep dorsal vein
Dorsal artery and nerve
24
Superficial (Dartos) fascia of penis
Deep (Buck's) fascia of penis
20
Corpus cavernosum
10
Deep artery
Corpus spongiosum
15
18
Urethra

FIG. 8



Fig. 9A



Fig. 9B




**Figure 10** (Large – Extra Large – 2X Large)



**Figure 11** (Mesh Tab Locations)

IMD-000559

J029-009




| Sample Color | Red | White | Blue |
|---|---|---|---|
| Durometer | **0 Type A** | **7 Type A** | **20 Type A** |
| Elongation | 290 psi | 350 psi | 700% |
| Tensile | 1140% | 1000% | 750 psi |
| Tear | 55 ppi | 70 ppi | 125 ppi |

Figure 12

IMD-000560

J029-010




**Mesh Material Options**

| Mesh | Mfg | Pore Size (mm) | Weight ($g/m^2$) | Filament | Mechanical Properties |
|---|---|---|---|---|---|
| 3D Max | Bard | 0.8 | 80–100 | Monofilament | Tensile 24.7 N/cm |
| Prolite | Atrium | 0.8 | 80–100 | Monofilament | Tensile 38 N/cm |
| Premilene | B-Braun | 0.8 | 80–100 | Monofilament | Tensile 41.4 N/cm |

Figure 13




Figure 14A Penile Implant Placement location






Figure 14B Implantation




Figure 14C Implant Sizing

IMD-000564

J029-014

Figure 15



IMD-000565

J029-015

## PENILE IMPLANTS THAT FACILITATE TISSUE EXPANSION

### CROSS REFERENCE TO RELATED APPLICATIONS

The instant application claims priority to U.S. Ser. No. 62/702,062 filed Jul. 23, 2018 and U.S. Ser. No. 62/779,825 filed Dec. 14, 2018. The aforementioned applications are incorporated by reference for U.S. purposes.

### BACKGROUND AND SUMMARY OF INVENTION

Cosmetic implants such as breast implants and penile implants are growing in popularity. Similarly, prosthetic and other medical devices are increasingly employed to treat or ameliorate conditions. For both implants and other medical devices it is often desired that they conform to existing tissue and/or mimic normal anatomical movement such that they resemble the natural human or animal body part or even have an enhanced appearance relative to the natural human or animal body part. Unfortunately, implants and devices made using conventional technology often results in an implant or device which does not facilitate tissue expansion, inhibits normal anatomical movement, and/or does not resemble a natural body party. Thus, what is needed is an implant that accomplishes one or more of the aforementioned desirable characteristics.

Advantageously, the instant invention implants and medical devices overcome the problems described above. The implants typically comprise one or more biocompatible materials. Advantageously, in some embodiments the one or more materials may be selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants also may advantageously resemble a natural body party or even have an enhanced appearance relative to a natural body part. Thus, the concepts of the instant invention are applicable to, for example, breast implants, penile implants, testicular implants as well as, incontinence devices such as male or female urethal continence plugs.

The above-described concepts may be particularly useful with respect to cosmetic penile implants because currently available cosmetic penile enhancement devices suffer from a number of limitations and deficiencies. Some comprise a rigid, inelastic silicone block that increases the risk of external erosion, patient discomfort, and an unnatural flaccid penile look and feel. Infection rates are also arguably higher with currently available cosmetic penile implants because none are antibiotic-coated or antimicrobial-resistant. Additionally, the current cosmetic penile implants are implanted using non-absorbable sutures near the dorsal neurovascular bundle distally, risking penile devascularization and denervation that can produce penile necrosis or reduced penile sensation. Further, the rigid silicone block and non-absorbable sutures prevent full penile elasticity during an erection that can reduce potency and cause discomfort during an erection.

Accordingly, in one specific embodiment the instant invention pertains to a penile implant. The penile implant generally comprises a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis. The body comprises a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. Advantageously, the penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion.

The improved cosmetic penile implant of the present invention greatly reduces these untoward complications and provides the patient with a safer, more comfortable, and more natural cosmetic penile enhancement while safeguarding natural penile sexual function. Thus, the cosmetic penile implant implanted subcutaneously may be configured to replicate as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel.

These and other embodiments are described in detail below.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a perspective view of an embodiment of a penile implant.

FIG. **2** illustrates a side view of the implant shown in FIG. **1**.

FIG. **3** illustrates a section view of a proximal end of the implant shown in FIG. **2**.

FIG. **4** illustrates a section view of a distal end of the implant shown in FIG. **2**.

FIG. **5** illustrates a distal end view of the implant shown in FIG. **1**.

FIG. **6** illustrates a proximal end view of the implant shown in FIG. **1**.

FIG. **7** illustrates a section view of the implant shown in FIG. **5**.

FIG. **8** shows a section of the natural anatomy of a penis.

FIGS. **9**A and **9**B illustrates perspective views of each side of an embodiment of a penile implant.

FIG. **10** illustrates various representative dimensions of various size penile implants.

FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B.

FIG. **12** illustrates Shore Hardness scale and representative properties of various implants.

FIG. **13** shows representative mesh material options.

FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments.

FIG. **15** shows various configurations of the internal pockets of an implant core.

### DETAILED DESCRIPTION OF THE INVENTION

General Implant—Description of Implants Methods of Making, Materials, Configurations, Characteristics (Cosmetic and Physical), Specific Implant Types

As described above, the implants and devices of this invention may be suitable for animals or humans. The specific material or materials employed will vary depending upon the specific implant, application, desired characteristics, and the like. In many applications the material employed will be biocompatible, i.e., not particularly harmful to the tissue that is near or in communication with the device or implant whether it be human or animal tissue. The one or more materials are typically selected, configured, or both to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and/or substantially mimicking soft tissue characteristics of the natural body part. Of course, the selected one or more materials and the

specific configuration will vary depending upon the specific implant and desired tissue expansion and/or other results.

In one embodiment, to facilitate tissue expansion while not substantially inhibiting normal anatomical movement the implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. Of course, using the present invention a measured property may be different at three or four or any number of locations on the implant. That is, the implant could, for example, exhibit a gradient, i.e., an increase or decrease in the magnitude of a measured property (e.g. hardness (durometer) and other properties such as tensile strength; tear strength; compressive strength; and elongation which also may be referred to as extensibility or stretching or elasticity) that is observed in passing from one point or location on the implant to another. This can be accomplished in at least two general ways or a combination of these two.

First, the material employed may be different at the first, second, and/or other additional locations of the implant. That is, the material or materials employed may vary at the first, second, and/or other locations of the implant with respect to a property of interest for the implant. That is the material or materials of the implant may be different with respect to, for example, one or more, two one or more, three one or more, four one or more, or even five of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

Making an implant having different properties at different locations on the implant may be accomplished in any convenient manner, e.g., by using different material of different properties. Such manners will differ based on the implant, its properties, materials employed, and desired characteristics.

Suitable methods may include molding, e.g., injection molding, extrusion, rotomolding, transfer molding, compression molding, blow molding, 3D printing, and the like. In general, any suitable process may be employed so long as the desired material with the desired property can be placed at the desired locations on and/or within the implant. For example, if using injection molding one might use a mold in the shape of the desired implant. The mold may have multiple injection points, e.g., two or more, three or more, four or more, or up to as many as necessary or desired. In this manner different materials (or the same material with varying properties) may be injected through each injection port. If desired, there may be compartments within the mold but often compartments are unnecessary as factors such as the different injection points and timing of injection may control the ultimate placement of the various materials. In this manner, the implant can be designed or tailored to have different properties at different locations or places on or within the implant. Thus, the desired properties such as (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation can be tailored throughout the implant by selecting the one or more biocompatible materials such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant.

A second method of making an implant wherein a measured property at a first location on said implant is different than said same measured property at a second or even more locations involves configuring the material within the implant to achieve this. This second method can be used independent of the first method which uses varying materials or a material that varies in properties. Alternatively, the configuring described further below may be done in in conjunction with the use of varying materials or the use of a material that varies in properties.



In some embodiments of this second method, the one or more materials are configured to comprise one or more internal pockets within the implant. Such pockets are void spaces within the implant. The design and configuration of the pockets or void spaces will vary depending upon the type of implant and desired characteristics. For example, the implant geometry, size, depth, and/or location of the pockets can be configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elongation (elasticity or extensibility) of at least a portion of the implant, or (4) increase compressibility of at least a portion of the implant. As a specific example, the internal pockets may comprise pockets to modify the measured compression or elongation at different places on or within the implant, i.e., compression pockets, elongation pockets, or both. In a specific embodiment, the implant may be configured with internal pockets that, for example, permit elongation or stretching. For example, in some embodiments, the implant may be configured with internal pockets such that stretching of at least 10%, or at least 20%, or at least 40%, or at least 60%, or at least 80%, or at least 100%, or at least 150%, or at least 200% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. On the other hand, the implant may be configured with internal pockets such that stretching of up to at most 500%, or at most 450%, or at most 400%, or at most 350%, or at most 300%, or at most 250% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. By stretching is meant to refer to either elongation in one direction or compression in the other direction.

As stated above, the particular geometry of the internal pockets may vary widely depending upon the desired results. In particular embodiments, the implant may be designed such that the internal pockets of the implant may be in a honeycomb (e.g., polygonal such as hexagonal), a zig zag (WWWWW), or even an elliptical configuration. In this manner, the implant can be made such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant. For example, the implant's hardness at a particular location will usually depend at least in part upon the nature and volume of the pockets or voids beneath the location. That is, the greater the volume of voids beneath a particular implant location, the softer the implant may feel at that particular location. Thus, an implant may have a dense honeycomb at the distal end with a less dense honeycomb at the proximal end or a gradient or graduated honeycomb densities leading to different hardnesses and/or other properties over the length and/or various dimensions of the implant. Likewise, the geometry, size, depth, and/or location of the pockets beneath a particular location also affect and/or determine the other properties of the implant beneath that location, e.g., tensile strength; tear strength; compressive strength; and elongation (extensibility or elasticity). In this manner, the configuration of the pockets can be tailored or designed to change the properties at various locations on the implant. FIG. **15** shows various configurations of the internal pockets of an implant core.

The desired configuration of the implant's pockets, if any, may be accomplished in any convenient manner and such

manners may differ depending upon the type of implant, material(s) employed, desired properties, and other factors. One way of configuring an implant is through the use of injection molding wherein the mold cavity may include a removable structure in the geometry of the desired pockets so that when structure is removed pockets or voids exist within the molded implant. A commonly used injection molding method using a core, a cavity side A, and a cavity side B may be employed. Dual or multiple extrusion, 3-D printing and other methods may also be used to make the aforementioned implant structures.

The specific material or materials employed for the implants herein are not particularly limited so long as they are typically biocompatible and can be made to have one or more, or two or more, or three or more, or four or more, or all of the desired properties (e.g., hardness, tensile strength; tear strength; compressive strength; and/or elongation) in the desired ranges described herein for the implant. Thermosets, thermoplastics, elastomers, or combinations thereof may be employed. Useful thermoplastics may include nylon, polyethylene, polypropylene, and polystyrene while useful thermosets may include various epoxy resins and phenolic resins in any form while preferred thermosets may include various gel colloids. Silicone and polyurethane may be particularly useful materials for some types of implants. Particularly preferred materials include foams, either solid or semi-solid, closed cell foams such as those comprising urethane, silicone, or mixtures thereof.

Particularly preferred configurations for various implants include those that comprise a wall having a varying wall thickness over one or more dimensions of the implant. Another preferred configuration is one in which the amount of materials employed within the implant are changed over one or more dimensions in a gradient such as by a changing or changed honeycomb structure. By reducing the wall thickness or alternatively having more voids in perhaps a honeycomb structure over the length of the implant the hardness or other properties may be changed such the implant is similar to natural tissue and/or allows normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part. In another embodiment the implant comprises one or more biocompatible materials having both linear and radial compression capability. This may assist in tissue expansion and may also contribute to the implant being similar to natural tissue and/or allowing normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part.

The specific properties of the implant may vary depending upon the material(s) employed, their placement, and the configuration, e.g., geometry, size, depth, or location of pockets, if any. In one embodiment the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material has a durometer range of from about 0, or from about 10, or from about 20, or from about 30 up to at most about 70, or up to at most 60, or up to at most 50, or up to at most 40 durometer on the Shore A scale according to ASTM D2240-15.

Other useful properties of the implant that may be determined by the material or configured as desired may include elongation, tensile strength, tear strength, compressibility or extensibility. Specifically, useful implant embodiments may comprise wherein the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tensile strength of from at least about 200 psi, or at least about 300 psi, or at least about 350 psi up to at most about 1000 psi, or up to



at most about 800 psi, up to at most about 700 psi, or up to at most 600 psi according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has an elongation of from at least about 400%, or at least about 500%, or at least about 600%, or at least about 700%, or at least about 800%, up to about 1200%, or up to about 1100%, or up to about 1000% according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tear strength of at least about 40 pounds per inch (ppi), or at least about 50 pounds per inch (ppi), or at least about 60 pounds per inch (ppi), or at least about 70 pounds per inch (ppi), or at least about 80 pounds per inch (ppi), up to about 200 ppi, or up to about 130 ppi, or up to about 120 ppi, or up to about 110 ppi according to ASTM D624. The implants of the present invention may also comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a compressibility and/or extensibility factor of from at least 0, or at least 5, or at least 10, or at least 15, up to about 20, or up to about 25%. Compression can be tested by, for example, ASTM D395-03.

In other embodiments of the instant invention the implants may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has at least one, or at least two, or at least three, or at least four or more of the above-described properties.

The implants may comprise further materials depending upon the desired properties and application. For example, the implant may comprise hydrophilic or hydrophobic agents on the interior or exterior of the implant. In one specific embodiment the implants have a hydrophilic agent on the exterior such that the implant is at least partially resistant to bacteria, viruses, and the like in that they cannot adhere to the surface. Such hydrophilic agents are not particularly limited and depend upon the application. As such they may be selected from any compatible material and applied in suitable amounts to achieve the desired effect.

Other suitable additives to the interior and/or exterior of the implant comprise a material capable of releasing heat and/or a material capable of absorbing heat. In this manner the implant or portions of the implant may be made to be exothermic or endothermic based on exposure to one or more stimuli.

As described above, the instant inventions are widely applicable to any number of types of implants and/or prosthetic or other medical devices. Specific embodiments may be particularly applicable to penile implant, a testicular implant, a female incontinence implant, a breast implant, or similar implants and devices. More specifically, the instant inventions may be particularly applicable to those applications wherein tissue expansion is desired. Such applications include, but are not limited to, e.g., applications wherein desired tissue expansion includes being near a urinary meatus, a fossa navicularis, or a bladder neck when, for example, said implant is intended for or placed in a human. Particularly preferred applications may include, for example, those wherein the implant may be a penile implant, a male or female incontinence implant or plug, or a breast implant. Of course, the method of placing, attaching, inserting, and/or employing the implants of the instant invention will vary depending upon the specific type of implant and the person or animal's anatomy with which it will be employed. In most instances conventional and known sur-

gical techniques or concepts can be employed with a given implant. A specific embodiment pertaining to a cosmetic penile implant is described below.

Specific Penile Implant Embodiments

The following specific embodiments disclosed relate to cosmetic penile implants and method of implanting. However, it should be understood that the concepts, materials, properties, methods of making, and other description above apply equally to cosmetic penile implants. Similarly, the concepts, materials, properties, methods of making, and other description specific to the penile implant embodiment described below may also be applicable to many other types of implants and/or prostheses.

FIG. **8** illustrates a cross-section of the natural penile anatomy consisting of several distinguishable parts. The glans penis is commonly referred to as the head of the penis. The skin **16** is the outer layer of the penis. The corpus cavernosum **10** are two columns of spongy erectile tissue comprising the dorsum of the penis bilaterally which, when filled with blood, cause an erection. The corpus spongiosum **15** is a column of sponge-like tissue comprising the medial ventrum of the penis surrounding the urethra **18** from the bladder neck to the glans penis which also fills with blood during an erection, but does not contribute to the erection. The paired corpora cavernosa **10** and the corpus spongiosum **15** are enclosed within a tube of deep fascia **20** called Buck's fascia. Buck's fascia **20** also surrounds the deep dorsal vein **22**, and the paired dorsal arteries and dorsal nerves **24** of the penis.

The cosmetic penile implant may have a body having a longitudinal axis of a selected longitudinal length to be aligned with the long axis of the penis. The body may have any length and any diameter or width. In one embodiment, the body may have a cylindrical cross section. In other embodiments, the body may have an elliptical or oblong cross section. In yet other embodiments, the body may have a cross section of any shape. The body has an outer surface and an inner surface. The body may be formed as one integral part. A cross-section perpendicular to the longitudinal axis of the body may have a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. The ventral edges may be straight or scalloped edges. The body may be open at both its proximal end (nearest to the base of the penis), as well as the opposite distal end (nearest to the glans penis).

The body may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end to the beginning of a distal portion at which point the wall thickness tapers from the beginning of the distal portion to the body's distal end. A constant wall thickness extending along a longitudinal length of the body from the proximal end to the beginning of the distal portion is preferred over a tapered wall thickness because the constant wall thickness more closely matches the natural anatomy of the penis. The distal portion has a tapered wall thickness only for a short portion near the distal end of the body (nearest the glans penis). The body may have all edges and corners rounded, chamfered, or pillowed. The implant is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin and adjacent Buck's fascia. When implanted the device may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The body may be made of any type of polymer, elastomer, rubber, composite material, or any other spongy or flexible or compressive material that replicates as nearly as possible



the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel. The implant body material will be as flexible, compliant and compressible to most closely simulate normal penile tissue in a flaccid state while producing enhanced flaccid penile length and girth. In one embodiment, the body may be made of a silicone. In another embodiment, the body may be made of polyurethane. The softness of the material forming the body of the implant may have a Shore A softness of less than 25, or less than 20, or less than 15, or less than 12, or more preferably less than 10. A shore durometer measures hardness of a material, typically of polymers, elastomers, and rubbers. High numbers in its scale indicate a greater resistance to indentation, and thus harder materials. Lower number indicate softer, more compressible or more flexible materials. There are several scales of durometer, used for materials with different properties. The two most common scales, using slightly different measurement systems, are the ASTM D2240 type A and type. D scales. The A scale is for softer materials, while the D scale is for harder materials.

If desired, mesh tabs of from about 1 to about 2 cm in length may be placed through the length of the lateral margins spaced from about 0.75 cm to about 1.25 cm apart. The body may have one or more embedded tabs, e.g., mesh tabs, protruding from its proximal end, and one or more embedded mesh tabs protruding from its distal end. The mesh tabs may protrude beyond the proximal end and the distal end up to any distance. For example, the embedded mesh tabs may protrude bilaterally (on both sides) up to 0.5 cm beyond the distal end, or up to 1.0 cm beyond the distal end, or up to 1.5 cm beyond the distal end, or greater. The embedded mesh tabs may protrude bilaterally up 1.0 cm beyond the proximal end, or up to 1.5 cm beyond the proximal end, or up to 2.0 cm beyond the proximal end, or greater. The mesh tabs may be any shape and size, such as, for example, rectangular or square with right angles at edges, and are provided as a functional means for suturing the body at both distal and proximal ends to Buck's fascia and the fibrous tunical sheath of the corpus cavernosa, to support maintaining the body in place and prevent longitudinal and/or rotational migration. The mesh tabs are configured to receive tissue ingrowth and may be made of any material and mesh size that supports and promotes natural tissue ingrowth. For example, the mesh may be polyurethane mesh. Or the mesh may be another other type of material commonly used in reconstructive general, plastic, or urologic surgery as will be understood by one of ordinary skill in the art. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the corpus cavernosa tunic. Suturing will be understood by one of ordinary skill in the art. The mesh tabs may be formed integrally with the body, or embedded within the body, or attached to it, or attached between multiple layers of the body, or attached to the body by other methods of attachment. The mesh tabs are located at the proximal end and the tapered distal end as near the ventral margin as possible. Mesh tabs are not located within or attached to the body along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle, which would risk denervation or devascularization of the penis both during implantation or during any subsequent required explantation.

The body may have an antimicrobial surface coating that contains an antimicrobial agent that inhibits the ability of microorganisms to grow on the surface of the body. For example, an antibiotic or antibacterial may coat the surface or be embedded into the implant material and thereby potentially reduce the risk of bacterial infections of the

implant. In one embodiment, the body may be dipped into an antibiotic or antibacterial agent to coat the surfaces. In another embodiment, the body may be impregnated with an antibiotic or antibacterial agent when the body is formed. The antibiotic coating or impregnation of the body will be consistent with bioprosthesis standards as will be understood by one ordinarily skilled in the art. Any type of antibiotic or antibacterial agent may be used. For example, in certain embodiments, Rifampin and/or Minocycline may be used.

FIGS. **1-7** illustrate an embodiment of a penile implant **100**. FIG. **1** illustrates a perspective view of an embodiment of the penile implant **100**. FIGS. **2** and **7** illustrate side and cross section views of the penile implant **100**, respectively. The implant **100** has a cylindrical body **110** having a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of the penis. The cylindrical body **110** has an outer cylindrical surface **112** and a smaller inner cylindrical surface **114**. FIGS. **3** and **4** illustrate cross-section views perpendicular to the longitudinal axis of the cylindrical body **110**. The cylindrical body **110** has a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline **120** to a minimum thickness along ventral edges **122** that form a ventral opening **124**. The ventral edges **122** are illustrated as scalloped, however they may also be straight edges. Reference numeral **200** in FIG. **7** cross-section refers to a few representative internal pockets disposed below the outer cylindrical surface **112** of the cylindrical body **110**.

FIG. **5** illustrates a distal end view, FIG. **6** illustrates a proximal end view of the penile implant **100**. The cylindrical body **110** may be open at both its proximal end **116** (nearest to the base of the penis), as well as the opposite distal end **119** (nearest to the glans penis). The body **110** may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end **116** to the beginning **117** of a distal portion **118** where the wall thickness tapers from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110**. The distal portion **118** has a tapered wall thickness from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110** (nearest the glans penis). The cylindrical body **110** may have pillowed or rounded edges **128** at both the proximal end **116** and the distal end **119**. The implant **100** is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin **16** and adjacent to Buck's fascia **20**. The implant may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The cylindrical body **110** further includes embedded mesh tabs **128** that are located at its proximal end **116**, and one or more embedded mesh tabs **128** that are located at its distal end **119**. The mesh tabs **128** are configured to receive tissue ingrowth and provide a functional means for suturing the cylindrical body at both distal **119** and proximal ends **116** to Buck's fascia **20** to keep the cylindrical body **110** in place and prevent longitudinal and/or rotational migration. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the underlying tunic of the corpus cavernosum. The mesh tabs **128** may be formed integrally with or embedded within the cylindrical body **110**, or attached to it, or secured between multiple layers of the cylindrical body **110**, or secured to the cylindrical body **110** by another other methods of attachment. The mesh tabs **128** are located at the proximal end **116** and distal end **119** as near the ventral edges **122** as possible. Mesh tabs **128** are not located within or attached to the body **110** along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle **22**, **24**, which would risk denervation or devascularization of the penis.

The following methods may be used for implanting the cosmetic penile implant. The cosmetic penile implant may be placed through a peno-scrotal or ventral phalloplasty incision without an abdominal incision being made and without associated surgical drain placement. Through a peno-scrotal or ventral phalloplasty incision, Buck's fascia overlying the fibrous tunic of the corpus cavernosa is identified and the soft tissue attachments are released through both blunt and sharp dissection. Care is taken to avoid disruption of Buck's fascia along the dorso-lateral margins of the corpus cavernosa to avoid injury to the underlying penile neurovascular bundle, thereby avoiding risk of penile devascularization or sensory denervation. Through this incision, the glans penis may be retracted caudally, thereby inverting the penile shaft and permitting direct inspection and additional dissection of the distal penile shaft. The distal implant margin containing the mesh tabs may then be secured lateral to the dorsal neurovascular bundle using absorbable sutures, ensuring secure and proper placement of the implant. Similarly, absorbable sutures may be used to secure the proximal margin of the implant ventrally, permitting tissue ingrowth at each position of the implant at all four quadrants. This additionally secures the implant in the desired location and reduces the risk of implant migration, malposition and erosion. This surgical approach also facilitates, through direct inspection, ventral placement of the implant lateral to the urethral margin bilaterally, further ensuring not only proper implant placement, but a more concealed and comfortable tapered lateral implant margin. The wound and the implant can be copiously irrigated with antibiotic solution and hemostasis achieved and confirmed before the subcutaneous tissue is reapproximated, also with absorbable sutures. The peno-scrotal skin is similarly reapproximated with absorbable sutures providing a two-layered closure. The shaft is then loosely wrapped with gauze and elastic adhesive, taking care to avoid penile ischemia. The patient may be discharged the same day following a brief recovery period with instructions to remove the dressing in 24-48 hours. Cleansing of the wound daily may then occur. Avoidance of sexual intercourse is advised until the one month postoperative examination.

Another method of implanting the cosmetic penile implant may be the methods that are taught by U.S. Pat. No. 4,202,530, which is incorporated herein by reference in its entirety.

The inflatable penile implant to correct erectile dysfunction may be subsequently implanted within the corpus cavernosa, deep to the cosmetic penile implant, without meaningful physical alteration to the cosmetic penile implant or compromise of the intended purpose of the cosmetic penile implant. Similarly, placement of the cosmetic penile implant subsequent to placement of an inflatable penile implant is possible with either surgical approach referenced above. Advantageously, there are no restrictions to erection of the penis following cosmetic implant placement given absorbable suture use, elasticity of the implant body and only segmental use of mesh attachments off the dorsal midline neurovascular bundle.

FIGS. **9**A and **9**B illustrate an embodiment of a penile implant with a perspective view of each side. As shown in FIG. **10** the penile implant, like the other implants herein, can be made in a wide range of sizes and dimensions. Advantageously, the wall thicknesses may vary over the length of the implant and/or the geometry and configuration

can be adjusted with pockets as described above. By subtraction of material using thinner walls and/or by adding more pockets, one can change the hardness over the various dimensions of the implant. Thus, the hardness and other properties may change from proximal to distal and vice versa, e.g., the distal portion may have a dense honeycomb structure while the proximal portion is less dense. This assists in, for example, providing augmentation while retaining physiological feel and function. That is, the penile and other implants of the present invention may mimic soft tissue more so than other implants which may, for example, employ a bag-like or balloon like exterior with a cavity filled with fluid-like material. In contrast, the implants of the present invention may be comprised of a single material configured with pockets to adjust the properties.

The penile and other implant may be attached in any convenient manner. As described previously in some embodiments the penile implant may comprise tabs for suturing the penile or other implant to the body. If employed, then the tabs may be located at any convenient location and be comprised of any biocompatible material. FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B while FIG. **13** shows exemplary types of mesh material that may be employed.

As described in detail above, the implants, including the penile implant, may be comprised of materials that exhibit various ranges of properties, e.g., durometer, elongation, tensile, tear, etc., at one or more different locations on the implant. FIG. **12** illustrates Shore Hardness scale and representative properties of various implants such as the penile implant. FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments. If course, if desired one or more of various other features may be incorporated into the penile or other implants so long as they don't substantially interfere with the function. A non-limiting list of such features may include ribs, knobs, horns, grooves, a radiopaque property, fluorescence or some other illuminating property.

The claimed subject matter is not to be limited in scope by the specific embodiments described herein. Indeed, various modifications of the invention in addition to those described herein will become apparent to those skilled in the art from the foregoing description. Such modifications are intended to fall within the scope of the appended claims.

What is claimed is:

**1**. A penile implant comprising:

a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis, wherein the body comprises:

a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening;

said penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion wherein said one or more biocompatible materials comprise internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant.

**2**. The penile implant of claim **1** wherein said one or more biocompatible materials are configured to comprise one or more internal pockets that vary in one or more of the following: geometry, size, depth, or location.

**3**. The penile implant of claim **2** wherein the said one or more internal pockets are configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elasticity of at least a portion of the implant, (4) increase extensibility of at least a portion of the implant, or (5) increase compressibility of at least a portion of the implant.

**4**. The penile implant of claim **2** wherein said internal pockets comprise a honeycomb design.

**5**. The penile implant of claim **1** wherein said implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said penile implant is different than said same measured property at a second location on said implant.

**6**. The penile implant of claim **5** wherein said measured property comprises one or more of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

**7**. The penile implant of claim **6** wherein the measured property of hardness is different at a first location on said penile implant from a second location on said implant.

**8**. The penile implant of claim **7** wherein the measured property of hardness differs from the proximal end of the implant to the distal end of the implant.

**9**. The penile implant of claim **2** wherein the said one or more internal pockets are configured to result in a change of one or more properties from the proximal end of the implant to the distal end of the implant.

**10**. The penile implant of claim **3** wherein the said one or more internal pockets are configured to result in a change in rigidity from the proximal end of the implant to the distal end of the implant.

**11**. The penile implant of claim **1** comprising one or more tabs configured to suture to a body.

**12**. The penile implant of claim **11** wherein the tabs are configured at both distal and proximal ends to suture Buck's fascia and receive tissue ingrowth.

**13**. The penile implant of claim **11** wherein the one or more tabs are attached to the body of the implant.

**14**. The penile implant of claim **11** wherein the one or more tabs comprise a mesh material.

**15**. The penile implant of claim **12**, wherein the tabs are configured to employ absorbable sutures.

**16**. The penile implant of claim **1**, further comprising an antibiotic or antibacterial agent.

* * * * *

# TAB 8

Patent No.: US 10,980,639 B2 (J.Ex. 78, Appx15977-15999)

US010980639B2

(12) **United States Patent**
**Cornell et al.**

(10) **Patent No.: US 10,980,639 B2**
(45) **Date of Patent: Apr. 20, 2021**

(54) **IMPLANTS THAT FACILITATE TISSUE EXPANSION**

(71) Applicant: **Augmenta, LLC**, Houston, TX (US)

(72) Inventors: **Robert J. Cornell**, Houston, TX (US); **David J. Nichols**, Bullard, TX (US); **Hans A. Mische**, Grey Eagle, MN (US)

(73) Assignee: **Augmenta, LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 39 days.

(21) Appl. No.: **16/238,821**

(22) Filed: **Jan. 3, 2019**

(65) **Prior Publication Data**

US 2020/0022812 A1 Jan. 23, 2020

**Related U.S. Application Data**

(60) Provisional application No. 62/779,825, filed on Dec. 14, 2018, provisional application No. 62/702,062, filed on Jul. 23, 2018.

(51) **Int. Cl.**
***A61F 2/26*** (2006.01)

(52) **U.S. Cl.**
CPC ........ ***A61F 2/26*** (2013.01); *A61F 2220/0008* (2013.01); *A61F 2250/0018* (2013.01); *A61F 2250/0019* (2013.01); *A61F 2250/0025* (2013.01); *A61F 2250/0037* (2013.01); *A61F 2250/0053* (2013.01); *A61F 2250/0071* (2013.01); *A61F 2250/0078* (2013.01)

(58) **Field of Classification Search**
CPC ......... A61F 2/02; A61F 2/26; A61F 2005/411
USPC ...................................................... 600/38–40
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,383,944 A | 7/1921 | Hart |
| 2,899,957 A | 11/1957 | Briggs |
| 3,893,456 A | 7/1975 | Small et al. |
| 3,987,789 A | 10/1976 | Timm et al. |
| 4,204,530 A | 5/1980 | Finney |
| 4,483,331 A | 11/1984 | Trick |
| 4,523,584 A | 6/1985 | Yachia et al. |
| 4,589,405 A | 5/1986 | Hemmeter |
| 4,602,625 A | 7/1986 | Yachia et al. |
| 4,669,456 A | 6/1987 | Masters |
| 5,445,594 A † | 8/1995 | Elist |

(Continued)

FOREIGN PATENT DOCUMENTS

WO 1986001398 A1 3/1986

OTHER PUBLICATIONS

Int'l Search Report & Written Opinion (PCT/US2019/042782), dated Oct. 3, 2019.

(Continued)

*Primary Examiner* — John P Lacyk
(74) *Attorney, Agent, or Firm* — Gregory L Porter; Hunton Andrews Kurth LLP

(57) **ABSTRACT**

The invention pertains to implants that facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants may be made of different materials or made in different configurations such that such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. In one particular embodiment the implants may be a cosmetic penile implant.

**22 Claims, 13 Drawing Sheets**




J078-001

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 2:20-cv-03503-CBM (RAOx)

International Medical Devices, Inc., et al.,

VS. Robert Cornell, MD, an individual; et al.,

JOINT EXHIBIT 78

DATE ____________ IDEN.

DATE ____________ EVID.

BY ____________

Deputy Clerk

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,512,033 A | 4/1996 | Westrum, Jr. et al. | |
| D376,011 S | 11/1996 | Nunokawa | |
| 5,669,870 A † | 9/1997 | Elist | |
| 5,899,849 A † | 5/1999 | Elist | |
| 6,015,380 A | 1/2000 | Subrini | |
| D462,770 S † | 9/2002 | Elist | |
| 6,475,137 B1 † | 11/2002 | Elist | |
| 6,537,204 B1 † | 3/2003 | Elist | |
| 7,572,221 B2 † | 8/2009 | Atala | |
| 8,986,193 B1 † | 3/2015 | Elist | |
| 9,504,573 B1 † | 11/2016 | Elist | |
| 9,877,835 B1 | 1/2018 | Loria | |
| 10,350,070 B2 † | 7/2019 | Elist | |
| 2003/0220539 A1 * | 11/2003 | George | A61F 2/26 600/40 |
| 2014/0031619 A1 | 1/2014 | Moon | |
| 2017/0020700 A1 | 1/2017 | Bienvenu et al. | |

OTHER PUBLICATIONS

Elist et al., "A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicon Sleeve Implant . . . ", J. Sex. Med (2018), pp. 1216-1223.
Elist et al., "Correction of retractile penis with subcutaneous soft silicon penile implant", published online at https://doi.org/10.1038/s41443-019-0174-3 (Aug. 5, 2019).

* cited by examiner
† cited by third party




Fig.1




Fig. 2




SECTION A-A

Fig. 3




SECTION B-B

Fig. 4




Distal View
Fig. 5




Proximal View
Fig. 6




Fig. 7 Section C-C




FIG. 8



Fig. 9A



Fig. 9B




**Figure 10** (Large – Extra Large – 2X Large)



**Figure 11** (Mesh Tab Locations)




| Sample Color | Red | White | Blue |
|---|---|---|---|
| Durometer | **0 Type A** | **7 Type A** | **20 Type A** |
| Elongation | 290 psi | 350 psi | 700% |
| Tensile | 1140% | 1000% | 750 psi |
| Tear | 55 ppi | 70 ppi | 125 ppi |

Figure 12

J078-011




**Mesh Material Options**

| Mesh | Mfg | Pore Size (mm) | Weight (g/m$^2$) | Filament | Mechanical Properties |
|---|---|---|---|---|---|
| 3D Max | Bard | 0.8 | 80–100 | Monofilament | Tensile 24.7 N/cm |
| Prolite | Atrium | 0.8 | 80–100 | Monofilament | Tensile 38 N/cm |
| Premilene | B-Braun | 0.8 | 80–100 | Monofilament | Tensile 41.4 N/cm |

Figure 13




Figure 14A Penile Implant Placement location




Figure 14B Implantation

J078-014




Figure 14C Implant Sizing

J078-015

Figure 15



# IMPLANTS THAT FACILITATE TISSUE EXPANSION

## CROSS REFERENCE TO RELATED APPLICATIONS

The instant application claims priority to U.S. Ser. No. 62/702,062 filed Jul. 23, 2018 and U.S. Ser. No. 62/779,825 filed Dec. 14, 2018. The aforementioned applications are incorporated by reference for U.S. purposes.

## BACKGROUND AND SUMMARY OF INVENTION

Cosmetic implants such as breast implants and penile implants are growing in popularity. Similarly, prosthetic and other medical devices are increasingly employed to treat or ameliorate conditions. For both implants and other medical devices it is often desired that they conform to existing tissue and/or mimic normal anatomical movement such that they resemble the natural human or animal body part or even have an enhanced appearance relative to the natural human or animal body part. Unfortunately, implants and devices made using conventional technology often results in an implant or device which does not facilitate tissue expansion, inhibits normal anatomical movement, and/or does not resemble a natural body party. Thus, what is needed is an implant that accomplishes one or more of the aforementioned desirable characteristics.

Advantageously, the instant invention implants and medical devices overcome the problems described above. The implants typically comprise one or more biocompatible materials. Advantageously, in some embodiments the one or more materials may be selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants also may advantageously resemble a natural body party or even have an enhanced appearance relative to a natural body part. Thus, the concepts of the instant invention are applicable to, for example, breast implants, penile implants, testicular implants as well as, incontinence devices such as male or female urethal continence plugs.

The above-described concepts may be particularly useful with respect to cosmetic penile implants because currently available cosmetic penile enhancement devices suffer from a number of limitations and deficiencies. Some comprise a rigid, inelastic silicone block that increases the risk of external erosion, patient discomfort, and an unnatural flaccid penile look and feel. Infection rates are also arguably higher with currently available cosmetic penile implants because none are antibiotic-coated or antimicrobial-resistant. Additionally, the current cosmetic penile implants are implanted using non-absorbable sutures near the dorsal neurovascular bundle distally, risking penile devascularization and denervation that can produce penile necrosis or reduced penile sensation. Further, the rigid silicone block and non-absorbable sutures prevent full penile elasticity during an erection that can reduce potency and cause discomfort during an erection.

Accordingly, in one specific embodiment the instant invention pertains to a penile implant. The penile implant generally comprises a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis. The body comprises a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. Advantageously, the penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion.



The improved cosmetic penile implant of the present invention greatly reduces these untoward complications and provides the patient with a safer, more comfortable, and more natural cosmetic penile enhancement while safeguarding natural penile sexual function. Thus, the cosmetic penile implant implanted subcutaneously may be configured to replicate as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel.

These and other embodiments are described in detail below.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a perspective view of an embodiment of a penile implant.

FIG. **2** illustrates a side view of the implant shown in FIG. **1**.

FIG. **3** illustrates a section view of a proximal end of the implant shown in FIG. **2**.

FIG. **4** illustrates a section view of a distal end of the implant shown in FIG. **2**.

FIG. **5** illustrates a distal end view of the implant shown in FIG. **1**.

FIG. **6** illustrates a proximal end view of the implant shown in FIG. **1**.

FIG. **7** illustrates a section view of the implant shown in FIG. **5**.

FIG. **8** shows a section of the natural anatomy of a penis.

FIGS. **9**A and **9**B illustrates perspective views of each side of an embodiment of a penile implant.

FIG. **10** illustrates various representative dimensions of various size penile implants.

FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B.

FIG. **12** illustrates Shore Hardness scale and representative properties of various implants.

FIG. **13** shows representative mesh material options.

FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments.

FIG. **15** shows various configurations of the internal pockets of an implant core.

## DETAILED DESCRIPTION OF THE INVENTION

### General Implant—Description of Implants Methods of Making, Materials, Configurations, Characteristics (Cosmetic and Physical), Specific Implant Types

As described above, the implants and devices of this invention may be suitable for animals or humans. The specific material or materials employed will vary depending upon the specific implant, application, desired characteristics, and the like. In many applications the material employed will be biocompatible, i.e., not particularly harmful to the tissue that is near or in communication with the device or implant whether it be human or animal tissue. The one or more materials are typically selected, configured, or both to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and/or substantially

mimicking soft tissue characteristics of the natural body part. Of course, the selected one or more materials and the specific configuration will vary depending upon the specific implant and desired tissue expansion and/or other results.

In one embodiment, to facilitate tissue expansion while not substantially inhibiting normal anatomical movement the implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. Of course, using the present invention a measured property may be different at three or four or any number of locations on the implant. That is, the implant could, for example, exhibit a gradient, i.e., an increase or decrease in the magnitude of a measured property (e.g. hardness (durometer) and other properties such as tensile strength; tear strength; compressive strength; and elongation which also may be referred to as extensibility or stretching or elasticity) that is observed in passing from one point or location on the implant to another. This can be accomplished in at least two general ways or a combination of these two.

First, the material employed may be different at the first, second, and/or other additional locations of the implant. That is, the material or materials employed may vary at the first, second, and/or other locations of the implant with respect to a property of interest for the implant. That is the material or materials of the implant may be different with respect to, for example, one or more, two one or more, three one or more, four one or more, or even five of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

Making an implant having different properties at different locations on the implant may be accomplished in any convenient manner, e.g., by using different material of different properties. Such manners will differ based on the implant, its properties, materials employed, and desired characteristics.

Suitable methods may include molding, e.g., injection molding, extrusion, rotomolding, transfer molding, compression molding, blow molding, 3D printing, and the like. In general, any suitable process may be employed so long as the desired material with the desired property can be placed at the desired locations on and/or within the implant. For example, if using injection molding one might use a mold in the shape of the desired implant. The mold may have multiple injection points, e.g., two or more, three or more, four or more, or up to as many as necessary or desired. In this manner different materials (or the same material with varying properties) may be injected through each injection port. If desired, there may be compartments within the mold but often compartments are unnecessary as factors such as the different injection points and timing of injection may control the ultimate placement of the various materials. In this manner, the implant can be designed or tailored to have different properties at different locations or places on or within the implant. Thus, the desired properties such as (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation can be tailored throughout the implant by selecting the one or more biocompatible materials such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant.

A second method of making an implant wherein a measured property at a first location on said implant is different than said same measured property at a second or even more locations involves configuring the material within the implant to achieve this. This second method can be used independent of the first method which uses varying materials or a material that varies in properties. Alternatively, the configuring described further below may be done in in conjunction with the use of varying materials or the use of a material that varies in properties.

In some embodiments of this second method, the one or more materials are configured to comprise one or more internal pockets within the implant. Such pockets are void spaces within the implant. The design and configuration of the pockets or void spaces will vary depending upon the type of implant and desired characteristics. For example, the implant geometry, size, depth, and/or location of the pockets can be configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elongation (elasticity or extensibility) of at least a portion of the implant, or (4) increase compressibility of at least a portion of the implant. As a specific example, the internal pockets may comprise pockets to modify the measured compression or elongation at different places on or within the implant, i.e., compression pockets, elongation pockets, or both. In a specific embodiment, the implant may be configured with internal pockets that, for example, permit elongation or stretching. For example, in some embodiments, the implant may be configured with internal pockets such that stretching of at least 10%, or at least 20%, or at least 40%, or at least 60%, or at least 80%, or at least 100%, or at least 150%, or at least 200% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. On the other hand, the implant may be configured with internal pockets such that stretching of up to at most 500%, or at most 450%, or at most 400%, or at most 350%, or at most 300%, or at most 250% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. By stretching is meant to refer to either elongation in one direction or compression in the other direction.

As stated above, the particular geometry of the internal pockets may vary widely depending upon the desired results. In particular embodiments, the implant may be designed such that the internal pockets of the implant may be in a honeycomb (e.g., polygonal such as hexagonal), a zig zag (WWWWW), or even an elliptical configuration. In this manner, the implant can be made such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant. For example, the implant's hardness at a particular location will usually depend at least in part upon the nature and volume of the pockets or voids beneath the location. That is, the greater the volume of voids beneath a particular implant location, the softer the implant may feel at that particular location. Thus, an implant may have a dense honeycomb at the distal end with a less dense honeycomb at the proximal end or a gradient or graduated honeycomb densities leading to different hardnesses and/or other properties over the length and/or various dimensions of the implant. Likewise, the geometry, size, depth, and/or location of the pockets beneath a particular location also affect and/or determine the other properties of the implant beneath that location, e.g., tensile strength; tear strength; compressive strength; and elongation (extensibility or elasticity). In this manner, the configuration of the pockets can be tailored or designed to change the properties at various locations on the implant. FIG. 15 shows various configurations of the internal pockets of an implant core.

The desired configuration of the implant's pockets, if any, may be accomplished in any convenient manner and such manners may differ depending upon the type of implant, material(s) employed, desired properties, and other factors. One way of configuring an implant is through the use of injection molding wherein the mold cavity may include a removable structure in the geometry of the desired pockets so that when structure is removed pockets or voids exist within the molded implant. A commonly used injection molding method using a core, a cavity side A, and a cavity side B may be employed. Dual or multiple extrusion, 3-D printing and other methods may also be used to make the aforementioned implant structures.

The specific material or materials employed for the implants herein are not particularly limited so long as they are typically biocompatible and can be made to have one or more, or two or more, or three or more, or four or more, or all of the desired properties (e.g., hardness, tensile strength; tear strength; compressive strength; and/or elongation) in the desired ranges described herein for the implant. Thermosets, thermoplastics, elastomers, or combinations thereof may be employed. Useful thermoplastics may include nylon, polyethylene, polypropylene, and polystyrene while useful thermosets may include various epoxy resins and phenolic resins in any form while preferred thermosets may include various gel colloids. Silicone and polyurethane may be particularly useful materials for some types of implants. Particularly preferred materials include foams, either solid or semi-solid, closed cell foams such as those comprising urethane, silicone, or mixtures thereof.

Particularly preferred configurations for various implants include those that comprise a wall having a varying wall thickness over one or more dimensions of the implant. Another preferred configuration is one in which the amount of materials employed within the implant are changed over one or more dimensions in a gradient such as by a changing or changed honeycomb structure. By reducing the wall thickness or alternatively having more voids in perhaps a honeycomb structure over the length of the implant the hardness or other properties may be changed such the implant is similar to natural tissue and/or allows normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part. In another embodiment the implant comprises one or more biocompatible materials having both linear and radial compression capability. This may assist in tissue expansion and may also contribute to the implant being similar to natural tissue and/or allowing normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part.

The specific properties of the implant may vary depending upon the material(s) employed, their placement, and the configuration, e.g., geometry, size, depth, or location of pockets, if any. In one embodiment the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material has a durometer range of from about 0, or from about 10, or from about 20, or from about 30 up to at most about 70, or up to at most 60, or up to at most 50, or up to at most 40 durometer on the Shore A scale according to ASTM D2240-15.

Other useful properties of the implant that may be determined by the material or configured as desired may include elongation, tensile strength, tear strength, compressibility or extensibility. Specifically, useful implant embodiments may comprise wherein the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tensile strength of from at least about 200 psi, or at least about 300 psi, or at least about 350 psi up to at most about 1000 psi, or up to at most about 800 psi, up to at most about 700 psi, or up to at most 600 psi according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has an elongation of from at least about 400%, or at least about 500%, or at least about 600%, or at least about 700%, or at least about 800%, up to about 1200%, or up to about 1100%, or up to about 1000% according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tear strength of at least about 40 pounds per inch (ppi), or at least about 50 pounds per inch (ppi), or at least about 60 pounds per inch (ppi), or at least about 70 pounds per inch (ppi), or at least about 80 pounds per inch (ppi), up to about 200 ppi, or up to about 130 ppi, or up to about 120 ppi, or up to about 110 ppi according to ASTM D624. The implants of the present invention may also comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a compressibility and/or extensibility factor of from at least 0, or at least 5, or at least 10, or at least 15, up to about 20, or up to about 25%. Compression can be tested by, for example, ASTM D395-03.

In other embodiments of the instant invention the implants may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has at least one, or at least two, or at least three, or at least four or more of the above-described properties.

The implants may comprise further materials depending upon the desired properties and application. For example, the implant may comprise hydrophilic or hydrophobic agents on the interior or exterior of the implant. In one specific embodiment the implants have a hydrophilic agent on the exterior such that the implant is at least partially resistant to bacteria, viruses, and the like in that they cannot adhere to the surface. Such hydrophilic agents are not particularly limited and depend upon the application. As such they may be selected from any compatible material and applied in suitable amounts to achieve the desired effect.

Other suitable additives to the interior and/or exterior of the implant comprise a material capable of releasing heat and/or a material capable of absorbing heat. In this manner the implant or portions of the implant may be made to be exothermic or endothermic based on exposure to one or more stimuli.

As described above, the instant inventions are widely applicable to any number of types of implants and/or prosthetic or other medical devices. Specific embodiments may be particularly applicable to penile implant, a testicular implant, a female incontinence implant, a breast implant, or similar implants and devices. More specifically, the instant inventions may be particularly applicable to those applications wherein tissue expansion is desired. Such applications include, but are not limited to, e.g., applications wherein desired tissue expansion includes being near a urinary meatus, a fossa navicularis, or a bladder neck when, for example, said implant is intended for or placed in a human. Particularly preferred applications may include, for example, those wherein the implant may be a penile implant, a male or female incontinence implant or plug, or a breast implant. Of course, the method of placing, attaching, inserting, and/or employing the implants of the instant invention will vary depending upon the specific type of implant and

the person or animal's anatomy with which it will be employed. In most instances conventional and known surgical techniques or concepts can be employed with a given implant. A specific embodiment pertaining to a cosmetic penile implant is described below.

### Specific Penile Implant Embodiments

The following specific embodiments disclosed relate to cosmetic penile implants and method of implanting. However, it should be understood that the concepts, materials, properties, methods of making, and other description above apply equally to cosmetic penile implants. Similarly, the concepts, materials, properties, methods of making, and other description specific to the penile implant embodiment described below may also be applicable to many other types of implants and/or prostheses.

FIG. **8** illustrates a cross-section of the natural penile anatomy consisting of several distinguishable parts. The glans penis is commonly referred to as the head of the penis. The skin **16** is the outer layer of the penis. The corpus cavernosum **10** are two columns of spongy erectile tissue comprising the dorsum of the penis bilaterally which, when filled with blood, cause an erection. The corpus spongiosum **15** is a column of sponge-like tissue comprising the medial ventrum of the penis surrounding the urethra **18** from the bladder neck to the glans penis which also fills with blood during an erection, but does not contribute to the erection. The paired corpora cavernosa **10** and the corpus spongiosum **15** are enclosed within a tube of deep fascia **20** called Buck's fascia. Buck's fascia **20** also surrounds the deep dorsal vein **22**, and the paired dorsal arteries and dorsal nerves **24** of the penis.

The cosmetic penile implant may have a body having a longitudinal axis of a selected longitudinal length to be aligned with the long axis of the penis. The body may have any length and any diameter or width. In one embodiment, the body may have a cylindrical cross section. In other embodiments, the body may have an elliptical or oblong cross section. In yet other embodiments, the body may have a cross section of any shape. The body has an outer surface and an inner surface. The body may be formed as one integral part. A cross-section perpendicular to the longitudinal axis of the body may have a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. The ventral edges may be straight or scalloped edges. The body may be open at both its proximal end (nearest to the base of the penis), as well as the opposite distal end (nearest to the glans penis).

The body may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end to the beginning of a distal portion at which point the wall thickness tapers from the beginning of the distal portion to the body's distal end. A constant wall thickness extending along a longitudinal length of the body from the proximal end to the beginning of the distal portion is preferred over a tapered wall thickness because the constant wall thickness more closely matches the natural anatomy of the penis. The distal portion has a tapered wall thickness only for a short portion near the distal end of the body (nearest the glans penis). The body may have all edges and corners rounded, chamfered, or pillowed. The implant is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin and adjacent Buck's fascia. When implanted the device may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The body may be made of any type of polymer, elastomer, rubber, composite material, or any other spongy or flexible or compressive material that replicates as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel. The implant body material will be as flexible, compliant and compressible to most closely simulate normal penile tissue in a flaccid state while producing enhanced flaccid penile length and girth. In one embodiment, the body may be made of a silicone. In another embodiment, the body may be made of polyurethane. The softness of the material forming the body of the implant may have a Shore A softness of less than 25, or less than 20, or less than 15, or less than 12, or more preferably less than 10. A shore durometer measures hardness of a material, typically of polymers, elastomers, and rubbers. High numbers in its scale indicate a greater resistance to indentation, and thus harder materials. Lower number indicate softer, more compressible or more flexible materials. There are several scales of durometer, used for materials with different properties. The two most common scales, using slightly different measurement systems, are the ASTM D2240 type A and type D scales. The A scale is for softer materials, while the D scale is for harder materials.

If desired, mesh tabs of from about 1 to about 2 cm in length may be placed through the length of the lateral margins spaced from about 0.75 cm to about 1.25 cm apart. The body may have one or more embedded tabs, e.g., mesh tabs, protruding from its proximal end, and one or more embedded mesh tabs protruding from its distal end. The mesh tabs may protrude beyond the proximal end and the distal end up to any distance. For example, the embedded mesh tabs may protrude bilaterally (on both sides) up to 0.5 cm beyond the distal end, or up to 1.0 cm beyond the distal end, or up to 1.5 cm beyond the distal end, or greater. The embedded mesh tabs may protrude bilaterally up 1.0 cm beyond the proximal end, or up to 1.5 cm beyond the proximal end, or up to 2.0 cm beyond the proximal end, or greater. The mesh tabs may be any shape and size, such as, for example, rectangular or square with right angles at edges, and are provided as a functional means for suturing the body at both distal and proximal ends to Buck's fascia and the fibrous tunical sheath of the corpus cavernosa, to support maintaining the body in place and prevent longitudinal and/or rotational migration. The mesh tabs are configured to receive tissue ingrowth and may be made of any material and mesh size that supports and promotes natural tissue ingrowth. For example, the mesh may be polyurethane mesh. Or the mesh may be another other type of material commonly used in reconstructive general, plastic, or urologic surgery as will be understood by one of ordinary skill in the art. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the corpus cavernosa tunic. Suturing will be understood by one of ordinary skill in the art. The mesh tabs may be formed integrally with the body, or embedded within the body, or attached to it, or attached between multiple layers of the body, or attached to the body by other methods of attachment. The mesh tabs are located at the proximal end and the tapered distal end as near the ventral margin as possible. Mesh tabs are not located within or attached to the body along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle, which would risk denervation or devascularization of the penis both during implantation or during any subsequent required explanation.

The body may have an antimicrobial surface coating that contains an antimicrobial agent that inhibits the ability of microorganisms to grow on the surface of the body. For example, an antibiotic or antibacterial may coat the surface or be embedded into the implant material and thereby potentially reduce the risk of bacterial infections of the implant. In one embodiment, the body may be dipped into an antibiotic or antibacterial agent to coat the surfaces. In another embodiment, the body may be impregnated with an antibiotic or antibacterial agent when the body is formed. The antibiotic coating or impregnation of the body will be consistent with bioprosthesis standards as will be understood by one ordinarily skilled in the art. Any type of antibiotic or antibacterial agent may be used. For example, in certain embodiments, Rifampin and/or Minocycline may be used.

FIGS. **1-7** illustrate an embodiment of a penile implant **100**. FIG. **1** illustrates a perspective view of an embodiment of the penile implant **100**. FIGS. **2** and **7** illustrate side and cross section views of the penile implant **100**, respectively. The implant **100** has a cylindrical body **110** having a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of the penis. The cylindrical body **110** has an outer cylindrical surface **112** and a smaller inner cylindrical surface **114**. FIGS. **3** and **4** illustrate cross-section views perpendicular to the longitudinal axis of the cylindrical body **110**. The cylindrical body **110** has a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline **120** to a minimum thickness along ventral edges **122** that form a ventral opening **124**. The ventral edges **122** are illustrated as scalloped, however they may also be straight edges.

FIG. **5** illustrates a distal end view, FIG. **6** illustrates a proximal end view of the penile implant **100**. The cylindrical body **110** may be open at both its proximal end **116** (nearest to the base of the penis), as well as the opposite distal end **119** (nearest to the glans penis). The body **110** may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end **116** to the beginning **117** of a distal portion **118** where the wall thickness tapers from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110**. The distal portion **118** has a tapered wall thickness from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110** (nearest the glans penis). The cylindrical body **110** may have pillowed or rounded edges **128** at both the proximal end **116** and the distal end **119**. The implant **100** is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin **16** and adjacent to Buck's fascia **20**. The implant may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The cylindrical body **110** further includes embedded mesh tabs **128** that are located at its proximal end **116**, and one or more embedded mesh tabs **128** that are located at its distal end **119**. The mesh tabs **128** are configured to receive tissue ingrowth and provide a functional means for suturing the cylindrical body at both distal **119** and proximal ends **116** to Buck's fascia **20** to keep the cylindrical body **110** in place and prevent longitudinal and/or rotational migration. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the underlying tunic of the corpus cavernosum. The mesh tabs **128** may be formed integrally with or embedded within the cylindrical body **110**, or attached to it, or secured between multiple layers of the cylindrical body **110**, or secured to the cylindrical body **110** by another other methods of attachment. The mesh tabs **128** are located at the proximal end **116** and distal end **119** as near the ventral edges **122** as possible. Mesh tabs **128** are not located within or attached to the body **110** along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle **22**, **24**, which would risk denervation or devascularization of the penis.

The following methods may be used for implanting the cosmetic penile implant. The cosmetic penile implant may be placed through a peno-scrotal or ventral phalloplasty incision without an abdominal incision being made and without associated surgical drain placement. Through a peno-scrotal or ventral phalloplasty incision, Buck's fascia overlying the fibrous tunic of the corpus cavernosa is identified and the soft tissue attachments are released through both blunt and sharp dissection. Care is taken to avoid disruption of Buck's fascia along the dorso-lateral margins of the corpus cavernosa to avoid injury to the underlying penile neurovascular bundle, thereby avoiding risk of penile devascularization or sensory denervation. Through this incision, the glans penis may be retracted caudally, thereby inverting the penile shaft and permitting direct inspection and additional dissection of the distal penile shaft. The distal implant margin containing the mesh tabs may then be secured lateral to the dorsal neurovascular bundle using absorbable sutures, ensuring secure and proper placement of the implant. Similarly, absorbable sutures may be used to secure the proximal margin of the implant ventrally, permitting tissue ingrowth at each position of the implant at all four quadrants. This additionally secures the implant in the desired location and reduces the risk of implant migration, malposition and erosion. This surgical approach also facilitates, through direct inspection, ventral placement of the implant lateral to the urethral margin bilaterally, further ensuring not only proper implant placement, but a more concealed and comfortable tapered lateral implant margin. The wound and the implant can be copiously irrigated with antibiotic solution and hemostasis achieved and confirmed before the subcutaneous tissue is reapproximated, also with absorbable sutures. The peno-scrotal skin is similarly reapproximated with absorbable sutures providing a two-layered closure. The shaft is then loosely wrapped with gauze and elastic adhesive, taking care to avoid penile ischemia. The patient may be discharged the same day following a brief recovery period with instructions to remove the dressing in 24-48 hours. Cleansing of the wound daily may then occur. Avoidance of sexual intercourse is advised until the one month postoperative examination.

Another method of implanting the cosmetic penile implant may be the methods that are taught by U.S. Pat. No. 4,202,530, which is incorporated herein by reference in its entirety.

The inflatable penile implant to correct erectile dysfunction may be subsequently implanted within the corpus cavernosa, deep to the cosmetic penile implant, without meaningful physical alteration to the cosmetic penile implant or compromise of the intended purpose of the cosmetic penile implant. Similarly, placement of the cosmetic penile implant subsequent to placement of an inflatable penile implant is possible with either surgical approach referenced above. Advantageously, there are no restrictions to erection of the penis following cosmetic implant placement given absorbable suture use, elasticity of the implant body and only segmental use of mesh attachments off the dorsal midline neurovascular bundle.

FIGS. **9A** and **9B** illustrate an embodiment of a penile implant with a perspective view of each side. As shown in

FIG. **10** the penile implant, like the other implants herein, can be made in a wide range of sizes and dimensions. Advantageously, the wall thicknesses may vary over the length of the implant and/or the geometry and configuration can be adjusted with pockets as described above. By subtraction of material using thinner walls and/or by adding more pockets, one can change the hardness over the various dimensions of the implant. Thus, the hardness and other properties may change from proximal to distal and vice versa, e.g., the distal portion may have a dense honeycomb structure while the proximal portion is less dense. This assists in, for example, providing augmentation while retaining physiological feel and function. That is, the penile and other implants of the present invention may mimic soft tissue more so than other implants which may, for example, employ a bag-like or balloon like exterior with a cavity filled with fluid-like material. In contrast, the implants of the present invention may be comprised of a single material configured with pockets to adjust the properties.

The penile and other implant may be attached in any convenient manner. As described previously in some embodiments the penile implant may comprise tabs for suturing the penile or other implant to the body. If employed, then the tabs may be located at any convenient location and be comprised of any biocompatible material. FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B while FIG. **13** shows exemplary types of mesh material that may be employed.

As described in detail above, the implants, including the penile implant, may be comprised of materials that exhibit various ranges of properties, e.g., durometer, elongation, tensile, tear, etc., at one or more different locations on the implant. FIG. **12** illustrates Shore Hardness scale and representative properties of various implants such as the penile implant. FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments. If course, if desired one or more of various other features may be incorporated into the penile or other implants so long as they don't substantially interfere with the function. A non-limiting list of such features may include ribs, knobs, horns, grooves, a radiopaque property, fluorescence or some other illuminating property.

The claimed subject matter is not to be limited in scope by the specific embodiments described herein. Indeed, various modifications of the invention in addition to those described herein will become apparent to those skilled in the art from the foregoing description. Such modifications are intended to fall within the scope of the appended claims.

What is claimed is:

**1**. An implant suitable for a desired animal or human body part or portion thereof wherein the implant comprises an implant body comprising one or more biocompatible materials wherein said one or more materials are selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and wherein said one or more biocompatible materials comprise internal pockets of inaccessible enclosed void spaces within the implant body configured such that a measured property of hardness at a first location on said implant is different than said same measured property at a second location on said implant.

**2**. The implant of claim **1** wherein at least one additional measured property at a first location on said implant is different than said same measured property at a second location on said implant.

**3**. The implant of claim **2** wherein said additional measured property comprises one or more of the following properties: (1) tensile strength; (2) tear strength; (3) compressive strength; and (4) elongation.

**4**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having both linear and radial compression capability.

**5**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a durometer range of from about 0 to about 70 durometer on the Shore A scale.

**6**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a tensile strength of from about 200 psi to about 800 psi.

**7**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having an elongation of from about 600% to about 1200%.

**8**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a tear strength of from about 40 pounds per inch (ppi) to about 130 ppi.

**9**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a compressibility and extensibility factor of up to about 25%.

**10**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having two or more of the following: (1) a durometer range of from about 0 to about 70 durometer; (2) a tensile strength of from about 200 psi to about 800 psi; an elongation of from about 600% to about 1200%; (3) a tear strength of from about 40 ppi to about 130 ppi; and (4) a compressibility and extensibility factor of up to about 25%.

**11**. The implant of claim **1** wherein said implant further comprises a hydrophilic agent.

**12**. The implant of claim **1** wherein said implant comprises a wall having a varying wall thickness.

**13**. The implant of claim **1** wherein said internal pockets vary in one or more of the following: geometry, size, depth, or location.

**14**. The implant of claim **13** wherein the said internal pockets are configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elasticity of at least a portion of the implant, (4) increase extensibility of at least a portion of the implant, or (5) increase compressibility of at least a portion of the implant.

**15**. The implant of claim **13** wherein said internal pockets comprise those selected from compression pockets, elongation pockets, or both.

**16**. The implant of claim **15** wherein said internal pockets permit stretching of up to 500% compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets.

**17**. The implant of claim **1** wherein said internal pockets comprise a honeycomb design.

**18**. The implant of claim **1** wherein said biocompatible material comprises a material that releases heat.

**19**. The implant of claim **1** wherein said biocompatible material comprises a material that absorbs heat.

**20**. The implant of claim **1** wherein one or more biocompatible materials have two or more of the following: (1) a durometer range of from about 10 to about 70 durometer; (2) a tensile strength of from about 200 psi to about 800 psi; an elongation of from about 600% to about 1200%; (3) a tear strength of from about 40 ppi to about 130 ppi; and (4) a compressibility and extensibility factor of up to about 25%.

**21**. The implant of claim **1** wherein the implant is configured in the form of a penis, testicle, or a breast.

**22**. The implant of claim **1** wherein the implant is configured in the form of a breast.

* * * * *