**No. 2025-1580**

United States Court of Appeals
For the Federal Circuit

**INTERNATIONAL MEDICAL DEVICES, INC., MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC, CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS, HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE LLC, RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER**
*Defendants-Appellants*

**v.**

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendants*

2025-1580, 2025-1605

Appeals from the Central District of California in No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall.

# BRIEF OF APPELLANTS

**AHMAD, ZAVITSANOS & MENSING, PLLC**
Kelsi Stayart White, *Principal Counsel*
Jason McManis
Weining Bai

1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101

*Counsel for Appellants (Other than Richard B. Finger)*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellants certifies the following:

**1. The full name of each part represented by me is:**

Robert Cornell, Augmenta, LLC, Cornell Cosmetic Urology LLC, David Louis Nichols, Huck Medical Technologies INC., Hans Mische, Hans Mische LLC, Run Wang, Robert J. Cornell, M.D., P.A.

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of each party represented by me are:**

N/A

**4. The name of all law firms and the partners or associates that appeared for each party now represented by me in the trial court or are expected to appear in this Court is:**

Shahmeer Halepota
Jason McManis
Weining Bai
Foster C. Johnson
John Zavitsanos
Karen B. Peck
Kelsi S. White
AHMAD, ZAVITSANOS & MENSING PLLC

Barbara B. DePena
(formerly with AHMAD, ZAVITSANOS & MENSING PLLC

Kevin F. Ruf
Natalie S. Pang
GLANCEY PRONGAY AND MURRAY LLP

**5. Related cases:**

No. 25-1605; *International Medical Devices, Inc., et al. v. Robert Cornell, et al.*; In the United States Court of Appeals for the Federal Circuit

No. 2:20-cv-03503-CBM-RAO; *International Medical Devices, Inc., et al. v. Robert Cornell M.D., et al.*; In the United States District Court for the Central District of California - Western Division

**6. Organizational Victims and Bankruptcy Cases:**

None.

## Table of Contents

**Table of Authorities** .......... 6
**Jurisdictional Statement** .......... 10
**Statement of the Issues** .......... 11
**Statement of the Case** .......... 12
**Summary of the Argument** .......... 24
**Standard of Review** .......... 26
**Argument** .......... 27
I. As a Matter of Law, the Potential Improvement Ideas and Instrument List Do Not Constitute Trade Secrets. .......... 27
A. The idea of applying a well-known concept to a particular product does not constitute a trade secret. .......... 27
B. Each Potential Improvement Idea was disclosed in a patent. .......... 29
C. The absorbable sutures idea adds nothing to the mesh tabs idea .......... 33
D. There is no evidence that the Potential Improvement Ideas derive independent economic value from secrecy. .......... 33
E. The instrument list does not constitute a trade secret. .......... 34
II. The Royalty Award Was Not Reasonable. .......... 36
A. Applicable Substantive Standards .......... 36
B. The royalty was not reasonably apportioned. .......... 38
C. The duration of the hypothetical license was unreasonable. .......... 50
D. The lump-sum conversion was unreasonable. .......... 51
III. The District Court Erroneously Awarded Additional Remedies under CUTSA. .......... 53
A. The Award of Exemplary Damages Must Be Reversed. .......... 53
B. The Five-Year Trade-Secrets Permanent Injunction is an Abuse of Discretion. .......... 53
IV. The District Court Erred by Imposing Liability on Certain Defendants. .......... 56
A. Plaintiffs Lack Misappropriation Evidence for Multiple Defendants. .......... 56
B. The Contract Claim against Cornell Fails for the Same Reasons as the Trade-Secret Claim. .......... 58

V. The District Court Erred in Awarding Additional Relief on the Non-CUTSA Claims for Counterfeiting and Patent Invalidation......................................59

A. Elist Did Not Prove Inventorship to Invalidate the ’413 and ’639 Patents. ..........................................................................................59

B. The Counterfeiting Claim Rests on a Mismatch Between the Registered Mark and the Evidence. ..................................................................60

**Conclusion.....................................................................................................63**

**Certificate of Service......................................................................................65**

**Certificate of Compliance with Type-Volume Limitations...............................66**

# Table of Authorities

## Cases

*Ajaxo, Inc. v. E*Trade Fin. Corp.*,
48 Cal. App. 5th 129 (2020) .................................................... 36, 37, 38

*Altavio, Inc v. Konica Minolta Sys. Lab., Inc.*,
226 Cal. App. 4th 26 (Cal. App. 2014) ..................................................27

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ..................................................................41

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017) ................................................................26

*Augme Techs., Inc. v. Yahoo! Inc.*,
755 F.3d 1326 (Fed. Cir. 2014) ................................................................34

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) ................................................... 38, 40, 48

*Comet Techs. USA Inc. v. XP Power LLC*,
No. 20-CV-06408-NC, 2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) .............55

*Computer Care v. Service Sys. Enters., Inc.*,
982 F.2d 1063 (7th Cir. 1992) ..................................................................28

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) ................................................................30

*Deere & Co. v. Int'l Harvester Co.*,
710 F.2d 1551 (Fed. Cir. 1983) ................................................................42

*Dupree v. Younger*,
598 U.S. 729 (2023) ................................................................................26

*Eli Lilly & Co. v. Aradigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004) ................................................ 26, 59, 60

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ................................................................38

*Felder v. United States*,
543 F.2d 657 (9th Cir. 1976) .......... 26

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .......... 38

*Gusler v. Kawasaki Motors Corp.*,
216 F.3d 1083 (9th Cir. 2000) .......... 28, 29, 32

*Homeland Houseware, LLC v. Sorensen Research*,
581 F. App'x 869 (Fed. Cir. 2014) .......... 57

*Imax Corp. v. Cinema Techs., Inc.*,
152 F.3d 1161 (9th Cir. 1998) .......... 27

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) .......... 31

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
331 F.3d 860 (Fed. Cir. 2003) .......... 37

*Kaloud, Inc. v. Shisha Land Wholesale, Inc.*,
741 F. Appx 393 (9th Cir. 2018) .......... 63

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .......... 30

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 39

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) .......... 41

*Morlife, Inc. v. Perry*,
66 Cal. Rptr. 2d 731 (Cal. App. 1997) .......... 35

*Nartron Corp. v. Schukra U.S.A. Inc.*,
558 F.3d 1352 (Fed. Cir. 2009) .......... 59

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) .......... 46

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................32

*Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*,
No. CIV. A. 96-CV-6961, 1998 WL 288423 (E.D. Pa. June 3, 1998) ...............63

*ResQNet.com, Inc v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ......................................................................43

*Roland Corp. v. inMusic Brands, Inc.*,
2025 WL 926703 (Fed. Cir. Mar. 27, 2025) ......................................... 41, 45, 47

*Self Directed Placement Corp. v. Control Data Corp.*,
908 F.2d 462 (9th Cir. 1990) ........................................................................27

*Stutz Motor Car of Am., Inc. v. Reebok Intern., Ltd.*,
909 F. Supp. 1353 (C.D. Cal. 1995), *affirmed*, 113 F.3d 1258 (Fed. Cir. 1997)
.............................................................................................................. 29, 32

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) ...................................................... 24, 29, 30, 32

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ............................................................... 40, 51

*Unilogic, Inc. v. Burroughs Corp.*,
10 Cal. App. 4th 612 (1992) ..........................................................................37

*United States v. Able Time, Inc.*,
545 F.3d 824 (9th Cir. 2008) .........................................................................63

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) .................................................................. 37, 48

*Vacco Indus., Inc. v. Van Den Berg*,
5 Cal. App. 4th 34 (1992) ..............................................................................55

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ......................................................................40

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ................................................................ 40, 41

*Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir. 2012)..42

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) ....................................................................41

*Yield Dynamics, Inc. v. TEA Sys. Corp.*,
66 Cal. Rptr. 3d 1 (Cal. App. 2007) ...............................................................35

**Statutes**

15 U.S.C. § 1116(d) .........................................................................................63

15 U.S.C. § 1116(d)(1)(B)(i) ..............................................................................61

18 U.S.C. § 1836 ...............................................................................................10

28 U.S.C. § 1295(a)(1) .......................................................................................10

28 U.S.C. §§ 1331 .............................................................................................10

28 U.S.C. §§ 1338(b) .........................................................................................10

28 U.S.C. §§ 1367 .............................................................................................10

Cal. Civ. Code § 3426.1(b) ................................................................................57

Cal. Civ. Code § 3426.1(d)(1) .............................................................. 27, 33, 34

Cal. Civ. Code § 3426.2(a) ................................................................. 53, 54, 55

**Other Authorities**

3 McCarthy on Trademarks and Unfair Competition § 25:15.50 (5th ed.)...61

Restatement (Third) of Unfair Competition § 39 cmt. f............................ 28, 29, 33

Restatement (Third) of Unfair Competition § 39, cmt. e .......................................35

**Rules**

Fed. R. App. P. 32(a) .......................................................................................66

Fed. R. App. P. 32(f)..........................................................................................66

## Jurisdictional Statement

The district court had jurisdiction under 18 U.S.C. § 1836 and 28 U.S.C. §§ 1331, 1338(b) , and 1367. Appx227, Appx249-251.

This Court has jurisdiction because the district court entered a final judgment and then an amended final judgment. Appx10476, Appx10. The district court denied Defendants' post-judgment motions. Appx12387-12390, Appx10503, Appx10526. Defendants timely appealed on March 17, 2025. Appx12383. The district court then entered a corrected amended final judgment, Appx1, and Defendants amended their notice of appeal. Appx12417-12420. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## Statement of the Issues

1. Whether conceptual ideas disclosed in prior patents and a list of medical instruments for a surgery are entitled to trade secrecy.
2. Whether the district court's award of $5.7M in royalty damages was reasonable.
3. Whether the district court erred by granting additional remedies under CUTSA, including exemplary damages.
4. Whether the district court erred by holding certain Defendants liable.
5. Whether the district court erred by granting relief on the non-CUTSA claims for counterfeiting and patent invalidity.

## Statement of the Case

Plaintiffs Dr. Elist, Menova, and International Medical Devices, Inc. (IMD) obtained a judgment currently worth more than $21 million based primarily on general ideas that Elist says he shared with Dr. Cornell during a brief visit between the two physicians on March 30, 2018. During that visit, Cornell observed Elist perform four Penuma (a penile enhancement surgical implant) operations and took some notes on an index card. Elist asserted that he told Cornell various untested, conceptual ideas for improving the Penuma during the visit. Elist admits that his claim "comes down to the conversations . . . in the operating room." Appx13165. Cornell directly denies that Elist told him any ideas for future improvements to Penuma during the visit.

Following the visit, Cornell and other Defendants began working to develop a cosmetic implant that improved on the Penuma in several respects. Ultimately, no version of Elist's Penuma used these untested ideas, and even today, no patient has ever received an implant that incorporates these ideas, from Plaintiffs or Defendants.

***Elist's "Trade Secrets."***

Elist does not claim that he shared any written materials, prototypes, or specific designs with Cornell. Appx13164-13165. Elist only claims he discussed various untested ideas for how he might try improving the Penuma—even though,

throughout eleven years of visits by different doctors, Elist had never shared these ideas with anyone else. Appx14900.

Here is what Elist testified that he told Cornell about his ideas for the future:

***Internal Voids.*** The current Penuma is construed of a solid silicon sleeve, which makes it unnaturally rigid. Appx13114-15. Elist claims that he told Cornell: "We try just to make it softer by having void or empty spaces inside that." Appx13138; *see also* Appx13616 ("[W]e are thinking about putting voids and spaces, large one, a small one, in different part of the implant so make the implant more flexible.").

***Mesh Tabs.*** The current Penuma is attached by non-absorbable sutures into a continuous sheet of mesh folded over the end of the implant. Elist claims to have shared the idea of replacing that mesh sheet with mesh tabs (i.e., pieces of mesh) attached to the implant. "I said, you know, at some point, I would like to talk to the company and get the mesh and make a tab and put it on the implant [.]" Appx13139.

This mesh tab would be "embedded in the implant" and "instead of going all the way around, it's just broken up into pieces." Appx13168; *see also* Appx13142 ("[T]his should be tab. It should not be continuous. It should be tab in that area."); Appx13616 ("I'm thinking instead of covering the whole tip of the distal end of the penis with mesh, we try to put the mesh tab different part of the penis….").

***Absorbable Sutures.*** The current Penuma is attached to the body with nonabsorbable sutures. Elist claims he said: "[I]f I put the mesh, then I can change my suture also. Instead of using nonabsorbable suture, I can put absorbable suture." Appx13616; *see also* Appx13144 ("And mesh and the implant, after growing the tissue, it stay there, and the suture dissolves ….").

These vague statements are the sum total of what Elist testified he disclosed to Cornell in the training session. This brief refers to these three concepts as the "Potential Improvement Ideas." According to Elist, he came up with them more than ten years before he met with Cornell but "didn't do anything with them." Appx13198. No version of the Penuma has incorporated them, and no patient has ever received an implant that incorporates these ideas. And although other doctors had been visiting Elist for more than a decade to observe the Penuma procedure, Elist claims he never shared these concepts with anyone until Cornell's questions prompted him to disclose them to a doctor he had never met before. Appx14900.

Elist testified that he had no idea whether these concepts would actually improve the product. Whether they would improve the Penuma is "speculation." Appx13199-13200. "I cannot tell you it is better or worse." *Id.* Testing these ideas and incorporating them into a commercial product would—according to Elist—have required a great deal of time and money. Appx13513.

***The Instrument List.*** The fourth alleged trade secret is different from the Potential Improvement Ideas. Elist claimed that Cornell also misappropriated a list of instruments and materials that might be used to perform the Penuma operation. Appx13194. Cornell received this list by email, without any confidentiality marking on the list. Appx13427-13428, Appx13431-13434, Appx15929-15930. No one told Cornell it was confidential. Appx14169. Elist's Penuma patent application states the operation "does not require special instruments." Appx13422. Elist agrees that the "vast majority of this list" are "regular surgical instruments." Appx13443.

***Defendants Develop Augmenta.***

According to Cornell, he "didn't ask any questions about improvements or potential improvements to the Penuma implant." Appx14162. "I was watching an operation. I asked him what suture he was using, and I asked him what mesh he was using. And I don't recall asking him anything else." Appx14163. Cornell is extraordinarily experienced in penile surgery:

> For the last 20 years, I have specialized in prosthetic urology, in penile surgery. As part of my training, I have done close to 2,000 penile implant operations. As a urology resident, I had done more penile implant operations than anybody before or since.

Appx14261. During the visit, Cornell saw "things that [he] wasn't comfortable with, things that [he] would improve upon." Appx14261-14262. According to Cornell, during the procedures, he was "detailing things that [he] would improve." Appx14262.

> . . . I watched nonabsorbable sutures being placed near the neurovascular bundle, which was the biggest problem I had with the procedure.
>
> And I noticed the rigid implant that looked like it wasn't compressible, which I thought wasn't very physiologic.

Appx14270.

Cornell enlisted other Defendants to develop his own implant, Augmenta, and file a patent application in July 2018. Appx15892, Appx15977. Cornell first partnered with Defendant Mische, Appx13852, and then later Defendants Nichols, his company Defendant Huck Medical Technologies, and Defendant Run Wang, M.D., with funding from background investors like Defendant Finger. Appx13924-13928, Appx13731-13732. The Augmenta implant has never been sold, however. Critically, it does not use any of the Potential Improvement Ideas or Instrument List:

***Internal Voids.*** During trial, Ed Leicht, with IMD's engineering firm, testified that Elist had conceived of "voids fully encapsulated within the walls of the silicone." Appx13690. When shown photographs of the Augmenta implant, which contained "openings on one surface but not the other," Leicht admitted that the Augmenta pockets design is "different" from Elist's alleged concept. Appx13691-13692. Culley Carson, Plaintiffs' urologist expert, testified the same. Appx14657-14658.

***Mesh Tabs.*** Carson also admitted that this concept was disclosed in a patent published since 1980. Appx14654. To distinguish IMD's asserted trade secret from

the prior art, Plaintiffs' engineering expert, Troy Drewry, testified that these mesh tabs are "extending from the distal tip" of the implant. Appx14336, Appx14517, Appx16829. It is undisputed that the FDA-cleared, market-ready version of the Augmenta implant has no embedded mesh tabs, let alone mesh tabs "extending from the distal tip of the implant." Appx14051-52.

***Absorbable Sutures.*** Because the FDA-cleared version of Augmenta has no embedded mesh tabs at all, as just explained, the Augmenta implant necessarily could never use the *combination* of absorbable sutures with embedded mesh tabs.

***The Instrument List.*** Plaintiffs' expert Carson testified he does not know how any Defendant used this list at all. Appx14673-14674. Leicht (with IMD's engineering firm) confirmed that such a list "would have no bearing on the implant." Appx13688. Defendant Mische, a prior contract engineer and the only individual to receive a copy of this list from Cornell, testified to the same. Appx13914.

| **"Trade Secret"** | **Augmenta Implant** |
|---|---|
| Internal Voids | No. Open pockets on the bottom surface of the silicone |
| Mesh Tabs | None |
| Absorbable Sutures | No embedded mesh tabs, alone or in combination with absorbable sutures |
| Instrument List | Not Applicable |

***Trial.***

Trial centered around the March 2018 visit and its aftermath. At trial, Plaintiffs asserted claims for trade-secret misappropriation against all Defendants under the California Uniform Trade Secret Act (CUTSA); a trademark infringement and counterfeiting claim against Defendant Cornell and his P.A. (Professional Association) (together Cornell); copyright infringement against three Defendants; and contract claims against Cornell and Wang. Appx7109-7111.

To corroborate Elist's version of events, Plaintiffs brought three witnesses who were present the day of the visit: a surgical technician who had worked with Elist for years, a representative of the Penuma's manufacturer, and Elist's son, Jonathan Elist (who is the CEO of Plaintiff IMD). The surgical technician changed her testimony from her deposition to corroborate Elist's account of the events. Appx14578-14600. The manufacturer's representative, who testified only by deposition, did the same—after a break during which he conferred with counsel. Appx19401-03. And predictably, Jonathan Elist testified that he had personally observed Elist describe his ideas for future improvements to Cornell. Appx14741. The deck was stacked. Although Plaintiffs and their witness could change their stories to engineer a verdict, they could not change the undisputed record of prior patents placing each of the Potential Improvement Ideas in the public domain.

Specifically, Defendants introduced uncontroverted evidence that each of the Potential Improvement Ideas was publicly disclosed in patents. U.S. Patent No. 5,088,477 ("Subrini"), discloses a "penile filling implant" with "cavities" that can be used to adjust "hardness":

> [T]he presence of cavities filled or not with a fluid, inside the implant, makes it possible to give it a hardness less than that which it would have if it were formed of a solid and homogeneous body; its hardness may thus be reduced below the minimum values which it is possible to obtain at the present time with a normal medical silicon.

Appx16600, at 4:3-9; *see also* Appx14986-14988 (testimony that Subrini discloses the internal voids). And in addition to Subrini, the Small-Carrion implant, taught in an article published in 1975, Appx16851-16848, is a prosthesis with "medical-grade silicone exterior with silicone sponge interior." Appx16843; *see also* Appx14981-14982 (testimony regarding the Small-Carrion implant).

U.S. Patent No. 4,204,530 ("Finney") teaches an "implantable sleeve for increasing the penile diameter" that includes "suturing strips on the inside wall of the sleeve . . . which facilitate the suturing of the sheet." Appx16607. It teaches that these strips—which Finney suggests should be made from Dacron, a kind of mesh, Appx14653—can be replaced with "patches or material for suturing." Appx16610. IMD's expert admitted that Finney "discloses a silicone-based cosmetic penile implant with mesh tabs at the distal end that promote tissue ingrowth." Appx14654

("Yes. There are tabs . . . at the distal end, yes, that promote tissue ingrowth."); *see also* Appx14994-14996 (agreeing that Finney discloses mesh tabs).

And in an international patent application, Elist disclosed a "penile prosthesis with anchoring tabs" on the distal end:




Appx16611. The "tabs" are "extensions of [a] silicon netting" and "are anchored using sutures". Appx16620. According to Elist, this "netting" is "like mesh." Appx13219. The only difference between this disclosure and the alleged trade secret is the replacement of the mesh-like netting with mesh, which Plaintiffs failed to show was a secret to those in the industry.

Moreover, Elist's application incorporates Finney, which describes mesh tabs that promote tissue ingrowth. *See* Appx16620 (noting that "Finney US 4202530 [sic]" "is hereby incorporated into the present application by reference"); Appx14524-14526 (testimony about incorporation by reference).

Similarly, U.S. Patent No. 7,806,821 ("Kim") teaches the implantation of a penile implant using absorbable sutures. Appx17080, at 3:31-32 ("The multiple slits

implant is then applied to the space and fixed to the Buck's fascia with an absorbable suture."); *see also* Appx14997-15001 (testimony about absorbable sutures).

Plaintiffs urged the jury to disregard these disclosures, contending that patent disclosures preclude trade secret protection only if the patents were embodied in "actual products" in the real world. Appx14334. They returned to this theme time and again at trial: "Here's a Finney '530 patent. Never existed in the real world." Appx15265 (closing).[1] They elicited testimony from witnesses that "[p]eople in this industry . . . don't know all these patents that are out there." Appx15263-15264; Appx15015 (testimony that "it's not part of your routine practice to read patents for urological devices"). They questioned Defendants' expert about whether he had "seen articles about the . . . patents that have been discussed today." Appx15015. And they contended that the patent disclosures were irrelevant unless Dr. Cornell "reviewed [them] in order to develop the Augmenta." Appx15039.

[1] *See, e.g.*, Appx13518-13519 ("[D]o you know if the device reflected in this patent exists in the real world?"); Appx13698 ("Q Did a product ever arise from this patent . . . that you know of?"); Appx14337 ("[Y]ou're not aware of this particular patent ever being manufactured in the real world; is that right?"); Appx14334 ("Are you aware of any actual products on the market that were manufactured to conform to the Finney patent?"); Appx14619 ("Are there patents for penile implants that have not been turned into actual products?"); Appx15016 ("And you're not aware of the [Finney] cosmetic penile implant ever being converted into an actual product; is that right?"); Appx15025 ("So you don't know if this particular [Subrini] patent was ever turned into an actual product; is that right?"); Appx15028 ("[A]re you aware of any actual products on the market that were ever sold based on this Subrini '380 patent?"); Appx15264 (arguing that patents "haven't been proven to be effective" unless they "been reduced to a[n] actual product that is sold on the market"); Appx15266 ("No actual [Subrini] product exists on the market.").

Plaintiffs also argued the issuance of ’413 Patent conclusively proved that every limitation of every claim was novel. *See, e.g.*, Appx13508 (“[T]his patent issued in spite of the consideration of all those other patents.”); Appx13519 (“[T]his didn’t prevent the issuance of the two patents.”); Appx14670 (“[T]hose concepts were novel because they resulted in patents.”). Plaintiffs’ expert, for example, testified that “the claims of the patent” are “what the inventor is claiming to be novel, unique, and different than anything that’s in the public domain.” Appx14330. Thus, according to Plaintiffs, the issuance of a patent means that every limitation (including limitations in dependent claims) is necessarily “novel.”

***The Verdict.***

As it relates to the issues on appeal, the jury returned a verdict finding all Defendants liable for misappropriation of the mesh tabs and absorbable sutures, and only certain Defendants for misappropriation of the internal voids and instrument list. Appx7461-7464. The jury found for Elist on his counterfeiting claim against Cornell. Appx7465. The jury determined Cornell had also breached his NDA. Appx7466. Finally, the jury returned a verdict invalidating Patents ’413 and ’639 based on an argument that Elist was an inventor. Appx7467.

Notably, Plaintiffs did not request the jury make any liability findings to support exemplary damages, which were not mentioned in the Final Pretrial Order.

***Royalty Damages, Exemplary Damages, and a Permanent Injunction*.**

Prior to trial, the parties had stipulated that the district court "will consider whether a reasonable royalty should be awarded." Appx7100, Appx7097-7107. That was the extent of the stipulation. Yet, after the verdict, Plaintiffs requested the district court not only award them royalty damages, but also exemplary damages and a permanent injunction, among other remedies. Appx7631-7633; Appx8655-8663.

The district court held an evidentiary hearing and ultimately entered a final judgment awarding Plaintiffs most of their requested relief, including more than $5.7 million in royalty damages, more than $11.4 million in exemplary damages, $1,000,000 in statutory damages for the counterfeiting claim, a five-year permanent injunction on the four asserted trade secrets, and invalidation of the '413 and '639 Patents. Appx1-6; Appx10473-10475.

## Summary of the Argument

The heart of Plaintiffs' case was the supposed theft of three untested, general concepts (the Potential Improvement Ideas) and a list of surgical instruments and supplies (the Instrument List). All three Potential Improvement Ideas are generally known in the medical field and were disclosed in prior patents, which destroyed any confidentiality or trade secrecy they could have theoretically had as a matter of law. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (California law). The Instrument List recites basic surgical tools and supplies (like Hibiclens soap) with which any experienced penile surgeon would be familiar. The district court erred in denying Defendants' motions for judgment as a matter of law for lack of trade secrets.

Compounding those legal errors, the district court then performed an unreasonable royalty damages calculation, awarding $5.7M in royalty damages collectively for the Potential Improvement Ideas and the Instrument List. Among other problems, the district court's analysis conflated the asserted "trade secrets" with Defendants' Augmenta implant, which the evidence conclusively demonstrated does not use *any of these "trade secrets."*

In addition to these unreasonable royalty damages for hypothetical, future sales, the district court simultaneously enjoined any such sales from occurring with a permanent injunction lasting an arbitrary period of five years. Then, the district

court awarded more than $11 million in joint-and-several exemplary damages based on its own "findings"—not a jury's. Plaintiffs had waived any request for exemplary damages by omitting that request from the pretrial order. Because Plaintiffs had not identified these damages in the pretrial order, Defendants had no notice to request a jury finding on willful and malicious conduct. Instead, the district court decided to make that finding itself after trial. Doing so violated the Defendants' fundamental Seventh Amendment right.

Finally, the errors go beyond just the trade-secret claim. The district court invalidated two patents based on these same generally known "trade secrets," which could not constitute "clear and convincing" evidence of inventorship. The district court then awarded $1M in statutory damages for a counterfeiting theory that was not tied to the scope of the registered trademark, which *only* covered goods.

Defendants ask this Court to reverse and render judgment in their favor based on the foregoing errors, or otherwise reverse and remand for further proceedings.

## Standard of Review

The district court's denial of Defendants' motion for judgment as a matter of law is reviewed de novo. *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023) (Rule 50(a) analysis "mirrors" summary judgment analysis). Appx7326-7344; Appx10526-10557.

When tried to a court, calculation of royalty damages is a question of fact, reviewed for clear error. *Felder v. United States*, 543 F.2d 657, 663 (9th Cir. 1976).

The district court's permanent injunction is reviewed for an abuse of discretion, with any legal conclusions reviewed de novo. *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1359 (Fed. Cir. 2017).

The district court's invalidation of the '413 and '639 Patents is a mixed question of fact and law. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362–63 (Fed. Cir. 2004). On review, this Court determines if there is "substantial evidence to support any set of implicit findings" supporting the jury's verdict. *Id*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate support to accept a conclusion." *Id.* at 1363. Because inventorship requires "clear and convincing evidence," this burden is heavier. *Id.* ("What is or is not substantial may only be determined with respect to the burden of proof that the litigant bore in the trial court.").

## Argument

### I. As a Matter of Law, the Potential Improvement Ideas and Instrument List Do Not Constitute Trade Secrets.

#### A. The idea of applying a well-known concept to a particular product does not constitute a trade secret.

The Potential Improvement Ideas—untried and untested concepts about how the Penuma might be improved—do not constitute trade secrets as a matter of law. In California, a trade secret must be separate from "matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade." *Altavio, Inc v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 43 (Cal. App. 2014) (citation omitted); *see also Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (same); Cal. Civ. Code § 3426.1(d)(1) (definition).

As the district court acknowledged, the field of medical devices recognizes "general use of mesh for ingrowth and voids/internal pockets in a medical device." Appx33 n.5. That is true of adding "internal voids" to make silicone more flexible, Appx14032, using mesh tabs "to grow fibrous tissue into the mesh to fix something in position," Appx14622, and using absorbable sutures in combination with mesh. Appx14034, 14246. Plaintiffs' alleged secrets are just "contemplated use[s] of those [well-known concepts] in a penile implant." Appx33 n.5. But California law bars this theory as a matter of law. *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465–66 (9th Cir. 1990).

No case has permitted the mere idea of applying a well-known concept in a particular field or to a particular product to constitute a trade secret. On the contrary, "[s]elf-evident variations or modifications of known processes, procedures, or methods also lack the secrecy necessary for protection as a trade secret." Restatement (Third) of Unfair Competition § 39 cmt. f. Unless a plaintiff shows that the leap from a known concept to its particular application was "not generally known or easily duplicated by the industry," it is not entitled to trade secret protection. *Computer Care v. Service Sys. Enters.*, *Inc*., 982 F.2d 1063, 1075 (7th Cir. 1992).

In this case there was no evidence that the leap from well-known medical device concepts—namely, use of internal voids to soften silicone, use of mesh tabs, and use of absorbable sutures with mesh—to the idea of applying these concepts to a penile implant was not generally known or easily duplicated. As in *Computer Care*, "[n]othing in the record suggests that the possibility of using [these ideas] would not be obvious to someone entering the [cosmetic penile implant] business." *Id.* at 1073. "Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." *Id.*

According to Elist's own testimony, he merely shared the idea of applying generally-known medical device concepts in designing cosmetic penile implants. *See* Appx33. That sort of obvious application cannot be a trade secret in California. *Gusler v. Kawasaki Motors Corp*., 216 F.3d 1083, *1 (9th Cir. 2000) (unpublished).

**B. Each Potential Improvement Idea was disclosed in a patent.**

In addition, applications of these ideas to cosmetic penile implants were disclosed in patents, which eliminates trade secret protection: "[D]isclosure of a trade secret in a patent places the information comprising the secret into the public domain," and "the trade secret is extinguished[.]" *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (applying California law); *accord* Restatement (Third) of Unfair Competition § 39 cmt. f ("[I]nformation that is disclosed in a patent . . . does not qualify for protection[.]"). Consider the following patents:

- Subrini discloses a "penile filling implant" with "cavities" that can be used to adjust the hardness of medical silicon. Appx16600, at 4:3-9.
- Finney teaches an implantable sleeve "with mesh tabs at the distal end that promote tissue ingrowth." Appx14654; *see also* Appx16607.
- Elist's international patent application incorporates Finney and teaches a "penile prosthesis with anchoring tabs" on the distal end made of a mesh-like netting. Appx16611; Appx13219.
- Kim teaches implanting a penile implant using absorbable sutures. Appx17080, at 3:31-32.

Every one of the Potential Improvement Ideas is already in the public domain and thus cannot be a trade secret. *Stutz Motor Car of Am., Inc. v. Reebok Intern., Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995), *affirmed*, 113 F.3d 1258 (Fed. Cir. 1997) (applying CUTSA); *Gusler*, 216 F.3d at *1 (same).

These disclosures establish, as a matter of law, that the concepts cannot receive trade secret protection. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974) ("By definition a trade secret has not been placed in the public domain."). Plaintiffs' only responses to these disclosures rest on errors of law.

First, Plaintiffs claimed the industry was unaware of these patent disclosures because the patents had not been embodied by "actual products" in the "real world." *See, e.g.*, Appx15265 (Closing: "Here's a Finney '530 patent. Never existed in the real world."); Appx15263-15264 (Closing: "People in this industry ... don't know all these patents that are out there."). The district court relied on this evidence as a basis for denying Defendants' Rule 50(b) motion. *See* Appx32 n.2 (citing, *inter alia*, Appx14334, Appx14619). This Court's precedent refutes this theory. As a matter of law, "[i]nformation disclosed in a patent . . . is 'generally known to the public,'" *Ultimax*, 587 F.3d at 1355–56, and cannot receive protection as a trade secret.

Second, Plaintiffs committed an error that this Court repeatedly warns against in the patent context: giving the Potential Improvement Ideas different meanings for purposes of the alleged disclosures to Cornell and the alleged secrecy of the ideas. *See Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) (cautioning against "twist[ing] claims, like a nose of wax, in one way to avoid invalidity and another to find infringement" (internal quotation marks omitted)).

In attempting to distinguish the trade secrets at issue from the prior art patents, Plaintiffs described them far more narrowly than Elist's broad and vague supposed disclosures. *See*, *e.g.*, Appx14617 (defining "internal pockets" to mean only "remov[ing] some tissue . . . from the inside, and then seal[ing] the end"); Appx14654 (purporting to discuss the "location" of the tabs on the Penuma). This was error—like patents, trade secrets cannot be twisted like a "nose of wax." Plaintiffs' accusations of misappropriation rest on the vague concepts that Elist allegedly disclosed to Cornell, and to recover, Plaintiffs were required to prove that those concepts are trade secrets, not the narrower and specific designs discussed by its expert.

Third, Plaintiffs argued that the issuance of the '413 Patent conclusively proved the novelty (and thus secrecy) of the concepts allegedly disclosed by Elist. *See, e.g.*, Appx14760. This argument distorts elementary principles of patent law.

The issuance of the patent says nothing about the novelty of either mesh tabs or absorbable sutures, which appear only in dependent claims. *See* Appx15912, Claims 11, 12, and 15; *see also In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious[.]"). Plaintiffs' assertion that issuance of the '413 Patent conclusively proved the novelty of these dependent claims is frivolous, and the applicant never contended that either mesh tabs or absorbable sutures was novel.

Nor does the ’413 prosecution history show the novelty of Elist’s concept of internal pockets—it indicates the opposite. The initial proposed claims included “one or more internal pockets” that would “reduce rigidity of at least a portion of the implant.” Appx16254. The Examiner found that Subrini and an Elist patent taught this limitation. Appx16180. Following this rejection, the claims were amended to require “internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant.” Appx16172. The prosecution history also defines “internal pockets” in narrow and technical terms. Appx16167-16168; *see also* Appx16161-16162; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (noting that an inventor may “limi[t] the invention in the course of prosecution, making the claim scope narrower than it would otherwise be”). Only after this amendment and the narrowed definition of “internal pockets” were the claims allowed. Appx16146. The prosecution history confirms that the issuance of the ’413 Patent does nothing to show the novelty of the broad and vague concepts allegedly shared by Elist.

Information disclosed in a prior patent cannot receive trade secret protection. This Court has applied that legal rule repeatedly in cases brought under CUTSA. *See Ultimax*, 587 F.3d at 1355; *Gusler*, 216 F.3d at *1; *Stutz*, 113 F.3d 1258 at *2. This case is no different, and the rule forecloses Plaintiffs’ claims.

### C. The absorbable sutures idea adds nothing to the mesh tabs idea.

The "absorbable sutures" trade secret fails for an independent reason: it adds nothing to the "mesh tabs" trade secret. There are only two types of sutures: absorbable and non-absorbable. Appx14998. Absorbable sutures are "the most commonly used sutures in penile implants and other surgeries." Appx14998-14999. Because they cannot deny this fact, Plaintiffs contend that the "trade secret" is the combination of using absorbable sutures with mesh tabs. But all the alleged novelty in this combination is the mesh tabs. Plaintiffs never argued—much less proved—that a surgeon aware of mesh tabs would not also know to use absorbable sutures. *See also* Appx15001 (testimony that using absorbable sutures is not secret "as part of any type of therapeutic or cosmetic silicone penile procedure . . . in the field of urology").

Put another way, Plaintiffs did not prove there is anything secret about the *combination* of mesh tabs and absorbable sutures. Even if mesh tabs could constitute a protected trade secret, the combination of mesh tabs and absorbable sutures is not "a secret combination." Restatement (Third) of Unfair Competition § 39 cmt. f.

### D. There is no evidence that the Potential Improvement Ideas derive independent economic value from secrecy.

Not only must information be secret to constitute a trade secret, but it must derive independent economic value from its secrecy. Cal. Civ. Code § 3426.1(d)(1). There is no such evidence. No witness testified that any Potential Improvement Idea

"[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." *Id*.

The only evidence cited by the district court in denying the Rule 50(b) motion on this issue was a conclusory comment by Jonathan Elist, who is neither an expert witness nor a doctor. Appx33 n.4. He nakedly declared the "trade secret concepts ... were very valuable." Appx14759-14760. But conclusory testimony is insufficient to raise a fact issue. *See Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337 (Fed. Cir. 2014). And Dr. Elist said that turning his ideas into a commercial product would take millions of dollars—and whether they would add value is "speculation." Appx13513, 13199. This is the antithesis of a trade secret.

**E. The instrument list does not constitute a trade secret.**

Plaintiffs also accused Defendants of misappropriating Elist's instrument list, a list of common and well-known medical instruments that might be helpful to a surgeon implanting a Penuma. But there is nothing remotely "secret" about such a list of common medical instruments, which is just the sort of "general knowledge" that CUTSA denies trade secret protection as a matter of law. *See* pp. 27–28 *supra*.

According to Elist, a Penuma implant procedure "can be performed by any surgeon familiar with penile surgery." Appx14678. After performing the surgery, such a surgeon would know what instruments were used, making the information

readily ascertainable. Making a list of the instruments would require a trivial amount of time, effort, and expense—which is incompatible with a protectable trade secret. *See Morlife, Inc. v. Perry*, 66 Cal. Rptr. 2d 731, 735 (Cal. App. 1997).

Indeed, the complete Penuma surgical procedure is shown in a publicly available video. Appx14885; *see also* Appx14949 ("IMD is okay with the procedure being published[.]"). While they might claim that not all the instruments are visible, Plaintiffs cannot post a video of a procedure online while claiming the instruments used in that procedure constitute "trade secrets."

And yet again, Plaintiffs offered no proof that Elist's instrument list derived independent economic value from its secrecy. To find independent economic value, a factfinder "is entitled to expect evidence from which it can form some solid sense of how useful the information is, e.g., how much time, money, or labor it would save, or at least that these savings would be 'more than trivial.'" *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 66 Cal. Rptr. 3d 1, 18 (Cal. App. 2007) (citing Restatement (Third) of Unfair Competition, § 39, cmt. e). Plaintiffs failed to provide any such evidence. They offered only generalized testimony that an instrument list is "really important," Appx14643, not evidence that Elist's personal list derives any economic value from its alleged secrecy.

* * *

In summary, neither the Potential Improvement Ideas nor the Instrument List constituted trade secrets. The district court erred by failing to enter judgment as a matter of law on this basis.

## II. The Royalty Award Was Not Reasonable.

The award of a $5,772,044 lump sum royalty was unreasonable and unsupported by sound economic and factual predicates. The district court adopted Plaintiffs' damages model wholesale and awarded the royalties that model suggested over the five years of Dr. Cornell's NDA. Appx10461-10462. The district court clearly erred because it (1) used *all* of Augmenta's expected profits as the royalty base and adopted a royalty rate that failed to apportion those profits to the value of the trade secrets, (2) stretched the hypothetical license to five years, even though IMD planned to (and did) destroy the trade secrets within two years by filing patents on them, and (3) calculated a lump sum payment using a "rule of thumb" multiplier far higher than that implied by a real-world transaction. The Court should correct these errors, vacate the damages award, and remand for recalculation.

### A. Applicable Substantive Standards

A reasonable royalty under CUTSA reflects "what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." *Ajaxo, Inc. v. E*Trade Fin. Corp.*, 48 Cal. App. 5th 129, 160 (2020) (quotation marks omitted). Calculating that sum typically involves "modeling a hypothetical

negotiation between the trade secret owner and trade secret user at the time the misappropriation began." *Id.* at 166 (quotation marks omitted). The "goal" "is to measure the value of the trade secret to the defendant." *Id.* at 170.

California courts frequently refer to the *University Computing* framework, which encourages "a flexible and imaginative approach to the problem of damages." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). That framework considers the (1) value of the trade secret to the plaintiff, (2) defendant's intended use, (3) change in competitive posture, and (4) price of past licenses. *Id.* at 539.

California courts have recognized that CUTSA's "hypothetical negotiation" framework mirrors that used in patent cases. *Ajaxo*, 48 Cal. App. 5th at 161. This accords with a "general trend of patterning trade secret damages after patent damages," and applying tools from patent law, such as the *Georgia-Pacific* factors and apportionment principles. *Id.* at 161, 169.

This Court has held that reasonable royalty awards "must be based on sound economic and factual predicates." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003) (quotation marks omitted) (collecting cases). The burden is Plaintiffs' to present "evidence that would allow the court to determine what royalty, if any, would be reasonable." *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 628 (1992).

### B. The royalty was not reasonably apportioned.

The district court erred by failing to properly apportion the royalties to the value of the trade secrets.

As in patent law, CUTSA plaintiffs "must in every case give evidence tending to separate or apportion the trade secret owner's damages between the trade secret and other features." *Ajaxo*, 48 Cal. App. 5th at 169 (cleaned up). California courts have endorsed "[t]he derivation of these standards from patent cases" (*id.*), where "apportionment is required" "[w]hen[ever] the accused technology does not make up the whole of the accused product." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). In such cases, "[t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the [IP] adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). To determine that royalty, courts must "[1] identify[] the incremental value of the claimed technology over noninfringing alternatives and [2] determin[e] how that gain would be shared." *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 876 (Fed. Cir. 2024) (cleaned up).

Here, the district court clearly erred because it never determined the incremental value added by the trade secrets. Its errors infected its analysis of (1) royalty base, (2) royalty rate, and (3) bargaining positions.

**1. Royalty Base**

The district court erred by accepting that "the misappropriated trade secrets are coextensive with … Augmenta" (and evidently with every other potential implant), and that the royalty base should therefore be "*all* of the profits anticipated by [Augmenta]." Appx7728.

But the trade secrets were *not* "coextensive" with the Augmenta implant, let alone with any alternative designs. Those trade secrets constituted an instrument list and three vague ideas about how the Penuma might be *improved*. *See* Appx9284-9285; Appx7716 ("trade secrets were … improvements"). Purported *improvements* are plainly not "coextensive" with the Augmenta implant—a full product with many other features (both old and new), and as it turned out, *none of the supposed trade secrets*. Appx9290.

Because the trade secrets were not coextensive with the Augmenta implant, the district court erred by setting the royalty base to "*all* of the profits anticipated by [Augmenta]." Appx7728. "Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the [rights holder] will be improperly compensated for non-infringing components of that product." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *see Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d

1308, 1326 (Fed. Cir. 2014) ("it is the exception, not the rule, that damages may be based upon the value of the multi-component product").

Here, the royalty base should have reflected the difference between the profits Augmenta could have obtained *with* the trade secrets and those it could have obtained *without*. *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1346 (Fed. Cir. 2023). Because the district court's royalty base calculation was not based on that measure, it does not reflect "the incremental value of the claimed technology over noninfringing alternatives." *Brumfield,* 97 F.4th at 876. The damages award should be vacated on that ground alone.

**2. Royalty Rate**

The district court compounded its errors by adopting Arst's 20% royalty *rate*, which fails to apportion the inflated royalty base to the small value of the trade secrets.

This Court has held that it does "not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011). But it has also contemplated that, at least theoretically, the base *can* be the value of the entire commercial embodiment, "so long as the multiplier accounts for the proportion of the base represented by the infringing component or

feature." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338-39 (Fed. Cir. 2009).

Arst's nosebleed 20% does not. Arst justified that rate as the "midpoint" of rates implied by two transactions: (1) the Penuma Term Sheet ("PTS") and (2) OAM's sale of its IP assets for 15% of Augmenta ("OAM Transaction"). Appx7728-7732; Appx10458. But neither was a comparable license. Moreover, neither suggested those rates.

"[T]he basic evidentiary precondition" for using "prices paid in actual licenses" "is that such licenses be sufficiently comparable to the [hypothetical license]." *VLSI Tech.*, 87 F.4th at 1346 (cleaned up) (collecting cases). It is Plaintiffs' "burden to prove that the licenses it relies on are sufficiently comparable." *Roland Corp. v. inMusic Brands, Inc.*, 2025 WL 926703, at *13 (Fed. Cir. Mar. 27, 2025).

Even "[w]hen relying on comparable licenses," plaintiffs must "account for differences in the technologies and economic circumstances of the contracting parties." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022); *see also Roland*, 2025 WL 926703, at *13; *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010).

Arst failed to meet either requirement: neither the PTS nor OAM Transaction is a comparable license, and Arst did not properly account for their differences in technology and circumstances.

**a. Penuma Term Sheet**

The higher of the two rates Arst used (30%) came from the Penuma Term Sheet ("PTS"). Appx7730-7731. But it was error to consider the PTS because it is not a signed license, let alone one comparable in technology, breadth, nature, or duration.

As a threshold matter, the PTS has no probative value because nobody ever agreed to it. Appx15523; Appx15560-15561; Appx15567. To the contrary, the *offeree* rejected it. Appx15422; Appx7693. The evidentiary value of "proposed licenses … is limited," particularly when rejected by the offeree. *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012); *see Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1556-57 (Fed. Cir. 1983) (offer that "does not result in agreement because considered unacceptably high by the offeree" had "no significant persuasive value").

Even if the PTS had been agreed to, it would still have no probative value because it is not comparable to the hypothetical license.

*First*, there was no technology overlap between the PTS and the hypothetical license. Appx15422; Appx15563-15564. The PTS did not even mention the disputed

trade secrets. Appx15422. Likewise, the hypothetical license did not convey any rights included in the PTS. Because the two licenses have no technology overlap, they are not comparable. *ResQNet.com, Inc v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (licenses not comparable because "none of these licenses even mentioned the patents in suit").

*Second*, the PTS is a broader and more significant agreement than the hypothetical license. Under the PTS, IMD would "give up" all *patents* and the *trademark* to its fully designed, FDA-cleared Penuma product. Appx15395; Appx9275; Appx9283; Appx9282. That is, IMD would sell the rights to its entire business. In contrast, under the hypothetical license, IMD would provide only a non-exclusive license to use limited, uncommercialized improvement ideas. Appx9284-9285. The PTS and hypothetical license therefore have profoundly different scopes and implications.

*Third*, the rights involved in the PTS and hypothetical license differ vastly in nature and duration. The PTS involved exclusive, perpetual ownership of a patent portfolio and trademark rights—exclusionary rights that would endure for many years. By contrast, the hypothetical license involved non-exclusive rights to "use" trade secrets that would be destroyed the moment either IMD or Augmenta commercialized or publicized them. And IMD planned to do just that within two years by applying for patents that would disclose the licensed trade secrets.

Appx15419; Appx15487; Appx15537; Appx15635-15636; Appx15642 (plans for 2020 patent); Appx7701 (same). The narrow, non-exclusive, and ephemeral rights of the hypothetical license are thus not comparable to the broad, exclusive, durable rights of the PTS.

Notwithstanding these key differences between the PTS and the hypothetical license, Arst leaned on the PTS for nearly every part of his analysis. *See* Appx7730-7731 (royalty rate); Appx7685 (lump sum); Appx7692 (*University Computing*); Appx7713-7719 ("market approach").

The district court dismissed these concerns for two reasons. Appx6391; *see* Appx1994-1995; Appx10511-10512. Neither holds water.

*First*, the district court held that comparing the hypothetical license to the PTS was permissible because Arst had considered the *University Computing* factors. Appx6391. The district court did not elaborate on what in that consideration suggests the two licenses are comparable or provides any basis for comparing their royalty rates. Nothing does.

*Second*, the district court observed that Arst had compared the PTS to the hypothetical license by (1) identifying certain "elements of comparability" and (2) noting that the PTS's broader scope suggested an unspecified "downward influence on the [hypothetical] royalty." Appx6391 (citing Appx7716). Neither of these half-measures reflects an actual apportionment.

To start, the "elements of comparability" were so superficial that they could apply to nearly any license. Indeed, a perpetual license to all of Nike's sneaker IP would be similarly comparable to a non-exclusive short-term license to place voids in sneaker soles. Both would:

> (1) include at least [Nike] as the licensor, (2) grant rights to technology related to [sneakers] developed by [Nike], (3) be negotiated against the backdrop of the significant market potential for [sneakers], (4) result in the loss of control of Plaintiffs' intellectual property asset, and (5) result in compensation terms that include significant fixed fee license payments.

Appx6391. These superficial "elements of comparability" offer no basis for comparing the royalties paid under two vastly different licenses, like the PTS and the hypothetical license. And indeed, Arst did not even try to use those elements for that purpose. *See* Appx7718-7719.

To be sure, Arst did note that, because PTS is "a broader [IP] portfolio," he would expect unspecified "downward influence on the royalty." Appx7715-7718; Appx6391 (citing Appx7716). But that is not an adequate comparison. Arst could have said the same about the two Nike licenses, and it would be equally unhelpful. "It is not enough that [plaintiff] merely *identified* a difference" between a real-world and hypothetical license. *Roland*, 2025 WL 926703, at *13. Instead, the Plaintiff must "account[] for such distinguishing facts in invoking [the licenses] to value the [hypothetical license]." *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1381

(Fed. Cir. 2021) (cleaned up). Simply noting that one license is more valuable than another—without elaboration or quantification—is not apportionment.

But that is all Arst did here. It was therefore clear error for Arst—and the district court—to rely on the non-comparable PTS to nearly double the royalty rate. Appx7732.

#### b. The OAM Transaction

The other data point the district court used was the 12.5%-13.4% "royalty" Arst derived from the OAM transaction (wherein the original Augmenta developers, Cornell and Mische, assigned their IP rights to Augmenta LLC). Appx7728-7730. That reliance was likewise clearly erroneous for (1) relying on a broader agreement without apportionment, and (2) misinterpreting it to imply a 12.5%-13.5% royalty rate.

*First*, the OAM transaction involved more IP rights than did the hypothetical license, and Arst failed to apportion. OAM bought 15% of Augmenta LLC in exchange for all of OAM's "preliminary designs, provisional patent application, and any other intellectual property." Appx7728 (quotation marks omitted). That payment included more than the trade secrets—*e.g.*, Hans Mische's intellectual property, which constituted potentially 40% of the payment. Appx9307. "Allegedly comparable licenses may cover more [rights] than are at issue in the action, however, testimony relying on licenses must account for such distinguishing facts when

invoking [the licenses] to value the [rights in the action]." *Roland*, 2025 WL 926703, at *13. Arst did not. It was therefore clear error to equate the 15% share OAM received for its entire IP portfolio with the trade secrets *alone*. Appx7730.

*Second*, the price OAM received for its IP (*i.e.*, 15% of Augmenta LLC) does not equate to a 12.5%-13.5% royalty rate. The district court based that translation on the unsupported assumption that Augmenta would obtain a higher operating margin than 99.95% of all manufacturing companies in the country. Appx9304-9306.

To translate OAM's 15% share into a royalty rate, Arst used a wildly unrealistic ratio of Augmenta's projected operating profits to projected revenues (*i.e.*, "operating margin")—*an unbelievable 89.6%*. Appx7730 ("$182 million in revenue and more than $163 million in pre-tax profits"); *see* Appx9304-9306 (Hatch critique). For comparison, IMD's operating margin the year before the hypothetical negotiation was *4.5%*. Appx9305. That year, fewer than *1%* of all manufacturing companies obtained a margin of even *50%*. Appx9305. Had Augmenta achieved the *89.6%* operating margin Arst used, Augmenta would have been one of the top three most profitable manufacturing companies in the United States. Appx9305. The operating margin used was thus unrealistic.

This mistake was impactful because reducing the operating margin would have reduced the implied royalty rate proportionately. For example, had Arst applied a reasonable margin (like 30%, Appx9306), the royalty rate he would have derived

for the OAM transaction would have been only 4.5%—far lower than the 12.5%-13.5% he advanced.[2]

### 3. The district court misunderstood the parties' relative bargaining positions.

Apportionment requires not only "identifying the incremental value of the claimed technology," but moreover, "how that gain would be shared." *Brumfield*, 97 F.4th at 876. The answer is informed by the strength of bargaining positions and the competitive impact of the hypothetical license. *Univ. Computing*, 504 F.2d at 539.

Arst's consideration of these issues was poisoned by a critical misunderstanding: that "the hypothetical license grant would enable the market entry of the Augmenta Implant." Appx7732; *see* Appx15471 (hypothetical license would "enable a new head-to-head competitor"); Appx7718-7719 (¶ 106) (hypothetical license covers the "technology necessary to commercialize the Augmenta").

No evidence suggests the minor improvement ideas in the hypothetical license were either necessary or sufficient to create a competing product. Indeed, none of those ideas was used in either the existing Penuma implant or in the FDA-approved Augmenta implant. Appx15427-15429; Appx9238 (citing Appx7476-7483). As IMD and Arst admitted, the hypothetical license merely covered ideas for possible "improvements"—not a complete competing product, let alone the only possible

[2] In Arst's table at Appx7730, simply replace the "Forecasted Operating Profits" with 30% of the "Forecasted Revenues."

competing product. Appx7716 ("trade secrets were … improvements"); Appx15514 (trade secrets were not "[t]he general concept of a cosmetic penile implant").

Far from *necessary* to enable competition, the trade secrets were not even *valuable* for that purpose. Despite conceiving those ideas *in 2008*, Appx15436, IMD did not even *try* to leverage them for nearly a decade. Appx9288-9289. And when it finally did try (in 2017), it failed. Appx9288-9289.

Arst's misunderstanding that the trade secrets were necessary to "enable the market entry of the Augmenta," Appx7732, led him to erroneously infer that the hypothetical agreement "would have [had] a profound impact on the market" and that IMD would therefore have had "no economic incentive" to deal. Appx7690.

Those inferences are unsupported: the trade secrets were not necessary to enable Augmenta's market entry, and IMD would have had an economic incentive to deal. It is incredible to suggest that the year after its long-delayed, failed effort to commercialize these vague trade secrets—a year in which IMD's total sales were $480,500—IMD would have been in a strong position to demand a $5,772,044 lump sum to "use" those vague ideas for five years, notwithstanding IMD's plans to destroy their trade secret status in two years. It is even more incredible to suggest that an unfunded startup with no product, sales, or money would have (or could have)

paid that sum for such a worthless license. Yet Arst relied on all these unsupported inferences throughout his apportionment analysis and elsewhere.[3]

### C. The duration of the hypothetical license was unreasonable.

Another clear error concerns the duration of the hypothetical license. The district court adopted a five-year term to match Dr. Cornell's five-year NDA. Appx10462. But that duration was overlong because, at the time of the hypothetical negotiation, IMD planned to apply for patents on the trade secrets—and thus destroy them—*within two years*.

The hypothetical negotiation would have taken place in March or "early April" of 2018. Appx7683; Appx9281. IMD representatives testified repeatedly that, at that time, IMD planned to patent the disputed trade secrets "sometime in 2020, maybe 2021." Appx15419 (Mr. Elist); *see* Appx15487 (Arst), Appx15537 (Arst), Appx15635-15636 (closing); Appx7701 (Arst). Indeed, those witnesses testified to IMD's "pattern and practice of filing patents to protect its ideas." Appx15486; *see* Appx15642 (closing), Appx15635-15636 (closing).

Taking a five-year license in light of those plans would have been folly: not only did IMD plan to destroy the trade secrets years before the license expired, but IMD could potentially use its future patent rights to prevent Cornell from

[3] The same error also poison's Arst's analysis of (1) the *University Computing* factors, Appx7690-7692, Appx7701; Appx15471; (2) quantitative royalty, Appx7718-7719, Appx7720-7721; (3) royalty base, Appx7728; (4) royalty rate, Appx7732, and (5) lump-sum conversion, Appx7684.

commercializing the products he had developed using those trade secrets. Given the circumstances, the district court clearly erred by ordering five years of royalties.

**D. The lump-sum conversion was unreasonable.**

The district court also erred when converting the five-year royalty to a lump-sum "present value" using a 35% rule of thumb, because that figure is insufficiently tied to the facts of the case. Appx10458-10459; Appx7732-7740.

Damages calculations cannot rest on generalized "rules of thumb" plucked from academic literature and thus untethered from the facts of the case. *Uniloc*, 632 F.3d at 1312-18 (rejecting "25 percent rule of thumb"); *Virnetx,* 767 F.3d at 1334 (rejecting 50/50 rule of thumb). Rather, a hypothetical negotiation must "account for the unique relationship between the parties." *Uniloc*, 632 F.3d at 1313.

The prohibition on rules of thumb applies here because Arst converted his 5-year royalty into a lump-sum "present value" using a 35% rule of thumb he found in a book. Appx7732-7734. That book endorsed a 30-40% range for "high risk" projects, which Arst considered Augmenta to be, and Arst simply used the midpoint of that range. *Id.* Arst made no further effort to tie his 35% figure to the facts of this case—whether to its parties, their products, their circumstances, their industry, or to any other relevant facts. Arst's 35% figure, plucked from generalized academic literature, is therefore an impermissible "rule of thumb" with insufficient grounding in the facts of the case.

Arst's course was particularly problematic here where the facts suggest a far steeper discount was appropriate. In 2018, Lata Lignum purchased 37.4% of Augmenta LLC for $300,000. Appx9301. If Arst's 35% "present value" conversion were correct, Lata Lignum should have paid well over $10M.[4] That Lata Lignum actually paid 3% of that price suggests Arst's present value conversion is dramatically wrong.

There is a ready explanation for why: the future profit projections Arst used were simply too rosy. Appx9300-9302. That is not hard to see. From 2017-2020, IMD (with its FDA—approved product and decade of market experience) averaged $713K in annual sales. Appx9302-9303. According to the projections Arst used, in its first five years, Augmenta (with no FDA—approved product and no market experience) would average over $36M in annual sales. Appx16394; Appx7730. Those projections were plainly speculative.

To be sure, Arst pulled the sanguine projections from Augmenta's own fundraising literature. But that literature presented only "best guesses," Appx13943, not certainties or even likelihoods. As Mr. Finger testified, the projections were "made with dozens of assumptions" and were thus highly speculative. Appx13943; *see* Appx9300.

[4] Apply Arst's annual "discount factors" (Appx10459) to Lata Lignum's 37.5% of Augmenta's projected profits over five years (Appx16394). *See also* Appx9301 (Hatch making similar point that Arst's *10-year* model valued OAM's 15% of Augmenta LLC at $15.44M).

Investors recognized the same. That much is clear from Augment's failure to raise more than $1M, notwithstanding its projections of over $163M in profits over five years. Appx9301; Appx16394. The parties at the hypothetical negotiation would have surely also recognized the speculative nature of the projections and adjusted their risk rates accordingly.

It was clear error for the district court to ignore these facts of the case in favor of a general-purpose 35% rule of thumb found in a textbook.

## III. The District Court Erroneously Awarded Additional Remedies under CUTSA.

### A. The Award of Exemplary Damages Must Be Reversed.

Defendants adopt by reference the challenges to exemplary damages presented in Richard Finger's appellant's brief. *See* Finger Br. pp. 24-31, 34.

### B. The Five-Year Trade-Secrets Permanent Injunction is an Abuse of Discretion.

The district court entered a five-year permanent injunction barring Defendants from "using, licensing, selling, exploiting, commercializing, promoting, marketing, advertising, publishing and/or profiting from" the Potential Improvement Ideas and the Instrument List. Appx10473-10474. This injunction was an abuse of discretion.

First, the five-year term lacks any evidentiary support, making it arbitrary. Under CUTSA, a permanent injunction cannot last once the trade secret is no longer secret. *See* Cal. Civ. Code § 3426.2(a). Plaintiffs admit that their trade secrets, if they existed, were destroyed prior to trial. Appx13593-13594. As a result, the only

argument for any permanent injunction was "for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Cal. Civ. Code § 3426.2(a). But Plaintiffs offered no evidence to support a five-year "head start" injunction. Indeed, Plaintiffs did not even try to support a five-year "head start" injunction because they requested an even longer, seven-year "head start" injunction, which also lacked any evidentiary support. Appx9169.

The actual Augmenta product that Defendants developed contained none of Plaintiffs' asserted trade secrets. Appx7477-7483. The only trial testimony concerning the time it took Elist to develop the asserted trade secrets was vague and generalized claims of "20 years for me to come up with ideas, different ideas, different trade secrets and all these things . . . ." Appx13606. This testimony does not explain the time it took Elist to develop the four asserted trade secrets specifically, such that Defendants obtained a "head start" by avoiding that development time. In any event, the vague "20 years" assertion contradicts Elist's declarations that he began implanting Penuma in 2004 and came up with these ideas in 2008, after just four years. Appx9170-9171.

Plaintiffs argued for a seven-year "head start" injunction by claiming that, had there been no misappropriation, Plaintiffs would have patented the ideas first and could have barred Defendants for 20 years under patent protection, so seven years

"is certainly a reasonable period." Appx8668-8669. In making that argument, Plaintiffs identified no supporting evidence. Appx9171-9172. That is not a head-start argument, but in any event, the district court did not accept it.

Instead, the district court's five-year period arose from Cornell's NDA, which was entered March 30, 2018 and expired after five years, on March 30, 2023. Appx10471. The district court transposed this five-year period to begin the date the permanent injunction was entered. Appx1052. But there is no evidence that five years reflects the "head start" that Defendants obtained; it is just the term of an NDA. The district court conflated apples and oranges.

Second, the district court made a legal error in awarding royalty damages and a permanent injunction. Cal. Civ. Code § 3426.2(a). They are alternative remedies. In arguing otherwise, Plaintiffs cited two California cases that awarded a permanent injunction alongside compensatory damages for past harm. *See, e.g.*, *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 41 (1992); *Comet Techs. USA Inc. v. XP Power LLC*, No. 20-CV-06408-NC, 2022 WL 4625149 (N.D. Cal. Sept. 30, 2022). Neither of those cases involved the award of reasonable royalties on projected future sales. In short, without any supporting precedent, the district court awarded royalty damages for future sales by Defendants, while also barring Defendants from making those sales for five years. That resulted in an untenable, duplicative award.

Third, the district court's injunction scope is overbroad because the descriptions of the four asserted trade secrets do not track the evidence at trial. Plaintiffs' witnesses described the trade secrets as follows:

- The internal pockets: "voids fully encapsulated within the walls of the silicone." Appx9176; Appx13690-13692.
- The mesh tabs: "mesh tabs *extending from* the distal tip of the implant." Appx9177, Appx14336, Appx14517 (emphasis added).
- The absorbable sutures: the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs *extending from* the distal tip of the implant." Appx9178, Appx14336, Appx14517 (emphasis added).

Despite this testimony from Plaintiffs' witnesses, the district court's injunction uses broader language, which Defendants opposed. Appx9175-9178. The district court's paragraph 1(a) of the injunction should specify that the use of open pockets on one surface of the implant, as opposed to fully encapsulated, is not enjoined. Similarly, paragraphs 1(b) and (c) should only restrain the use of mesh tabs *extending from* the distal tip of the implant, Appx9177, Appx14336, Appx14517, Appx14523-14524, not any mesh tabs "embedded in and around the distal tip of the implant". Appx10474.

## IV. The District Court Erred by Imposing Liability on Certain Defendants.

### A. Plaintiffs Lack Misappropriation Evidence for Multiple Defendants.

Because it is undisputed that only Cornell attended the March 2018 visit with Elist and signed an NDA, Plaintiffs had to establish that the other Defendants "knew

or had reason to know" that Cornell had improperly acquired each asserted trade secret or otherwise had some duty to limit use or maintain secrecy of each asserted trade secret. Cal. Civ. Code § 3426.1(b). Plaintiffs fell short.

Specifically, as for Wang, he testified that Elist never discussed any of the four asserted trade secrets with him, and that he never discussed them with any other defendant. Appx13816-13817. Thus, there is no evidence of him obtaining the trade secrets from Cornell, even somehow indirectly from another Defendant. Plaintiffs could not simply ask the jury to disbelieve Wang—they had to offer evidence to meet their burden. *See, e.g.*, *Homeland Houseware, LLC v. Sorensen Research*, 581 F. App'x 869, 874 (Fed. Cir. 2014).

For Mische and his company, the evidence is similarly one-sided. Mische testified that he never received anything from Cornell that he knew to be confidential. Appx13912. That testimony is unrebutted. While Cornell forwarded Mische the Instrument List, there is no evidence whatsoever showing that Mische either (1) knew it was covered by an NDA or otherwise confidential, or (2) did anything with it. Appx13912-13914.

For Nichols and Huck Medical Technologies, the lack of evidence is equally stark. Nichols explained that he told Cornell about the idea "to put honeycomb pockets into the Augmenta implant design," not the other way around. Appx14017. Nichols further denied receiving any of the four asserted IMD trade secrets.

Appx14049, Appx14060. During examination, Plaintiffs' counsel reaffirmed as much. Appx14063 ("Q. And you have never asked Dr. Cornell what information he got from Dr. – if, in fact, he did get confidential information form Dr. Elist? A. No.")

### B. The Contract Claim against Cornell Fails for the Same Reasons as the Trade-Secret Claim.

At trial, Plaintiffs' asserted an alternative breach of contract theory against Cornell based on the same information Elist supposedly told Cornell during his March 30, 2018 visit and disclosed in the '413 and '639 Patents. In other words, the evidence supporting the trade-secret claim is identical to that supporting the claim for breach of Cornell's NDA. Appx13042-13043; Appx13049-13055. The district court relied on the jury's breach finding as an alternative basis for the royalty damages award. Appx5.

The Potential Improvement Ideas and the Instrument List do not satisfy the contractual definition of Confidential Information, Appx15860, for the same reasons as described in Section I, *supra*. All the Potential Improvement Ideas were "generally available to the public" from disclosure in prior patents. As for the Instrument List, according to Elist, a Penuma implant procedure "can be performed by any surgeon familiar with penile surgery," Appx14678, which means the information is "generally available to the public [*i.e.*, any surgeon familiar with penile surgery] other than as a result by disclosure" of Cornell. Appx15860. Indeed, a video of the Penuma surgery is publicly available on the Internet, undermining any

claim that the instruments used during the procedure are somehow secret. Appx14885; *see also* Appx14949.

## V. The District Court Erred in Awarding Additional Relief on the Non-CUTSA Claims for Counterfeiting and Patent Invalidation.

### A. Elist Did Not Prove Inventorship to Invalidate the ’413 and ’639 Patents.

The district court also invalidated the ’413 and ’639 Patents based on the jury’s finding that Elist was an inventor not named in the Patents. Appx15; Appx7388. Elist had the burden to prove by “clear and convincing evidence” that he was an inventor on the ’413 and ’639 Patents. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). His theory was that he told Cornell about “internal pockets” (one of the Potential Improvement Ideas), which was his contribution to the Patents.

First, as discussed above in section I.B, the Potential Improvement Ideas had been disclosed in prior art. This Circuit has made clear that “a contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception.” *Eli Lilly & Co.*, 376 F.3d at 1362; *see also Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1357 (Fed. Cir. 2009).

Second, at trial, Elist testified that Cornell and the other Inventor-Defendants (the Inventors) obtained the ’413 Patent by adding the idea of internal pockets. Appx13175. But the idea of internal pockets had been in the original application for

this Patent, which the Examiner rejected for reasons of obviousness. Appx13176-13178, Appx14006-14010, Appx14056-14060. The '413 Patent was only approved by the Examiner after the Inventor-Defendants changed the language of the Patent to "Internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant." Appx14011 (referred to as gradient elasticity). Defendant Nichols and his company Defendant Huck Medical had the idea to use internal pockets in a specific configuration to create gradient elasticity, with a honeycomb pattern as one such configuration. Appx14017-14022; *see also* Appx14044-14045, Appx14052. Thus, Elist's generalized "internal pockets" idea was not the inventive subject matter that supported the Patent. *See Eli Lilly & Co.*, 376 F.3d at 1358-559 (describing how putative inventor must "contribute[] to the conception of the claimed invention" and that something "may not amount to a contribution to conception if they merely explain what was 'then the state of the art' . . . .) (cleaned up).

Elist offered no unique theory regarding the '639 Patent, Appx15209-15217, and so the foregoing arguments apply with equal force for the erroneous invalidation of the '639 Patent. Appx15209-15217.

**B. The Counterfeiting Claim Rests on a Mismatch Between the Registered Mark and the Evidence.**

Menova owns the federally registered Penuma mark for "implants comprising natural, non-living material." Appx1538. At trial, Plaintiffs claimed Cornell had

engaged in counterfeiting of the Penuma mark based upon advertisements listing Cornell as a "Penuma doctor" and various blog posts on Cornell's website describing Cornell as a "Penuma penile enhancement specialist" who performed "Penuma" surgeries. Appx14725-14727, Appx14730-14731, Appx13463. Plaintiffs did not offer evidence of Cornell putting "Penuma" on *an implant or its packaging*, nor of internet posts containing advertising a "Penuma *implant*" for sale. Appx13464. According to Jonathan Elist, Cornell was "trying to offer a service that he didn't have" by having the word Penuma on the website. Appx14961; Appx13039 ("But he didn't implant Penuma. He was waiting to give them his own competing implant.").

For counterfeit mark claims, it is a "statutory requirement . . . that the accused mark is used on goods or services that are the same as those for which the plaintiff's mark is registered." 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:15.50 (5th ed.); *see also* 15 U.S.C. § 1116(d)(1)(B)(i) (requiring that the owner's mark "is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed" as the counterfeit). Because Plaintiffs failed to offer any evidence that Cornell used a copy of the Penuma mark to sell, offer for sale, or distribute "implants, comprising of non-living materials"—the only thing for which Penuma is registered—the

counterfeit mark judgment and corresponding $1,000,000 statutory damages award cannot stand.

At trial, the Court issued Jury Instruction No. 24 over Defendants' objection that it did not match the goods for which Penuma is registered because it included both "goods or services". Appx7381. Plaintiffs capitalized on this overreach by arguing in closing that Cornell's "website used a counterfeit mark to Penuma goods, the product, and services, the procedure." Appx15248-15250, Appx15178, Appx15235. The inclusion of "services"—which the Penuma mark does not cover—erroneously led the jury and district court to consider whether Cornell had used the Penuma mark in connection with services (penile enhancement surgeries), not offering the sale of goods (implants). Plaintiffs purposefully conflated those concepts. Appx15248-15250.

In awarding statutory damages, the district court relied on internet posts describing (1) Cornell as a "Penuma penile enhancement specialist" or (2) "Penuma" procedures. Appx10464-10465. The district court reasoned that advertising "Penuma" or "penile enhancement surgeries" constitutes offering the sale of goods. Appx40-41. But penile enhancement surgeries are not the same thing as implants (or even a product to begin with). "Penuma" services (*i.e.*, procedures) cannot be counterfeits because "Penuma" only protects goods (*i.e.*, "implants comprising natural, non-living material." *See, e.g.*, *United States v. Able Time, Inc.*, 545 F.3d

824, 832 (9th Cir. 2008) (describing how "Congress included an explicit identity of goods or services requirement" in 15 U.S.C. § 1116(d)); *Kaloud, Inc. v. Shisha Land Wholesale, Inc.*, 741 F. Appx 393, 396 (9th Cir. 2018) (affirming directed verdict for flavored hookah water trademark when applied to charcoal hookah container because the two were not the same product); *Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*, No. CIV. A. 96-CV-6961, 1998 WL 288423, at *4 (E.D. Pa. June 3, 1998) (Bunny mark registered for "operating establishments which feature food, drink, and entertainment" could not form basis of counterfeit mark claim for "Bunny" applied to "hard core on-line services" on an adult web page). Because no evidence shows that Cornell used a counterfeit of the Penuma mark to sell, offer to sell, or distribute *implants*—as opposed to advertise penile surgery services—the counterfeiting damages should be reversed and rendered.

## Conclusion

For the foregoing reasons, this Court should reverse and render judgment against Plaintiffs and in the Defendants' favor based on the foregoing errors or otherwise remand for further proceedings.

June 17, 2025

Respectfully submitted,

*/s/ Kelsi Stayart White*
Kelsi Stayart White
Jason McManis
Weining Bai

**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101

*Counsel for Appellants Robert Cornell, Augmenta, LLC, Cornell Cosmetic Urology LLC, David Louis Nichols, Huck Medical Technologies INC., Hans Mische, Hans Mische LLC, Run Wang, and Robert J. Cornell, M.D., P.A.*

## Certificate of Service

I hereby certify that on June 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system for filing and served the foregoing document on all counsel of record via the ECF system.

*/s/ Kelsi Stayart White*
Kelsi Stayart White

**Certificate of Compliance with Type-Volume Limitations**

This brief complies with the type-volume limits of FED. R. APP. P. 32(a)(7) because this brief consists of 13,942 words as determined by Microsoft Word Office 365, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This word count incorporates the sections of Finger's Brief that are adopted by reference.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Times New Roman font.

*/s/ Kelsi Stayart White*
Kelsi Stayart White

**No. 2025-1580**

United States Court of Appeals
For the Federal Circuit

**INTERNATIONAL MEDICAL DEVICES, INC., MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC, CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS, HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE LLC, RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER**
*Defendants-Appellants*

**v.**

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendants*

2025-1580, 2025-1605

Appeals from the Central District of California in No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall.

# ADDENDUM TO BRIEF OF APPELLANTS

AHMAD, ZAVITSANOS & MENSING, PLLC
Kelsi Stayart White, *Principal Counsel*
Jason McManis
Weining Bai

1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101

*Counsel for Appellants (Other than Richard B. Finger)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

INTERNATIONAL MEDICAL DEVICES, INC. et al,

Plaintiffs,

v.

ROBERT CORNELL, M.D. ; ROBERT J. CORNELL, M.D., P.A. ; AUGMENTA, LLC ; AUGMENTA INVESTORS, LLC ; CORNELL COSMETIC UROLOGY, LLC ; DAVID LOUIS NICHOLS ; HUCK MEDICAL TECHNOLOGIES, INC. ; HANS MISCHE ; HANS MISCHE, LLC ; RUN WANG, M.D. ; and RICHARD B. FINGER,

Defendants.

Case No. 2:20-cv-03503-CBM (RAOx)

**CORRECTED AMENDED FINAL JUDGMENT**

Judge: Hon. Consuelo B. Marshall
Trial Date: June 6, 2023

In accordance with the jury's verdict in this matter (Dkt. 649) and the Court's Orders on Plaintiffs International Medical Devices, Inc. ("IMD"); Menova International, Inc. ("Menova"); and James Elist, M.D.'s (collectively, "Plaintiffs'") Post-Trial Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages (Dkt. 698) and Plaintiffs' Motion for Injunctive Relief and Patent Invalidation (Dkt. 699), the Court, pursuant to Federal Rule of Civil Procedure 58, enters this Corrected Amended Final Judgment in favor of Plaintiffs and against Defendants Robert Cornell, M.D., Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger (collectively, "Defendants") as follows:

It is hereby **ORDERED AND ADJUDGED** that:

1. Judgment is hereby entered in favor of Plaintiffs and against Defendants.

2. Defendants are jointly and severally liable to Plaintiff IMD for Misappropriation of Trade Secrets under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 1836, *et seq*., for a reasonable royalty as follows:

   a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $3,037,917.90 for misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

   b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic

Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $1,215,167.16 for misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $911,375.36 for misappropriation of the incorporation a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $607,583.58 for misappropriation of the incorporation a trade secret consisting of a particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

e. Defendants are liable for prejudgment interest at a rate of 7% pursuant to Cal. Civ. Code § 3287(c) accruing from March 30, 2018—the date

the trade secrets were misappropriated—until the date of entry of this Final Judgment.

3. Defendants are liable to Plaintiff IMD for exemplary damages for willful and malicious trade secret misappropriation under CUTSA § 3426.3(c) as follows:

a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell CosmeticUrology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $6,075,835.79 for willful and malicious misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $2,430,334.32 for the willful and malicious misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of

$1,822,750.74 for the willful and malicious misappropriation of a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $1,215,167.15 for the willful and malicious misappropriation of a trade secret consisting of particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

4. Defendant Robert Cornell is liable to Plaintiffs for breach of the Non-Disclosure Agreement. This finding supports an alternative basis for a reasonable royalty award to Plaintiffs in the amount of $5,772,044 and against Defendant Robert Cornell only.

5. Defendants Robert Cornell and Robert J. Cornell M.D., P.A. are liable to Plaintiff Menova for $1,000,000 in statutory damages for use of a counterfeit mark under 15 U.S.C. § 1117(c)(2), plus prejudgment interest in accordance with 26 U.S.C. § 6621(a)(2), accruing from April 22, 2020—the date Defendants were served with the original Complaint in this action—until the date of entry of this Final Judgment.

6. Defendants Robert Cornell, Hans Mische, and David Louis Nichols are liable to Plaintiffs in the amount of $1,650 for copyright infringement under 17 U.S.C. § 501.

7. Defendant Run Wang is liable to Plaintiffs for nominal damages in the amount of $1 for breach of contract.

8. Defendants shall pay post judgment interest on any amounts due after 30 days of the entry of the Amended Final Judgment (Dkt. No. 708) pursuant to 28 U.S.C. § 1961.

9. The Court entered a Permanent Injunction at Dkt. No. 700.

10. Violation of the Permanent Injunction shall expose Defendants and all other persons bound by such permanent injunction to all applicable penalties, including sanctions and contempt of Court.

11. The lifting of the Permanent Injunction is conditioned upon full payment of the royalty and damages ordered in paragraphs 2-7 above.

12. This Court shall retain continuing jurisdiction to modify and/or enforce the Permanent Injunction, which may also be enforced by any other court of competent jurisdiction.

13. Pursuant to CUTSA § 3426.4 and 15 U.S.C. § 1117(a), Defendants may be liable for attorneys' fees and costs in an amount to be determined by motion or stipulation. The Court retains jurisdiction to adjudicate any motion for reasonable attorneys' fees and costs. To the extent the Parties are unable to stipulate to an award of attorneys' fees and costs, Plaintiffs' motion shall be brought within 28 days of entry of this Final Judgment.

14. The jury found by clear and convincing evidence that Defendants' '413 and '639 Patents are invalid.

**IT IS SO ORDERED.**

Dated: March 19, 2025

By: ______________________
Honorable Consuelo B. Marshall
United States District Judge

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

INTERNATIONAL MEDICAL DEVICES, INC.; et al.,

Plaintiffs,

v.

ROBERT CORNELL, MD, an individual; et al.,

Defendants.

Case No. 2:20-cv-03503-CBM (RAOx)

**ORDER RE PLAINTIFFS' *EX PARTE* APPLICATION FOR ORDER TO CORRECT AMENDED FINAL JUDGMENT [723]**

Judge: Hon. Consuelo B. Marshall

Having considered Plaintiffs' *Ex Parte* Application for an Order correcting the Amended Final Judgment (the "Application"), and good cause appearing, the Court **GRANTS** the Application. The dollar figures apportioned to each of the trade secrets in the royalty and exemplary damages portions of the Amended Final Judgment (Section 2.a-d and 3.a-d of Dkt. 708) shall be corrected based on the following tables:

Reasonable Royalty:

| | | | |
|---|---|---|---|
| Incorrect Trade Secret 1 | $2,886,022.00 | Corrected Trade Secret 1 | $3,037,917.90 |
| Incorrect Trade Secret 2 | $1,154,408.80 | Corrected Trade Secret 2 | $1,215,167.16 |
| Incorrect Trade Secret 3 | $865,806.60 | Corrected Trade Secret 3 | $911,375.36.00 |
| Incorrect Trade Secret 4 | $577,204.40 | Corrected Trade Secret 4 | $607,583.58 |

Exemplary Damages:

| | | | |
|---|---|---|---|
| Incorrect Trade Secret 1 | $5,772,044.00 | Corrected Trade Secret 1 | $6,075,835.79 |
| Incorrect Trade Secret 2 | $2,308,817.60 | Corrected Trade Secret 2 | $2,430,334.32 |
| Incorrect Trade Secret 3 | $1,731,613.20 | Corrected Trade Secret 3 | $1,822,750.74 |
| Incorrect Trade Secret 4 | $1,154,408.80 | Corrected Trade Secret 4 | $1,215,167.15 |

It Is So Ordered.

Dated: March 19, 2025

Hon. Consuelo B. Marshall
United States District Judge

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| INTERNATIONAL MEDICAL DEVICES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT CORNELL, M.D. ; ROBERT J. CORNELL, M.D., P.A. ; AUGMENTA, LLC ; AUGMENTA INVESTORS, LLC ; CORNELL COSMETIC UROLOGY, LLC ; DAVID LOUIS NICHOLS ; HUCK MEDICAL TECHNOLOGIES, INC. ; HANS MISCHE ; HANS MISCHE, LLC ; RUN WANG, M.D. ; and RICHARD B. FINGER,<br><br>Defendants. | Case No. 2:20-cv-03503-CBM (RAOx)<br><br>**AMENDED FINAL JUDGMENT**<br><br>Judge: Hon. Consuelo B. Marshall<br>Trial Date: June 6, 2023 |

In accordance with the jury's verdict in this matter (Dkt. 649) and the Court's Orders on Plaintiffs International Medical Devices, Inc. ("IMD"); Menova International, Inc. ("Menova"); and James Elist, M.D.'s (collectively, "Plaintiffs'") Post-Trial Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages (Dkt. 698) and Plaintiffs' Motion for Injunctive Relief and Patent Invalidation (Dkt. 699), the Court, pursuant to Federal Rule of Civil Procedure 58, enters this Final Judgment in favor of Plaintiffs and against Defendants Robert Cornell, M.D., Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger (collectively, "Defendants") as follows:

It is hereby **ORDERED AND ADJUDGED** that:

1. Judgment is hereby entered in favor of Plaintiffs and against Defendants.

2. Defendants are jointly and severally liable to Plaintiff IMD for Misappropriation of Trade Secrets under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 1836, *et seq*., for a reasonable royalty as follows:

   a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $2,886,022.00 for misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

   b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic

Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $1,154,408.80 for misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $865,806.60 for misappropriation of the incorporation a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for a reasonable royalty of $577,204.40 for misappropriation of the incorporation a trade secret consisting of a particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

e. Defendants are liable for prejudgment interest at a rate of 7% pursuant to Cal. Civ. Code § 3287(c) accruing from March 30,

2018—the date the trade secrets were misappropriated—until the date of entry of this Final Judgment.

3. Defendants are liable to Plaintiff IMD for exemplary damages for willful and malicious trade secret misappropriation under CUTSA § 3426.3(c) as follows:

a. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $5,772,044 for willful and malicious misappropriation of a trade secret consisting of the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity;

b. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $2,308,817.60 for the willful and malicious misappropriation of a trade secret consisting of the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth;

c. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of

$1,731,613.20 for the willful and malicious misappropriation of a trade secret consisting of the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and

d. Defendants Robert Cornell, M.D.; Robert J. Cornell, M.D., P.A.; Augmenta, LLC; Augmenta Investors, LLC; Cornell Cosmetic Urology, LLC; Hans Mische; Hans Mische, LLC; Run Wang, M.D.; and Richard B. Finger are jointly and severally liable for exemplary damages of $1,154,408.80 for the willful and malicious misappropriation of a trade secret consisting of particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List.

4. Defendant Robert Cornell is liable to Plaintiffs for breach of the Non-Disclosure Agreement. This finding supports an alternative basis for a reasonable royalty award to Plaintiffs in the amount of $5,772,044 and against Defendant Robert Cornell only.

5. Defendants Robert Cornell and Robert J. Cornell M.D., P.A. are liable to Plaintiff Menova for $1,000,000 in statutory damages for use of a counterfeit mark under 15 U.S.C. § 1117(c)(2), plus prejudgment interest in accordance with 26 U.S.C. § 6621(a)(2), accruing from April 22, 2020—the date Defendants were served with the original Complaint in this action—until the date of entry of this Final Judgment.

6. Defendants Robert Cornell, Hans Mische, and David Louis Nichols are liable to Plaintiffs in the amount of $1,650 for copyright infringement under 17 U.S.C. § 501.

7. Defendant Run Wang is liable to Plaintiffs for nominal damages in the amount of $1 for breach of contract.

8. Defendants shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961.

9. The Court entered a Permanent Injunction at Dkt. No. 700.

10. Violation of the Permanent Injunction shall expose Defendants and all other persons bound by such permanent injunction to all applicable penalties, including sanctions and contempt of Court.

11. The lifting of the Permanent Injunction is conditioned upon full payment of the royalty and damages ordered in paragraphs 2-7 above.

12. This Court shall retain continuing jurisdiction to modify and/or enforce the Permanent Injunction, which may also be enforced by any other court of competent jurisdiction.

13. Pursuant to CUTSA § 3426.4 and 15 U.S.C. § 1117(a), Defendants may be liable for attorneys' fees and costs in an amount to be determined by motion or stipulation. The Court retains jurisdiction to adjudicate any motion for reasonable attorneys' fees and costs. To the extent the Parties are unable to stipulate to an award of attorneys' fees and costs, Plaintiffs' motion shall be brought within 28 days of entry of this Final Judgment.

14. The jury found by clear and convincing evidence that Defendants' '413 and '639 Patents are invalid.

**IT IS SO ORDERED.**

DATED: MAY 30, 2024

[signature]

The Honorable Consuelo B. Marshall
United States District Judge

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| International Medical Devices, et al,<br>Plaintiffs,<br>v.<br>Robert Cornell, MD, an individual, et al,<br>Defendants. | Case No.: 2:20-cv-03503-CBM (RAOx)<br><br>**ORDER RE: DEFENDANTS' MOTION FOR AMENDED OR ADDITIONAL FINDINGS, AND TO ALTER OR AMEND** |

The matter before the Court is Motion for Amended or Additional Findings, and to Alter or Amend, under Federal Rules of Civil Procedure 52(a) and 59(e). (Dkt. No. 715 ("Motion").)

## I. BACKGROUND

This is a trade secrets case filed by Plaintiffs International Medical Devices, Inc., Menova International, Inc., and James Elist, MD against multiple Defendants.[1] (Dkt. No. 578.) The parties are familiar with the factual and procedural background of the case; therefore, the Court does not repeat the relevant facts herein. On June 13, 2024, Defendants filed the instant Motion, and on June 24, 2024, Defendants filed an amended version of the Motion. (Dkt. Nos. 712, 715.)

## II. STATEMENT OF THE LAW

Federal Rule of Civil Procedure 52(a) states that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

Federal Rule of Civil Procedure 59(e) states that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." "To alter or amend the judgment requires a substantive change of mind by the court." *Id.* (internal quotations, ellipses, and brackets omitted). *United States ex rel. Hoggett v. Univ. of Phoenix*, 863 F.3d 1105, 1108 (9th Cir. 2017) (internal quotations and brackets omitted). Thus, "amending a judgment after its entry remains an extraordinary remedy which should be used sparingly." *Allstate Ins. Co.*

[1] Defendants are Robert Cornell, MD; Augmenta, LLC; Robert J. Cornell M.D., P.A.; Jonathan Clavell Hernandez, MD; Clavell Urology, PLLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Richard B. Finger; and Lata Lignum LLC. (Dkt. No. 578 at 4.)

*v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Id*. "A court considering a Rule 59(e) motion is not limited merely to these four situations, however." *Id*. "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *Id*.

## III. DISCUSSION

### A. Failure to Comply with Rule 52(a)

Defendants argue that the Court "failed to provide the necessary findings of fact to support" the compensatory and exemplary damages and permanent injunction it ordered. (Mot. at 6.)

In the Court's Order re Plaintiffs' Post-Trial Motion for Award, the Court included a section titled "The Court's Findings re Reasonably Royalty" which set forth the facts upon which the Court found a reasonably royalty of $5,772,044. (Dkt. No. 698 at 12–13 (citing Trial Ex. 6-020; Trial Tr. 1190:21-1191:8; Trial Exs. 29, 78).) Based on these facts, the Court found that "the nature and extent of Defendants' use of IMD's trade secrets weighs in favor of a reasonable royalty higher than that proposed by Dr. Hatch [Defendants' expert witness]," and adopted Mr. Arst's approach to finding reasonable royalties instead. (*Id.*) The Court also explained its reasoning in calculating the royalty award using Mr. Arst's calculations. (*Id*. at 13.) Finally, the Court found "the conduct in which the Defendants engaged amounted to a willful and malicious misappropriation," which was the basis for the Court's award of exemplary damages. *See* Cal. Civ. Code § 3426.3(c).

Thus, the Court properly analyzed and made factual findings regarding the nature of the misconduct and the amount of compensatory damages. The Court did not make any findings as to Defendants' financial condition, but, as Plaintiffs explain, this "was not considered by the Court because the Parties stipulated at the October 25, 2023 post-trial hearing that neither side would offer evidence of Defendants' net worth, and that Defendants would not challenge an exemplary damages award for such lack of evidence." (Opp. at 24.) The transcript of the October 25, 2023 evidentiary hearing confirms this:

> The parties agree that neither side will offer or be required to offer any evidence of net worth for Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetic Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC. Defendants agree that, should the Court make an award of any exemplary damages against Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetic Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC, defendants will not challenge such finding on the basis that plaintiffs did not adduce any evidence of net worth for Dr. Robert Cornell, Richard Finger, Robert J. Cornell, M.D., PA, Cornell Cosmetics Urology, LLC, Augmenta, LLC, or Augmenta Investors, LLC. Defendants further agree not to challenge on appeal any such exemplary damages award on the basis that there is no evidence of net worth.

(Dkt. No. 733-3 ("Evid. Hearing Tr.") at 247:14-248:8.)

The Court's Order re Plaintiffs' Post-Trial Motion for Award sufficiently details how the Court calculated the award such that an appellate court can "adequately resolve objections raised regarding validity of an award." *Simeonoff v. Hiner*, 249 F.3d 883, 891–92 (9th Cir. 2001) (rejecting appellant's Rule 52(a) challenge because his arguments "are merely observations that the district court's award for past and future economic damages are lump sum awards" and "[l]ump sum damage awards are not per se insufficient under Rule 52(a)"). Accordingly, the Court's ruling complied with Rule 52(a).

### B. Compensatory Damages

Defendants contend that the Court "offered an inadequate reasoning for" adopting Plaintiffs' expert Mr. Arst's model for calculating reasonable royalties over Defendants' expert Dr. Hatch's model. (Mot. at 9.) Defendants contend that the Court should "reconsider its findings regarding the award of compensatory damages" because '[t]here are several critical deficiencies in Mr. Arst's opinion." (*Id.*) Defendants essentially attempt to re-litigate issues regarding the validity of Arst's expert opinion that the Court has already ruled on multiple times.[2] These arguments are no more convincing on the third try.[3] The fact that there were no sales of the Augmenta product and the preliminary injunction in this case barred Defendants from profiting off Agumenta does not preclude an award of reasonable royalties.[4] *See Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of California, Inc.*, 2015 WL 3825318, at *5 (C.D. Cal. June 18, 2015) ("section 3426.3(b) permits a royalty award even where a defendant was not found as a matter of fact to have profited

---

[2] (*See* Dkt. Nos. 539 (finding Arst's reliance on statements by Dr. Elist and Mr. Elist sufficient, his apportionment of value attributable to the trade secrets proper, and his reliance on the October 2018 projection sufficient); 698 (noting Dr. Hatch's criticisms of Arst's model and finding that the "nature and extent of Defendants' use of IMD's trade secrets weighs in favor" of adopting Arst's model rather than Hatch's).)

[3] Defendants' cites to *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) and *LinkCo, Inc. v. Fujitsu Ltd*, 232 F. Supp. 2d 182, 188–89 (S.D.N.Y. 2002) were already addressed by the Court in an earlier order (Dkt. No. 539 at 2) and are inapposite. Defendants' cite to *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 882 (Fed. Cir. 1995) does not support its position that IMD can only seek damages for "past sales" and not "future sales"—the *Carborundum* court noted that because Metaullics "did not attempt to obtain damages for *future* repair parts sales" because of an injunction, Metaullics "was not fully compensated for the infringement because the damages award did not include future lost sales of repair parts for which Metaullics had established entitlement."

[4] *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, does not state what Defendants contend it states—nothing in the case holds that use of projected sales in determining royalties is improper. 289 U.S. 689, 697 (1933).

from his misappropriation," "allowing misappropriators to gamble with other people's trade secrets would undermine 'important standards of commercial ethics,'" and "even if a defendant does not profit from a misappropriated trade secret, he may nonetheless achieve non-pecuniary benefits from the secret") (discussing *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295 (2010)).

Defendants provide no evidence that there has been a "manifest error of law or fact upon which the judgment rests," "newly discovered or previously unavailable evidence," a "manifest injustice," or an "intervening change in controlling law" that would warrant a "substantive change of mind by the Court" on the compensatory damages awarded. *Allstate*, 634 F.3d at 1111. Accordingly, amendment of findings on this basis is unwarranted.

**C. Exemplary Damages**

Defendants contend that the Court erred in awarding exemplary damages for trade secret misappropriation because (1) Plaintiffs "waived any right to recover exemplary damages by omitting it from the Final Pretrial Order"; (2) whether misappropriation was "willful and malicious" is an issue for the jury, not the Court; (3) exemplary damages requires a finding that a "particular defendant" engaged in willful and malicious appropriation; (4) a finding of willful misappropriation only permits the Court to exercise discretion in awarding damages and does not "automatically lead[]" to exemplary damages; and (5) joint and several liability is inappropriate. (Mot. a 12–18.) Each of these arguments is addressed in turn below.

*1. Waiver of Right to Exemplary Damages*

Defendants contend that Plaintiffs waived their right to recover exemplary damages because they omitted it from the Final Pretrial Order, and that because the Final Pretrial Order "supersedes the pleadings and governs the course of the trial of this cause," Plaintiffs forfeited any claim for exemplary damages. (Mot. at 12 (brackets omitted).) This argument is not credible given the parties' stipulation during the evidentiary hearing, in which Defendants made no mention that they

believed exemplary damages were waived altogether by way of the Final Pretrial Conference Order and in fact acknowledged that the Court may make an award of exemplary damages against Defendants.[5] (*See* Evid. Hearing Tr. at 247:11-248:8 ("Defendants agree that, should the Court make an award of any exemplary damages against [Defendants] . . .").) Therefore, this is not a basis for amending the Court's findings on exemplary damages.

*2. Willful and Malicious Determination*

Defendants contend that Plaintiffs also forfeited exemplary damages "by failing to secure (or even request) a jury finding that any misappropriation was willful and malicious" because this question is "a triable issue by a jury in federal court." (Mot. at 13.) Defendants contend that under federal patent law (section 284), there is a right to a jury trial on the question of willfulness—therefore, there is also a right to jury trial on the question of willful and malicious misappropriation under the CUTSA, and the Court "violate[d] Defendants' rights to a jury trial under the Seventh Amendment" by deciding the issue itself. (*Id.*) Defendants contend that Ninth Circuit precedent is not controlling because "[t]his case will be decided on appeal by the Federal Circuit," which holds that the willfulness question "must

---

[5] The cases cited by Defendants are inapposite, and none held that exemplary damages are forfeited when not included in the final pretrial conference order. *See Rockwell Int'l*, 549 U.S. at 474 (discussing final pretrial order precluding claims); *S. California Retail Clerks Union & Food Emps. Joint Pension Tr. Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984) (finding defendant failed to preserve "the issue of whether Warren was acting as an agent of the plaintiff Trust Funds"); *Eagle v. American Telephone and Telegraph Co.*, 769 F.2d 541, 548 (9th Cir. 1985) (finding pretrial conference order precluded plaintiff from raising a new *theory* of damages); *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1317 (Fed. Cir. 2005) (finding defendant waived affirmative defenses that were not included in the final pretrial order); *Arriaga v. Logix Fed. Credit Union*, 2022 WL 3098495 (C.D. Cal. Apr. 22, 2022) (same); *Asfall v. Los Angeles Unified Sch. Dist.*, 2020 WL 2951920 (C.D. Cal. Feb. 11, 2020) (finding it would prejudice defendant to allow plaintiff to obtain injunctive relief when defendant "was not on notice that the adequacy of its Title IX training program would be at issue").

be decided by the jury." (*Id*. at 8.)

Defendants' argument is belied by the parties' stipulation prior to trial that the Court, not the jury, would consider harm and appropriate damages for trade secret liability (*see* Dkt. No. 599), and the parties' stipulation at the October 25, 2023 evidentiary hearing that acknowledged that the Court may award exemplary damages. If Defendants wished for the jury to determine whether conduct was willful and malicious, they could have raised the issue before the Court excused the jury. They did not—consequently, the issue was not preserved for the jury.

In any case, Ninth Circuit law appears to allow district courts to determine whether misappropriation was willful and malicious. The CUTSA states that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b)." Cal. Civ. Code § 3426.3(c). CACI 4411 commentary states that "[n]o reported California state court case has addressed whether the jury or the court should decide whether any misappropriation was "willful and malicious." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*. involved the Montana Unfair Trade Practices Act, not the CUTSA—but the MUTSA contains the same comment in the CUTSA Defendants rely on to argue that the Court should find "willful and malicious misappropriation" is a question for the jury. 259 F.3d 1101, 1112 (9th Cir. 2001) (noting MUTSA's official commentary states the exemplary damages provision "follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury"). Despite this commentary, the Ninth Circuit still "reverse[d] the district court's refusal to consider plaintiff's motion for exemplary damages and attorney's fees" and remanded to "allow the district court to make an independent judgment about whether [the] misappropriation was 'willful and malicious.'" *Id*.

Defendants' argument that this issue is governed by Federal Circuit law is incorrect. "The Federal Circuit applies its own law with respect to issues of

substantive patent law and certain procedural issues pertaining to patent law, but applies the law of our sister circuits to non-patent issues." *Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255 (Fed. Cir. 2008). In *Uroplasty, Inc. v. Advanced Uroscience, Inc.*, 239 F.3d 1277 (Fed. Cir. 2001), the Federal Circuit held that the plaintiff's "state law trade-secrets claim" was "not governed by federal patent law" because although the relevant "patent may be evidence in support of Uroplasty's allegations, [] the mere presence of the patent does not create a substantial issue of patent law." *Id.* at 1280; *see also Intellisoft, Ltd. v. Acer Am. Corp.*, 955 F.3d 927, 933 (Fed. Cir. 2020) ("We have made clear that a plaintiff's reliance on a patent as evidence to support its state law claims does not necessarily require resolution of a substantial patent question"). Thus, Ninth Circuit law applies here.[6]

Therefore, amendment of the findings on this basis is unwarranted.

*3. Willfulness of Each Defendant*

Defendants contend that the "CUTSA allows for exemplary damages only against a particular defendant that engaged in willful and malicious appropriation," and that Plaintiffs needed but failed to "present evidence of . . . willful and malicious appropriation for each defendant separately for each trade secret." (Mot. at 15.) But nothing in the CUTSA statutory provision states that there must be a finding of willful and malicious misappropriation as to each Defendant separately before imposing exemplary damages. *See* Cal. Civ. Code § 3426.3(c). The only case Defendants cite in support is an out-of-circuit case where the district court found that certain defendants' conduct did not "evince willfulness or malice" because "their motives were purely competitive, in the interest of acquiring a valuable new customer." *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 494 (M.D. Pa. 2018).

---

[6] Defendants' cases from the Federal Circuit involved federal patent claims, not state trade secrets claims.

Under CACI 4411, "willful" conduct is where the defendant "acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith." "Malicious" conduct is where a defendant "acted with an intent to cause injury, or that [defendant's] conduct was despicable and was done with a willful and knowing disregard for the rights of others." CACI 4411; *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016) ("[t]he sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant or . . . characteristic of a pirate."). Malice may be proven either expressly by direct evidence probative of the existence of ill-will, or by implication from indirect evidence. *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 923 n.6 (1978); *Ajaxo Inc. v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 66–67 (2005).

The Court's Order Granting the Motion for Award cites to evidence supporting its finding of willful and malicious misappropriation as to each Defendant. (*See* Dkt. No. 698 at 13–14 (citing Trial Tr. 1254:1-25, 1061:20-1065:2; Trial Exs. 6, 14, 17, 206).) The direct and indirect evidence cited by Plaintiffs also support a finding of willfulness.[7] Based on this record, all Defendants (1) knew that

[7] (*See* Trial Tr. at 354:11-357:9, 1088:19-1097:9, 1605:24-1610:12, 1773:16-1779:25, Exs. 123, 308 (testimony and exhibits re Cornell's attendance at Penuma training session, taking notes "to document his theft" of trade secrets, and signing an NDA); 1254:1-25 (testimony regarding Cornell's correspondence with Mische); 1090:18-1091:20, 1100:2-25, Ex. 123 (testimony and exhibits regarding HMT's involvement with Augmenta); 1192:13-1195:16; Exs. 24, 25, 511, 531 (testimony and exhibits regarding Cornell's personal medical practice advertising and using Penuma trademark and maintaining a patient waiting list based on inquiries received from advertising); 1060:18-20, 1040:24-1042:7, 1043:19-22, 1048:21-1049:1, Exs. 206, 324 (testimony and exhibits related to Finger's involvement in Augmenta Investors and that Finger knew Cornell's Penuma training was covered by an NDA); Ex. 280 (email from Finger to Wang noting that Wang provided "invaluable design input" to Augmenta); Ex. 258 (flow chart of Augmenta Investors LLC organization).)

Cornell learned certain information during the Penuma training, and (2) aimed to introduce a competing product into the market. The evidence also indirectly suggests that all Defendants knew the Penuma training was part of how Cornell developed the technology for Augmenta. Therefore, the Court's finding of willful and malicious misappropriation was supported by evidence, and amendment of the findings on this ground is unwarranted.

*4. Discretion in Awarding Damages*

Defendants contend that the Court "erroneously impl[ied] that willful and malicious misappropriation automatically leads to exemplary damages of twice the compensatory damages." (Mot. at 16.) Defendants' argument is unpersuasive for the reasons addressed above. The Court's Order addressed the nature and extent of the misconduct and the amount of compensatory damages. The third factor was not addressed because the parties stipulated that they would not submit evidence related to Defendants' net worth. Further, nothing in the Order indicates that the Court "automatically" applied exemplary damages after finding willful and malicious misappropriation. Therefore, amendment of the findings on this ground is unwarranted.

*5. Joint and Several Liability*

Finally, Defendants argue that joint and several liability for exemplary damages is inappropriate and "has no basis in CUTSA," and that exemplary damages "must be tailored to the specific situation of each individual actor." (Mot. at 18.) Nothing in the text of the CUTSA provision supports this position, and the statute does not prohibit the Court from imposing joint and several liability. Defendants' cited cases do not involve the CUTSA or trade secret misappropriation, but rather stand for the general proposition that punitive damages must be tied to the egregiousness of a defendant's conduct.[8] In contrast, *Brocade Communications*

---

[8] *See Magallanes v. Superior Ct.*, 167 Cal. App. 3d 878, 888 (Ct. App. 1985) (noting the "measure of that malice or oppression requires the determination of the state of

*Systems., Inc. V. A10 Networks, Inc.* addressed whether joint and several liability is appropriate in the context of CUTSA and concluded that it is. 873 F. Supp. 2d 1192 (N.D. Cal. 2012) *on reconsideration in part*, 2012 WL 12925716 (N.D. Cal. July 8, 2012). Like here, the individual defendants in *Brocade* argued that "Brocade had not established damages as against each of them to support a claim of trade secret misappropriation." 873 F. Supp. 2d at 1217. The district court concluded that "the rule allowing joint and several liability in trade secret misappropriation cases likely survived the adoption of CUTSA." *Id.* at 1218 (noting that "[c]ommentators on trade secret law also suggest that, in general, liability for misappropriation claims is joint and several"). Defendants do not cite any authority holding that liability for exemplary damages should be treated differently than compensatory damages. Therefore, amendment of the findings on this basis is unwarranted.

**D. Permanent Injunction**

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). California Civil Code section 3426.2(a) states that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from

---

mind of the particular defendant while committing the alleged wrongful act"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (holding a $2 million punitive damages award was "grossly excessive" when considering "the degree of reprehensibility of the nondisclosure," that $2 million was "500 times the amount of [] actual harm as determined by the jury," and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (reversing judgment of Utah Supreme Court where "most relevant civil sanction under Utah state law for the wrong done" was a $10,000 fine, "an amount dwarfed by the $145 million punitive damages award").

the misappropriation." Therefore, the Court had discretion to enter an injunction in order to eliminate the commercial advantage Defendants would otherwise derive from their misappropriation. The Court's Order Granting Permanent Injunction stated that the five-year limit is "the period of time during which IMD could have prohibited Dr. Cornell from using the trade secrets based on the duration of the [NDA] . . . signed on March 30, 2018." (Dkt. No. 699 at 6.) This is actually shorter than "it would have taken [the defendant], either by reverse engineering or by independent development, to develop [the product] legitimately without use of [plaintiff's] trade secrets." *Lamb-Weston*, 941 F.2d at 974. The NDA would only have prevented Defendants from using the trade secrets to develop Augmenta for five years; instead, Cornell began developing the product only weeks after the Penuma training. Therefore, the record reflects that the head start Defendants obtained was about five years.

Defendants raise the same arguments they raised in Defendants' Motion to Dissolve Paragraphs 1a-1b of Preliminary Injunction. (*See* Dkt. No. 666.) The Court already considered and found these arguments unpersuasive. (*See* Dkt. No. 699 (granting permanent injunction and denying Defendants' Motion to Dissolve).) Defendants provide no new arguments that warrant a different conclusion. Therefore, the Court finds that amendment of the permanent injunction is unwarranted.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

DATED: March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

International Medical Devices, et al,

Plaintiffs,

v.

Robert Cornell, MD, an individual, et al,

Defendants.

Case No.: 2:20-cv-03503-CBM (RAOx)

**ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL**

The matter before the Court is Renewed Motion for Judgment as a Matter of Law and Motion for New Trial. (Dkt. No. 716 ("Motion").)

## I. BACKGROUND

This is a trade secrets case filed by Plaintiffs International Medical Devices, Inc., Menova International, Inc., and James Elist, MD against multiple Defendants.[1] (Dkt. No. 578.) The parties are familiar with the factual and procedural background of the case; therefore, the Court does not repeat the relevant facts herein. On June

[1] Defendants are Robert Cornell, MD; Augmenta, LLC; Robert J. Cornell M.D., P.A.; Jonathan Clavell Hernandez, MD; Clavell Urology, PLLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Richard B. Finger; and Lata Lignum LLC. (Dkt. No. 578 at 4.)

13, 2024, Defendants filed the instant Motion, and on June 24, 2024, Defendants filed an amended version of the Motion. (Dkt. Nos. 713, 716.)

## II. STATEMENT OF THE LAW

Federal Rule of Civil Procedure Rule 50(b) states that "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id.* (internal quotations omitted). Relief is proper if "a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves*, 530 U.S. at 149. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* at 150. And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

Rule 59(a) states, "[a] new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Rule 59 authorizes the district courts to grant a motion for new trial "on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Ninth Circuit has applied Rule 59 to permit a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal citation omitted).

## III. DISCUSSION

### A. Trade Secret Misappropriation

#### *1. Secrecy*

The CUTSA defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "The secrecy requirement is generally treated as a relative concept and requires a fact-intensive analysis." *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). "[T]he value of a trade secret arises from its secrecy and the ability to control whether, how and to whom it is disclosed," not from their novelty. *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 452111, at *3 (N.D. Cal. Jan. 17, 2018) (citing *Bunner*).

Defendants contend that Plaintiffs failed to introduce sufficient evidence that the alleged four trade secrets were secret, that they derived "independent economic value from secrecy," and that Plaintiffs "used reasonable efforts to maintain its secrecy." (Mot. at 7.)

a) <u>Not generally known</u>

The four trade secrets at issue here are: (1) the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity; (2) the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth; (3) the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and (4) a particular list of instruments and materials used to perform the surgical method associated with the placement of

a cosmetic penile implant referred to as the Penuma Instrument and Supply List. Plaintiffs introduced evidence that each of the four trade secrets was not generally known in 2018.[2]

b) Reasonable steps to protect trade secrets

"'Reasonable efforts' can include advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995) (citations omitted). In *Religious Tech*, the district court found reasonable steps were taken, including "use of locked cabinets, safes, logging and identification of the materials, availability of the materials at only a handful of sites worldwide . . . and confidentiality agreements for all of those given access to the materials." *Id*. at 1254. Plaintiffs introduced evidence at trial of the reasonable steps they took to protect their trade secrets.[3]

---

[2] (*See* Trial Tr. at 1182:18-1183:1, 1184:7-10, 820:17-822:24, 1591:3-1592:17, 1596:8-1597:12, 1658:15-24, 1660:1-1661:22 (testimony showing that internal pockets/voids within implant was not generally known); *id*. at 1591:10-25, 1415:14-1418:3, 1419:9-1420:17, 1651:18-1652:7, 1653:5-1655-4, 1657:11-1658:1, 1671:7-1673:14, 1673:15-1674:19, 1655:24-1657:10 (testimony showing that mesh tabs around distal tip of implant was not generally known); *id*. at 1555:9-15, 1419:9-1420:17 (testimony that mesh tabs around distal tip in combination with absorbable sutures was not generally known); *id*. at 1678:3-1679:18, 1709:13-16 (testimony that the Penuma instrument and supply list was not generally known).

[3] (*See* Trial Tr. at 1780:21-1783:21 (testimony from Jonathan Elist describing steps Plaintiffs took to keep information confidential); *id*. at 1778:11-17, 1784:20-1785:5 (testimony regarding why IMD requires visiting surgeons sign an NDA and how IMD conducts its trade secret audits to make sure all measures to protect trade secrets "are in use and that they continue to be effective measures"); Ex. 86 (image of cabinet labeled "CONFIDENTIAL AND SENSITIVE, AUTHORIZED IMD PERSONNEL ONLY").

c) <u>Independent economic value</u>

"To have independent economic value, a trade secret must be 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Calendar Rsch. LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007). "Independent economic value can be shown by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Id*. Moreover, "information can have independent economic value even if there is no actual product on the market utilizing the information. *Id*. "The standard to show that trade secrets derive economic value is not a high standard." *Id*. Plaintiffs introduced evidence establishing the trade secrets had economic value.[4] *See Calendar Rsch.*, 2017 WL 10378336 at *4 (noting that creation and development of products "would be less profitable without the expedited and simplified development processes inherent in these trade secrets").

Accordingly, there was evidence supporting that the four trade secrets were indeed secret, and judgment as a matter of law on this basis is not warranted. Similarly, Defendants have not identified evidence[5] that shows the clear weight of all the evidence was contrary to the jury verdict. Thus, a new trial is not warranted

---

[4] (*See* Trial Tr. at 1787:18-22, 1792:18-1794:13 (testimony from Jonathan Elist regarding value of trade secrets); *id*. at 1677:2-1678:2 (expert testimony that instrument list was valuable); *id*. at 1778:11-17, 1780:21-1783:21, 1784:20-1785:5, Ex 436 (testimony and exhibit describing steps taken to protect trade secrets); *id*. at 1075:1-21, Ex. 76 (Offering Memorandum for Augmenta Investors LLC indicating value of Augmenta product); *id*. at 1271:12-1279:23, Exs. 29 ('413 Patent), 78 ('639 Patent) (testimony and exhibits regarding the two patents Cornell obtained using the trade secrets).

[5] (*See* Trial Tr. at 334:21-335:4, 414:25-415:2 (evidence merely showing that general use of mesh for ingrowth and voids/internal pockets in a medical device is not a trade secret, not that Plaintiffs' contemplated use of those items in a penile implant was not a trade secret); 334:7-9, 1704:21-22 (evidence only indicates that the trade secret alleged is not the absorbable sutures itself).)

on this basis either.

*2. Each Defendant's Misappropriation*

Defendants contend that Plaintiffs "failed to introduce evidence" establishing "that each Defendant, individually, misappropriated any of [Plaintiffs'] four alleged trade secrets" because there was no evidence that each Defendant acquired the trade secrets "by improper means," no evidence that any Defendant other than Cornell "acquired knowledge of a trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use," and no evidence that any Defendants other than Cornell "used or disclosed any trade secret with knowledge that it was derived from or through a person who owed a duty to Plaintiff[s] to maintain its secrecy or limit its use." (Mot. at 12–16.)

The CUTSA defines "misappropriation" to mean:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A) Used improper means to acquire knowledge of the trade secret; or
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> (i) Derived from or through a person who had utilized improper means to acquire it;
> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code 3426.1(b). The CUTSA also states that "improper means":

> "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone

shall not be considered improper means."

Cal. Civ. Code 3426.1(a).

a) <u>Cornell</u>

The evidence at trial demonstrated that Cornell acquired the trade secrets when he attended the Penuma training session, that the NDA gave rise to a duty to maintain the secrecy of the information, that Cornell knew the NDA required him to maintain secrecy, and that he used those trade secrets in developing Augmenta.[6] This is sufficient to establish misappropriation as to Cornell. *See BladeRoom*, 2018 WL 452111 at *4 ("The court reiterates that a violation of CUTSA may occur when trade secrets are disclosed in violation of a contractual duty to maintain confidentiality").[7] Second, the CUTSA explicitly lists breach of a duty to maintain secrecy as "improper means." Even if Cornell did not use his breach of the NDA to *acquire* the information, signing the NDA to acquire the trade secrets only to breach the NDA later can also constitute "improper means." There was circumstantial evidence indicating that when Cornell signed the NDA, he did not intend to keep the trade secrets confidential, but instead was there to learn information he could use to develop a competing implant product.[8] Therefore, there was evidence supporting Cornell's liability under either section 3426.1(b)(2)(A) or 3426.1(b)(2)(B)(ii), and judgment as a matter of law is not warranted. Nor is a new

---

[6] *See* Exs. 29, 78 (trade secrets incorporated into '413 and '639 patents).

[7] It is unclear why Defendants argue that Plaintiffs must show the Defendants each acquired the trade secrets by "improper means" when the statute provides for multiple ways of misappropriation, some referencing "improper means" and some not. Note, however, that in the Final Pretrial Conference Order, the parties agreed that one of the elements necessary to establish a trade secret claim is "Defendants acquired, used, or disclosed Plaintiffs' trade secrets through improper means." The parties adopted this language from CACI 4401. (Dkt. No. 578 at 12.)

[8] *See* Exs. 20 (document incorporating trade secrets into a plan for developing Augmenta weeks after signing NDA); 212 (email from Cornell to Mische asking if the NDA required Cornell to stay "under the radar on the patent"); 1605:2-1607:14 (testimony regarding Cornell's questions and behavior during Penuma training).

trial warranted, as the clear weight of the evidence is not contrary to the jury verdict as to Cornell's misappropriation. (*See* Dkt. No. 649.)

a) <u>Other defendants</u>

Plaintiffs argue that the other Defendants "induced Cornell to breach the NDA and thus themselves acquired the trade secrets by improper means." (Opp. at 17.) This argument is tenuous. "To induce means to 'bring on or about, to affect, cause, to influence to an actor or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on.'" *In re Qualcomm Litig.*, 2019 WL 13159816, at *9 (S.D. Cal. Mar. 14, 2019) (quoting Black's Law Dictionary 775 (6th ed. 1990)). None of the evidence cited by Plaintiffs reflects that these Defendants took any actions to "bring . . . about," cause, influence, or incite Cornell to share the trade secrets he learned from the training. However, there *was* evidence to support that these Defendants knew or had reason to know that some of the trade secrets were "[d]erived from or through a person who had utilized improper means to acquire it" or "derived from . . . a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(B)(i) & (iii).

First, the evidence showed that Defendants Mische and Nichols (and by extension, HMT) knew Cornell signed an NDA with IMD in connection with the Penuma training session.[9] This evidence also showed that Cornell shared certain of the trade secrets with these Defendants to develop a competing product to Penuma.[10] Thus, there was evidence supporting that Mische and Nichols (and HMT) had reason to know that these trade secrets were derived from a person (Cornell) who

---

[9] (*See* Trial Tr. at 972:13-974:22, 979:10-984:8 (testimony that Mische knew about the NDA); 1097:6-15 (testimony that Nichols knew about the NDA).)

[10] (*See* Trial Tr. at 984:4-986:16, 972:13- 974:22, Exs. 20, 213, 308 (testimony and exhibits showing Cornell shared trade secrets with Mische); 1100:2-25, 1113:3-1114:10, 1105:12-1107:11, Exs. 119, 123 (testimony and exhibits showing Cornell shared trade secrets with Nichols and HMT); Exs. 29, 78 (the '413 and '639 patents incorporating internal pockets, mesh tabs, and mesh tabs with absorbable sutures ideas and listing Cornell, Mische, and Nichols as inventors).)

owed a duty to Plaintiffs to maintain the secrecy of those ideas—Mische as to the mesh tabs, mesh tabs with absorbable sutures, and instrument list, and Nichols and HMT as to the internal pockets, mesh tabs, and mesh tabs with absorbable sutures.

Defendants argue that the jury "could not reasonably infer that any of the Defendants knew or had reason to know" that the information Cornell shared was in violation of the NDA from the evidence Plaintiffs cited. (Reply at 5.) But "[b]ecause direct evidence of misappropriation and misuse is not always available, plaintiffs can rely on circumstantial evidence to prove their case. [citation]. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Wisk Aero LLC v. Archer Aviation Inc.*, at *14 (N.D. Cal. June 9, 2023) (internal quotations and citation omitted). As for "disclosure or use" of the trade secrets, there was evidence that Defendants Mische and Nichols used the trade secrets in designing and developing Augmenta and by filing patents that incorporated the trade secrets.[11]

Second, there was evidence to support a reasonable inference that Finger had reason to know aspects of the Augmenta were derived from a person who owed a duty to Plaintiffs to maintain trade secrets.[12] Finger was aware Cornell attended the Penuma training and that Cornell built off what he learned at the training to develop the Augmenta. Evidence also showed that Finger was involved in the development of the implant with HMT. The Offering Memorandum, in which Finger was involved as CFO, showed that Augmenta Investors LLC was aware of the risk of litigation over the trade secrets at issue. A reasonable jury could conclude that (1) Finger was so involved in Augmenta that he would have been familiar with its

[11] (*See* Trial Tr. at 1088:1-10 (HMT hired to help develop Augmenta implant); Exs. 20, 29, 78, 119.)

[12] (*See* Trial Tr. at 1048:7-1049:1, 1097:6-15, 1044:22-1045:8; Exs. 206, 261, 324.)

product specifications, including the trade secrets, and (2) Finger knew Cornell observed the Penuma procedure under an NDA and anticipated Elist might sue for trade secret misappropriation, yet proceeded with developing Augmenta with Cornell anyway.[13]

Third, there was evidence to support a reasonable inference that Wang had reason to know aspects of the Augmenta were derived from a person (Cornell) who owed a duty to maintain the secrecy of those ideas. The evidence established that Wang "was a member of IMD's advisory board" and had himself signed an NDA with Plaintiffs.[14] Wang also assisted Cornell in performing two cadaver surgeries testing prototypes of Augmenta that incorporated the trade secrets.[15] Based on this evidence, a reasonable jury could conclude that, having signed an IMD NDA himself, Wang had reason to know during the cadaver surgeries that Cornell was utilizing the same trade secrets in the Augmenta that belonged to IMD.

Accordingly, judgment as a matter of law is not warranted on the basis that there was no evidence of each Defendant's misappropriation. As for a new trial, Defendants have not shown that the clear weight of the evidence is contrary to the jury verdict. (*See* Dkt. No. 649.)

*3. Harm*

Defendants contend that "IMD introduced no evidence" showing that the misappropriation "harmed Plaintiffs or caused Defendants to be unjustly enriched." (Mot. at 21.) Defendants cite to nothing in support of this argument. Jonathan Elist

---

[13] Defendants' argument that Finger could not have acquired the trade secrets because the technical information would be "incomprehensible" to him is unavailing. "Liability under CUTSA is not dependent on the defendant's 'comprehension' of the trade secret"—rather, it requires only "knowledge" of the secret. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 229 (2010), *as modified on denial of reh'g* (May 27, 2010), *disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 210, 229 (2011).

[14] (*See* Trial Tr. at 885:10-888:4; Ex. 339.)

[15] (*See* Trial Tr. at 883:1-884:12, 924:1-6, 925:14-926:4.)

testified that Cornell's breach of the NDA "put our confidential concepts out into the world" such that "they're not protected anymore" and "the value is just destroyed," and that in addition, the concepts are "now in a patent precluding us from using our own ideas." (Trial Tr. at 1792:18-24.) Elist also testified that because of Defendants' "use, unauthorized misappropriation of the plaintiffs' trade secret concepts, and the instrument list," Plaintiffs have been "extremely harmed" because they "lost something that was in development based on [Dr. Elist's] experience" and that "there is no ability to commercialize it at this point and have any modicum of protection around it." (Trial Tr. at 1793:5-14.) Elist elaborated that the trade secrets, use of the Penuma mark "to syphon off patients," use of Plaintiffs' "copyright image to get a patent," "complete disregard" for the NDA, and the "idea of pretending to be one of our customers," particularly "just as we were starting to get going as a company," were instances of harm to Plaintiffs. (*Id.* at 1793:14-22.) Thus, judgment as a matter of law on the basis that there was no evidence of harm is not warranted. Nor is a new trial warranted, as Defendants have not shown that the clear weight of the evidence is contrary to the jury verdict.

* * *

Accordingly, the Court denies the Motion as to the misappropriation claims.

**B. Trademark Infringement**

Defendants argue that Cornell and his medical practice (the "Cornell Defendants") are entitled to judgment as a matter of law or a new trial on the trademark infringement claim because Plaintiffs "offered no evidence of damages caused by" the Cornell Defendants' "use of the Penuma mark or evidence of profits attributable to their use of the Penuma mark." (Mot. at 22.) That no damages stemmed from the infringement does not mean that no harm was suffered. Jonathan Elist's testimony at trial indicated that Plaintiffs suffered harm.[16] On this basis, the

[16] (*See* Trial Tr. at 1792:6-17 (in response to the question of how IMD has been harmed by the Cornell Defendants' unauthorized use of the Penuma mark, Jonathan

Court entered a permanent injunction with respect to the Penuma trademark. (Dkt. No. 700 at 3.)

Defendants also argue that Menova did not introduce sufficient evidence as to likelihood of customer confusion, a factor in the *Sleekcraft* test for trademark infringement. (Mot. at 22–24.) The trial record reflects there was actual confusion due to the trademark.[17] As for Defendants' request for a new trial, Defendants cite to no evidence indicating the jury's finding was clearly wrong. Accordingly, the Court denies the Motion as to the trademark infringement claim.

**C. Counterfeit Mark**

Defendants contend that the Cornell Defendants are entitled to judgment as a matter of law or a new trial on the counterfeit claim because Menova failed to "establish evidence" that the mark used was a counterfeit mark, that the Cornell Defendants knew the mark used was counterfeit, or that the use of the mark was likely to confuse or deceive. (Mot. at 25–26.) Defendants also argue that Plaintiffs fail to show use of the mark "in connection with the sale, offering for sale, or distribution of goods." (Reply at 10.)

Evidence in the record demonstrated that the mark was counterfeit and Cornell knew the mark was counterfeit (Cornell was not authorized to provide Penuma, which he knew, and he used the mark "in anticipation of being credentialed to provide" the implant), and that the use was likely to confuse (patients contacted Plaintiffs and were under the impression Penuma was offered at Cornell's clinic).[18]

---

Elist testified that "[i]t caused a lot of confusion in the marketplace" at a time "when [Plaintiffs were] just starting to establish [themselves]" and "represented lost opportunities with patients.").)

[17] (*See* Trial Tr. at 1792:6-17; Ex. 94A (document logging inquiries received regarding Cornell offering the Penuma procedure and implant).)

[18] (*See* Trial Tr. at 1192:13-1195:16 (testimony by Cornell indicating the website for Robert J. Cornell, M.D., PA displayed the Penuma mark, confirming that Cornell didn't provide the Penuma surgery at the time the website displayed the mark, and confirming Cornell was not authorized to provide Penuma and that the

Contrary to Defendants' contentions, the evidence indicated that Cornell and his medical practice did "offer for sale" the Penuma implant (even if no actual sale or distribution occurred), as Penuma was advertised on the website. Defendants' alternative request for a new trial is unsupported by any evidence that clearly weighs against the jury verdict on this claim. Accordingly, the Court denies the Motion as to the counterfeit mark claim.

**D. Breach of Contract**

Defendants argue that Cornell is entitled to judgment as a matter of law or a new trial on the breach of contract claim because "[e]vidence at trial confirmed that some or all of the trade secrets alleged by Plaintiffs were publicly available, already known by Dr. Cornell, or otherwise generally known," and that therefore the information was not confidential "under the definition in the NDA." (Mot. at 26.)

As explained above, there was evidence in the record that Defendants misappropriated the four trade secrets, which necessarily also showed that the trade secrets were not generally known. The same evidence indicated that Cornell breached the NDA. Judgment as a matter of law on this claim is not warranted. The evidence similarly supports the jury verdict and a new trial is not warranted. Accordingly, the Court denies the Motion as to the breach of contract claim.

**E. Patent Invalidation**

Defendants contend that Plaintiffs failed to prove the elements of their patent invalidity claims "by clear and convincing evidence" because there was no evidence the trade secrets "constituted the 'significant inventive' aspects of" the Augmenta

---

advertisement "was in anticipation of being credentialed to provide this product"); Ex. 24 (image of the website for Robert J. Cornell, M.D., PA advertising Cornell as a "Penuma Penile Enhancement Specialist"); Ex. 25 (June 25, 2018 cease-and-desist email from Jonathan Elist to Cornell); Ex. 511 (August 4-6, 2024 email correspondence between Jonathan Elist and Cornell regarding Elist "receiving some confusing inquiries from potential patients about Penuma being offered at your clinic" and Cornell confirming he would "request that" his marketing team "completely remove" references to Penuma).)

patents. (Reply at 11.) Defendants contend that the significant element in the '413 Patent was varying the pockets along the implant to achieve a gradient of elasticity, as described in Claim 1 of the patent. (*Id*. at 12 (citing to Ex. 29, the '413 Patent).) But evidence in the record indicates that the trade secrets at issue significantly contributed to other claims in the patents.[19] The "clear weight" of this evidence does not indicate that the jury verdict on patent invalidity was wrong. Accordingly, neither judgment as a matter of law nor a new trial are warranted on this basis. The Court denies the Motion as to the patent invalidity claims.

**F. New Trial Based on Claim Construction Question**

Defendants argue that because "[m]uch of the dispute in this case concerned the meaning of the Augmenta patent and various prior-art patents and the Court "never construed the claims," the Court "erroneously treat[ed] the meaning of the claims as a question of fact for the jury (and a subject for expert testimony). (*Id*.) Plaintiffs argue that Defendants waived any claim construction argument because they raised no such objections previously, and in fact "consistently took the position the jury must decide . . . who invented the claims of [the patents]." (Opp. at 25–26.)[20]

Defendants previously did not object to the lack of claim construction, and in fact took the position that these issues should be decided by the jury. They cannot

---

[19] (*See* Trial Tr. at 328:15-23, 334:16-335:4 (Dr. Elist testified that he conceived of the use of internal pockets to make Penuma softer and more flexible); 335:11-337:1 (Dr. Elist planned to incorporate mesh at or around the distal tip to secure the implant in place, which could be used in combination with absorbable sutures); 1789:21-1791:11 (Defendants used the design concept trade secrets Cornell obtained during the Penuma training to obtain the '413 Patent and the '639 Patent); Exs. 29, 78 (Claims 1-10 of the '413 Patent and claims 1, and 13-17 of the '639 Patent based on Plaintiffs' internal pockets concept); Ex. 29 (Claims 11-15 of the '413 Patent based on Plaintiffs' design concepts for mesh tabs and absorbable sutures).)

[20] Plaintiffs also note that "Defendants argued in a bench brief that 'the question of inventorship must be submitted to the jury under the Seventh Amendment.'" (*Id*.)

now argue the opposite. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). In any case, "the determination of secrecy under the UTSA is not the same as the PTO's decision whether an invention is obvious in view of the prior art," and this question of whether patent applications or prior art made information generally known is a "fact-intensive question" for the jury. *SkinMedica, Inc. v. Histogen Inc.,* 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012). Accordingly, the Court denies the Motion for a new trial on this ground.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

DATED: March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-03503-CBM-RAO | Date | January 16, 2025 |
| Title | *International Medical Devices, Inc. et al v. Robert Cornell et al* | | |

| | |
|---|---|
| Present: The Honorable | CONSUELO B. MARSHALL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| V.R. VALLERY | NOT REPORTED |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| NONE PRESENT | NONE PRESENT |

**Proceedings:** **IN CHAMBERS- ORDER RE: EX PARTE APPLICATION FOR LEAVE TO FILE RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF**

The matter before the Court is Defendants' ex parte application for leave to file a response to Plaintiffs' Supplemental Brief. (Dkt. No. 758.) Plaintiffs oppose Defendants' application. (Dkt. No. 762.) The Court finds that additional briefing on the issues already raised in the parties' previous briefs is not necessary, and thus ex parte relief is not warranted. *See Great Am. Ins. Co. v. Berl*, 2017 WL 8180627, at *1 (C.D. Cal. Oct. 23, 2017) ("an argument is not 'new' when it is made in response to an issue raised in an earlier briefing"). Defendants' request is **DENIED**.

**IT IS SO ORDERED.**

00 :

US010413413B1

(12) **United States Patent**
**Cornell et al.**

(10) **Patent No.: US 10,413,413 B1**
(45) **Date of Patent: Sep. 17, 2019**

(54) **PENILE IMPLANTS THAT FACILITATE TISSUE EXPANSION**

(71) Applicant: **Augmenta, LLC**, Houston, TX (US)

(72) Inventors: **Robert J. Cornell**, Houston, TX (US); **Hans A. Mische**, Grey Eagel, MN (US); **David A. Nichols**, Bullard, TX (US)

(73) Assignee: **Augmenta, LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/238,792**

(22) Filed: **Jan. 3, 2019**

**Related U.S. Application Data**

(60) Provisional application No. 62/702,062, filed on Jul. 23, 2018, provisional application No. 62/779,825, filed on Dec. 14, 2018.

(51) **Int. Cl.**
***A61F 5/00*** (2006.01)
***A61F 2/26*** (2006.01)

(52) **U.S. Cl.**
CPC ........ ***A61F 2/26*** (2013.01); *A61F 2220/0008* (2013.01); *A61F 2250/0025* (2013.01); *A61F 2250/0053* (2013.01); *A61F 2250/0078* (2013.01)

(58) **Field of Classification Search**
CPC ............................ A61F 2/26; A61F 2005/411
USPC ..................................................... 600/38–41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,383,944 A 7/1921 Hart
2,899,957 A 11/1957 Briggs
3,893,456 A 7/1975 Small et al.
3,987,789 A 10/1976 Timm et al.
4,204,530 A 5/1980 Finney
4,483,331 A 11/1984 Trick
4,523,584 A 6/1985 Yachia et al.
4,589,405 A 5/1986 Hemmeter
4,602,625 A 7/1986 Yachia et al.
4,669,456 A 6/1987 Masters
5,088,477 A * 2/1992 Subrini .................... A61F 2/26 600/40
5,445,594 A 8/1995 Elist
5,512,033 A 4/1996 Westrum, Jr. et al.
D376,011 S 11/1996 Nunokawa
5,669,870 A 9/1997 Elist
6,015,380 A * 1/2000 Subrini .................... A61F 2/26 600/38
6,537,204 B1 * 3/2003 Elist ......................... A61F 2/26 600/40
7,806,821 B2 * 10/2010 Kim ......................... A61F 2/26 600/38
8,986,193 B1 * 3/2015 Elist ......................... A61F 2/26 600/38

(Continued)

FOREIGN PATENT DOCUMENTS

WO 1986001398 A1 3/1986

*Primary Examiner* — John P Lacyk

(74) *Attorney, Agent, or Firm* — Gregory L. Porter; Hunton Andrews Kurth LLP

(57) **ABSTRACT**

The invention pertains to penile implants that facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants may be made of different materials or made in different configurations such that such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant.

**16 Claims, 13 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

9,504,573 B1 11/2016 Elist

* cited by examiner




Fig.1




Fig. 2




SECTION A-A

Fig. 3




SECTION B-B

Fig. 4




Distal View
Fig. 5




Proximal View

Fig. 6




Fig. 7 Section C-C


14
Skin
Superficial dorsal vein
22
Deep dorsal vein
Dorsal artery and nerve
24
Superficial (Dartos) fascia of penis
Deep (Buck's) fascia of penis
20
Corpus cavernosum
10
Deep artery
Corpus spongiosum
15
18
Urethra

FIG. 8



Fig. 9A



Fig. 9B




**Figure 10** (Large – Extra Large – 2X Large)



**Figure 11** (Mesh Tab Locations)




| Sample Color | Red | White | Blue |
|---|---|---|---|
| Durometer | **0 Type A** | **7 Type A** | **20 Type A** |
| Elongation | 290 psi | 350 psi | 700% |
| Tensile | 1140% | 1000% | 750 psi |
| Tear | 55 ppi | 70 ppi | 125 ppi |

Figure 12




**Mesh Material Options**

| Mesh | Mfg | Pore Size (mm) | Weight ($g/m^2$) | Filament | Mechanical Properties |
|---|---|---|---|---|---|
| 3D Max | Bard | 0.8 | 80–100 | Monofilament | Tensile 24.7 N/cm |
| Prolite | Atrium | 0.8 | 80–100 | Monofilament | Tensile 38 N/cm |
| Premilene | B-Braun | 0.8 | 80–100 | Monofilament | Tensile 41.4 N/cm |

Figure 13




Figure 14A Penile Implant Placement location




Figure 14B Implantation




Figure 14C Implant Sizing

Figure 15



# PENILE IMPLANTS THAT FACILITATE TISSUE EXPANSION

## CROSS REFERENCE TO RELATED APPLICATIONS

The instant application claims priority to U.S. Ser. No. 62/702,062 filed Jul. 23, 2018 and U.S. Ser. No. 62/779,825 filed Dec. 14, 2018. The aforementioned applications are incorporated by reference for U.S. purposes.

## BACKGROUND AND SUMMARY OF INVENTION

Cosmetic implants such as breast implants and penile implants are growing in popularity. Similarly, prosthetic and other medical devices are increasingly employed to treat or ameliorate conditions. For both implants and other medical devices it is often desired that they conform to existing tissue and/or mimic normal anatomical movement such that they resemble the natural human or animal body part or even have an enhanced appearance relative to the natural human or animal body part. Unfortunately, implants and devices made using conventional technology often results in an implant or device which does not facilitate tissue expansion, inhibits normal anatomical movement, and/or does not resemble a natural body party. Thus, what is needed is an implant that accomplishes one or more of the aforementioned desirable characteristics.

Advantageously, the instant invention implants and medical devices overcome the problems described above. The implants typically comprise one or more biocompatible materials. Advantageously, in some embodiments the one or more materials may be selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants also may advantageously resemble a natural body party or even have an enhanced appearance relative to a natural body part. Thus, the concepts of the instant invention are applicable to, for example, breast implants, penile implants, testicular implants as well as, incontinence devices such as male or female urethal continence plugs.

The above-described concepts may be particularly useful with respect to cosmetic penile implants because currently available cosmetic penile enhancement devices suffer from a number of limitations and deficiencies. Some comprise a rigid, inelastic silicone block that increases the risk of external erosion, patient discomfort, and an unnatural flaccid penile look and feel. Infection rates are also arguably higher with currently available cosmetic penile implants because none are antibiotic-coated or antimicrobial-resistant. Additionally, the current cosmetic penile implants are implanted using non-absorbable sutures near the dorsal neurovascular bundle distally, risking penile devascularization and denervation that can produce penile necrosis or reduced penile sensation. Further, the rigid silicone block and non-absorbable sutures prevent full penile elasticity during an erection that can reduce potency and cause discomfort during an erection.

Accordingly, in one specific embodiment the instant invention pertains to a penile implant. The penile implant generally comprises a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis. The body comprises a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. Advantageously, the penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion.

The improved cosmetic penile implant of the present invention greatly reduces these untoward complications and provides the patient with a safer, more comfortable, and more natural cosmetic penile enhancement while safeguarding natural penile sexual function. Thus, the cosmetic penile implant implanted subcutaneously may be configured to replicate as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel.

These and other embodiments are described in detail below.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a perspective view of an embodiment of a penile implant.

FIG. **2** illustrates a side view of the implant shown in FIG. **1**.

FIG. **3** illustrates a section view of a proximal end of the implant shown in FIG. **2**.

FIG. **4** illustrates a section view of a distal end of the implant shown in FIG. **2**.

FIG. **5** illustrates a distal end view of the implant shown in FIG. **1**.

FIG. **6** illustrates a proximal end view of the implant shown in FIG. **1**.

FIG. **7** illustrates a section view of the implant shown in FIG. **5**.

FIG. **8** shows a section of the natural anatomy of a penis.

FIGS. **9**A and **9**B illustrates perspective views of each side of an embodiment of a penile implant.

FIG. **10** illustrates various representative dimensions of various size penile implants.

FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B.

FIG. **12** illustrates Shore Hardness scale and representative properties of various implants.

FIG. **13** shows representative mesh material options.

FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments.

FIG. **15** shows various configurations of the internal pockets of an implant core.

## DETAILED DESCRIPTION OF THE INVENTION

General Implant—Description of Implants Methods of Making, Materials, Configurations, Characteristics (Cosmetic and Physical), Specific Implant Types

As described above, the implants and devices of this invention may be suitable for animals or humans. The specific material or materials employed will vary depending upon the specific implant, application, desired characteristics, and the like. In many applications the material employed will be biocompatible, i.e., not particularly harmful to the tissue that is near or in communication with the device or implant whether it be human or animal tissue. The one or more materials are typically selected, configured, or both to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and/or substantially mimicking soft tissue characteristics of the natural body part. Of course, the selected one or more materials and the

specific configuration will vary depending upon the specific implant and desired tissue expansion and/or other results.

In one embodiment, to facilitate tissue expansion while not substantially inhibiting normal anatomical movement the implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. Of course, using the present invention a measured property may be different at three or four or any number of locations on the implant. That is, the implant could, for example, exhibit a gradient, i.e., an increase or decrease in the magnitude of a measured property (e.g. hardness (durometer) and other properties such as tensile strength; tear strength; compressive strength; and elongation which also may be referred to as extensibility or stretching or elasticity) that is observed in passing from one point or location on the implant to another. This can be accomplished in at least two general ways or a combination of these two.

First, the material employed may be different at the first, second, and/or other additional locations of the implant. That is, the material or materials employed may vary at the first, second, and/or other locations of the implant with respect to a property of interest for the implant. That is the material or materials of the implant may be different with respect to, for example, one or more, two one or more, three one or more, four one or more, or even five of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

Making an implant having different properties at different locations on the implant may be accomplished in any convenient manner, e.g., by using different material of different properties. Such manners will differ based on the implant, its properties, materials employed, and desired characteristics.

Suitable methods may include molding, e.g., injection molding, extrusion, rotomolding, transfer molding, compression molding, blow molding, 3D printing, and the like. In general, any suitable process may be employed so long as the desired material with the desired property can be placed at the desired locations on and/or within the implant. For example, if using injection molding one might use a mold in the shape of the desired implant. The mold may have multiple injection points, e.g., two or more, three or more, four or more, or up to as many as necessary or desired. In this manner different materials (or the same material with varying properties) may be injected through each injection port. If desired, there may be compartments within the mold but often compartments are unnecessary as factors such as the different injection points and timing of injection may control the ultimate placement of the various materials. In this manner, the implant can be designed or tailored to have different properties at different locations or places on or within the implant. Thus, the desired properties such as (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation can be tailored throughout the implant by selecting the one or more biocompatible materials such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant.

A second method of making an implant wherein a measured property at a first location on said implant is different than said same measured property at a second or even more locations involves configuring the material within the implant to achieve this. This second method can be used independent of the first method which uses varying materials



or a material that varies in properties. Alternatively, the configuring described further below may be done in in conjunction with the use of varying materials or the use of a material that varies in properties.

In some embodiments of this second method, the one or more materials are configured to comprise one or more internal pockets within the implant. Such pockets are void spaces within the implant. The design and configuration of the pockets or void spaces will vary depending upon the type of implant and desired characteristics. For example, the implant geometry, size, depth, and/or location of the pockets can be configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elongation (elasticity or extensibility) of at least a portion of the implant, or (4) increase compressibility of at least a portion of the implant. As a specific example, the internal pockets may comprise pockets to modify the measured compression or elongation at different places on or within the implant, i.e., compression pockets, elongation pockets, or both. In a specific embodiment, the implant may be configured with internal pockets that, for example, permit elongation or stretching. For example, in some embodiments, the implant may be configured with internal pockets such that stretching of at least 10%, or at least 20%, or at least 40%, or at least 60%, or at least 80%, or at least 100%, or at least 150%, or at least 200% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. On the other hand, the implant may be configured with internal pockets such that stretching of up to at most 500%, or at most 450%, or at most 400%, or at most 350%, or at most 300%, or at most 250% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. By stretching is meant to refer to either elongation in one direction or compression in the other direction.

As stated above, the particular geometry of the internal pockets may vary widely depending upon the desired results. In particular embodiments, the implant may be designed such that the internal pockets of the implant may be in a honeycomb (e.g., polygonal such as hexagonal), a zig zag (WWWWW), or even an elliptical configuration. In this manner, the implant can be made such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant. For example, the implant's hardness at a particular location will usually depend at least in part upon the nature and volume of the pockets or voids beneath the location. That is, the greater the volume of voids beneath a particular implant location, the softer the implant may feel at that particular location. Thus, an implant may have a dense honeycomb at the distal end with a less dense honeycomb at the proximal end or a gradient or graduated honeycomb densities leading to different hardnesses and/or other properties over the length and/or various dimensions of the implant. Likewise, the geometry, size, depth, and/or location of the pockets beneath a particular location also affect and/or determine the other properties of the implant beneath that location, e.g., tensile strength; tear strength; compressive strength; and elongation (extensibility or elasticity). In this manner, the configuration of the pockets can be tailored or designed to change the properties at various locations on the implant. FIG. **15** shows various configurations of the internal pockets of an implant core.

The desired configuration of the implant's pockets, if any, may be accomplished in any convenient manner and such

manners may differ depending upon the type of implant, material(s) employed, desired properties, and other factors. One way of configuring an implant is through the use of injection molding wherein the mold cavity may include a removable structure in the geometry of the desired pockets so that when structure is removed pockets or voids exist within the molded implant. A commonly used injection molding method using a core, a cavity side A, and a cavity side B may be employed. Dual or multiple extrusion, 3-D printing and other methods may also be used to make the aforementioned implant structures.

The specific material or materials employed for the implants herein are not particularly limited so long as they are typically biocompatible and can be made to have one or more, or two or more, or three or more, or four or more, or all of the desired properties (e.g., hardness, tensile strength; tear strength; compressive strength; and/or elongation) in the desired ranges described herein for the implant. Thermosets, thermoplastics, elastomers, or combinations thereof may be employed. Useful thermoplastics may include nylon, polyethylene, polypropylene, and polystyrene while useful thermosets may include various epoxy resins and phenolic resins in any form while preferred thermosets may include various gel colloids. Silicone and polyurethane may be particularly useful materials for some types of implants. Particularly preferred materials include foams, either solid or semi-solid, closed cell foams such as those comprising urethane, silicone, or mixtures thereof.

Particularly preferred configurations for various implants include those that comprise a wall having a varying wall thickness over one or more dimensions of the implant. Another preferred configuration is one in which the amount of materials employed within the implant are changed over one or more dimensions in a gradient such as by a changing or changed honeycomb structure. By reducing the wall thickness or alternatively having more voids in perhaps a honeycomb structure over the length of the implant the hardness or other properties may be changed such the implant is similar to natural tissue and/or allows normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part. In another embodiment the implant comprises one or more biocompatible materials having both linear and radial compression capability. This may assist in tissue expansion and may also contribute to the implant being similar to natural tissue and/or allowing normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part.

The specific properties of the implant may vary depending upon the material(s) employed, their placement, and the configuration, e.g., geometry, size, depth, or location of pockets, if any. In one embodiment the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material has a durometer range of from about 0, or from about 10, or from about 20, or from about 30 up to at most about 70, or up to at most 60, or up to at most 50, or up to at most 40 durometer on the Shore A scale according to ASTM D2240-15.

Other useful properties of the implant that may be determined by the material or configured as desired may include elongation, tensile strength, tear strength, compressibility or extensibility. Specifically, useful implant embodiments may comprise wherein the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tensile strength of from at least about 200 psi, or at least about 300 psi, or at least about 350 psi up to at most about 1000 psi, or up to at most about 800 psi, up to at most about 700 psi, or up to at most 600 psi according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has an elongation of from at least about 400%, or at least about 500%, or at least about 600%, or at least about 700%, or at least about 800%, up to about 1200%, or up to about 1100%, or up to about 1000% according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tear strength of at least about 40 pounds per inch (ppi), or at least about 50 pounds per inch (ppi), or at least about 60 pounds per inch (ppi), or at least about 70 pounds per inch (ppi), or at least about 80 pounds per inch (ppi), up to about 200 ppi, or up to about 130 ppi, or up to about 120 ppi, or up to about 110 ppi according to ASTM D624. The implants of the present invention may also comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a compressibility and/or extensibility factor of from at least 0, or at least 5, or at least 10, or at least 15, up to about 20, or up to about 25%. Compression can be tested by, for example, ASTM D395-03.



In other embodiments of the instant invention the implants may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has at least one, or at least two, or at least three, or at least four or more of the above-described properties.

The implants may comprise further materials depending upon the desired properties and application. For example, the implant may comprise hydrophilic or hydrophobic agents on the interior or exterior of the implant. In one specific embodiment the implants have a hydrophilic agent on the exterior such that the implant is at least partially resistant to bacteria, viruses, and the like in that they cannot adhere to the surface. Such hydrophilic agents are not particularly limited and depend upon the application. As such they may be selected from any compatible material and applied in suitable amounts to achieve the desired effect.

Other suitable additives to the interior and/or exterior of the implant comprise a material capable of releasing heat and/or a material capable of absorbing heat. In this manner the implant or portions of the implant may be made to be exothermic or endothermic based on exposure to one or more stimuli.

As described above, the instant inventions are widely applicable to any number of types of implants and/or prosthetic or other medical devices. Specific embodiments may be particularly applicable to penile implant, a testicular implant, a female incontinence implant, a breast implant, or similar implants and devices. More specifically, the instant inventions may be particularly applicable to those applications wherein tissue expansion is desired. Such applications include, but are not limited to, e.g., applications wherein desired tissue expansion includes being near a urinary meatus, a fossa navicularis, or a bladder neck when, for example, said implant is intended for or placed in a human. Particularly preferred applications may include, for example, those wherein the implant may be a penile implant, a male or female incontinence implant or plug, or a breast implant. Of course, the method of placing, attaching, inserting, and/or employing the implants of the instant invention will vary depending upon the specific type of implant and the person or animal's anatomy with which it will be employed. In most instances conventional and known sur-

gical techniques or concepts can be employed with a given implant. A specific embodiment pertaining to a cosmetic penile implant is described below.

Specific Penile Implant Embodiments

The following specific embodiments disclosed relate to cosmetic penile implants and method of implanting. However, it should be understood that the concepts, materials, properties, methods of making, and other description above apply equally to cosmetic penile implants. Similarly, the concepts, materials, properties, methods of making, and other description specific to the penile implant embodiment described below may also be applicable to many other types of implants and/or prostheses.

FIG. **8** illustrates a cross-section of the natural penile anatomy consisting of several distinguishable parts. The glans penis is commonly referred to as the head of the penis. The skin **16** is the outer layer of the penis. The corpus cavernosum **10** are two columns of spongy erectile tissue comprising the dorsum of the penis bilaterally which, when filled with blood, cause an erection. The corpus spongiosum **15** is a column of sponge-like tissue comprising the medial ventrum of the penis surrounding the urethra **18** from the bladder neck to the glans penis which also fills with blood during an erection, but does not contribute to the erection. The paired corpora cavernosa **10** and the corpus spongiosum **15** are enclosed within a tube of deep fascia **20** called Buck's fascia. Buck's fascia **20** also surrounds the deep dorsal vein **22**, and the paired dorsal arteries and dorsal nerves **24** of the penis.

The cosmetic penile implant may have a body having a longitudinal axis of a selected longitudinal length to be aligned with the long axis of the penis. The body may have any length and any diameter or width. In one embodiment, the body may have a cylindrical cross section. In other embodiments, the body may have an elliptical or oblong cross section. In yet other embodiments, the body may have a cross section of any shape. The body has an outer surface and an inner surface. The body may be formed as one integral part. A cross-section perpendicular to the longitudinal axis of the body may have a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. The ventral edges may be straight or scalloped edges. The body may be open at both its proximal end (nearest to the base of the penis), as well as the opposite distal end (nearest to the glans penis).

The body may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end to the beginning of a distal portion at which point the wall thickness tapers from the beginning of the distal portion to the body's distal end. A constant wall thickness extending along a longitudinal length of the body from the proximal end to the beginning of the distal portion is preferred over a tapered wall thickness because the constant wall thickness more closely matches the natural anatomy of the penis. The distal portion has a tapered wall thickness only for a short portion near the distal end of the body (nearest the glans penis). The body may have all edges and corners rounded, chamfered, or pillowed. The implant is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin and adjacent Buck's fascia. When implanted the device may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The body may be made of any type of polymer, elastomer, rubber, composite material, or any other spongy or flexible or compressive material that replicates as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel. The implant body material will be as flexible, compliant and compressible to most closely simulate normal penile tissue in a flaccid state while producing enhanced flaccid penile length and girth. In one embodiment, the body may be made of a silicone. In another embodiment, the body may be made of polyurethane. The softness of the material forming the body of the implant may have a Shore A softness of less than 25, or less than 20, or less than 15, or less than 12, or more preferably less than 10. A shore durometer measures hardness of a material, typically of polymers, elastomers, and rubbers. High numbers in its scale indicate a greater resistance to indentation, and thus harder materials. Lower number indicate softer, more compressible or more flexible materials. There are several scales of durometer, used for materials with different properties. The two most common scales, using slightly different measurement systems, are the ASTM D2240 type A and type. D scales. The A scale is for softer materials, while the D scale is for harder materials.

If desired, mesh tabs of from about 1 to about 2 cm in length may be placed through the length of the lateral margins spaced from about 0.75 cm to about 1.25 cm apart. The body may have one or more embedded tabs, e.g., mesh tabs, protruding from its proximal end, and one or more embedded mesh tabs protruding from its distal end. The mesh tabs may protrude beyond the proximal end and the distal end up to any distance. For example, the embedded mesh tabs may protrude bilaterally (on both sides) up to 0.5 cm beyond the distal end, or up to 1.0 cm beyond the distal end, or up to 1.5 cm beyond the distal end, or greater. The embedded mesh tabs may protrude bilaterally up 1.0 cm beyond the proximal end, or up to 1.5 cm beyond the proximal end, or up to 2.0 cm beyond the proximal end, or greater. The mesh tabs may be any shape and size, such as, for example, rectangular or square with right angles at edges, and are provided as a functional means for suturing the body at both distal and proximal ends to Buck's fascia and the fibrous tunical sheath of the corpus cavernosa, to support maintaining the body in place and prevent longitudinal and/or rotational migration. The mesh tabs are configured to receive tissue ingrowth and may be made of any material and mesh size that supports and promotes natural tissue ingrowth. For example, the mesh may be polyurethane mesh. Or the mesh may be another other type of material commonly used in reconstructive general, plastic, or urologic surgery as will be understood by one of ordinary skill in the art. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the corpus cavernosa tunic. Suturing will be understood by one of ordinary skill in the art. The mesh tabs may be formed integrally with the body, or embedded within the body, or attached to it, or attached between multiple layers of the body, or attached to the body by other methods of attachment. The mesh tabs are located at the proximal end and the tapered distal end as near the ventral margin as possible. Mesh tabs are not located within or attached to the body along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle, which would risk denervation or devascularization of the penis both during implantation or during any subsequent required explantation.

The body may have an antimicrobial surface coating that contains an antimicrobial agent that inhibits the ability of microorganisms to grow on the surface of the body. For example, an antibiotic or antibacterial may coat the surface or be embedded into the implant material and thereby potentially reduce the risk of bacterial infections of the

implant. In one embodiment, the body may be dipped into an antibiotic or antibacterial agent to coat the surfaces. In another embodiment, the body may be impregnated with an antibiotic or antibacterial agent when the body is formed. The antibiotic coating or impregnation of the body will be consistent with bioprosthesis standards as will be understood by one ordinarily skilled in the art. Any type of antibiotic or antibacterial agent may be used. For example, in certain embodiments, Rifampin and/or Minocycline may be used.

FIGS. **1-7** illustrate an embodiment of a penile implant **100**. FIG. **1** illustrates a perspective view of an embodiment of the penile implant **100**. FIGS. **2** and **7** illustrate side and cross section views of the penile implant **100**, respectively. The implant **100** has a cylindrical body **110** having a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of the penis. The cylindrical body **110** has an outer cylindrical surface **112** and a smaller inner cylindrical surface **114**. FIGS. **3** and **4** illustrate cross-section views perpendicular to the longitudinal axis of the cylindrical body **110**. The cylindrical body **110** has a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline **120** to a minimum thickness along ventral edges **122** that form a ventral opening **124**. The ventral edges **122** are illustrated as scalloped, however they may also be straight edges. Reference numeral **200** in FIG. **7** cross-section refers to a few representative internal pockets disposed below the outer cylindrical surface **112** of the cylindrical body **110**.

FIG. **5** illustrates a distal end view, FIG. **6** illustrates a proximal end view of the penile implant **100**. The cylindrical body **110** may be open at both its proximal end **116** (nearest to the base of the penis), as well as the opposite distal end **119** (nearest to the glans penis). The body **110** may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end **116** to the beginning **117** of a distal portion **118** where the wall thickness tapers from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110**. The distal portion **118** has a tapered wall thickness from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110** (nearest the glans penis). The cylindrical body **110** may have pillowed or rounded edges **128** at both the proximal end **116** and the distal end **119**. The implant **100** is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin **16** and adjacent to Buck's fascia **20**. The implant may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The cylindrical body **110** further includes embedded mesh tabs **128** that are located at its proximal end **116**, and one or more embedded mesh tabs **128** that are located at its distal end **119**. The mesh tabs **128** are configured to receive tissue ingrowth and provide a functional means for suturing the cylindrical body at both distal **119** and proximal ends **116** to Buck's fascia **20** to keep the cylindrical body **110** in place and prevent longitudinal and/or rotational migration. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the underlying tunic of the corpus cavernosum. The mesh tabs **128** may be formed integrally with or embedded within the cylindrical body **110**, or attached to it, or secured between multiple layers of the cylindrical body **110**, or secured to the cylindrical body **110** by another other methods of attachment. The mesh tabs **128** are located at the proximal end **116** and distal end **119** as near the ventral edges **122** as possible. Mesh tabs **128** are not located within or attached to the body **110** along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle **22**, **24**, which would risk denervation or devascularization of the penis.

The following methods may be used for implanting the cosmetic penile implant. The cosmetic penile implant may be placed through a peno-scrotal or ventral phalloplasty incision without an abdominal incision being made and without associated surgical drain placement. Through a peno-scrotal or ventral phalloplasty incision, Buck's fascia overlying the fibrous tunic of the corpus cavernosa is identified and the soft tissue attachments are released through both blunt and sharp dissection. Care is taken to avoid disruption of Buck's fascia along the dorso-lateral margins of the corpus cavernosa to avoid injury to the underlying penile neurovascular bundle, thereby avoiding risk of penile devascularization or sensory denervation. Through this incision, the glans penis may be retracted caudally, thereby inverting the penile shaft and permitting direct inspection and additional dissection of the distal penile shaft. The distal implant margin containing the mesh tabs may then be secured lateral to the dorsal neurovascular bundle using absorbable sutures, ensuring secure and proper placement of the implant. Similarly, absorbable sutures may be used to secure the proximal margin of the implant ventrally, permitting tissue ingrowth at each position of the implant at all four quadrants. This additionally secures the implant in the desired location and reduces the risk of implant migration, malposition and erosion. This surgical approach also facilitates, through direct inspection, ventral placement of the implant lateral to the urethral margin bilaterally, further ensuring not only proper implant placement, but a more concealed and comfortable tapered lateral implant margin. The wound and the implant can be copiously irrigated with antibiotic solution and hemostasis achieved and confirmed before the subcutaneous tissue is reapproximated, also with absorbable sutures. The peno-scrotal skin is similarly reapproximated with absorbable sutures providing a two-layered closure. The shaft is then loosely wrapped with gauze and elastic adhesive, taking care to avoid penile ischemia. The patient may be discharged the same day following a brief recovery period with instructions to remove the dressing in 24-48 hours. Cleansing of the wound daily may then occur. Avoidance of sexual intercourse is advised until the one month postoperative examination.

Another method of implanting the cosmetic penile implant may be the methods that are taught by U.S. Pat. No. 4,202,530, which is incorporated herein by reference in its entirety.

The inflatable penile implant to correct erectile dysfunction may be subsequently implanted within the corpus cavernosa, deep to the cosmetic penile implant, without meaningful physical alteration to the cosmetic penile implant or compromise of the intended purpose of the cosmetic penile implant. Similarly, placement of the cosmetic penile implant subsequent to placement of an inflatable penile implant is possible with either surgical approach referenced above. Advantageously, there are no restrictions to erection of the penis following cosmetic implant placement given absorbable suture use, elasticity of the implant body and only segmental use of mesh attachments off the dorsal midline neurovascular bundle.

FIGS. **9**A and **9**B illustrate an embodiment of a penile implant with a perspective view of each side. As shown in FIG. **10** the penile implant, like the other implants herein, can be made in a wide range of sizes and dimensions. Advantageously, the wall thicknesses may vary over the length of the implant and/or the geometry and configuration

can be adjusted with pockets as described above. By subtraction of material using thinner walls and/or by adding more pockets, one can change the hardness over the various dimensions of the implant. Thus, the hardness and other properties may change from proximal to distal and vice versa, e.g., the distal portion may have a dense honeycomb structure while the proximal portion is less dense. This assists in, for example, providing augmentation while retaining physiological feel and function. That is, the penile and other implants of the present invention may mimic soft tissue more so than other implants which may, for example, employ a bag-like or balloon like exterior with a cavity filled with fluid-like material. In contrast, the implants of the present invention may be comprised of a single material configured with pockets to adjust the properties.

The penile and other implant may be attached in any convenient manner. As described previously in some embodiments the penile implant may comprise tabs for suturing the penile or other implant to the body. If employed, then the tabs may be located at any convenient location and be comprised of any biocompatible material. FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B while FIG. **13** shows exemplary types of mesh material that may be employed.

As described in detail above, the implants, including the penile implant, may be comprised of materials that exhibit various ranges of properties, e.g., durometer, elongation, tensile, tear, etc., at one or more different locations on the implant. FIG. **12** illustrates Shore Hardness scale and representative properties of various implants such as the penile implant. FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments. If course, if desired one or more of various other features may be incorporated into the penile or other implants so long as they don't substantially interfere with the function. A non-limiting list of such features may include ribs, knobs, horns, grooves, a radiopaque property, fluorescence or some other illuminating property.

The claimed subject matter is not to be limited in scope by the specific embodiments described herein. Indeed, various modifications of the invention in addition to those described herein will become apparent to those skilled in the art from the foregoing description. Such modifications are intended to fall within the scope of the appended claims.

What is claimed is:

**1**. A penile implant comprising:

a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis, wherein the body comprises:

a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening;

said penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion wherein said one or more biocompatible materials comprise internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant.

**2**. The penile implant of claim **1** wherein said one or more biocompatible materials are configured to comprise one or more internal pockets that vary in one or more of the following: geometry, size, depth, or location.

**3**. The penile implant of claim **2** wherein the said one or more internal pockets are configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elasticity of at least a portion of the implant, (4) increase extensibility of at least a portion of the implant, or (5) increase compressibility of at least a portion of the implant.

**4**. The penile implant of claim **2** wherein said internal pockets comprise a honeycomb design.

**5**. The penile implant of claim **1** wherein said implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said penile implant is different than said same measured property at a second location on said implant.

**6**. The penile implant of claim **5** wherein said measured property comprises one or more of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

**7**. The penile implant of claim **6** wherein the measured property of hardness is different at a first location on said penile implant from a second location on said implant.

**8**. The penile implant of claim **7** wherein the measured property of hardness differs from the proximal end of the implant to the distal end of the implant.

**9**. The penile implant of claim **2** wherein the said one or more internal pockets are configured to result in a change of one or more properties from the proximal end of the implant to the distal end of the implant.

**10**. The penile implant of claim **3** wherein the said one or more internal pockets are configured to result in a change in rigidity from the proximal end of the implant to the distal end of the implant.

**11**. The penile implant of claim **1** comprising one or more tabs configured to suture to a body.

**12**. The penile implant of claim **11** wherein the tabs are configured at both distal and proximal ends to suture Buck's fascia and receive tissue ingrowth.

**13**. The penile implant of claim **11** wherein the one or more tabs are attached to the body of the implant.

**14**. The penile implant of claim **11** wherein the one or more tabs comprise a mesh material.

**15**. The penile implant of claim **12**, wherein the tabs are configured to employ absorbable sutures.

**16**. The penile implant of claim **1**, further comprising an antibiotic or antibacterial agent.

* * * * *

US010980639B2

# (12) United States Patent

Cornell et al.

(10) Patent No.: US 10,980,639 B2

(45) Date of Patent: Apr. 20, 2021

(54) **IMPLANTS THAT FACILITATE TISSUE EXPANSION**

(71) Applicant: **Augmenta, LLC**, Houston, TX (US)

(72) Inventors: **Robert J. Cornell**, Houston, TX (US); **David J. Nichols**, Bullard, TX (US); **Hans A. Mische**, Grey Eagle, MN (US)

(73) Assignee: **Augmenta, LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 39 days.

(21) Appl. No.: **16/238,821**

(22) Filed: **Jan. 3, 2019**

(65) **Prior Publication Data**

US 2020/0022812 A1 Jan. 23, 2020

**Related U.S. Application Data**

(60) Provisional application No. 62/779,825, filed on Dec. 14, 2018, provisional application No. 62/702,062, filed on Jul. 23, 2018.

(51) **Int. Cl.**
***A61F 2/26*** (2006.01)

(52) **U.S. Cl.**
CPC ........ ***A61F 2/26*** (2013.01); *A61F 2220/0008* (2013.01); *A61F 2250/0018* (2013.01); *A61F 2250/0019* (2013.01); *A61F 2250/0025* (2013.01); *A61F 2250/0037* (2013.01); *A61F 2250/0053* (2013.01); *A61F 2250/0071* (2013.01); *A61F 2250/0078* (2013.01)

(58) **Field of Classification Search**
CPC ......... A61F 2/02; A61F 2/26; A61F 2005/411
USPC ...................................................... 600/38–40
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,383,944 | A | 7/1921 | Hart |
| 2,899,957 | A | 11/1957 | Briggs |
| 3,893,456 | A | 7/1975 | Small et al. |
| 3,987,789 | A | 10/1976 | Timm et al. |
| 4,204,530 | A | 5/1980 | Finney |
| 4,483,331 | A | 11/1984 | Trick |
| 4,523,584 | A | 6/1985 | Yachia et al. |
| 4,589,405 | A | 5/1986 | Hemmeter |
| 4,602,625 | A | 7/1986 | Yachia et al. |
| 4,669,456 | A | 6/1987 | Masters |
| 5,445,594 | A † | 8/1995 | Elist |

(Continued)

FOREIGN PATENT DOCUMENTS

WO 1986001398 A1 3/1986

OTHER PUBLICATIONS

Int'l Search Report & Written Opinion (PCT/US2019/042782), dated Oct. 3, 2019.

(Continued)

*Primary Examiner* — John P Lacyk

(74) *Attorney, Agent, or Firm* — Gregory L Porter; Hunton Andrews Kurth LLP

(57) **ABSTRACT**

The invention pertains to implants that facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants may be made of different materials or made in different configurations such that such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. In one particular embodiment the implants may be a cosmetic penile implant.

**22 Claims, 13 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,512,033 A | 4/1996 | Westrum, Jr. et al. | |
| D376,011 S | 11/1996 | Nunokawa | |
| 5,669,870 A † | 9/1997 | Elist | |
| 5,899,849 A † | 5/1999 | Elist | |
| 6,015,380 A | 1/2000 | Subrini | |
| D462,770 S † | 9/2002 | Elist | |
| 6,475,137 B1 † | 11/2002 | Elist | |
| 6,537,204 B1 † | 3/2003 | Elist | |
| 7,572,221 B2 † | 8/2009 | Atala | |
| 8,986,193 B1 † | 3/2015 | Elist | |
| 9,504,573 B1 † | 11/2016 | Elist | |
| 9,877,835 B1 | 1/2018 | Loria | |
| 10,350,070 B2 † | 7/2019 | Elist | |
| 2003/0220539 A1 * | 11/2003 | George | A61F 2/26 600/40 |
| 2014/0031619 A1 | 1/2014 | Moon | |
| 2017/0020700 A1 | 1/2017 | Bienvenu et al. | |

OTHER PUBLICATIONS

Elist et al., "A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicon Sleeve Implant . . . ", J. Sex. Med (2018), pp. 1216-1223.
Elist et al., "Correction of retractile penis with subcutaneous soft silicon penile implant", published online at https://doi.org/10.1038/s41443-019-0174-3 (Aug. 5, 2019).

* cited by examiner
† cited by third party




Fig.1




Fig. 2




SECTION A-A

Fig. 3




SECTION B-B

Fig. 4




Distal View
Fig. 5




Proximal View

Fig. 6




Fig. 7 Section C-C




FIG. 8



Fig. 9A



Fig. 9B




**Figure 10** (Large – Extra Large – 2X Large)



**Figure 11** (Mesh Tab Locations)




| Sample Color | Red | White | Blue |
|---|---|---|---|
| Durometer | **0 Type A** | **7 Type A** | **20 Type A** |
| Elongation | 290 psi | 350 psi | 700% |
| Tensile | 1140% | 1000% | 750 psi |
| Tear | 55 ppi | 70 ppi | 125 ppi |

Figure 12




**Mesh Material Options**

| Mesh | Mfg | Pore Size (mm) | Weight ($g/m^2$) | Filament | Mechanical Properties |
|---|---|---|---|---|---|
| 3D Max | Bard | 0.8 | 80–100 | Monofilament | Tensile 24.7 N/cm |
| Prolite | Atrium | 0.8 | 80–100 | Monofilament | Tensile 38 N/cm |
| Premilene | B-Braun | 0.8 | 80–100 | Monofilament | Tensile 41.4 N/cm |

Figure 13




Figure 14A Penile Implant Placement location






Figure 14B Implantation




Figure 14C Implant Sizing

Figure 15



# IMPLANTS THAT FACILITATE TISSUE EXPANSION

## CROSS REFERENCE TO RELATED APPLICATIONS

The instant application claims priority to U.S. Ser. No. 62/702,062 filed Jul. 23, 2018 and U.S. Ser. No. 62/779,825 filed Dec. 14, 2018. The aforementioned applications are incorporated by reference for U.S. purposes.

## BACKGROUND AND SUMMARY OF INVENTION

Cosmetic implants such as breast implants and penile implants are growing in popularity. Similarly, prosthetic and other medical devices are increasingly employed to treat or ameliorate conditions. For both implants and other medical devices it is often desired that they conform to existing tissue and/or mimic normal anatomical movement such that they resemble the natural human or animal body part or even have an enhanced appearance relative to the natural human or animal body part. Unfortunately, implants and devices made using conventional technology often results in an implant or device which does not facilitate tissue expansion, inhibits normal anatomical movement, and/or does not resemble a natural body party. Thus, what is needed is an implant that accomplishes one or more of the aforementioned desirable characteristics.

Advantageously, the instant invention implants and medical devices overcome the problems described above. The implants typically comprise one or more biocompatible materials. Advantageously, in some embodiments the one or more materials may be selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement. The implants also may advantageously resemble a natural body party or even have an enhanced appearance relative to a natural body part. Thus, the concepts of the instant invention are applicable to, for example, breast implants, penile implants, testicular implants as well as, incontinence devices such as male or female urethal continence plugs.

The above-described concepts may be particularly useful with respect to cosmetic penile implants because currently available cosmetic penile enhancement devices suffer from a number of limitations and deficiencies. Some comprise a rigid, inelastic silicone block that increases the risk of external erosion, patient discomfort, and an unnatural flaccid penile look and feel. Infection rates are also arguably higher with currently available cosmetic penile implants because none are antibiotic-coated or antimicrobial-resistant. Additionally, the current cosmetic penile implants are implanted using non-absorbable sutures near the dorsal neurovascular bundle distally, risking penile devascularization and denervation that can produce penile necrosis or reduced penile sensation. Further, the rigid silicone block and non-absorbable sutures prevent full penile elasticity during an erection that can reduce potency and cause discomfort during an erection.

Accordingly, in one specific embodiment the instant invention pertains to a penile implant. The penile implant generally comprises a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis. The body comprises a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. Advantageously, the penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion.



The improved cosmetic penile implant of the present invention greatly reduces these untoward complications and provides the patient with a safer, more comfortable, and more natural cosmetic penile enhancement while safeguarding natural penile sexual function. Thus, the cosmetic penile implant implanted subcutaneously may be configured to replicate as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel.

These and other embodiments are described in detail below.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a perspective view of an embodiment of a penile implant.

FIG. **2** illustrates a side view of the implant shown in FIG. **1**.

FIG. **3** illustrates a section view of a proximal end of the implant shown in FIG. **2**.

FIG. **4** illustrates a section view of a distal end of the implant shown in FIG. **2**.

FIG. **5** illustrates a distal end view of the implant shown in FIG. **1**.

FIG. **6** illustrates a proximal end view of the implant shown in FIG. **1**.

FIG. **7** illustrates a section view of the implant shown in FIG. **5**.

FIG. **8** shows a section of the natural anatomy of a penis.

FIGS. **9**A and **9**B illustrates perspective views of each side of an embodiment of a penile implant.

FIG. **10** illustrates various representative dimensions of various size penile implants.

FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B.

FIG. **12** illustrates Shore Hardness scale and representative properties of various implants.

FIG. **13** shows representative mesh material options.

FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments.

FIG. **15** shows various configurations of the internal pockets of an implant core.

## DETAILED DESCRIPTION OF THE INVENTION

### General Implant—Description of Implants Methods of Making, Materials, Configurations, Characteristics (Cosmetic and Physical), Specific Implant Types

As described above, the implants and devices of this invention may be suitable for animals or humans. The specific material or materials employed will vary depending upon the specific implant, application, desired characteristics, and the like. In many applications the material employed will be biocompatible, i.e., not particularly harmful to the tissue that is near or in communication with the device or implant whether it be human or animal tissue. The one or more materials are typically selected, configured, or both to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and/or substantially

mimicking soft tissue characteristics of the natural body part. Of course, the selected one or more materials and the specific configuration will vary depending upon the specific implant and desired tissue expansion and/or other results.

In one embodiment, to facilitate tissue expansion while not substantially inhibiting normal anatomical movement the implant comprises one or more biocompatible materials selected or configured such that a measured property at a first location on said implant is different than said same measured property at a second location on said implant. Of course, using the present invention a measured property may be different at three or four or any number of locations on the implant. That is, the implant could, for example, exhibit a gradient, i.e., an increase or decrease in the magnitude of a measured property (e.g. hardness (durometer) and other properties such as tensile strength; tear strength; compressive strength; and elongation which also may be referred to as extensibility or stretching or elasticity) that is observed in passing from one point or location on the implant to another. This can be accomplished in at least two general ways or a combination of these two.

First, the material employed may be different at the first, second, and/or other additional locations of the implant. That is, the material or materials employed may vary at the first, second, and/or other locations of the implant with respect to a property of interest for the implant. That is the material or materials of the implant may be different with respect to, for example, one or more, two one or more, three one or more, four one or more, or even five of the following properties: (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation.

Making an implant having different properties at different locations on the implant may be accomplished in any convenient manner, e.g., by using different material of different properties. Such manners will differ based on the implant, its properties, materials employed, and desired characteristics.

Suitable methods may include molding, e.g., injection molding, extrusion, rotomolding, transfer molding, compression molding, blow molding, 3D printing, and the like. In general, any suitable process may be employed so long as the desired material with the desired property can be placed at the desired locations on and/or within the implant. For example, if using injection molding one might use a mold in the shape of the desired implant. The mold may have multiple injection points, e.g., two or more, three or more, four or more, or up to as many as necessary or desired. In this manner different materials (or the same material with varying properties) may be injected through each injection port. If desired, there may be compartments within the mold but often compartments are unnecessary as factors such as the different injection points and timing of injection may control the ultimate placement of the various materials. In this manner, the implant can be designed or tailored to have different properties at different locations or places on or within the implant. Thus, the desired properties such as (1) hardness; (2) tensile strength; (3) tear strength; (4) compressive strength; and (5) elongation can be tailored throughout the implant by selecting the one or more biocompatible materials such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant.

A second method of making an implant wherein a measured property at a first location on said implant is different than said same measured property at a second or even more locations involves configuring the material within the implant to achieve this. This second method can be used independent of the first method which uses varying materials or a material that varies in properties. Alternatively, the configuring described further below may be done in in conjunction with the use of varying materials or the use of a material that varies in properties.

In some embodiments of this second method, the one or more materials are configured to comprise one or more internal pockets within the implant. Such pockets are void spaces within the implant. The design and configuration of the pockets or void spaces will vary depending upon the type of implant and desired characteristics. For example, the implant geometry, size, depth, and/or location of the pockets can be configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elongation (elasticity or extensibility) of at least a portion of the implant, or (4) increase compressibility of at least a portion of the implant. As a specific example, the internal pockets may comprise pockets to modify the measured compression or elongation at different places on or within the implant, i.e., compression pockets, elongation pockets, or both. In a specific embodiment, the implant may be configured with internal pockets that, for example, permit elongation or stretching. For example, in some embodiments, the implant may be configured with internal pockets such that stretching of at least 10%, or at least 20%, or at least 40%, or at least 60%, or at least 80%, or at least 100%, or at least 150%, or at least 200% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. On the other hand, the implant may be configured with internal pockets such that stretching of up to at most 500%, or at most 450%, or at most 400%, or at most 350%, or at most 300%, or at most 250% occurs compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets. By stretching is meant to refer to either elongation in one direction or compression in the other direction.

As stated above, the particular geometry of the internal pockets may vary widely depending upon the desired results. In particular embodiments, the implant may be designed such that the internal pockets of the implant may be in a honeycomb (e.g., polygonal such as hexagonal), a zig zag (WWWWW), or even an elliptical configuration. In this manner, the implant can be made such that a measured property at a first location on said implant is different than said same measured property at a second, third, fourth, or even additional locations on said implant. For example, the implant's hardness at a particular location will usually depend at least in part upon the nature and volume of the pockets or voids beneath the location. That is, the greater the volume of voids beneath a particular implant location, the softer the implant may feel at that particular location. Thus, an implant may have a dense honeycomb at the distal end with a less dense honeycomb at the proximal end or a gradient or graduated honeycomb densities leading to different hardnesses and/or other properties over the length and/or various dimensions of the implant. Likewise, the geometry, size, depth, and/or location of the pockets beneath a particular location also affect and/or determine the other properties of the implant beneath that location, e.g., tensile strength; tear strength; compressive strength; and elongation (extensibility or elasticity). In this manner, the configuration of the pockets can be tailored or designed to change the properties at various locations on the implant. FIG. **15** shows various configurations of the internal pockets of an implant core.

The desired configuration of the implant's pockets, if any, may be accomplished in any convenient manner and such manners may differ depending upon the type of implant, material(s) employed, desired properties, and other factors. One way of configuring an implant is through the use of injection molding wherein the mold cavity may include a removable structure in the geometry of the desired pockets so that when structure is removed pockets or voids exist within the molded implant. A commonly used injection molding method using a core, a cavity side A, and a cavity side B may be employed. Dual or multiple extrusion, 3-D printing and other methods may also be used to make the aforementioned implant structures.

The specific material or materials employed for the implants herein are not particularly limited so long as they are typically biocompatible and can be made to have one or more, or two or more, or three or more, or four or more, or all of the desired properties (e.g., hardness, tensile strength; tear strength; compressive strength; and/or elongation) in the desired ranges described herein for the implant. Thermosets, thermoplastics, elastomers, or combinations thereof may be employed. Useful thermoplastics may include nylon, polyethylene, polypropylene, and polystyrene while useful thermosets may include various epoxy resins and phenolic resins in any form while preferred thermosets may include various gel colloids. Silicone and polyurethane may be particularly useful materials for some types of implants. Particularly preferred materials include foams, either solid or semi-solid, closed cell foams such as those comprising urethane, silicone, or mixtures thereof.

Particularly preferred configurations for various implants include those that comprise a wall having a varying wall thickness over one or more dimensions of the implant. Another preferred configuration is one in which the amount of materials employed within the implant are changed over one or more dimensions in a gradient such as by a changing or changed honeycomb structure. By reducing the wall thickness or alternatively having more voids in perhaps a honeycomb structure over the length of the implant the hardness or other properties may be changed such the implant is similar to natural tissue and/or allows normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part. In another embodiment the implant comprises one or more biocompatible materials having both linear and radial compression capability. This may assist in tissue expansion and may also contribute to the implant being similar to natural tissue and/or allowing normal physiological movement while augmenting the size or otherwise enhancing the appearance of the body part.

The specific properties of the implant may vary depending upon the material(s) employed, their placement, and the configuration, e.g., geometry, size, depth, or location of pockets, if any. In one embodiment the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material has a durometer range of from about 0, or from about 10, or from about 20, or from about 30 up to at most about 70, or up to at most 60, or up to at most 50, or up to at most 40 durometer on the Shore A scale according to ASTM D2240-15.

Other useful properties of the implant that may be determined by the material or configured as desired may include elongation, tensile strength, tear strength, compressibility or extensibility. Specifically, useful implant embodiments may comprise wherein the implant comprises one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tensile strength of from at least about 200 psi, or at least about 300 psi, or at least about 350 psi up to at most about 1000 psi, or up to at most about 800 psi, up to at most about 700 psi, or up to at most 600 psi according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has an elongation of from at least about 400%, or at least about 500%, or at least about 600%, or at least about 700%, or at least about 800%, up to about 1200%, or up to about 1100%, or up to about 1000% according to ASTM D412-06. Similarly, the implant may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a tear strength of at least about 40 pounds per inch (ppi), or at least about 50 pounds per inch (ppi), or at least about 60 pounds per inch (ppi), or at least about 70 pounds per inch (ppi), or at least about 80 pounds per inch (ppi), up to about 200 ppi, or up to about 130 ppi, or up to about 120 ppi, or up to about 110 ppi according to ASTM D624. The implants of the present invention may also comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has a compressibility and/or extensibility factor of from at least 0, or at least 5, or at least 10, or at least 15, up to about 20, or up to about 25%. Compression can be tested by, for example, ASTM D395-03.

In other embodiments of the instant invention the implants may comprise one or more biocompatible materials wherein a specific location on the implant and/or the material employed has at least one, or at least two, or at least three, or at least four or more of the above-described properties.

The implants may comprise further materials depending upon the desired properties and application. For example, the implant may comprise hydrophilic or hydrophobic agents on the interior or exterior of the implant. In one specific embodiment the implants have a hydrophilic agent on the exterior such that the implant is at least partially resistant to bacteria, viruses, and the like in that they cannot adhere to the surface. Such hydrophilic agents are not particularly limited and depend upon the application. As such they may be selected from any compatible material and applied in suitable amounts to achieve the desired effect.

Other suitable additives to the interior and/or exterior of the implant comprise a material capable of releasing heat and/or a material capable of absorbing heat. In this manner the implant or portions of the implant may be made to be exothermic or endothermic based on exposure to one or more stimuli.

As described above, the instant inventions are widely applicable to any number of types of implants and/or prosthetic or other medical devices. Specific embodiments may be particularly applicable to penile implant, a testicular implant, a female incontinence implant, a breast implant, or similar implants and devices. More specifically, the instant inventions may be particularly applicable to those applications wherein tissue expansion is desired. Such applications include, but are not limited to, e.g., applications wherein desired tissue expansion includes being near a urinary meatus, a fossa navicularis, or a bladder neck when, for example, said implant is intended for or placed in a human. Particularly preferred applications may include, for example, those wherein the implant may be a penile implant, a male or female incontinence implant or plug, or a breast implant. Of course, the method of placing, attaching, inserting, and/or employing the implants of the instant invention will vary depending upon the specific type of implant and

the person or animal's anatomy with which it will be employed. In most instances conventional and known surgical techniques or concepts can be employed with a given implant. A specific embodiment pertaining to a cosmetic penile implant is described below.

## Specific Penile Implant Embodiments

The following specific embodiments disclosed relate to cosmetic penile implants and method of implanting. However, it should be understood that the concepts, materials, properties, methods of making, and other description above apply equally to cosmetic penile implants. Similarly, the concepts, materials, properties, methods of making, and other description specific to the penile implant embodiment described below may also be applicable to many other types of implants and/or prostheses.

FIG. **8** illustrates a cross-section of the natural penile anatomy consisting of several distinguishable parts. The glans penis is commonly referred to as the head of the penis. The skin **16** is the outer layer of the penis. The corpus cavernosum **10** are two columns of spongy erectile tissue comprising the dorsum of the penis bilaterally which, when filled with blood, cause an erection. The corpus spongiosum **15** is a column of sponge-like tissue comprising the medial ventrum of the penis surrounding the urethra **18** from the bladder neck to the glans penis which also fills with blood during an erection, but does not contribute to the erection. The paired corpora cavernosa **10** and the corpus spongiosum **15** are enclosed within a tube of deep fascia **20** called Buck's fascia. Buck's fascia **20** also surrounds the deep dorsal vein **22**, and the paired dorsal arteries and dorsal nerves **24** of the penis.

The cosmetic penile implant may have a body having a longitudinal axis of a selected longitudinal length to be aligned with the long axis of the penis. The body may have any length and any diameter or width. In one embodiment, the body may have a cylindrical cross section. In other embodiments, the body may have an elliptical or oblong cross section. In yet other embodiments, the body may have a cross section of any shape. The body has an outer surface and an inner surface. The body may be formed as one integral part. A cross-section perpendicular to the longitudinal axis of the body may have a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening. The ventral edges may be straight or scalloped edges. The body may be open at both its proximal end (nearest to the base of the penis), as well as the opposite distal end (nearest to the glans penis).

The body may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end to the beginning of a distal portion at which point the wall thickness tapers from the beginning of the distal portion to the body's distal end. A constant wall thickness extending along a longitudinal length of the body from the proximal end to the beginning of the distal portion is preferred over a tapered wall thickness because the constant wall thickness more closely matches the natural anatomy of the penis. The distal portion has a tapered wall thickness only for a short portion near the distal end of the body (nearest the glans penis). The body may have all edges and corners rounded, chamfered, or pillowed. The implant is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin and adjacent Buck's fascia. When implanted the device may extend from the base of the penis at its proximal end to the glans penis at its distal end.



The body may be made of any type of polymer, elastomer, rubber, composite material, or any other spongy or flexible or compressive material that replicates as nearly as possible the natural human anatomy in shape, appearance, elasticity, compressibility, texture, and feel. The implant body material will be as flexible, compliant and compressible to most closely simulate normal penile tissue in a flaccid state while producing enhanced flaccid penile length and girth. In one embodiment, the body may be made of a silicone. In another embodiment, the body may be made of polyurethane. The softness of the material forming the body of the implant may have a Shore A softness of less than 25, or less than 20, or less than 15, or less than 12, or more preferably less than 10. A shore durometer measures hardness of a material, typically of polymers, elastomers, and rubbers. High numbers in its scale indicate a greater resistance to indentation, and thus harder materials. Lower number indicate softer, more compressible or more flexible materials. There are several scales of durometer, used for materials with different properties. The two most common scales, using slightly different measurement systems, are the ASTM D2240 type A and type D scales. The A scale is for softer materials, while the D scale is for harder materials.

If desired, mesh tabs of from about 1 to about 2 cm in length may be placed through the length of the lateral margins spaced from about 0.75 cm to about 1.25 cm apart. The body may have one or more embedded tabs, e.g., mesh tabs, protruding from its proximal end, and one or more embedded mesh tabs protruding from its distal end. The mesh tabs may protrude beyond the proximal end and the distal end up to any distance. For example, the embedded mesh tabs may protrude bilaterally (on both sides) up to 0.5 cm beyond the distal end, or up to 1.0 cm beyond the distal end, or up to 1.5 cm beyond the distal end, or greater. The embedded mesh tabs may protrude bilaterally up 1.0 cm beyond the proximal end, or up to 1.5 cm beyond the proximal end, or up to 2.0 cm beyond the proximal end, or greater. The mesh tabs may be any shape and size, such as, for example, rectangular or square with right angles at edges, and are provided as a functional means for suturing the body at both distal and proximal ends to Buck's fascia and the fibrous tunical sheath of the corpus cavernosa, to support maintaining the body in place and prevent longitudinal and/or rotational migration. The mesh tabs are configured to receive tissue ingrowth and may be made of any material and mesh size that supports and promotes natural tissue ingrowth. For example, the mesh may be polyurethane mesh. Or the mesh may be another other type of material commonly used in reconstructive general, plastic, or urologic surgery as will be understood by one of ordinary skill in the art. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the corpus cavernosa tunic. Suturing will be understood by one of ordinary skill in the art. The mesh tabs may be formed integrally with the body, or embedded within the body, or attached to it, or attached between multiple layers of the body, or attached to the body by other methods of attachment. The mesh tabs are located at the proximal end and the tapered distal end as near the ventral margin as possible. Mesh tabs are not located within or attached to the body along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle, which would risk denervation or devascularization of the penis both during implantation or during any subsequent required explanation.

The body may have an antimicrobial surface coating that contains an antimicrobial agent that inhibits the ability of microorganisms to grow on the surface of the body. For example, an antibiotic or antibacterial may coat the surface or be embedded into the implant material and thereby potentially reduce the risk of bacterial infections of the implant. In one embodiment, the body may be dipped into an antibiotic or antibacterial agent to coat the surfaces. In another embodiment, the body may be impregnated with an antibiotic or antibacterial agent when the body is formed. The antibiotic coating or impregnation of the body will be consistent with bioprosthesis standards as will be understood by one ordinarily skilled in the art. Any type of antibiotic or antibacterial agent may be used. For example, in certain embodiments, Rifampin and/or Minocycline may be used.

FIGS. **1-7** illustrate an embodiment of a penile implant **100**. FIG. **1** illustrates a perspective view of an embodiment of the penile implant **100**. FIGS. **2** and **7** illustrate side and cross section views of the penile implant **100**, respectively. The implant **100** has a cylindrical body **110** having a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of the penis. The cylindrical body **110** has an outer cylindrical surface **112** and a smaller inner cylindrical surface **114**. FIGS. **3** and **4** illustrate cross-section views perpendicular to the longitudinal axis of the cylindrical body **110**. The cylindrical body **110** has a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline **120** to a minimum thickness along ventral edges **122** that form a ventral opening **124**. The ventral edges **122** are illustrated as scalloped, however they may also be straight edges.

FIG. **5** illustrates a distal end view, FIG. **6** illustrates a proximal end view of the penile implant **100**. The cylindrical body **110** may be open at both its proximal end **116** (nearest to the base of the penis), as well as the opposite distal end **119** (nearest to the glans penis). The body **110** may also have a constant wall thickness in a direction extending longitudinally from the body's proximal end **116** to the beginning **117** of a distal portion **118** where the wall thickness tapers from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110**. The distal portion **118** has a tapered wall thickness from the beginning **117** of the distal portion **118** to the distal end **119** of the cylindrical body **110** (nearest the glans penis). The cylindrical body **110** may have pillowed or rounded edges **128** at both the proximal end **116** and the distal end **119**. The implant **100** is configured to have a size and shape adapted for subcutaneous implantation between the exterior skin **16** and adjacent to Buck's fascia **20**. The implant may extend from the base of the penis at its proximal end to the glans penis at its distal end.

The cylindrical body **110** further includes embedded mesh tabs **128** that are located at its proximal end **116**, and one or more embedded mesh tabs **128** that are located at its distal end **119**. The mesh tabs **128** are configured to receive tissue ingrowth and provide a functional means for suturing the cylindrical body at both distal **119** and proximal ends **116** to Buck's fascia **20** to keep the cylindrical body **110** in place and prevent longitudinal and/or rotational migration. Absorbable sutures may be used to fasten the mesh tabs to Buck's fascia and the underlying tunic of the corpus cavernosum. The mesh tabs **128** may be formed integrally with or embedded within the cylindrical body **110**, or attached to it, or secured between multiple layers of the cylindrical body **110**, or secured to the cylindrical body **110** by another other methods of attachment. The mesh tabs **128** are located at the



proximal end **116** and distal end **119** as near the ventral edges **122** as possible. Mesh tabs **128** are not located within or attached to the body **110** along or near the dorsal midline to avoid suturing or tissue ingrowth near the dorsal neurovascular bundle **22**, **24**, which would risk denervation or devascularization of the penis.

The following methods may be used for implanting the cosmetic penile implant. The cosmetic penile implant may be placed through a peno-scrotal or ventral phalloplasty incision without an abdominal incision being made and without associated surgical drain placement. Through a peno-scrotal or ventral phalloplasty incision, Buck's fascia overlying the fibrous tunic of the corpus cavernosa is identified and the soft tissue attachments are released through both blunt and sharp dissection. Care is taken to avoid disruption of Buck's fascia along the dorso-lateral margins of the corpus cavernosa to avoid injury to the underlying penile neurovascular bundle, thereby avoiding risk of penile devascularization or sensory denervation. Through this incision, the glans penis may be retracted caudally, thereby inverting the penile shaft and permitting direct inspection and additional dissection of the distal penile shaft. The distal implant margin containing the mesh tabs may then be secured lateral to the dorsal neurovascular bundle using absorbable sutures, ensuring secure and proper placement of the implant. Similarly, absorbable sutures may be used to secure the proximal margin of the implant ventrally, permitting tissue ingrowth at each position of the implant at all four quadrants. This additionally secures the implant in the desired location and reduces the risk of implant migration, malposition and erosion. This surgical approach also facilitates, through direct inspection, ventral placement of the implant lateral to the urethral margin bilaterally, further ensuring not only proper implant placement, but a more concealed and comfortable tapered lateral implant margin. The wound and the implant can be copiously irrigated with antibiotic solution and hemostasis achieved and confirmed before the subcutaneous tissue is reapproximated, also with absorbable sutures. The peno-scrotal skin is similarly reapproximated with absorbable sutures providing a two-layered closure. The shaft is then loosely wrapped with gauze and elastic adhesive, taking care to avoid penile ischemia. The patient may be discharged the same day following a brief recovery period with instructions to remove the dressing in 24-48 hours. Cleansing of the wound daily may then occur. Avoidance of sexual intercourse is advised until the one month postoperative examination.

Another method of implanting the cosmetic penile implant may be the methods that are taught by U.S. Pat. No. 4,202,530, which is incorporated herein by reference in its entirety.

The inflatable penile implant to correct erectile dysfunction may be subsequently implanted within the corpus cavernosa, deep to the cosmetic penile implant, without meaningful physical alteration to the cosmetic penile implant or compromise of the intended purpose of the cosmetic penile implant. Similarly, placement of the cosmetic penile implant subsequent to placement of an inflatable penile implant is possible with either surgical approach referenced above. Advantageously, there are no restrictions to erection of the penis following cosmetic implant placement given absorbable suture use, elasticity of the implant body and only segmental use of mesh attachments off the dorsal midline neurovascular bundle.

FIGS. **9**A and **9**B illustrate an embodiment of a penile implant with a perspective view of each side. As shown in

FIG. **10** the penile implant, like the other implants herein, can be made in a wide range of sizes and dimensions. Advantageously, the wall thicknesses may vary over the length of the implant and/or the geometry and configuration can be adjusted with pockets as described above. By subtraction of material using thinner walls and/or by adding more pockets, one can change the hardness over the various dimensions of the implant. Thus, the hardness and other properties may change from proximal to distal and vice versa, e.g., the distal portion may have a dense honeycomb structure while the proximal portion is less dense. This assists in, for example, providing augmentation while retaining physiological feel and function. That is, the penile and other implants of the present invention may mimic soft tissue more so than other implants which may, for example, employ a bag-like or balloon like exterior with a cavity filled with fluid-like material. In contrast, the implants of the present invention may be comprised of a single material configured with pockets to adjust the properties.

The penile and other implant may be attached in any convenient manner. As described previously in some embodiments the penile implant may comprise tabs for suturing the penile or other implant to the body. If employed, then the tabs may be located at any convenient location and be comprised of any biocompatible material. FIG. **11** illustrates representative mesh tab locations for the penile implant shown in FIGS. **9**A and **9**B while FIG. **13** shows exemplary types of mesh material that may be employed.

As described in detail above, the implants, including the penile implant, may be comprised of materials that exhibit various ranges of properties, e.g., durometer, elongation, tensile, tear, etc., at one or more different locations on the implant. FIG. **12** illustrates Shore Hardness scale and representative properties of various implants such as the penile implant. FIGS. **14**A, **14**B, and **14**C illustrate penile implant location, method, and sizing embodiments. If course, if desired one or more of various other features may be incorporated into the penile or other implants so long as they don't substantially interfere with the function. A non-limiting list of such features may include ribs, knobs, horns, grooves, a radiopaque property, fluorescence or some other illuminating property.

The claimed subject matter is not to be limited in scope by the specific embodiments described herein. Indeed, various modifications of the invention in addition to those described herein will become apparent to those skilled in the art from the foregoing description. Such modifications are intended to fall within the scope of the appended claims.

What is claimed is:

**1**. An implant suitable for a desired animal or human body part or portion thereof wherein the implant comprises an implant body comprising one or more biocompatible materials wherein said one or more materials are selected or configured to facilitate tissue expansion while not substantially inhibiting normal anatomical movement and wherein said one or more biocompatible materials comprise internal pockets of inaccessible enclosed void spaces within the implant body configured such that a measured property of hardness at a first location on said implant is different than said same measured property at a second location on said implant.

**2**. The implant of claim **1** wherein at least one additional measured property at a first location on said implant is different than said same measured property at a second location on said implant.

**3**. The implant of claim **2** wherein said additional measured property comprises one or more of the following properties: (1) tensile strength; (2) tear strength; (3) compressive strength; and (4) elongation.

**4**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having both linear and radial compression capability.

**5**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a durometer range of from about 0 to about 70 durometer on the Shore A scale.

**6**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a tensile strength of from about 200 psi to about 800 psi.

**7**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having an elongation of from about 600% to about 1200%.

**8**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a tear strength of from about 40 pounds per inch (ppi) to about 130 ppi.

**9**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having a compressibility and extensibility factor of up to about 25%.

**10**. The implant of claim **1** wherein said implant comprises one or more biocompatible materials having two or more of the following: (1) a durometer range of from about 0 to about 70 durometer; (2) a tensile strength of from about 200 psi to about 800 psi; an elongation of from about 600% to about 1200%; (3) a tear strength of from about 40 ppi to about 130 ppi; and (4) a compressibility and extensibility factor of up to about 25%.

**11**. The implant of claim **1** wherein said implant further comprises a hydrophilic agent.

**12**. The implant of claim **1** wherein said implant comprises a wall having a varying wall thickness.

**13**. The implant of claim **1** wherein said internal pockets vary in one or more of the following: geometry, size, depth, or location.

**14**. The implant of claim **13** wherein the said internal pockets are configured to result in one or more of the following: (1) reduce rigidity of at least a portion of the implant, (2) reduce the total weight of the implant, (3) increase elasticity of at least a portion of the implant, (4) increase extensibility of at least a portion of the implant, or (5) increase compressibility of at least a portion of the implant.

**15**. The implant of claim **13** wherein said internal pockets comprise those selected from compression pockets, elongation pockets, or both.

**16**. The implant of claim **15** wherein said internal pockets permit stretching of up to 500% compared to the same implant substrate (e.g., same polymer in same shape) without internal pockets.

**17**. The implant of claim **1** wherein said internal pockets comprise a honeycomb design.

**18**. The implant of claim **1** wherein said biocompatible material comprises a material that releases heat.

**19**. The implant of claim **1** wherein said biocompatible material comprises a material that absorbs heat.

**20**. The implant of claim **1** wherein one or more biocompatible materials have two or more of the following: (1) a durometer range of from about 10 to about 70 durometer; (2) a tensile strength of from about 200 psi to about 800 psi; an elongation of from about 600% to about 1200%; (3) a tear strength of from about 40 ppi to about 130 ppi; and (4) a compressibility and extensibility factor of up to about 25%.

**21**. The implant of claim **1** wherein the implant is configured in the form of a penis, testicle, or a breast.

**22**. The implant of claim **1** wherein the implant is configured in the form of a breast.

* * * * *