# United States Court of Appeals for the Federal Circuit

INTERNATIONAL MEDICAL DEVICES, INC.,
MENOVA INTERNATIONAL, INC., JAMES ELIST,
*Plaintiffs-Appellees*

v.

ROBERT CORNELL, AUGMENTA, LLC, CORNELL COSMETIC UROLOGY LLC, DAVID
LOUIS NICHOLS, HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE
LLC, RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER,
*Defendants-Appellants*

v.

DOES, 1 THROUGH 10, INCLUSIVE,
*Defendants*

On Appeal from the United States District Court for the Central District of
California, No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

Ryan Baker
May Chan
WAYMAKER LLP
515 Flower Street
Suite 3500
Los Angeles, CA 90071

Nathan S. Mammen
Cole T. Tipton
SNELL & WILMER LLP
2001 K Street, N.W.
Suite 425 North
Washington, DC 20006-1073
Telephone: (771) 772-5502
Facsimile: (202) 925-5956
nmammen@swlaw.com

*Counsel for Plaintiffs-Appellees*

August 20, 2025

## Trade Secrets (Appx7368)

(1) The incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile implant to add softness and elasticity;

(2) The incorporation of mesh tabs embedded in or around the distal tip of a cosmetic silicone penile implant to facilitate tissue ingrowth;

(3) The use of absorbable sutures as part of the cosmetic silicone penile implant procedure in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant;

(4) A particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant (referred to as the Penuma Instrument and Supply List).

## U.S. Patent No. 10,413,413 (Appx15912)

1. A penile implant comprising:

a body having outer and inner surfaces and a longitudinal axis and of a selected longitudinal length to be aligned with the long axis of a penis, wherein the body comprises:

a cross-section perpendicular to the longitudinal axis of the body having a wall thickness that tapers circumferentially in opposite directions beginning from a maximum thickness along a dorsal midline to a minimum thickness along ventral edges that form a ventral opening;

said penile implant comprises one or more biocompatible materials selected or configured to facilitate tissue expansion wherein said one or more biocompatible materials comprise internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant.

11. The penile implant of claim 1 comprising one or more tabs configured to suture to a body.

14. The penile implant of claim 11 wherein the one or more tabs comprise a mesh material.

15. The penile implant of claim 12, wherein the tabs are configured to employ absorbable sutures.

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees International Medical Devices, Inc., Menova International, Inc., and James Elist certify the following:

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):**

   International Medical Devices, Inc., Menova International, Inc., and James Elist

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):**

   Same as above

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):**

   None

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

   <u>Waymaker LLP</u>: Brian Grace, Scott Malzahn, Samuel Meehan, Donald Pepperman, Emily Stierwalt, Melisa Meister (no longer with firm)

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   *International Medical Devices, Inc. v. Cornell*, No. 25-1843 (consolidated with Nos. 25-1844 and 25-1863)

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):**

   None/Not Applicable

Date: August 20, 2025                                          */s/ Nathan S. Mammen*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

TABLE OF ABBREVIATIONS ........................................................... xiii

STATEMENT OF RELATED CASES ....................................................xiv

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE.............................................................4

I.     Background......................................................................................4

       A.     Dr. Elist Develops Penuma Implant Technology...................4

       B.     Dr. Wang Joins IMD's Advisory Board ................................8

       C.     Dr. Cornell Learns About Dr. Elist's Improvement
              Ideas.......................................................................................9

       D.     Dr. Cornell Starts Work with Mische to Develop
              Augmenta ...............................................................................10

       E.     Richard Finger, David Nichols, Huck Medical, and
              Dr. Wang Become Involved with Augmenta and the
              Misappropriation ...................................................................13

II.    District Court Proceedings..............................................................18

       A.     Pretrial ...................................................................................18

       B.     Jury Trial and Verdict............................................................19

       C.     Damages Hearing and Findings .............................................20

       D.     Post-trial Motions and Final Judgment .................................22

SUMMARY OF ARGUMENT ...........................................................25

STANDARD OF REVIEW ................................................................26

ARGUMENT ....................................................................................27

I.  Substantial Evidence Supports the Jury's Factual Finding that Defendants Misappropriated IMD's Trade Secrets ...............................27

    A.  The Cosmetic Penile Implant Improvements and Instrument List Were Not Known ......................................27

        1.  The Improvements ....................................................28

        2.  The Instrument List ................................................32

    B.  The Improvements and Instrument List Were Valuable ..................................................................34

    C.  All Defendants Misappropriated .....................................35

II.  Defendants Fail to Show Clear Error in the District Court's Reasonable Royalty Decision .........................................................40

    A.  The Reasonable Royalty Is Supported by the Evidence .................................................................40

        1.  Royalty Base .............................................................41

        2.  Royalty Rate .............................................................42

        3.  Bargaining Position.................................................47

    B.  License Duration ............................................................48

    C.  Lump Sum .......................................................................49

III.  The District Court Properly Awarded Exemplary Damages....................................................................................50

    A.  Defendants' Waiver Argument Based on the Pretrial Order Is Forfeited and Wrong ................................50

    B.  The District Court Properly Decided Exemplary Damages ........................................................................52

        1.  Defendants Consented to the District Court Deciding Exemplary Damages .............................52

2.    The Seventh Amendment Does Not Require
      a Jury to Decide Whether Misappropriation
      Was Willful and Malicious Under California
      Law....................................................................................54

C.    The District Court Correctly Found that Finger's
      Misappropriation Was Willful and Malicious.....................58

D.    California Allows Joint and Several Liability for
      Exemplary Damages............................................................60

IV.   The District Court Did Not Abuse Its Discretion in
      Entering an Injunction .................................................................62

V.    Substantial Evidence Supports the Jury's Finding that
      Cornell Violated His Non-Disclosure Agreement........................64

VI.   Substantial Evidence Supports the Jury's Finding that the
      '413 and '639 Patents Are Invalid..............................................64

VII.  Substantial Evidence Supports the Jury's Finding of
      Counterfeiting .............................................................................66

CONCLUSION ........................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ajaxo Inc. v. E\*Trade Fin. Corp.*,
  187 Cal. App. 4th 1295 (2010) .................................................................40, 63

*Ajaxo, Inc. v. E\*Trade Fin. Corp.*,
  48 Cal. App. 5th 129 (2020) .....................................35, 40, 43, 59, 60

*Altavio, Inc. v. Konica Minolta Sys. Lab'y, Inc.*,
  226 Cal. App. 4th 26 (2014) .....................................31, 32, 34, 35, 46

*Am. Can Co. v. Mansukhani*,
  742 F.2d 314 (7th Cir. 1984) ..............................................................64

*Amado v. Microsoft Corp.*,
  517 F.3d 1353 (Fed. Cir. 2008) ...........................................................52

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985)............................................................................2

*Applied Med. Distrib. Corp. v. Jarrells*,
  100 Cal. App. 5th 556 (2024) .............................................................58

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
  659 F.3d 1345 (Fed. Cir. 2011) ...........................................................28

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
  303 F.3d 1332 (Fed. Cir. 2002) ...........................................................39

*Birdsall v. Coolidge*,
  93 U.S. 64 (1876).............................................................................57

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996)...........................................................................62

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
  345 F.3d 347 (5th Cir. 2003) .............................................................49

*Colibri Heart Valve LLC v. Medtronic Corevalve, LLC*,
  143 F.4th 1367 (Fed. Cir. 2025) .........................................................51

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001) ........................................................61

*Curtis v. Loether*,
    415 U.S. 189 (1974)........................................................................56

*Day v. Woodworth*,
    54 U.S. 363 (1851)..........................................................................57

*Energy Cap. Corp. v. United States*,
    302 F.3d 1314 (Fed. Cir. 2002) ......................................................50

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ......................................................41

*Fromson v. Citiplate, Inc.*,
    886 F.2d 1300 (Fed. Cir. 1989) ........................................................2

*Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc.*,
    674 F.2d 1336 (9th Cir. 1982) ........................................................29

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ........................................................66

*Imax Corp. v. Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998) ........................................................28

*Ironburg Inventions Ltd. v. Valve Corp.*,
    64 F.4th 1274 (Fed. Cir. 2023) ......................................................26

*Kaloud, Inc. v. Shisha Land Wholesale, Inc.*,
    741 F. App'x 393 (9th Cir. 2018) ..................................................68

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ..........................................................62

*Landes Constr. Co. v. Royal Bank of Can.*,
    833 F.2d 1365 (9th Cir. 1987) ........................................................41

*Lentini v. Cal. Ctr. for the Arts, Escondido*,
    370 F.3d 837 (9th Cir. 2004) ..........................................................27

*Magallanes v. Superior Court*,
  167 Cal. App. 3d 878 (1985) ..............................................................61

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).................................................................55, 56

*Masimo Corp. v. True Wearables, Inc.*,
  2022 WL 205485 (Fed. Cir. Jan. 24, 2022) ......................................27

*Melendres v. Maricopa County*,
  897 F.3d 1217 (9th Cir. 2018) ..........................................................27

*Microsoft Corp. v. Motorola, Inc.*,
  795 F.3d 1024 (9th Cir. 2015) ..........................................................54

*Miller v. Safeco Title Ins. Co.*,
  758 F.2d 364 (9th Cir. 1985) ............................................................52

*Morlife, Inc. v. Perry*,
  56 Cal. App. 4th 1514 (1997) ....................................................33, 63

*Neal v. Farmers Ins. Exch.*,
  582 P.2d 980 (Cal. 1978).................................................................58

*O'Reilly v. Morse*,
  56 U.S. 62 (1853)..............................................................................41

*Playboy Enters. v. Universal Tel-A-Talk, Inc*,
  1998 WL 288423 (E.D. Pa. June 3, 1998)........................................68

*PMC, Inc. v. Kadisha*,
  78 Cal. App. 4th 1368 (2000) ....................................................39, 61

*In re Providian Credit Card Cases*,
  96 Cal. App. 4th 292 (2002) .............................................................27

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
  127 F.4th 896 (Fed. Cir. 2025) .........................................................27

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ..........................................................43

*Richardson v. Suzuki Motor Co.*,
    868 F.2d 1226 (Fed. Cir. 1989) ....................................................28, 35

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
    719 F.3d 1305 (Fed. Cir. 2013) ...........................................................53

*Salazar v. AT&T Mobility LLC*,
    64 F.4th 1311 (Fed. Cir. 2023) ............................................................66

*Seymour v. McCormick*,
    57 U.S. 480 (1853)................................................................................57

*Silvaco Data Sys. v. Intel Corp.*,
    184 Cal. App. 4th 210 (010) ................................................................38

*Sinclair v. Aquarius Elecs., Inc.*,
    42 Cal. App. 3d 216 (1974) .................................................................33

*Snellman v. Ricoh Co.*,
    862 F.2d 283 (Fed. Cir. 1988) .............................................................46

*Solis v. County of Los Angeles*,
    514 F.3d 946 (9th Cir. 2008) ...............................................................53

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)..............................................................................62

*Swofford v. B & W, Inc.*,
    336 F.2d 406 (5th Cir. 1964) .........................................................56, 57

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) ...............................................................36

*Teese v. Huntingdon*,
    64 U.S. 2 (1859)....................................................................................57

*Teutscher v. Woodson*,
    835 F.3d 936 (9th Cir. 2016) ...............................................................55

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018) .....................................................55, 56

*Thompson v. Impaxx, Inc.*,
    113 Cal. App. 4th 1425 (2003) ..........................................................27

*Tri-Tron Int'l v. Velto*,
    525 F.2d 432 (9th Cir. 1975) ...........................................................63

*Tull v. United States*,
    481 U.S. 412 (1987)..........................................................................55

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986) ........................................................46

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017) ...........................................................59

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ......................................................49

*United States v. Able Time, Inc.*,
    545 F.3d 824 (9th Cir. 2008) ...........................................................68

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
    546 U.S. 394 (2006)..........................................................................66

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) .....................................................40, 46

*Vacco Indus., Inc. v. Van Den Berg*,
    5 Cal. App. 4th 34 (1992) .........................................................61, 63

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ................................................44, 49

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) ......................................................58

*White v. McGinnis*,
    903 F.2d 699 (9th Cir. 1990) ...........................................................54

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ...........................................................43

*Y.Y.G.M. SA v. Redbubble, Inc.*,
  75 F.4th 995 (9th Cir. 2023) .............................................................67

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ..........................................................57

**Statutes**

15 U.S.C. § 1117(c)(2)...........................................................................68

Cal. Civ. Code § 3426.2(a) ..............................................................62, 63

Cal. Civ. Code § 3426.2(b) .................................................................63

Cal. Civ. Code § 3426.3(a) ..............................................................20, 63

Cal. Civ. Code § 3426.3(b). .................................................................20

Cal. Civ. Code § 3426.3(c) ..................................................................54

**Other Authorities**

California Civil Jury Instructions No. 4411 (2025 ed.) .........................55

J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair
  Competition § 30:95 (5th ed.).........................................................68

Restatement (Third) of Unfair Competition § 39 (1995)..................27, 33

Restatement (Third) of Unfair Competition § 40 (1995)......................39

Restatement (Third) of Unfair Competition § 44 (1995)......................64

# TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief.

| Abbreviation | Term |
|---|---|
| (__:__) | Transcript page and line numbers, or patent column and line numbers |
| CornellBr.___ | Corrected Brief of Appellants Robert Cornell, Augmenta, LLC, Cornell Cosmetic Urology LLC, David Louis Nichols, Huck Medical Technologies Inc., Hans Mische, Hans Mische LLC, Run Wang, Robert J. Cornell, M.D., P.A. (appellants other than Richard Finger), No. 25-1580 (June 30, 2025), ECF No. 25 |
| FingerBr.___ | Corrected Brief of Appellant Richard Finger, No. 25-1580 (June 30, 2025), ECF No. 24 |
| Elist | Dr. James Elist |
| IMD | International Medical Devices, Inc. |
| Menova | Menova International, Inc. |
| Cornell | Dr. Robert Cornell |
| Mische | Hans Mische |
| Nichols | David Louis Nichols |
| HMT | Huck Medical Technologies Inc. |
| Finger | Richard B. Finger |
| PPM | Personal Placement Memorandum |
| PTS | Penuma Term Sheet |
| '413 patent | U.S. Patent No. 10,413,413 |
| '639 patent | U.S. Patent No. 10,980,639 |

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, Plaintiffs-Appellees state that this appeal is related to *International Medical Devices, Inc. v. Cornell*, No. 25-1843 (consolidated with Nos. 25-1844 and 25-1863), which is pending in this Court and involves Defendants' appeals of the costs award in this case and Plaintiffs-Appellees' cross-appeal of the denial of fees. Those appeals may be directly affected by this Court's decision in this appeal.

## INTRODUCTION

On March 30, 2018, Houston urologist Dr. Robert Cornell went to Beverly Hills, California, to be trained by Dr. James Elist on how to implant Penuma, the only commercially available cosmetic penile implant at that time. Elist developed Penuma over many years based on his decades of experience as a urologist. Cornell had never even seen a cosmetic penile implant before, but he wanted to learn how to implant Penuma because he had patients interested in it. While watching Elist perform surgeries, Cornell peppered Elist with questions about plans for improvements to Penuma and additional ideas regarding the Penuma procedure. Because Cornell had signed an NDA with Elist's company International Medical Devices, Inc. (IMD) prior to training, Elist shared with Cornell his design ideas of adding voids in the implant to make it softer and more natural looking, adding mesh tabs to the end of the implant to aid in securing it to the penis, and using absorbable sutures with the mesh tabs to hold the implant in place until the surrounding tissue integrated the mesh. Cornell took notes.

Cornell never completed his Penuma training. Instead, he went back to Houston and almost immediately started developing a competing penile implant he called Augmenta that used the improvements Elist had shared with him. To do so, he teamed up with two engineers, an IMD advisory board member, and Houston financier Richard Finger. Cornell shared with them his notes and what Elist had told

him. Everyone knew Cornell had attended a training session with Elist and had signed an NDA. Yet, they all proceeded to help develop Augmenta. They predicted huge revenues from Augmenta.

The jury heard from Elist and each of the Defendants and determined that each Defendant misappropriated IMD's trade secrets. The district court determined the reasonable royalty Defendants would have paid had they sought a license from IMD to use the trade secrets, rather than misappropriating them. The court also determined that Defendants owed exemplary damages for their willful and malicious misappropriation. The court enjoined Defendants from using the trade secrets for five years, which was the length of Cornell's NDA with IMD.

This appeal begins and ends with the basic principle that a trial is the "main event" in litigation, not simply a "tryout on the road" to appellate review. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *see Fromson v. Citiplate, Inc*., 886 F.2d 1300, 1302 (Fed. Cir. 1989). At every turn, Defendants ask this Court reexamine the factual findings of the jury and the district court. Defendants raise new arguments never presented to the district court. Defendants take positions contrary to the ones they took below. The judge and jury heard the evidence, evaluated Defendants' credibility, and rejected their excuses. This Court should affirm.

## STATEMENT OF THE ISSUES

1.     Whether the district court's denial of Defendants' Rule 50(b) motion should be affirmed because substantial evidence supports the jury's verdict that Defendants misappropriated IMD's trade secrets.

2.     Whether the district court's reasonable royalty award should be affirmed because (a) Defendants fail to show clear error in the district court's factual findings, (b) Defendants argued for a five-year license term, thereby waiving any objection to it, and (c) Defendants forfeited any objection to the discount factor applied.

3.     Whether the district court's exemplary damages award should be affirmed because (a) Defendants forfeited their argument that exemplary damages were precluded by the pretrial order, (b) Defendants consented to the court's determination of exemplary damages, (c) the Seventh Amendment and California law do not require a jury to determine whether misappropriation was willful and malicious, (d) the district court properly found Finger's misappropriation was willful and malicious, and (e) California law allows joint and several liability for exemplary damages.

4.     Whether the district court abused its discretion in granting an injunction.

5. Whether substantial evidence supports the jury's finding that Cornell violated his NDA.

6. Whether substantial evidence supports the jury's finding that U.S. Patent Nos. 10,413,413 and 10,980,639 are invalid for improper inventorship.

7. Whether substantial evidence supports the jury's finding that Cornell used a counterfeit mark.

## STATEMENT OF THE CASE

## I. BACKGROUND

On March 30, 2018, Houston urologist Dr. Cornell traveled to Beverly Hills, California, to observe Dr. Elist perform four surgeries to provide patients with the Penuma cosmetic penile implant. Appx13134(354:15-21); Appx14155-14156(1236:19-1237:4). Penuma was the only FDA-cleared cosmetic penile implant on the market then. Appx13301(487:3-5); Appx14620(1654:12-15). Cornell had never seen a cosmetic penile implant before training with Elist, but he wanted to become a trained Penuma surgeon. Appx14071(1187:5-11); Appx14278(1359:14-19); Appx14074(1190:12-15); Appx14075(1191:6-8); Appx14142-14143(1223:22-1224:3); Appx15857-15859.

### A. Dr. Elist Develops Penuma Implant Technology

Elist, a urologist since 1982, has performed more than 4,000 Penuma cosmetic implant procedures, and he has implanted thousands more therapeutic implants. Appx13094(314:10-23); Appx13605-13606(757:14-758:1). He began developing

the Penuma cosmetic penile implant in the late 1990s to help patients who had received therapeutic implants or had tried other procedures for cosmetic correction of their penis. Appx13096-13097(316:17-317:18); Appx13097-13099(317:24-319:1). Elist has invented other implants including therapeutic implants for treating erectile dysfunction. Appx13103(323:9-21).

Therapeutic implants and cosmetic implants are significantly different. Appx14072(1188:1-4). A therapeutic implant is inserted inside the corpus cavernosa, which are the arteries inside the penis, and substitutes for the blood flow inside the penis. Appx13089(309:9-24); Appx13090(310:4-8). A cosmetic penile implant goes under the penile skin on top of the corpus cavernosum. Appx13090(310:9-10). A cosmetic penile implant requires different considerations than other types of implants, such as those for breasts, because the penis moves and changes size and shape. Appx13600-13601(752:9-753:14).

Penuma was cleared by the FDA in 2004 and became the first FDA-cleared subcutaneous silicone implant for penile cosmetic corrective surgery. Appx13102(322:11-13); Appx13516(702:19-20); Appx15917-15928; Appx16525-16527.

 

Appx15919                              Appx15904

Elist maintains a confidential list of instruments specifically required for Penuma surgeries because what is used for a Penuma surgery is different than other surgeries. Appx13621(773:4-21); Appx13622(774:14-21); Appx13623(775:5-22); Appx13801(929:20-25).

By 2008, Elist started developing improvements to Penuma. Appx13107-13109(327:4-329:6). These were based on his years of experience of developing and commercializing Penuma. Appx14759(1793:23-1794:13). Elist determined that voids of space within the implant would make it softer, more flexible, and more natural looking. Appx13114-13115(334:16-335:4); Appx13121-13122(341:22-342:4); Appx13607(759:11-21); Appx16012. Because the penis naturally moves and expands and implants can experience trauma during sexual activities, the implant must be attached securely or it could migrate in the body or perforate the skin. Appx13606-13607(758:7-759:8). Elist concluded that mesh tabs at the distal

end of the implant could be used to anchor the implant to the head of the penis. Tissue will grow naturally through the holes in the mesh, securing the implant, but allowing the implant to move as the penis naturally expands. Appx13113-13114(333:12-334:6); Appx13115(335:11-23); Appx13116-13117(336:17-337:1); Appx13120(340:3-24); Appx13215(435:5-8); Appx16012. Elist also determined that he could use absorbable sutures with mesh tabs to hold the implant in place while the tissue grows in the mesh and until the suture dissolves. Appx13113-13114(333:15-334:4); Appx13114(334:10-15). In 2008 and again in 2017, Elist had prototypes made reflecting improvements to Penuma. Appx13646-13647(798:13-799:4); Appx13648-13649(800:17-801:7); Appx13653-13654(805:17-806:15); Appx13655(807:3-23); Appx13658(810:3-21); Appx13711(863:9-15); Appx13713(865:14-25); Appx13714-13715(866:23-867:1); Appx13717-13718(869:22-870:19); Appx14709(1743:10-22); Appx14711(1745:1-15); Appx16012; Appx16100-16102; Appx16672; Appx16424-16437.



Appx17522. Elist's improvement ideas were logged in IMD's trade secret audits. Appx16519-16520; Appx16663-16664.

## B. Dr. Wang Joins IMD's Advisory Board

In 2017, Elist's company that manufactures and markets Penuma, International Medical Devices (IMD), formed an advisory board to help advise IMD on how to recruit and train other doctors to provide Penuma surgery. Appx13125(345:1-17); Appx14691(1725:4-11); Appx14693-14694(1727:17-1728:5); Appx14695(1729:15-17). Elist wanted to train other doctors to perform Penuma surgery to increase the market for Penuma and help patients in other states avoid travel to California for surgery. Appx13302(488:19-25). Because IMD was developing new design features for the implant and new ways of doing the surgery, IMD required its advisory board members to sign confidentiality agreements. Appx14694(1728:6-17).

On October 6, 2017, Dr. Run Wang, a urologist from Houston, signed a consulting agreement to join the IMD advisory board. Appx13127(347:5-7); Appx13728-13729(880:16-881:16); Appx16550-16557; Appx16558-16559. Wang traveled to Beverly Hills to watch Elist perform multiple Penuma surgeries. Appx13732-13733(884:13-885:3); Appx13742(894:14-18); Appx13778(906:15-19); Appx13779(907:12-16). Wang completed the Penuma training and became an

authorized Penuma physician.  Appx13774(902:13-19).  He performed 15 Penuma surgeries.  Appx13509-13510(695:25-696:3); Appx13733(885:7-9).

As a member of IMD's advisory board, Wang had access to IMD confidential information.    Appx14701(1735:8-10).    Elist "shared everything with him." Appx13088(308:11-14).   Wang's consulting agreement included a confidentiality provision to protect IMD's trade secrets.    Appx13127-13128(347:23-348:4); Appx16552-16553.   Wang also agreed not to consult with competitors while consulting for IMD.  Appx13790(918:8-11); Appx16554(§7.3).

### C.    Dr. Cornell Learns About Dr. Elist's Improvement Ideas

Cornell reached out to IMD's sales representatives to request training because he had several patients interested in Penuma.  Appx14145(1226:2-24); Appx15857. On March 30, 2018, while attending the training session with Elist, Cornell signed an NDA, consistent with IMD's practice of requiring surgeons learning about Penuma to sign NDAs to protect IMD's trade secrets.   Appx14146(1227:3-5); Appx14694(1728:9-17); Appx15860-15863; Appx16000-16003.

During the surgeries, Cornell asked Elist numerous questions about plans for improvements to Penuma and additional ideas regarding the Penuma procedure. Appx13135(355:5-9); Appx13615-13617(767:25-769:2).  The surgical technician assisting Elist recalled that Cornell "was asking questions on and on" and that these questions differed from other physicians in that he "was inquiring more about the

implant than the surgical procedure." Appx14572-14573(1606:13-1607:21). Cornell also took notes while watching and listening to Elist. Appx13140(360:3-6); Appx14163-14164(1244:25-1245:11); Appx14572(1606:1-3); Appx14575(1609:21-23); Appx16505.

Elist told Cornell about plans to make the implant softer and more natural by having void or empty spaces inside, to put mesh tabs on the distal end of the implant, and to change to using absorbable sutures with the mesh tabs. Appx13138(358:16-24); Appx13615-13617(767:25-769:2); Appx14573(1607:15-18); Appx14574(1608:8-17). Elist explained where to put the sutures to avoid the neurovascular bundle. Appx13140(360:14-23).

Following the surgery, Cornell asked an IMD sales representative for a copy of Elist's instrument list. Appx14167-14168(1248:5-1249:2); Appx15864-15866.

### D. Dr. Cornell Starts Work with Mische to Develop Augmenta

On April 9, 2018, ten days after training with Elist, Cornell met with an engineer, Hans Mische, to discuss developing a "girth enhancement product" to compete with Penuma. Appx13853-13854(969:25-970:15); Appx14170(1251:7-18); Appx14171(1252:4-10); Appx15869. Before then, Cornell had never designed a medical device. Appx14176(1257:10-12); Appx14269(1350:4-8).

Mische had known about Elist's Penuma for years prior to meeting Cornell. Appx13859(975:21-25). Mische also knew that Cornell had come to him to develop

an implant shortly after he had attended training with Elist. Appx13857(973:2-18). Cornell told Mische that he had signed an NDA. Appx13858(974:18-22); Appx14172(1253:12-14); Appx15868. This was consistent with Miche's experience that medical device companies require doctors to sign NDAs when they receive surgical training on a proprietary medical device. Appx13860(976:8-11).

Mische asked Cornell about the Penuma design, and Cornell shared Elist's surgical technique with Mische. Appx13875-13876(991:21-992:16); Appx14187-14188(1268:19-1269:15); Appx15885-15886. Cornell shared his notes with Mische. Appx14176(1257:20-22). Cornell told Mische he wanted to use mesh tabs and absorbable sutures. Appx13869(985:16-20); Appx14176(1257:23-25). Cornell and Mische soon started calling this implant "Augmenta," Appx15877; Appx16381, and Cornell founded "Augmenta, LLC" to hold IP. Appx14190-14191(1271:22-1272:1). Cornell described the "AugMENTA Advantage" as that it "would use absorbable sutures away from the dorsal neurovascular bundle" and "would use spongy polyurethane and incorporate mesh." Appx15880. Cornell also sent Mische what he called the "Ellis [sic] pick list," which was Elist's confidential Penuma instrument and supply list. Appx16389-016391. After discussions with Cornell, Mische drew concepts with mesh positioned at the distal end of the implant. Appx15877-15884; Appx16926.

Two weeks after their first meeting, Cornell sent Mische the NDA and asked, "[t]ell me if you think this NDA Elist made me sign on the way out of the door following my visit will pose any issues for me, requiring I stay under the radar on the patent, etc." Appx16384; *see also* Appx13889(1005:12-22); Appx16921-16924. In response, Mische asked Cornell if Elist had "discuss[ed] any confidential info on new designs, methods or stuff that wasn't already in the public?" Appx16384. Cornell never responded to that question. Appx16383; Appx13864(980:3-14); Appx14174(1255:6-18). Mische never asked again. Appx13868(984:2-3).

In July 2018, Cornell filed a provisional patent application naming himself and Mische as inventors and claiming a cosmetic implant with mesh tabs and use of absorbable sutures to fasten the tabs to the penis. Appx13892-13893(1008:16-1009:8); Appx13894(1010:13-23); Appx14071(1187:16-20); Appx14191(1272:14-24); Appx16285; Appx16295.

Despite working to develop a competing implant, Cornell contacted an IMD sales representative on April 23 about making a second trip to California to observe Elist perform surgeries. Appx14175(1256:9-12); Appx14176(1257:7-9); Appx15867. He later excused this as "just keeping [his] options open." Appx14268-14269(1349:21-1350:3). He never told IMD that he was developing a competing product. Appx14175-14176(1256:21-1257:6).

By June 2018, Cornell had updated his website to describe himself as a "Penuma Penile Enhancement Specialist" and to state that he "provides Penuma penile enhancement surgery" and included a scheduling link. Appx15888-15890; Appx14075(1191:12-21); Appx14078-14079(1194:11-1195:2); Appx14204(1285:3-12). He started Google ad campaigns using the Penuma name. Appx14080(1196:16-18); Appx14868-14869(1851:25-1852:11); Appx14869-14870(1852:25-1853:24); Appx16660-16662. Cornell later admitted it was false that he offered Penuma surgery and that he was making this claim even as he was developing the competing Augmenta. Appx14207(1288:2-8); Appx14208-14209(1289:24 -1290:10). IMD became aware of Cornell's website and demanded that he stop advertising himself as a Penuma doctor. Appx14202-14204(1283:20-1285:12); Appx15891.

### E. Richard Finger, David Nichols, Huck Medical, and Dr. Wang Become Involved with Augmenta and the Misappropriation

Around June 2018, Richard Finger, an options trader, learned about the Augmenta project from Cornell, whom he had known for 25 years. Appx13932(1048:3-6); Appx13926(1042:12-19). Finger decided to invest in Augmenta because Cornell told him that "cosmetic penile implants was potentially a big market" and he "wanted to make money." Appx13927(1043:5-9, 1043:13-25). Through his investment entity "Lata Lignum," Finger owns 31-32% of Augmenta,

LLC.  Appx13925(1041:20-22); Appx13931(1047:7-25); Appx13963(1079:9-17); Appx16438; Appx16504.

Finger was aware at the time of his investment that Cornell had entered into an NDA with IMD relating to Penuma and had attended a Penuma training with Elist.          Appx13932(1048:7-12);          Appx13932-13933(1048:21-1049:4); Appx13952(1068:17-21).   Finger discussed the Penuma training session with Cornell, but at trial Finger said he could not recall what Cornell said.  Appx13953-13954(1069:3-1070:1).   Nonetheless, Finger was aware that Elist "might bring a lawsuit claiming theft or disclosure of confidential information and/or trade secrets relating to the Penuma implant."  Appx13950-13951(1066:25-1067:5).

In August 2018, Finger reached out to David Nichols of Huck Medical Technologies Inc. (HMT) to replace Mische on the design of the Augmenta. Appx13971(1087:20-25); Appx13972-13973(1088:16-1089:4).  Finger sent Nichols the concept drawing that Mische had prepared.  Appx13974(1090:6-9).

In September, Cornell and Finger met with HMT employees to discuss the project.          Appx13974-13975(1090:20-1091:4);          Appx13975-13976(1091:14-1092:25); Appx16069.  Elist "came up a lot in that meeting."  Appx13988(1104:1-3).   Cornell shared with HMT his notes from his March training session with Elist. Appx14189(1270:7-17).  Elist was identified as "inventor of th[e] predicate" device to Augmenta.  Appx13976(1092:5-9).  Cornell told the group about the type of mesh

Elist used and shared Elist's "going commercial" plans.  Appx13976(1092:17-25); Appx13977(1093:3-20);   Appx13982(1098:7-10);   Appx16069-16071.   HMT learned   Cornell   had   an   NDA   with   IMD.   Appx13981(1097:6-9); Appx140001(1117:23-25).

By October 2018, Finger was "provid[ing] financial management and oversight for Augmenta and assisting Dr. Cornell in overseeing the development work being performed by [HMT]."   Appx16312; Appx16541; Appx13946-13947(1062:13-1063:5); Appx13957(1073:21-25).  Finger was the "Chief Financial Officer" for Augmenta, LLC.  Appx16440.  Finger hired a law firm to draft the "private placement memoranda" (PPM) used to solicit funds for Augmenta. Appx13943(1059:1-8);        Appx13959(1075:1-6);        Appx14229(1310:12-14); Appx14231-14232(1312:25-1313:5); Appx16300; Appx15797; Appx15931.   He helped draft the section of the PPM that identified a potential lawsuit from Elist relating to intellectual property as a "risk factor."   Appx13948(1064:11-25); Appx16313.  Although attorneys reviewed whether Augmenta would infringe Elist's patents, they were not directed to review trade secrets.  Appx14234(1315:10-25). Finger with Cornell prepared the revenue forecasts for Augmenta that were included in   the   PPM.   Appx13943-13944(1059:24-1060:2);   Appx13961(1077:1-6); Appx16336; Appx15976.  They projected the annual revenues for Augmenta to be

$103 million in five years. Appx14239-14240(1320:20-1321:8); Appx14242-14243(1323:6-1324:4).

By November 2018, Wang became involved with Augmenta. Appx13786-13787(914:22-915:10); Appx16000. Wang knew that the Augmenta cosmetic penile implant was going to be a competitor to Penuma. Appx13788(916:21-24). Yet, Wang evaluated and provided input about Augmenta while he was still sitting on the Penuma advisory board, which gave him familiarity with Penuma and its surgical procedures. Appx13795(923:9-25); Appx13742-13743(894:2-895:4). In December, Wang performed a cadaver surgery for Cornell with Augmenta and provided feedback about Augmenta's design. Appx13729(881:18-22); Appx13739(891:17-20); Appx13804(932:6-13). For his assistance, Wang received a 1% ownership interest in Augmenta LLC. Appx13730-13731(882:24-883:6). Finger later told Wang he was receiving as a bonus an "extra one percent ownership in Augmenta LLC" for his "invaluable design input." Appx16443; Appx13955(1071:22-24). Wang continued to provide input on Augmenta's design and was later listed as CEO of Augmenta LLC on its website. Appx13790-13791(918:17-919:24); Appx16542; Appx015914. Wang never told IMD that he was—in violation of his agreement with IMD—consulting for Augmenta, and he continued to serve on the IMD advisory board until October 2020 when discovery

16

in this case revealed his involvement with Augmenta. Appx13792(920:2-10); Appx13734(886:19-25); Appx14735-14736(1769:16-1770:6).

Meanwhile, Finger continued to update potential investors about Augmenta's development and design. Appx16541. In December 2018, Finger reported "[w]e had a very successful initial cadaver lab testing of the Augmenta device," noting that Cornell tried a new surgical technique not used with "the predicate device (Penuma)" and noted Wang would participate in the next cadaver study. Appx16541. He closed by inviting any potential investors "still perched on the tree bra[n]ch" about investing to "call or e-mail me with any questions." Appx16541.

On September 17, 2019, the '413 patent issued, naming Cornell, Mische, and Nichols as inventors. Appx15892; Appx14197-14198(1278:15-1279:14). The '413 patent used a screenshot of one of Elist's copyrighted images. Appx15904(Fig.14B); Appx14073(1189:4-10); Appx14291(1372:3-11); Appx14005-14006(1121:16-1122:6). The sole independent claim claimed an implant with "internal pockets" to vary the hardness of the implant across its length. Appx15912(12:2-5); Appx13896-13897(1012:12-1013:3). The '413 patent's dependent claims were directed to an implant with mesh tabs and use of absorbable sutures. Appx15912(12:44-45, 12:49-54). The related '639 patent issued later with similar claim limitations. Appx15998(11:57-60).

Defendants sought FDA clearance for Augmenta. Their 510(k) identified IMD's Penuma as Augmenta's predicate device. Appx17217-17219. Augmenta received FDA clearance on September 30, 2022. Appx15412-15413(41:23-42:15); Appx17214-17219.

## II. DISTRICT COURT PROCEEDINGS

### A. Pretrial

On April 15, 2020, IMD, Menova,[1] and Dr. Elist filed a complaint against Dr. Cornell and Augmenta, LLC for trade secret misappropriation under the federal Defend Trade Secrets Act and California Uniform Trade Secrets Act (CUTSA), trademark infringement, copyright infringement, other state law claims, and declaratory judgment that Dr. Elist was the inventor of the '413 and '639 patents or the patents were invalid. Appx216-251. IMD filed an amended complaint on November 10, 2020, adding additional claims and Mische, Wang, HMT, and Finger as defendants. Appx1291-1349.

On November 10, 2020, the district court granted IMD a preliminary injunction to stop Defendants from using IMD's trade secrets, prosecuting patents or seeking FDA approvals that involved IMD's trade secrets, and using the Penuma mark. Appx520-522. Appx1289. The court later prohibited Defendants from using

---

[1] Menova holds the Penuma trademark and patents. Appx14690(1724:8-11). Elist owns Menova and IMD. Appx14690(1724:18-20); Appx14701(1735:16-19).

or disclosing the trade secrets or commercializing and promoting Augmenta. Appx1707-1708; Appx1710-1727. Defendants appealed to the Ninth Circuit but dismissed their appeal. Appx128; *Int'l Med. Devices v. Cornell*, No. 21-55144 (9th Cir.). On November 2, 2022, the district court found Defendants in civil contempt for violating that injunction. Appx19938-19949.

The district court granted summary judgment that Defendants infringed IMD's copyright. Appx6374-Appx6376. The court granted summary judgment that Dr. Wang breached his consulting contracts with IMD by assisting with the development of Augmenta. Appx6378-6382.

## B. Jury Trial and Verdict

On June 16, 2023, following a 9-day trial, a jury returned a verdict finding that all Defendants were liable for misappropriating IMD's trade secrets,[2] that Cornell was liable for trademark infringement, use of a counterfeit mark, and breach of his Non-Disclosure Agreement with IMD, and that Cornell, Mische, and Nichols were liable for copyright infringement. Appx7460-7466. The jury further found

---

[2] The jury found all Defendants were liable for misappropriating the trade secrets relating to mesh tabs and absorbable sutures. Appx7462-7463. The jury found all Defendants but Mische liable for misappropriating the trade secret relating to internal pockets or voids of space within the silicone body, and found all Defendants but Nichols and HMT liable for misappropriating the trade secret relating to the Penuma instrument list. Appx7461; Appx7464.

that IMD had proven by clear and convincing evidence that the '413 and '639 patents were invalid because of improper inventorship.  Appx7467; Appx7388.

## C.     Damages Hearing and Findings

Under CUTSA, recoverable damages may be damages for the actual loss caused by the misappropriation or the unjust enrichment.  Cal. Civ. Code. § 3426.3(a).  "If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty … ."  *Id.* § 3426.3(b).     Because the preliminary injunction stopped Defendants' commercialization of Augmenta, prior to the jury trial the parties stipulated that IMD "cannot prove any damages or prove unjust enrichment as a result of the alleged misappropriation" and that "[i]f the jury finds liability under CUTSA or the NDA claims, the Court will consider whether a reasonable royalty should be awarded." Appx7099-7100; Appx20.

Following the jury verdict, IMD moved for an award of reasonable royalty damages and exemplary damages for Defendants' trade secret misappropriation, damages for Cornell's breach of the NDA, and statutory damages for Cornell's use of a counterfeit mark.  Appx7624-7654.  In response, Defendants argued that the court could not calculate and award exemplary damages because IMD did not seek a jury finding of willful or malicious misappropriation.   Appx9241-9242. Defendants did not argue exemplary damages were waived by not being mentioned

in the pretrial order or that there was a Seventh Amendment right to a jury determination of willful or malicious misappropriation. Appx9241-9242.

The court held an evidentiary hearing on damages on October 25, 2023, during which it heard testimony of IMD's CEO Jonathan Elist, IMD's damages expert Kevin Arst, and Defendants' damages expert John Hatch. Appx10453. After the evidentiary presentation, the parties made the following stipulation:

> The parties dispute whether any award of exemplary damages is justified based on the evidence at trial and the jury's verdict.
>
> The parties agree that neither side will offer or be required to offer any evidence of net worth for [Defendants]. Defendants agree that, should the Court make an award of any exemplary damages against [Defendants], defendants will not challenge such finding on the basis that plaintiffs did not adduce any evidence of net worth for [Defendants].
>
> Defendants further agree not to challenge on appeal any such exemplary damages award on the basis that there is no evidence of net worth.
>
> No party is waiving any other rights to challenge or support an exemplary damages award other than those set forth above.

Appx15618-15619(247:11-248:2). Defendants raised no other objections at the hearing to the district court determining exemplary damages, including none based on the pretrial order or Seventh Amendment.

On March 28, 2024, the district court entered an order granting IMD's motion for damages and finding that the genesis of Augmenta was the training session Cornell attended with Elist, that IMD's trade secrets were used in Defendants' patent applications, and that "[t]he nature and extent of Defendants' use of IMD's trade

secrets weighs in favor of a reasonable royalty higher than that proposed by" Defendants' expert. Appx10461-10462. The court concluded that IMD was entitled to a royalty award for the five-year period that Cornell's NDA would have prevented him from using the trade secrets and determined based on Arst's calculations that amount would be $5,772,044. The court found that "the conduct in which the Defendants engaged amounted to a willful and malicious misappropriation" and awarded exemplary damages of twice the reasonable royalty award. Appx10463. The court awarded IMD $1 million in statutory damages for Cornell's use of the counterfeit mark. App10464-10465. The district court also enjoined Defendants from using or commercializing IMD's trade secret concepts for five years. Appx10471.

### D. Post-trial Motions and Final Judgment

Defendants filed a motion to amend the court's damages judgment and reconsideration of the injunction and a renewed motion for JMOL under Rules 50(b) and new trial. Appx10504-1505; Appx10527-10554. In their post-hearing motion to amend, Defendants argued for the first time that exemplary damages were waived by not being mentioned in the pretrial order and that the Seventh Amendment requires a jury determine whether the misappropriation was willful and malicious. Appx10514-10516.

The district court rejected Defendants' challenge to the compensatory damages award as relitigating objections to Arst's opinions that the court had rejected multiple times. Appx20; Appx6387-6393.

The court rejected Defendants' argument that IMD had forfeited a claim to exemplary damages as "not credible" in view of the parties' stipulation during the evidentiary hearing, when Defendants never mentioned the pretrial order and acknowledged the court would rule on exemplary damages. Appx21-22. Similarly, the court found that Defendants' arguments that the Seventh Amendment required a jury determination of willful and malicious misappropriation was "belied by the parties' stipulation prior to trial" that the court would determine damages and the fact that Defendants never raised the issue before the jury was excused. Appx22-23. The court concluded that Ninth Circuit precedent allows courts to determine whether misappropriation was willful and malicious. Appx23.

The court rejected Defendants' argument that the evidence failed to show each defendant engaged in willful and malicious misappropriation and identified direct and indirect evidence that supported its finding of misappropriation as to each defendant. Appx24-26. The court further concluded that CUTSA does not prohibit joint and several liability. Appx26-27.

The district court denied Defendants' motion to terminate the five-year permanent injunction, noting that under California law it "had discretion to enter an

injunction in order to eliminate the commercial advantage Defendants would otherwise derive from their misappropriation." Appx27-28. The court observed that Defendants had a five-year head start because Cornell's NDA would have prevented Defendants from using the trade secrets to develop Augmenta for five years, but Cornell started secretly developing Augmenta only weeks after the Penuma training. Appx28.

Finally, the court denied Defendants' motion for JMOL and a new trial, pointing to testimony and exhibits that supported the jury's verdict on each issue. Appx29-43.

On March 19, 2025, the district court entered final judgment for IMD. Appx1-6. The court awarded IMD a total of $5,772,044 in reasonable royalty damages for misappropriation of the four trade secrets, exemplary damages of $11,544,088 for willful and malicious misappropriation, $1,000,000 in statutory damages for use of a counterfeit mark, $1,650 for copyright infringement, and nominal damages of $1 for Wang's breach of contract. Appx1-6. For Cornell's breach of the NDA, the court awarded IMD $5,772,044 as an alternative basis for the reasonable royalty award. Appx5. The court entered a permanent injunction, and conditioned lifting of the injunction upon full payment of the royalty and damages awards. Appx6. The court entered judgment that the '413 and '639 patents are invalid. Appx6.

Defendants appealed.

## SUMMARY OF ARGUMENT

The judgment should be affirmed because the jury's verdict and the district court's findings are firmly grounded in the record and law. Defendants' appeal simply reargues factual disputes already resolved against them, relies on excluded evidence, and advances waived theories.

Substantial evidence supports the jury's determination that IMD's cosmetic penile implant improvements and instrument list were protectable trade secrets. Fact and expert testimony established that internal voids, mesh tabs, and absorbable sutures in combination were novel, not disclosed in prior art, and unknown in the field. The Penuma instrument list likewise represented a valuable compilation that gave IMD a competitive advantage. The jury was entitled to credit this evidence over Defendants' denials.

The district court correctly awarded a reasonable royalty. CUTSA authorizes royalties based on a hypothetical negotiation, and the court relied on admitted evidence—including Defendants' own projections and transactions—showing that Augmenta's value was tied to the stolen trade secrets. Defendants' criticisms rest on an excluded expert report and arguments forfeited below; they cannot show clear error.

The district court also correctly awarded exemplary damages. Defendants waived their pretrial order argument and consented to the court deciding willfulness.

CUTSA vests exemplary damages in the court, and precedent confirms no Seventh Amendment jury right exists. The finding that Finger acted willfully and maliciously was supported by evidence of his active involvement and conscious disregard for IMD's rights.

The district court did not abuse its discretion in entering an injunction. The five-year term reflected the NDA's duration, and the scope precisely matched the jury's verdict. CUTSA expressly authorizes injunctions to prevent unfair commercial advantage even after secrecy is lost.

Finally, the jury's verdicts on breach of contract, improper inventorship, and counterfeiting are supported by substantial evidence, and Defendants' sufficiency challenge to counterfeiting is forfeited.

## STANDARD OF REVIEW

The Court "review[s] decisions on motions for judgment as a matter of law … under the law of the regional circuit." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1291 (Fed. Cir. 2023). When reviewing the denial of a JMOL motion, the Ninth Circuit analyzes "'whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.'" *Id.* (quoting *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002)).

The Ninth Circuit reviews for clear error a district court's factual findings and computation of damages after a bench trial. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004). "This standard is significantly deferential," and the reviewing court accepts "the lower court's findings of fact unless" it is "left with the definite and firm conviction that a mistake has been committed." *Id.* (citation omitted). The Ninth Circuit reviews de novo a district court's legal conclusions. *Id.*

The Court reviews the grant of an injunction under the law of the regional circuit. *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 910 (Fed. Cir. 2025). The Ninth Circuit reviews "the scope and terms of an injunction for an abuse of discretion." *Melendres v. Maricopa County*, 897 F.3d 1217, 1220 (9th Cir. 2018).

## ARGUMENT

## I. Substantial Evidence Supports the Jury's Factual Finding that Defendants Misappropriated IMD's Trade Secrets

### A. The Cosmetic Penile Implant Improvements and Instrument List Were Not Known

"[W]hether information constitutes a trade secret [is] a question of fact." *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 300 (2002); *see Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003) (same); *Masimo Corp. v. True Wearables, Inc.*, 2022 WL 205485, at *2 (Fed. Cir. Jan. 24, 2022) (same); Restatement (Third) of Unfair Competition § 39 cmt. d (1995) ("The existence of a

trade secret is properly considered a question of fact to be decided by the judge or jury as fact-finder."). Defendants try to frame its challenge as a legal question based on cases about the requirements for identifying trade secrets with particularity. *See* CornellBr.28 (citing *Altavio, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal. App. 4th 26, 43 (2014); *Imax Corp. v. Cinema Techs., Inc*., 152 F.3d 1161, 1164-65 (9th Cir. 1998)). But Defendants do not dispute that the trade secrets were identified with particularity; rather, they dispute the factual conclusion of whether they are trade secrets. The jury heard the evidence and concluded Elist's cosmetic penile implant improvements were trade secrets. Substantial evidence supports the jury's findings.

### 1. The Improvements

The jury heard and rejected Defendants' arguments that the cosmetic penile implant improvements were not trade secrets because they were disclosed in prior art patents. CornellBr.30. Whether the trade secrets were disclosed in prior patents is a question of fact and a "matter[] for the jury to decide." *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011); *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1244-45 (Fed. Cir. 1989) (applying California law).

The jury heard that Subrini was "a patent for a therapeutic penile implant," not a cosmetic implant, and Subrini has never been produced in an implant or implanted. Appx14636(1670:19-22); Appx14637(1671:1-6). IMD's technical expert Troy Drewry explained that the Subrini patent did not disclose IMD's internal

pockets/voids trade secret. Appx14557-14558(1591:3-1592:17); *see* Appx14562(1596:8-20) (explaining that the Small-Carrion implant did not disclose IMD's pockets/voids). IMD's urologist expert Dr. Carson explained that "functional implants" for treating erectile dysfunction—like Subrini—"don't need to have voids or pockets in the devices to make them softer" because "[y]ou want them to be rigid but yet flexible." Appx14626(1660:1-12); *see* Appx14624(1658:15-24) (explaining that the Small-Carrion implant also did not have internal pockets). Nichols, who had worked on numerous urological devices over 35 years, testified that he had never used internal pockets in those devices. Appx14066-14067(1182:18-1183:1); Appx14068(1184:7-10). Subrini does not disclose IMD's trade secrets. *See Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc*., 674 F.2d 1336, 1342 (9th Cir. 1982) (holding that patent drawings that provided "only a general depiction of a gearing system" and did not disclose the precise information that the plaintiff sought to protect did not destroy trade secret protection).

The jury rejected Defendants' argument that "Finney teaches an implantable sleeve 'with mesh tabs at the distal end that promote tissue ingrowth.'" CornellBr.30 (quoting Appx14654(1688:7-15)). Carson explained that Finney's mesh patches are "all along the entire length of the cylinder," rather than at the distal end. Appx14684(1718:11-21); Appx14638(1672:16-19). Drewry also testified Finney's mesh patches, which "run the length of the inside of the sleeve," are "dissimilar" to

the trade secrets, which "extend[] from the distal tip of the implant for attachment with absorbable sutures." Appx14336(1417:7-17); *see* Appx14334-14335(1415:14-1416:23); Appx14557(1591:10-25) (testifying Finney did not disclose the mesh tabs concept).

The jury rejected Defendants' argument that Elist's 2005 PCT publication "teaches a 'penile prosthesis with anchoring tabs' on the distal end made of a mesh-like netting." CornellBr.30 (citing Appx16611; Appx13219). Drewry explained that the PCT publication discloses silicone tabs for use with permanent sutures. Appx14338-14339(1419:9-1420:17). Carson explained that silicone tabs do not result in tissue ingrowth. Appx14639-14640(1673:15-1674:7). Carson also testified that the mesh tab concept was not generally known to a urologist in 2018 and was not used in therapeutic or cosmetic implants. Appx14617-14618(1651:18-1652:7); Appx14623-14624(1657:11-1658:9).

Cornell argues that "Kim teaches implanting a penile implant using absorbable sutures." CornellBr.30 (citing Appx17080(3:31-32). But the trade secret Defendants were found to misappropriate is the "use of absorbable sutures as part of the cosmetic silicone penile implant procedure in combination with mesh tabs." Appx7463; Appx14521(1555:9-12) (explaining the trade secret is absorbable sutures when used in conjunction with an elongated tab on the distal end of the implant). Kim does not disclose using absorbable sutures *with* mesh tabs or in a

30

silicone implant; rather, Kim concerned implants made from tissue, such as dermal fat. Appx17080(3:5-8).

Although Defendants try to run from the '413 patent and prosecution history, CornellBr.32-33, it too confirms the internal voids in a cosmetic penile implant were novel and protected as trade secrets before Defendants' improper disclosure. Cornell initially proposed dependent claim 2 to "one or more internal pockets" configured to produce various alternative results including "reducing rigidity of at least a portion of the implant." Appx16254. The examiner initially rejected this claim as obvious over Elist and Subrini, relying on Subrini to teach "perforations or grooves to render the device more light and supple." Appx16180. Cornell did not accede to the examiner's rejection that the internal pockets were obvious but instead added to the independent claim a limitation that the implant comprised "internal pockets" configured to result in a change of hardness between the proximal end and distal end. Appx16172. Cornell *also argued* to the examiner that "[t]he 'internal pockets' are not 'grooves or perforations' like Subrini which are exterior." Appx16167; *see* Appx16159 (interview summary: "discussed the internal pockets and how they differ from the prior art"). In response, the examiner allowed the claims. Appx16151. The jury "could reasonably infer that [IMD's trade secrets] w[ere] not generally known from the fact that [Defendants] obtained patents based on the technology." *Altavion,* 226 Cal. App. at 63.

Defendants do not dispute that no prior art patent discloses every aspect of each trade secret. *See* CornellBr.29. None of the prior art patents on which Defendants relied had been embodied in actual products, refuting Defendants' argument that the prior art made the trade secrets known obvious improvements. Appx15263-15264(2204:21-2205:14); *see Altavion*, 226 Cal. App. 4th at 47 ("[E]ven if some or all of the elements of Altavion's design were in the public domain and thus unprotectable, the combination was a protectable trade secret if it was secret and had independent economic value."). Defendants fail to show that voids, mesh tabs, and use of absorbable sutures with mesh tabs were known in a cosmetic penile implant.

Defendants are wrong in accusing IMD of changing the meanings of the trade secrets. CornellBr.31-32. IMD defined the trade secrets the same way at the beginning of trial, Appx13049-13051(269:17-271:23), as at the end, Appx15255-15258(2196:17-2199:9). The jury found Defendants misappropriated these secrets. Appx7461-7464.

## 2. The Instrument List

Defendants argue that the Penuma instrument list cannot be a trade secret because it is "a list of common and well-known medical instruments that might be helpful to a surgeon implanting a Penuma." CornellBr.35. But what is "helpful to a surgeon" is exactly the type of information that *is* protectable as a trade secret.

"[A] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Sinclair v. Aquarius Elecs., Inc*., 42 Cal. App. 3d 216, 221 (1974); *see also* Restatement (Third) of Unfair Competition § 39 cmt. d (1995) (similar).

IMD's urologist expert Dr. Carson explained that the "instrument list is really important for us as surgeons because it allows all the tools we need to be available right when we are doing the surgery." Appx14643(1677:2-8). Although most of the instruments are commonplace, the Penuma surgery requires some instruments that are not often used in urology and would not have been available to a surgeon doing a functional penile prosthesis. Appx14644(1678:3-8); Appx14675(1709:13-16). If an instrument is not on the surgery list, then it can take time for the nurse to find the instrument, which increases the time the patient is under anesthesia and open for surgery and increases the costs to the patient for the surgery. Appx14643(1677:2-22). The Penuma instrument list was a compilation of information not known (hence Cornell requested it) and valuable to Elist and Cornell. *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1523 (1997) (affirming a trial court's finding that a customer list was a trade secret because it "had independent economic value to" the owner and misappropriator).

### B. The Improvements and Instrument List Were Valuable

Whether information is valuable as a trade secret can be shown by direct or circumstantial evidence, "including the amount of resources invested by the plaintiff in the production of the information, the precautions taken by the plaintiff to protect the secrecy of the information ... , and the willingness of others to pay for access to the information." *Altavion*, 226 Cal. App. 4th at 62 (citing Restatement, §39, cmt. e).

The jury heard that the trade secrets were based on Elist's "clinical experience over the years," having developed the first commercialized cosmetic penile implant. Appx14759-14760(1793:23-1794:10). IMD was "going to eventually commercialize" the trade secrets but lost "any modicum of protection" for them because of Defendants' misappropriation and disclosure in patents. Appx14753(1787:18-21); Appx14759(1793:5-19).

IMD took "'precautions … to protect the secrecy of the information.'" *Altavion*, 226 Cal. App. 4th at 62 (citing Restatement, § 39, cmt. e). It had standard operating procedures for trade secret protection. Appx14747(1781:8-19); Appx16636-16638. It required NDAs of anyone getting access to the information. Appx13137(357:8-25); Appx14746(1780:21-25); Appx16921-16924. It kept the trade secrets physically segregated in a locked cabinet. Appx14746-14747(1780:21-1781:7); Appx14749(1783:2-23); Appx16010. It conducted annual trade secret

audits.        Appx14748-14749(1782:15-1783:1);        Appx14755(1789:7-14);

Appx13408(594:9-15); Appx16519-16520; Appx16663-16664; Appx16098-16099.

In addition, the jury was allowed to find that the implant improvements had

economic value because Defendants obtained patents covering them. *Altavion*, 226

Cal. App. 4th at 63-64; *Richardson*, 868 F.2d at 1245 ("The Alternate Shock Mount

was considered sufficiently novel and valuable that Suzuki included it in a patent

application filed in Japan and later in the United States.").

### C.    All Defendants Misappropriated

Finally, all Defendants except Cornell argue that only Cornell should be liable

for misappropriation.   CornellBr.57-59; FingerBr.16-23.   But as the district court

explained, "there *was* evidence to support that these Defendants knew or had reason

to know that some of the trade secrets were '[d]erived from or through a person who

had utilized improper means to acquire it' or 'derived from … a person who owed a

duty to the person seeking relief to maintain its secrecy or limit its use.'"  Appx36

(quoting Cal. Civ. Code § 3426.1(b)(2)(B)(i), (iii).  Under CUTSA, "a person who

acquires a trade secret from the discloser" is liable for misappropriation. *Ajaxo, Inc.

v. E\*Trade Fin. Corp*., 48 Cal. App. 5th 129, 179 (2020) (citation omitted).  The

jury's verdict shows a careful assessment of the evidence in finding Mische and

Nichols/HMT were not liable for some of the misappropriation.   Appx7461;

Appx7464.  Defendants cite their own testimony that they did not know about the

trade secrets or the misappropriation. CornellBr.57-59; FingerBr.16-18. The jury was "entitled to disbelieve" this "self-serving testimony" in view of all the evidence. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1000 (9th Cir. 2020) (citation modified).

To start, each Defendant knew that Cornell had attended training with Elist and signed an NDA in connection with the Penuma training session. Appx36; Appx13858(974:18-22); Appx14172(1253:12-14); Appx13932(1048:7-12); Appx13932-13933(1048:21-1049:4); Appx13952(1068:17-21); Appx13981(1097:6-9); Appx140001(1117:23-25); Appx14694(1728:6-17); Appx15868. Cornell even sent Mische his NDA and identified it as a potential problem. Appx016384; Appx13889(1005:12-22); Appx16921. Wang was a member of IMD's advisory board and had signed his own NDA with IMD and knew he was obligated to protect IMD's trade secrets. Appx38; Appx14694(1728:6-17); Appx13127-13128(347:23-348:4); Appx16552. Finger admits he "knew that [Cornell's] training session was covered by a nondisclosure agreement." FingerBr.5. The PPMs show Defendants knew they risked a lawsuit that Cornell violated his NDA. Appx15811; Appx15946; Appx16313.

Each Defendant "had reason to know that these trade secrets were derived from a person (Cornell) who owed a duty to Plaintiffs to maintain the secrecy of those ideas." Appx36-37; Appx13932-13933(1048:7-1049:1); Appx13981(1097:6-

15); Appx13972(1088:1-10); Appx15877-15884; Appx15904; Appx16312-16313; Appx16049; Appx16541. Cornell had never designed any implant before his training with Elist. Appx14176(1257:10-12); Appx14269(1350:4-8). Cornell provided Mische, Nichols, and HMT with information about the Penuma design and the trade secrets to develop a competing product to Penuma. Appx36; Appx13875-13876(991:21-992:16); Appx14187-14188(1268:19-1269:15); Appx15885-15886. Cornell sent Mische the "Ellis [sic] pick list." Appx16389-16391. Cornell shared his notes from his training session in a meeting with Nichols and HMT that Finger attended. Appx14176(1257:20-22); Appx14189(1270:7-17). Elist was frequently mentioned and was identified as the inventor of the predicate to Augmenta. Appx13988(1104:1-3); Appx13976(1092:5-9). Wang participated in Augmenta's development, despite his own NDA, knowing it would be a competitor to Penuma. Appx13786-13787(914:22-915:10); Appx13788(916:21-24); Appx13795(923:9-25); Appx13742-13743(894:2-895:4); Appx16000.

The jury had ample reasons to disbelieve Finger too. They observed Finger's testimony shift from "nothing was discussed" between Cornell and Elist, to saying he "misspoke" and there was "[v]ery little discussion," to saying "I don't remember" what was discussed. Appx13953(1069:3-20). Finger knew Cornell had an NDA with IMD. Appx13932(1048:7-12). He was aware "Cornell attended the Penuma training and that Cornell built off what he learned at the training to develop the

Augmenta." Appx37; FingerBr.5. He helped draft the investor memoranda that showed awareness of the risk Defendants could be sued for misappropriation. Appx37; Appx13948(1064:11-25); Appx15931; Appx16313. Finger sent Nichols/HMT the concept drawings Mische had prepared under Cornell's instruction. Appx13974(1090:6-9). "Finger had reason to know aspects of the Augmenta were derived from a person who owed a duty to Plaintiffs to maintain trade secrets." Appx37; *see* Appx13932-13933(1048:7-1049:1); Appx13981(1097:6-15); Appx16312-16313; Appx16440; Appx16541.

Finger tries to avoid his responsibility by characterizing himself as merely "an investor and business advisor." FingerBr.15. But Defendants' documents showed he was Augmenta LLC's CFO with responsibilities of providing "oversight for Augmenta" and "overseeing the development work being performed by [HMT]." Appx16312; Appx16440. The evidence shows Finger acquired the trade secrets from Cornell and Mische, disclosed them to HMT, and used them to solicit investments. Finger makes a false analogy with *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 226 (010). FingerBr.15. There, the court held Intel was not liable for misappropriation by purchasing software because it never possessed the *source* code identified by Silvaco as constituting the trade secrets and the object code Intel had could not disclose the underlying source. *Silvaco*, 184 Cal. App. 4th at 217, 220. Here, Finger discussed the Penuma training session with Cornell and

38

attended the meetings where Cornell discussed what he learned from Elist. Appx13953-13954(1069:3-1070:1); Appx13974-13975(1090:20-1091:4); Appx13975-13976(1091:14-1092:25); Appx13977(1093:3-20); Appx13982(1098:7-10); Appx16069. Finger is not insulated because he was an investor, where evidence permitted the jury to find he was involved in the continuing use and disclosure of the trade secrets through his direct involvement with Augmenta. *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1385-86 (2000). Further, "[s]hareholders, officers, and directors of corporations have been held personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." *Id.* at 1387.

Defendants cannot avoid liability for misappropriation by "[a] studied ignorance of the circumstances surrounding the acquisition of the information" when "a reasonable person would have inquired further and learned that possession of the information was wrongful." Restatement (Third) of Unfair Competition § 40 (1995). All the red flags about Cornell's acquisition and sharing of information meant that Defendants had reason to know the information was obtained unlawfully. "[T]he record includes substantial evidence showing that [all Defendants] had reason to know the information was secret and had been acquired by improper means." *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1342 (Fed. Cir. 2002).

## II. Defendants Fail to Show Clear Error in the District Court's Reasonable Royalty Decision

A reasonable royalty under CUTSA is simply "a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret." *Ajaxo,* 48 Cal. App. 5th at 160 (citation omitted). It is an "attempt 'to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.'" *Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1308 (2010) (citation omitted).

"Determination of a reasonable royalty is a question of fact," including issues of apportionment. *Ajaxo*, 48 Cal. App. 5th at 162. Under CUTSA, the reasonable royalty "is typically determined by modeling a hypothetical negotiation between trade secret owner and trade secret user at the time the misappropriation began." *Id.* at 166 (citation modified); *see Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). Defendants challenge the district court's fact-finding, CornellBr.37, but fail to show clear error in the court's damages decision.

### A. The Reasonable Royalty Is Supported by the Evidence

An overarching failure in Defendants' challenge to the district court's decision is that it is based on an inaccurate representation of the evidence before the court. *Ajaxo*, 48 Cal. App. 5th at 165-166. Defendants fault the court's reliance on Arst's sworn declaration, which was in evidence. Appx15458-15460(87:8-89:2); Appx7656-Appx7741. On the other hand, Defendants base their critiques on the

*report* of their expert Dr. Hatch. CornellBr.40 (citing Appx9284-9285; Appx9290). But Hatch's *report* was *not* admitted into evidence and therefore cannot be a basis for challenging the district court's fact-finding.[3] Appx15388(17:4-12); Appx15566(195:3-5). Defendants have not appealed the admission of Arst's testimony or exclusion of Hatch's report.

### 1. Royalty Base

Defendants argue that the district court erred by setting the royalty base "to 'all the profits anticipated by [Augmenta]'" and that the court had to apportion the base. CornellBr.40 (citing Appx7728). Yet, as this Court has explained in the patent context, it is "the ultimate combination of royalty base and royalty rate [that] must reflect the value attributable to the infringing features of the product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

The evidence before the district court supports its use of the projected Augmenta profits as the base. As Arst explained, Defendants' documents show that the misappropriated trade secrets were coextensive with and served as the basis for

---

[3] Throughout the damages section of their brief (CornellBr.40, 42, 47-54), Defendants repeatedly challenge the sufficiency of the evidence before the district court by citing their expert's report, Appx9264-9363—which was filed as an exhibit to Defendants' prehearing brief (Dkt.673-3) *but never admitted into evidence.* Appx15388(17:4-15); Appx15566(195:3-7). The sufficiency of evidence is evaluated based on "evidence presented at trial." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987); *see O'Reilly v. Morse*, 56 U.S. 62, 110 (1853) ("[T]his case must be decided by the testimony in the record, and we cannot go out of it.").

the design and anticipated market entry of Augmenta.  Appx7728; Appx7686-7689.

Defendants' FDA 510k submission relied on the substantial equivalence of Augmenta to Penuma—the only cosmetic penile implant on the market. Appx17214-17219.  Cornell identified the "AugMENTA Advantage" over Penuma based on the trade secrets he stole from IMD.  Appx15880.  Defendants' investor presentations touted Augmenta as having features that "could offer significant advantages" over Penuma and stated that Augmenta's success "depends significantly" on protecting their rights to intellectual property.  Appx16306; Appx16316.  Those features and IP critical to Augmenta were the trade secrets the jury determined Defendants stole from IMD, making the Augmenta projected royalties the appropriate base.

### 2.     Royalty Rate

Defendants argue Arst's royalty rate failed to apportion the base to the contribution of the trade secrets.  CornellBr.41.  That is wrong.  Appx7726-7730; Appx15495(124:15-22).  Arst's conclusions were based on Defendants' valuation of the trade secrets.   Arst explained that he "determine[d] the portion of the Augmenta Implant's anticipated sales and profits that could be reasonably attributed to the misappropriated trade secrets" by determining the value that Defendants placed on Cornell's and Mische's contributions to Augmenta in the OAM Transaction.  Appx7726-7729; Appx10458.  Arst also considered the royalty rate

envisioned in the Penuma Term Sheet (PTS) as evidence of what terms IMD considered acceptable. Appx7730-7731; Appx7714-7719; Appx16594-16596.

Although Defendants contend that "neither [the PTS or the OAM Transaction] was a comparable license," CornellBr.42, they did not object to the admission of either agreement. Appx15394(23:15-24); Appx15478(107:4-9); Appx15510(139:12-18); Appx13906(1022:1-6); Appx16594-16596; Appx16300. Defendants also do not appeal the district court's admission of these agreements or Arst's testimony about them.

### a.    Penuma Term Sheet

Defendants are wrong that the PTS has "no probative value" because it was never executed. This Court has "acknowledge[d] that proposed licenses may have some value for determining a reasonable royalty in certain situations." *Whitserve, LLC v. Comput. Packages, Inc*., 694 F.3d 10, 29-30 (Fed. Cir. 2012). California courts have used "a trade secret owner's pre-misappropriation offer to license" as the starting point of a hypothetical negotiation analysis. *Ajaxo*, 48 Cal. App. 5th at 167.

Likewise, Defendants are wrong that the PTS is not comparable because it did not involve the trade secrets. In *ResQNet.com, Inc. v. Lansa, Inc*., the non-comparable licenses had no "discernible link to the claimed technology." 594 F.3d 860, 870 (Fed. Cir. 2010). "[I]dentity of circumstances" is not required; licenses to

"related technology" can be comparable. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014). Like the trade secrets, the PTS involved licensing a cosmetic penile implant. Appx16594. The intellectual property is related.

Arst explained how he accounted for the similarities and differences between the PTS and the hypothetical license. Appx7713-7719. Arst did not rely on the PTS as by "itself establish[ing] a royalty for the trade secrets," but rather as "provid[ing] some visibility into the thinking of IMD … about what type of consideration would be agreeable to at least IMD and what would the structure of the license that would be agreeable to IMD look like." Appx15475(104:5-10); Appx7718-7719. He explained that "[b]oth would grant rights to technology related to cosmetic penile implant products developed by Dr. Elist." Appx7715. Arst acknowledged the term sheet covered broader rights to intellectual property than the hypothetical license and explained that the suggested royalty for the hypothetical license would be lower than what was reflected in the term sheet. Appx15476(105:5-15); Appx7716. Arst also explained that the PTS occurred before certain regulatory approval and a safety study, which would be a downward influence compared with the later hypothetical license with Defendants. Appx7716-7717. And, Arst explained, "the market opportunity" for the products covered by the PTS and the hypothetical license "is comparable." Appx15476(105:16-17); Appx7715-7719.

b.     OAM Transaction

Defendants challenge the district court's reliance on Arst's testimony about the OAM transaction, in which Cornell and Mische assigned "preliminary designs, provisional applications, and any other intellectual property" to Augmenta LLC. CornellBr.47; Appx7726-7730; Appx15938; Appx15517(156:10-18).  Once again, Defendants improperly base their factual challenge on their expert's *unadmitted* expert report.  CornellBr.48 (citing Appx9304-9306 (Hatch report)).

*First*, Defendants assert that Arst failed to apportion the OAM transaction. CornellBr.47.  But Arst, relying on Defendants' documents, explained that the intellectual property transferred to Augmenta LLC in the OAM transaction reflected the misappropriated trade secrets.  Appx15528-15529(157:23-158:1); Appx15516-15517(145:18-146:18); Appx15938; Appx16307; Appx16313.  OAM contributed "to Augmenta all of the preliminary designs, provisional patent applications, and any other intellectual property in exchange for 15% of the membership units of Augmenta."  Appx16307.

Defendants argue that the transaction included "more than the trade secrets" because it included "Mische's intellectual property."  CornellBr.47.  But Defendants introduced no *evidence* to show that Mische, who was found to have misappropriated the trade secrets, contributed anything valuable besides the trade secrets.  *See* CornellBr.47 (citing Hatch's unadmitted expert report).

*Second*, Defendants challenge Arst's use of Defendants' own projections for their operating margin. CornellBr.48. Arst relied on Defendants' investor memorandums, used to solicit investments, which forecast $182 million in revenue and $163 million in pre-tax profits by year five. Appx7730; Appx16394; Appx16336. Arst compared Defendants' anticipated profit margins to the profit margins of other companies selling implants and determined that the Augmenta was expected to generate significantly higher profit margins than the broader implant industry. Appx7731. The district court was entitled to rely on Defendants' pre-suit projections. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899-900 (Fed. Cir. 1986) (affirming damages based on a defendant's pre-infringement internal projections of anticipated profits); *Snellman v. Ricoh Co.*, 862 F.2d 283, 289 (Fed. Cir. 1988) ("[D]ocument projecting Ricoh's anticipated sale and expert testimony relating to those calculations, was relevant and proper in determining a reasonable royalty"); *cf. Altavion*, 226 Cal. App. 4th at 64 (considering the defendant's marketing reports as evidence the trade secrets were valuable).

Apportionment can be "based on an approximation of the actual value of the infringed device to the defendant." *Univ. Computing Co.*, 504 F.2d at 537. The evidence before the district court showed IMD's trade secrets were critical to Defendants' expected profits. When Cornell went to train with Elist, Penuma was the only cosmetic penile implant commercially available. Appx13301(487:3-5);

46

Appx14620(1654:12-15). Defendants got a head start by relying on Penuma as the pathbreaking device, with the Augmenta (incorporating the trade secret improvements) as a follow-on. Defendants knew that their success depended on Cornell's efforts (who stole the information from IMD) and protecting intellectual property (which the jury found came from IMD). Appx16313; Appx16316. Cornell believed that Augmenta would have a "streamline[d] path to market" because Penuma as a predicate device would "obviate the need for clinical testing." Appx15884.

### 3. Bargaining Position

Arst explained that IMD was in a much better bargaining position than Cornell because a hypothetical license would imperil IMD's position of having the only cosmetic penile implant on the market and its commercial prospects of using the trade secrets. Appx15488-15490(117:14-119:8); Appx7732. Defendants needed the license, while IMD had little economic incentive to grant it. Appx7732.

Defendants now try to downplay the significance of the trade secrets to their ability to compete. CornellBr.49. But Defendants' documents show that IMD's trade secrets were key to distinguishing Augmenta as an improvement over Penuma. Appx7687-7689; Appx15803. Defendants' investor documents recognized that Augmenta's "success … will depend, in significant part," on obtaining and preserving intellectual property—the very intellectual property the jury determined

Defendants misappropriated from IMD.  Appx7680; Appx15816.

## B.    License Duration

The district court determined that the reasonable royalty was "limited to a five-year period" because that was "[t]he period of time during which the use of the trade secrets could have been prohibited … based on the duration of the NDA." Appx10462.    Defendants' only challenge to the duration of the five-year hypothetical term is that it is too long because IMD intended to eventually patent the trade secrets.  CornellBr.51.

Defendants waived any objection to the five-year length of the license because they never raised that issue to the district court and in fact *argued* for a five-year term.  Appx9241; Appx9356; Appx10511-10514 (post-trial motion not challenging license term).  Defendants sought a five-year term that was shorter than the 10 years Arst opined should apply.  Appx10458; Appx10460; *see* Appx15536-15537(165:18-166:9); Appx15610(239:1-14).  Defendants' expert Dr. Hatch opined that the royalty term would be for five years, based on the term of the NDA.    Appx15593-15594(222:22-223:2); Appx15594-15595(223:12-224:3); Appx9356.    At closing, Defendants argued that five years (2018-2023) was what "was bargained for in the NDA."  Appx15653(282:5-10).  The district court agreed with Defendants about the term.  Appx10462.  They cannot challenge that term now.

## C. Lump Sum

Defendants challenge the district court's reliance on Arst for a 35% discount rate. CornellBr.52; Appx10462. The discount rate is used to reduce the expected royalty stream to a present value at the date of the hypothetical negotiation. Appx15490-15491(119:15-120:8); *see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 364 (5th Cir. 2003) (affirming the application of a "discount rate to convert projected lost revenues to present value").

Yet again, this argument is forfeited. Defendants never challenged Arst's opinions on the discount factor, either during *Daubert* or in response to IMD's motion for reasonable royalty damages. Appx1970-2002; Appx6387-6393; Appx9226-9249. Defendants never questioned Arst at the hearing about his discount factor. Appx15497-15535(126:6-164:11). Even after receiving the district court's damages opinion, Defendants never argued that the discount factor was wrong. Appx10503-10514.

Defendants' argument also fails on the merits. Their attempt to equate the discount factor with the "rules of thumb" addressed in *Uniloc* and *VirnetX* is specious. Those cases concerned an arbitrary profit split that the expert "fail[ed] to tie … to the facts of the case at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011); *see VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) (holding that the 50/50 split was "insufficiently tied to

the facts of the case").

Arst's selection of the applicable discount rate is not like the 25% rule of thumb or 50/50 profit split. "[T]he discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk." *Energy Cap. Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002). Economists choose from a range of discount rates based on the risk of the product being licensed. Appx15491-15492(120:9-25); Appx7768. Based on his analysis of the facts surrounding Augmenta, Arst concluded that a 35% discount rate for "high risk" products should apply. Appx15491(120:12-13).

Defendants argue that "the facts suggest a far steeper discount was appropriate." CornellBr.53. But Defendants never argued for a steeper discount. In fact, Defendants' documents prove otherwise: Finger's memorandum to potential investors used a 9% discount rate, suggesting a much lower risk profile than what Arst applied. Appx15492-15493(121:7-122:14); Appx15976.

## III. The District Court Properly Awarded Exemplary Damages

### A. Defendants' Waiver Argument Based on the Pretrial Order Is Forfeited and Wrong

Defendants argue that IMD waived its right to seek exemplary damages by omitting exemplary damages and willful and malicious misappropriation from the pretrial order. FingerBr.24. Defendants forfeited this waiver argument by not timely raising it to the district court. Regardless, it is wrong.

"[A] waiver argument may be forfeited 'by addressing the claim on the merits without also making a waiver argument.'" *Colibri Heart Valve LLC v. Medtronic Corevalve, LLC*, 143 F.4th 1367, 1377 (Fed. Cir. 2025) (quoting *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010)). Before the damages hearing, Defendants never cited the pretrial order or argued that IMD had waived exemplary damages by not including it in the pretrial order. Instead, Defendants argued that IMD's request for exemplary damages failed because a jury finding of willful and malicious misappropriation was a "prerequisite." Appx9241-9242. Nor did Defendants cite the pretrial order during the damages hearing. Appx15618-15619(247:1-248:11). Defendants *first* raised waiver based on the pretrial order *after* the district court awarded exemplary damages. Appx10462-10463; Appx10514-10515. That was too late.

Defendants' waiver assertion is also wrong. The district court found Defendants' argument "not credible given the parties' stipulation" when "Defendants made no mention that they believed exemplary damages were waived altogether by way of the Final Pretrial Conference Order." Appx21-22. In addition, the record is clear that Defendants knew IMD was continuing to seek exemplary damages throughout the case. IMD's original and amended complaints sought exemplary damages under CUTSA, Appx241(¶104); Appx1331(¶145), each of IMD's Rule 26 disclosures made clear IMD was seeking exemplary damages,

51

Appx19841; Appx19848; Appx19869, and Defendants' pretrial memorandum acknowledged IMD "contend[ed] that the alleged misappropriation was willful and malicious," Appx6675. Defendants were not "ambushed" with IMD's request for exemplary damages. FingerBr.26. They expected it.

The district court's interpretation of its pretrial order as not forfeiting exemplary damages is entitled to deference. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1358 (Fed. Cir. 2008) ("A district court's interpretation of its order is entitled to deference unless the interpretation is unreasonable or is otherwise an abuse of discretion."); *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir. 1985) ("The district court's] … decisions regarding the preclusive effect of a pretrial order on issues of law and fact at trial will not be disturbed unless they evidence a clear abuse of discretion.").

## B. The District Court Properly Decided Exemplary Damages

Defendants next challenge the district court's award of exemplary damages by arguing it required a jury finding that the misappropriation was willful and malicious. FingerBr.26-28. Defendants assert that they "did not have an opportunity to insist on a jury finding." FingerBr.26. That is incorrect.

### 1. Defendants Consented to the District Court Deciding Exemplary Damages

Defendants could have requested that willfulness be tried to the jury with liability, or they could have requested a jury trial on willful and malicious

misappropriation before the court decided exemplary damages. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1319 (Fed. Cir. 2013) (en banc) (noting that district courts have discretion to try willfulness with liability or separately). Defendants did neither, however.

First, as the district court observed, before the jury trial, Defendants stipulated that [t]he jury will make a determination whether Plaintiffs have proven liability under CUTSA and the NDA" and "[i]f the jury finds liability … , the Court will consider whether a reasonable royalty should be awarded," which was a necessary predicate to exemplary damages. Appx7115-7116. If Defendants wanted a jury determination of willful and malicious conduct, which their pretrial brief acknowledged was a live issue, they could have requested it then and proposed a jury instruction. They did not. Defendants also never raised willfulness in a Rule 50(a) motion or at all during trial. Appx23. Instead, they waited until after the liability trial to tell the court that it could not award exemplary damages without a jury "finding of willful and malicious misappropriation," but Defendants were careful to not demand that a jury be empaneled at that time to decide the issue. Appx9241-9242; Appx15659-15660(288:22-289:8).

Second, to preserve a right to a jury trial (assuming one exists, *see infra*), Defendants had to "continu[e] to demand a jury trial" while participating in the bench trial on exemplary damages. *Solis v. County of Los Angeles*, 514 F.3d 946,

956 (9th Cir. 2008). Instead, during the damages hearing, Defendants acknowledged in another stipulation that the court could make an award of exemplary damages and never argued that the court lacked constitutional or statutory authority to do so. Appx15618(247:19-248:8). Defendants waited until *after* the district court awarded exemplary damages to argue that they had a Seventh Amendment right to a jury trial on willful and malicious misappropriation. Appx10516. Such sandbagging is not allowed. "A party may not stand silently by as the court proceeds to try his claim from the bench, only later to demand a jury trial after the court has ruled against him." *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1054 (9th Cir. 2015) (citation modified); *see Wite v. McGinnis*, 903 F.2d 699, 703 (9th Cir. 1990) (en banc) ("[K]nowing participation in a bench trial without objection is sufficient to constitute a jury waiver.").

> 2. **The Seventh Amendment Does Not Require a Jury to Decide Whether Misappropriation Was Willful and Malicious Under California Law**

In any event, Defendants are wrong that the Seventh Amendment requires a jury determine whether trade secret misappropriation was willful and malicious before the court can award exemplary damages under CUTSA. To start, CUTSA makes exemplary damages a decision for the court: "If willful and malicious misappropriation exists, the court may award exemplary damages … ." Cal. Civ. Code § 3426.3(c). California Civil Jury Instructions notes that "[n]o reported

California state court case has addressed whether the jury or the court should decide whether any misappropriation was 'willful and malicious.'" CACI No. 4411 (2025 ed.).

Whether there is a Seventh Amendment jury trial right for any statutory issue requires a careful historical examination of the action and remedy and 18th-century English practice. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996); *see Tull v. United States*, 481 U.S. 412, 417–18 (1987); *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1319-21 (Fed. Cir. 2018). Defendants do none of that analysis and instead assume that because this Court has held there is a right to a jury trial on the willfulness question for patent infringement, then the willfulness and malicious issue under CUTSA must also be decided by a jury. FingerBr.27. This Court's precedent on willful patent infringement does not mean a jury must determine willful and malicious misappropriation under California and Ninth Circuit precedent.

Defendants (FingerBr.28-29) rely on the Ninth Circuit's decision in *Teutscher v. Woodson,* but that case concerned whether there was a right to a jury trial for actual and punitive damages for a state law wrongful discharge claim. 835 F.3d 936, 942-43 (9th Cir. 2016). *Teutscher* did not hold there was a right to a jury to determine exemplary damages for trade secret misappropriation. In concluding that the actual and punitive damages sought in that case were legal remedies, *Teutscher*

cited *Curtis v. Loether*, 415 U.S. 189 (1974). *Curtis* held that actual and punitive damages under the Civil Rights Act were legal relief for a jury to determine. *Id.* at 195-96. But the Supreme Court clarified that it was not stating that "any award of monetary relief must necessarily be 'legal' relief" and pointed to other cases where monetary relief was decided by a court. *Id.* at 196. One of those cases was *Swofford v. B & W, Inc*., 336 F.2d 406 (5th Cir. 1964). *Id.* at 196 n.12.

*Swofford* analyzed the history of enhanced damages under the patent acts and concluded there was "no authority for the proposition that the parties enjoyed a constitutional right to jury trial on the award and amount of exemplary damages." 336 F.2d at 412-414. "[E]xemplary damages … are not money claims triable by jury, although they are awarded in a 'legal' action." *Id.* at 413.

History is even clearer that there is no Seventh Amendment right to a jury trial for exemplary damages for trade secret misappropriation. "Claims for that wrong were first recognized in the American and English equity (or chancery) courts in the nineteenth century." *Tex. Advanced Optoelectronic Sols.,* 895 F.3d at 1322. That contrasts with patent cases, which were tried in law courts prior to 1791. *Markman*, 517 U.S. at 377. Exemplary damages for trade secret misappropriation therefore also arose after 1791. Defendants' argument that the CUTSA provision for exemplary damages tracks patent law's enhanced damages proves too much, because patent law's enhanced damages also arose after 1791 and from its beginning

was an issue for a court to decide. *Swofford*, 336 F.2d at 412-414; *see also Day v. Woodworth*, 54 U.S. 363, 372 (1851); *Seymour v. McCormick*, 57 U.S. 480, 489 (1853); *Teese v. Huntingdon*, 64 U.S. 2, 9 (1859); *Birdsall v. Coolidge*, 93 U.S. 64, 68 (1876).

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), confirms the district court's authority to determine that misappropriation was willful and malicious and award exemplary damages. Appx23. In *Yeti*, the jury found misappropriation of trade secrets under Montana's uniform trade secret act but also found that the defendants did not act with actual fraud or malice as required for punitive damages under Montana's general punitive damages statute. 259 F.3d at 1105, 1111. In view of the jury's punitive damages verdict, the district court denied plaintiffs' subsequent motion for exemplary damages under the trade secret act for willful and malicious misappropriation. *Id.* at 1105, 1111. The Ninth Circuit reversed the district court's refusal to consider exemplary damages based on the jury verdict and remanded "to allow the *district court* to make an independent judgment about whether Deckers' misappropriation was 'willful and malicious.'" *Id.* at 1112 (emphasis added).

Finally, even if Defendants' arguments were accepted, that would not entitle them to a judgment of no exemplary damages. Instead, at minimum IMD would be entitled to a new trial on whether Defendants' misappropriation was willful and

malicious. *Applied Med. Distrib. Corp. v. Jarrells*, 100 Cal. App. 5th 556, 566 (2024) (remanding for a jury trial on willful and malicious misappropriation after reversing the trial court's nonsuit on this issue); *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1328-29 (Fed. Cir. 2008).

### C. The District Court Correctly Found that Finger's Misappropriation Was Willful and Malicious

On the merits, Defendants only challenge the district court's fact-finding that Finger's misappropriation was willful and malicious. FingerBr.30-33; CornellBr.54. Willful and malicious conduct can be shown through either direct or circumstantial evidence. *Neal v. Farmers Ins. Exch.*, 582 P.2d 980, 987 n.6 (Cal. 1978). Finger fails to show clear error in the district court's finding that his misappropriation was willful and malicious.

The evidence showed Finger's "willingness to commit" misappropriation and that his actions were "carried on with a willful and conscious disregard" of IMD's trade secret rights. *Applied Med. Distrib.*, 100 Cal. App. 5th at 594. Finger knew from the start that Cornell had signed an NDA with IMD and was trained by Elist. Appx13932(1048:7-12); Appx13932-13933(1048:21-1049:4); Appx13952(1068:17-21). He discussed the Penuma training session with Cornell. Appx13953-13954(1069:3-1070:1). He sent Mische's drawings to HMT and attended the meeting with HMT where Cornell shared his notes from his training session with Elist and discussed Penuma and Elist's plans. Appx13974-

13975(1090:6-1091:24); Appx13975-13976(1091:14-1092:25); Appx13977(1093:3-20); Appx13982(1098:7-10); Appx13988(1104:1-3); Appx14189(1270:7-17); Appx16069. And he knew the risk IMD would sue for trade secret misappropriation. Appx13950-13951(1066:25-1067:5).

Yet, Finger was extensively involved in the misappropriation of IMD's trade secrets in Augmenta. He was CFO and responsible for "provid[ing] financial management and oversight for Augmenta and assisting Dr. Cornell in overseeing the development work." Appx16312; Appx16541; Appx13946-13947(1062:13-1063:5); Appx13948(1064:11-25); Appx13957(1073:21-25). He oversaw and helped draft the PPM used to solicit funds for Augmenta. Appx13943(1059:1-8); Appx13959(1075:1-6); Appx14229(1310:12-14); Appx14231-14232(1312:25-1313:5); Appx16300; Appx15797; Appx15931. He updated investors about Augmenta's development and design. Appx16541. And it was Finger who rewarded Wang—while he was still an IMD advisory board member—with an extra ownership share in Augmenta for his "invaluable design input." Appx16443; Appx13955(1071:22-24). Finger acted willingly and his conduct was not reasonable under the circumstances and not in good faith. *Ajaxo*, 135 Cal. App. 4th at 66. At minimum, he was "reckless[] or willful[ly] blind[]" to the misappropriation. *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 992 (9th Cir. 2017). He did so because he "wanted to make money." Appx13927(1043:5-9, 1043:13-25); *see*

*Ajaxo*, 135 Cal. App. 4th at 67 (defendants willfully engaged in course of conduct "so that they might gain financially"). Finger's assertion now that he was "simply the financier" (FingerBr.1) and surprised as anyone about the misappropriation (FingerBr.10) is disproved by the evidence.

Finally, Finger's repeated assertion that the exemplary damages judgment will bankrupt him (FingerBr.1, 12) is unproven and irrelevant and should be disregarded. To avoid cross-examination again at the damages hearing, Finger stipulated that he would not challenge the court's exemplary damages award based on lack of evidence of net worth, and during the jury trial Finger's counsel successfully blocked questioning of his net worth. Appx13930(1046:14-17); Appx15618(247:19-25). Finger cannot now sneak through the backdoor a challenge to the damages award based on his assertion it will be ruinous.

### D. California Allows Joint and Several Liability for Exemplary Damages

Finger's challenge to the joint and several liability of exemplary damages turns on his challenge to the district court's willful and malicious finding against him. FingerBr.34 ("Once the award of exemplary damages against Finger is reversed … , the award of joint and several liability for exemplary damages must also be reversed."). Because the court did not clearly err in finding Finger willfully misappropriated, he is jointly and severally liable for exemplary damages. "Damages for willfulness are punitive and are thus levied against parties found to

willfully infringe." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001).  Exemplary damages under CUTSA can be awarded jointly even if levels of responsibility vary.  *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 46 (1992).  Under California law, "[a]ll persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered."  *PMC*, 78 Cal. App. 4th at 1381.

Finger mischaracterizes California law regarding exemplary damages.  Finger relies on *Magallanes v. Superior Court*, but that case concerned the narrow issue of applicability of punitive damages in market share liability cases.  167 Cal. App. 3d 878, 883-84, 889-90 (1985).  Market share liability theory allows a plaintiff to sue any manufacturer of a fungible product that caused her injury, even if she cannot prove which manufacturer actually made the product that caused her injury.  *Id.* at 884-85.  In that context, because punitive damages could be assessed against a manufacturer who did not actually cause plaintiff's injury, the court held "public policy considerations … preclude such damages in market share liability cases."  *Id.* at 889-90.  That rationale has no application here, where each of the Defendants jointly and severally liable were found to have willfully misappropriated and therefore caused IMD's injury.

Finger also fails to show the Due Process Clause prohibits joint and several liability.  His cited cases address when punitive awards are so grossly excessive as

to become unconstitutional. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 586 (1996) (holding that a punitive award 500 times the amount of actual harm "transcends the constitutional limit"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426, 429 (2003) (holding that a punitive award 145 times the compensatory award is unconstitutional). These cases are irrelevant here.

## IV. The District Court Did Not Abuse Its Discretion in Entering an Injunction

Defendants challenge the five-year injunction term. CornellBr.54. Even when a trade secret has been destroyed, such as it by Defendants' actions, CUTSA authorizes a court to continue an injunction "for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Cal. Civ. Code § 3426.2(a). Here, the district court determined a five-year limit was appropriate because that is "'the period of time during which IMD could have prohibited Dr. Cornell from using the trade secrets based on the duration of the [NDA].'" Appx28 (quoting Appx10471); *see Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained.").

Defendants argue the district court legally erred in awarding royalty damages *and* a permanent injunction, resulting in a "duplicative award." CornellBr.56. Defendants assert—without support—that these "are alternative remedies."

CornellBr.56.  They are different remedies that can be issued in the same case.  *See Morlife*, 56 Cal. App. 4th at 1528-29 (affirming damages and permanent injunction); *Vacco Indus.,* 5 Cal. App. 4th at 57; *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975) ("[E]ither injunctive relief or damages, or both, might be awarded in a trade secret case.").  Damages compensate the trade secret owner for what was taken. Cal. Civ. Code § 3426.3(a).  An injunction prevents the defendant from achieving a "commercial advantage" from his misappropriation.  Cal. Civ. Code § 3426.2(a); Appx27-28.  A court may tie them together such as "condition[ing] future use upon payment of a reasonable royalty."  Cal. Civ. Code § 3426.2(b).  The district court did that here.  Appx10475(¶6).  The premise of Defendants' argument—that "the district court awarded royalty damages for futures sales by Defendants"—is wrong. CornellBr.56.  The royalty damages reflect the value of "what the defendant wrongfully obtained from the plaintiff" at the time of the misappropriation.  *Ajaxo*, 187 Cal. App. 4th at 1308.

Defendants argue the injunction scope is overbroad.  CornellBr.57.  But the scope of the injunction, Appx10474, matches *exactly* the trade secrets that the jury found Defendants misappropriated.  *Compare* Appx10474 (injunction) *with* Appx7461-7464 (verdict).  Defendants' complaints about the injunction's scope are really just another disagreement with the jury's verdict.

Further, the district court had discretion to enjoin Defendants "from using the trade secret and anything substantially derived from the trade secret."  Restatement (Third) of Unfair Competition § 44 cmt. d (1995).  [A] party may not use another's trade secret, even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret."  *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 328-29 (7th Cir. 1984).

The district court did not abuse its discretion in granting the injunction.

## V.     Substantial Evidence Supports the Jury's Finding that Cornell Violated His Non-Disclosure Agreement

Defendants make the same arguments for why Cornell did not violate his NDA with IMD as they do in challenging the jury's finding of trade secret misappropriation.  CornellBr.59-60.  This evidentiary challenge fails for the same reasons.

## VI.    Substantial Evidence Supports the Jury's Finding that the '413 and '639 Patents Are Invalid

The jury found by clear and convincing evidence that the '413 and '639 patents are invalid based on improper inventorship.  App7467; Appx7388; Appx15; Appx41-42.  Defendants argue that Elist cannot be an inventor because the Potential Improvement Ideas were disclosed in prior art.  CornellBr.60.  This is the same factual disagreement with the jury's verdict as for whether the Improvements were trade secrets and is wrong for the same reasons as stated above.

In addition, the '413 patent's prosecution history confirms Elist's trade secret of incorporating internal pockets or voids of space within the silicone body of the implant to add softness and elasticity was novel and key to patentability of the claims. In response to the examiner's initial rejection of the claims, Defendants added a limitation to the independent claim that the implant comprises "internal pockets configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant." Appx16172. That is substantively the same as the trade secret Defendants misappropriated. Appx7461. Defendants also argued that the "interior pockets" were "voids within the interior of the implant" and not disclosed by the prior art. Appx16167-16168. In response, the examiner allowed the claims. Appx16151.

Defendants argue that defendant Nichols and HMT came up with the idea to use internal pockets with "a specific configuration" of "a honeycomb pattern." CornellBr.61. But a honeycomb pattern is only one possible configuration for voids, and it does not negate Elist's contribution to the concepts of internal voids in a cosmetic implant that is claimed in the independent claim. Appx16172; Appx15912(12:19-20); Appx15998(12:53-54); Appx15215-15216(2156:21-2157:3).

## VII. Substantial Evidence Supports the Jury's Finding of Counterfeiting

The jury found that Cornell was liable for use of a counterfeit mark. Appx7465. Cornell now argues that the evidence was insufficient because there was a "mismatch" between the registered Penuma mark for implants and the evidence of Cornell's use of Penuma for implant services. CornellBr.61-64.

Cornell forfeited this sufficiency challenge because he did not raise it in his Rule 50(a) or Rule 50(b) motions. Appx7335-7337; Appx10549-10551. "A party must make proper motions under Rule 50 in order to appeal an adverse verdict on grounds relating to the sufficiency of the evidence." *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1318 (Fed. Cir. 2023); *see i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ("[A] party must file a pre-verdict JMOL motion on all theories … that it wishes to challenge with a post-verdict JMOL."); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006) ("[F]ailure to comply with Rule 50(b) forecloses [a party's] challenge to the sufficiency of the evidence").

Even overlooking forfeiture, Cornell's challenge to the verdict fails on the merits. As the district court recounted, "the evidence indicated that Cornell and his medical practice did 'offer for sale' the Penuma implant … , as Penuma was advertised on the website." Appx41. Cornell advertised himself as a "Penuma penile enhancement specialist" and used the registered Penuma mark, even though

he was not an authorized Penuma specialist. Appx14074(1190:4-6); Appx15888-15889. Cornell admitted his website said he "could now offer Penuma." Appx14211(1292:2-4).

The Penuma products offered on Cornell's website "are the kinds of trade-marked goods" that IMD sells, *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1004 (9th Cir. 2023), and for which Menova owns a trademark. Appx1538. Cornell admitted he continued to use the Penuma mark even after he received two cease-and-desist letters from IMD.[4]    Appx14075(1191:13-25); Appx14209-14211(1290:19-1292:4); Appx15888-15889; Appx15891; Appx16657-16659.

"The use of a counterfeit is obviously intended to confuse consumers." *Y.Y.G.M.*, 75 F.4th at 1004 (citation modified). The jury considered evidence of actual consumer confusion in IMD's call log from confused patients asking if Cornell offered Penuma and at least some who asked for Penuma when meeting with Cornell.    Appx14217-14219(1298:6-1300:24);    Appx14758(1792:6-17); Appx16014-16015; Appx14865-14866(1848:20-1849:6).

---

[4] Cornell states Defendants objected to the jury instruction for counterfeit marks, but Cornell raises only an evidentiary challenge to the jury verdict. CornellBr.63-64. Regardless, Cornell fails to show that the "good and services" language in the instruction was erroneous or that any error in the instruction was prejudicial. Instruction No. 25 made clear that the counterfeit mark had to be for the same goods as the Penuma mark. Appx7382.

None of the cases Cornell cites are relevant. In *United States v. Able Time, Inc.*, the issue was whether the Tarriff Act "require[d] the owner of the registered mark to make the same type of goods as those bearing the offending mark." 545 F.3d 824, 827 (9th Cir. 2008). In *Kaloud, Inc. v. Shisha Land Wholesale, Inc.*, the court affirmed a directed verdict of no trademark counterfeiting because the plaintiff's "trademark for flavored hookah water did not provide trademark protection for charcoal hookah containers" that the defendant sold. 741 F. App'x 393, 396 (9th Cir. 2018) ("A charcoal container is not the 'same product' as flavored hookah water."). And in *Playboy Enters. v. Universal Tel-A-Talk, Inc.*, there was no counterfeiting because the trademark for "operating establishments which feature food, drink, and entertainment" was not the same use of goods or services as "hard core on-line services." 1998 WL 288423, at *4 (E.D. Pa. June 3, 1998). Here, Cornell offered Penuma, which necessarily required the services of a doctor to implant it.

The district court did not abuse its discretion in awarding statutory damages to IMD. *See* 15 U.S.C. § 1117(c)(2) (court may award statutory damages "as the court considers just"); *see* J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 30:95 (5th ed.) ("The statute gives the trial court judge considerable discretion in awarding the amount of statutory damages"). Cornell

68

willfully used a counterfeit Penuma mark to offer for sale the same goods for which IMD owns a federal registration, causing actual confusion.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Respectfully submitted,

*/s/ Nathan S. Mammen*

|  |  |
|---|---|
| Ryan Baker | Nathan S. Mammen |
| May Chan | Cole T. Tipton |
| WAYMAKER LLP | SNELL & WILMER LLP |
| 515 Flower Street | 2001 K Street, N.W. |
| Suite 3500 | Suite 425 North |
| Los Angeles, CA 90071 | Washington, DC 20006-1073 |
|  | Telephone: (771) 772-5502 |
|  | Facsimile: (202) 925-5956 |
|  | nmammen@swlaw.com |

*Attorneys for Plaintiffs-Appellees.*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing Response Brief for Plaintiffs-Appellees:

1.　　Complies with the type-volume limitation of Fed. Cir. R. 32. This brief contains 13,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b). Microsoft Word was used to calculate the word count.

2.　　Complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman type style.

Dated: August 20, 2025

*/s/ Nathan S. Mammen*
Nathan S. Mammen
nmammen@swlaw.com
SNELL & WILMER LLP
2001 K Street, N.W.
Suite 425 North
Washington, DC 20006-1073
Telephone:　(771) 772-5502
Facsimile:　(202) 925-5956

*Attorney for Plaintiffs-Appellees.*