**Nos. 2025-1580, 2025-1605**

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔉𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

**INTERNATIONAL MEDICAL DEVICES, INC.,
MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC,
CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS,
HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS
MISCHE LLC, RUN WANG, ROBERT J. CORNELL, M.D., P.A.,
RICHARD B. FINGER**
*Defendants-Appellants*

**v.**

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendants*

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

Appeals from the Central District of California in No. 2:20-cv-03503-
CBM-RAO, Senior Judge Consuelo Bland Marshall.

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

**REPLY BRIEF OF APPELLANTS**

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

**AHMAD, ZAVITSANOS &
MENSING, PLLC**
Kelsi Stayart White, *Principal Counsel*
Jason McManis
Weining Bai

1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101

*Counsel for Appellants (Other than Richard B. Finger)*

# Table of Contents

**Table of Authorities** ...........................................................................................3

**Arguments in Reply** ...........................................................................................5

I.    The Potential Improvement Ideas and Instrument List Are Not Trade Secrets as a Matter of Law. ...........................................................................5

    A.    New applications of matters known in the trade are not secrets. ............5

        1.    Plaintiffs proved only new applications of known concepts, which are not trade secrets. ...........................................................5

        2.    Plaintiffs' expert testimony cannot overcome this legal rule...........6

        3.    The history of the '413 patent defeats trade secrecy.........................7

    B.    Information disclosed in a patent is not a trade secret............................8

        1.    Internal voids/pockets.......................................................................8

        2.    Mesh tabs.........................................................................................11

        3.    Absorbable sutures. .........................................................................13

    C.    The instrument list is not a trade secret. ................................................14

II.    The Royalty Award Was Unreasonable. ........................................................15

    A.    The royalty was not reasonably apportioned. ........................................16

        1.    Royalty base ....................................................................................16

        2.    Royalty rate .....................................................................................18

        3.    Bargaining positions.........................................................................21

    B.    The license duration was unreasonable. .................................................21

    C.    The lump-sum conversion was unreasonable. ........................................21

III.    There is legally insufficient evidence of misappropriation for Nichols, HMT, Mische, Mische LLC, and Wang.....................................................................22

IV.    The district court entered an arbitrary five-year injunction. .........................23

V.    The district court erred in invalidating the patents and awarding counterfeiting damages.................................................................................26

**Conclusion**...........................................................................................................28

**Certificate of Service**.........................................................................................29

**Certificate of Compliance with Type-Volume Limitations**...............................30

# Table of Authorities

## Cases

*Altavio, Inc v. Konica Minolta Sys. Lab., Inc.*,
226 Cal. App. 4th 26 (Cal. App. 2014) ...................................................6

*Atl. Research Mktg. Sys., Inc. v. Troy*,
659 F.3d 1345 (Fed. Cir. 2011) ...............................................................9

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .................................................................................7

*Computer Care v. Serv. Sys. Enters., Inc.*,
982 F.2d 1063 (7th Cir. 1992)..................................................................6

*Cordis Corp. v. Boston Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011) .............................................................11

*Gonzalez-Bermudez v. Abbott Laboratories P.R. Inc.*,
990 F.3d 37 (1st Cir. 2021) ....................................................................27

*Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc.*,
674 F.2d 1336 (9th Cir. 1982).................................................................10

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017)..............................................................11

*In re Providian Credit Card Cases*,
96 Cal. App. 4th 292 (2002)......................................................................7

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ..................................................................................9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................... 18, 19

*Masimo Corp. v. True Wearables, Inc.*,
No. 2021-2146, 2022 WL 205485 (Fed. Cir. Jan. 24, 2022) .................7

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015)..............................................................10

*On-Line Tech. v. Bodenseewerk Perkin-Elmer*,
386 F.3d 1133 (Fed. Cir. 2004) ..............................................................9

*Perez v. El Tequila, LLC*,
847 F.3d 127 (10th Cir. 2017) ..............................................................27

*Provisur Techs., Inc. v. Weber, Inc.*,
119 F.4th 948 (Fed. Cir. 2024) ..............................................................17

*Ring Plus, Inc. v. Cingular Wireless Corp.*,
614 F.3d 1354 (Fed. Cir. 2010) ..............................................................20

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) ..............................................................10

*Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*,
113 F.3d 1258 (Fed. Cir. 1997) ..............................................................9

*Thompson v. Impaxx, Inc.*,
113 Cal. App. 4th 1425 (2003) ..............................................................7

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ..............................................................10

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) ..............................................................9

**Statutes**

Cal. Civ. Code § 3426.1(b)(1) ..............................................................22

Cal. Civ. Code § 3426.1(b)(2)(B) ..............................................................22

Cal. Civ. Code § 3426.2(a) ..............................................................24

**Rules**

Fed. R. Civ. P. 52(a)(5) ..............................................................18

Fed. R. Evid. 103(b) ..............................................................18

## Arguments in Reply

## I.  The Potential Improvement Ideas and Instrument List Are Not Trade Secrets as a Matter of Law.

Plaintiffs' inability to defend the "secrecy" of their supposed trade secrets is exposed by their failure to confront the cases cited in Defendants' opening brief. Defendants cited decisions holding that matters of common knowledge and matters disclosed in patents are not protected trade secrets.  Cornell.Br.25, 28-33 (citing *Ultimax*, *Self Directed*, *Gusler*, and *Stutz*).  Plaintiffs completely ignore those cases, and the "evidence" they cite (at 28-32) provides no basis for trade secrecy.

### A.  New applications of matters known in the trade are not secrets.

To begin, the three Potential Improvement Ideas are not trade secrets because they involve matters that are known in the medical device field.  Cornell.Br.28-29.

#### 1.  Plaintiffs proved only new applications of known concepts, which are not trade secrets.

Plaintiffs do not deny that the concept of using internal voids to soften silicone and the use of mesh tabs to facilitate tissue ingrowth (frequently in connection with absorbable sutures) are well-known in the medical implant field.  Cornell.Br.28-29. Elist admitted it.  Appx13194-13195. Tellingly, Plaintiffs respond to Defendants' argument regarding patent disclosures (at 28-32) but essentially ignore this barrier to their claims, which provides a simple basis for reversal.

Plaintiffs repeatedly suggest that these ideas had not been implemented in a "cosmetic penile implant" (at 28, 30, 32).  That is irrelevant.  "Simply being the first

or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1073 (7th Cir. 1992).

Plaintiffs do not even attempt to answer this challenge with evidence as to the internal pockets and absorbable sutures claims. By contrast, Plaintiffs claim (at 30) that Carson testified the mesh tabs concept was not generally known in this field (Appx14617-14618). But even if Elist was the first to suggest using mesh tabs in cosmetic penile implants, it does not prove "the possibility of using [mesh tabs] would not be obvious to someone entering the [cosmetic penile implant] business." *Computer Care*, 982 F.2d at 1073. Thus, Carson's testimony is insufficient.

Because the Potential Improvement Ideas are just "[s]elf-evident variations" of "matters of general knowledge in the trade," *Altavio, Inc v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 43 (Cal. App. 2014), they are not trade secrets.

## 2. Plaintiffs' expert testimony cannot overcome this legal rule.

Plaintiffs characterize trade secrecy as a factual issue for experts (at 27-28), but that argument fails.

First, as to internal pockets and absorbable sutures, Plaintiffs do not cite any expert testimony that these features are unknown in the field.

Second, although Plaintiffs cite expert testimony regarding mesh tabs (at 30), testimony contrary to "indisputable record facts…cannot support a jury's verdict."

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Plaintiffs' cases (at 27-28) do not contradict the rule that new applications of known concepts are not trade secrets, and no expert could abolish that legal rule. It was not implicated by *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292 (2002), or *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425 (2003). And even if there could be a factual dispute regarding "common knowledge" in some cases, *e.g.*, *Masimo Corp. v. True Wearables, Inc.*, No. 2021-2146, 2022 WL 205485, at *2 (Fed. Cir. Jan. 24, 2022), the fact that "not a lot of urologists...do cosmetic implants" (Appx14618) does not change the reality that using mesh tabs in this context is just a new application of known concepts. That rule is a legal barrier to this claim.

### 3. The history of the '413 patent defeats trade secrecy.

Plaintiffs argue that the '413 patent proves the internal pockets idea was novel (at 31), but that patent issued only because of its transitional gradient of hardness—a design that was *not* part of Elist's idea. Cornell.Br.32-33; Appx16172. Regardless, Elist said that he told Cornell the high-level idea of using voids to soften implants, Cornell.Br.14, not that he discussed specific features like those in the '413 patent. Thus, the '413 patent is no evidence that the general concept of using internal voids— the alleged trade secret—was unknown to the medical implant field.

**B.  Information disclosed in a patent is not a trade secret.**

Not only were the basic concepts disclosed by Elist well-known in the medical device field, but their application to penile implants was also disclosed in patents—defeating trade secret protection.  Cornell.Br.30-33.

### 1.  Internal voids/pockets.

As a matter of law, Subrini '477 discloses the use of internal voids ("cavities") in a penile implant, which "makes it possible to give [the implant] a hardness less than that which it would have if it were formed of a solid and homogeneous body."  Appx16600, at 4:3-9.  Plaintiffs can only muster a single paragraph in response to Subrini '477 (at 28-29).[1]

First, the distinction between a therapeutic implant and a cosmetic implant (Appx14636) and the fact that therapeutic implants do not need voids (Appx14646) are irrelevant.  The legally material fact is that Subrini '477 teaches the use of voids to soften silicone—the alleged trade secret.  That disclosure has nothing to do with "therapeutic" or "cosmetic" applications.

Likewise, the fact that Subrini '477 has never been embodied in a product (Appx14637) is immaterial.  Again, the legally material fact is the public disclosure of the alleged secret—not its commercial application.

---

[1]  Plaintiffs' citations regarding the Small-Carrion implant are irrelevant to Subrini '477.

Both arguments stem from a misunderstanding of the relationship between patent law and trade secret law. An idea disclosed in a patent belongs to the public and cannot be a trade secret, regardless of how it is used in commercial applications or whether it is embodied in a product. "[T]hat which is in the public domain cannot be removed therefrom by action of the States," including by state trade secret law. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). Placement of an idea into the "public domain," *id.* at 484, deprives the idea of trade secret protection— not its commercial application.

Thus, this Court routinely holds that information disclosed in a patent cannot constitute a trade secret. *Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011); *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009); *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004); *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 113 F.3d 1258 (Fed. Cir. 1997). This case is no different.

Plaintiffs contend this question is for the jury (at 28), but they are mistaken. Plaintiffs rely on *Atlantic Research*, but that case upheld a trade secret finding after the jury found the alleged trade secret was "'not present or disclosed in'" a patent. 659 F.3d at 1357. By contrast, Subrini '477 disclosed the internal voids/pockets idea, so it "cannot be a trade secret." *Id.*

Plaintiffs also cite *Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1342 (9th Cir. 1982), but it acknowledges that "[m]atters disclosed in a patent publication destroy any trade secret contained therein." In *Henry Hope*, patent drawings disclosed "only a general depiction" of the alleged trade secret, *id.*, but here, Subrini '477 "revealed the details" of the internal voids/pockets idea. *Id.* Therefore, this case is governed by the general rule.

Next, the fact that Defendant Nichols has never used internal pockets in a urological device (Appx14066-14068) has nothing do with the patent disclosures. This argument is a variation on the fallacy that an idea disclosed in a patent remains a trade secret unless it is embodied in a product, which is not the law.

Finally, *ipse dixit* statements of Plaintiffs' expert Drewry (Appx14557-14558) are no evidence of secrecy. He simply said the internal voids/pockets idea was not "provided in the prior art references." Appx14558. But he provided no explanation and did not discuss Subrini '477. "[C]onclusory expert testimony does not qualify as substantial evidence," *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019), so it is "insufficient to sustain a jury's verdict." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015). Conclusory statements that "conflict with the plain language of the written description" in a patent are afforded "no weight." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) (citation omitted).

This Court disregards expert testimony "based on an incorrect understanding of the claim construction," *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011), so it must also disregard expert testimony based on an incorrect understanding of a patent disclosure. Subrini '477 teaches the use of internal voids to soften silicone in a penile implant, and if Drewry's testimony suggested otherwise, it was an "'incorrect understanding of the claim[s].'" *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378 (Fed. Cir. 2017) (quoting *Cordis*).

## 2. Mesh tabs.

As a matter of law, Finney '530 and Elist's international patent application disclose mesh tabs at the distal end to promote tissue ingrowth.

Finney '530 teaches the use of "suturing strips on the inside wall of the sleeve" of a penile implant to "facilitate the suturing" of the implant. Appx16607. The strips should be made from Dacron—a kind of mesh. Appx14653.

Plaintiffs' expert admitted that Finney "discloses a silicone-based cosmetic penile implant with mesh tabs at the distal end that promote tissue ingrowth." Appx14654 ("There are tabs...at the distal end, yes, that promote tissue ingrowth."); Appx14994-14996 (agreeing that Finney discloses mesh tabs). That concession kills this claim.

Moreover, Elist's own international patent application discloses mesh tabs extending beyond the distal end of the implant—the very "secret" Elist alleges here. Appx16611. These "tabs" are "extensions of [a] silicon netting" that "are anchored using sutures." Appx16620. Elist admitted that this "netting" is "like mesh," Appx13219, and there is no other difference from the alleged secret. Appx13220. That concession is also decisive.

Replacing "mesh-like" netting with "mesh" is a self-evident variation—particularly in light of Finney's teachings about the use of mesh to anchor an implant. Indeed, Elist's application made that connection, incorporating Finney by reference. Appx16620. Plaintiffs introduced no evidence that it would be a "secret" to replace Elist's "mesh-like" tabs with Finney's "mesh," so Finney forecloses this claim.

Hoping to blunt these concessions, Plaintiffs offer three superficial responses (at 29-30).

First, the fact that Finney used mesh tabs all along the length of the implant, and not simply at the distal end, is insubstantial. Plaintiffs' experts testified about the different placement of the mesh (Appx14684; Appx14638; Appx14334-14336) but did not dispute that Finney discloses the use of mesh tabs in a penile implant or explain how their placement matters to the patent disclosures.

Plaintiffs cite Drewry's conclusory statement that "the information was not available in the prior art references," Appx14558, but that conclusory testimony fails for the reasons explained above. *Supra* 10-11.

Second, even if the placement made a difference, Plaintiffs do not dispute that Elist's international patent application incorporates Finney and discloses the use of tabs at the distal end of a cosmetic penile implant. They say the application discloses silicone tabs (Appx14338), which do not allow tissue ingrowth (Appx14639-14640). That misses the point. Finney '530 discloses the use of mesh tabs and Elist discloses the use of tabs at the distal end. Taken together, those patent disclosures placed the entire mesh tabs idea in the public domain.

Third, Plaintiffs argue that the use of mesh tabs was not known to urologists (Appx14617-14618). But even if urologists are unaware of them, patent disclosures in the public domain are not secrets. *Supra* 9. And Plaintiffs resort to the theme that mesh tabs are not currently used in commercial products (Appx14623-14624), which is immaterial. *Supra* 9-10.

### 3. Absorbable sutures.

The medical device industry is familiar with the use of absorbable sutures with mesh tabs. Plaintiffs' expert explained that "the purpose of those mesh tabs is to allow for…the attachment of absorbable sutures," Appx14517, which are preferred for penile implants. Appx14670-14672. This combination is no "secret."

Unsurprisingly, the idea is also disclosed in patents. Kim '821 teaches the implantation of a penile implant using absorbable sutures. Appx17080, at 3:31-32 ("The multiple slits implant is then applied…with an absorbable suture.").

Plaintiffs offer only one response (at 30-31): they note that Kim teaches the use of absorbable sutures only with tissue, not with mesh tabs or silicone implants (Appx17080). But the combination of absorbable sutures and mesh tabs is no secret. By design, mesh tabs allow the use of absorbable sutures, which Plaintiffs' expert admitted he has used in thousands of penile implants. Appx14670-14672; *see also* Appx14996-15000 (agreeing absorbable sutures are common in penile implants). Plaintiffs cite *no* testimony—even from their experts—in support of this claim.

## C.     The instrument list is not a trade secret.

Plaintiffs' assertion that the Penuma instrument list is a trade secret (at 32-33) is laughably thin. Cornell.Br.35-36. Claiming trade secret protection for a surgeon's instrument list is like a lawyer claiming trade secret protection for the organization of his case files; it fails the straight-face test. But it is unnecessary to dwell on that issue because Plaintiffs' arguments about "independent economic value" (at 34-35) cite *nothing* to prove the instrument list has independent economic value. Their brief focuses solely on the design concepts, implicitly conceding that there is no evidence of independent economic value for the instrument list.

## II. The Royalty Award Was Unreasonable.

The royalty calculation was unreasonable: nearly ten-fold IMD's total sales the year before. Appx15555.

For a startup with no product, sales, or funding to pay that exorbitant sum (without cash to do so), one might imagine the hypothetical license granted exclusive rights to a blockbuster product. Instead, it conferred only non-exclusive rights for ideas to improve a competitor's product.

So the *improvements* were blockbusters? Also no: the competitor sat on them for a decade, failed to commercialize them, and planned to destroy their "secrecy" very soon. And the "improvements" never even made it into the startup's product. For *that* license, IMD says the cashless startup would have paid *ten years* of IMD's total revenues—all up front. The position makes no sense.

Plaintiffs begin with a distraction, complaining about citations to a declaration by Defendants' expert, Hatch (at 41). Defendants may cite his sworn declaration because they filed it in opposition to IMD's motion for royalties. Appx9261-9263. It is inconsequential that the declaration was not moved into evidence at the hearing; it was before the court, and as shown below, none of Defendants' arguments require support from it. This sideshow cannot conceal the flaws in Plaintiffs' evidence and the clearly erroneous nature of the findings based on it.

## A. The royalty was not reasonably apportioned.

### 1. Royalty base

The district court clearly erred by using a royalty base of *all* expected profits rather than *additional profits from the secrets*.

IMD argues that the secrets were "coextensive" with Augmenta's product. IMD.Br.41-42. Not so; the secrets were not product designs but merely *features* for improving IMD's product. Appx13049-13050 ("improvements to [IMD's] device"); Appx13616-13617; Appx13051; Appx13144; Appx13087; Appx13128; Appx13135-13136. The secrets were therefore not "coextensive" with *any* implant, let alone Augmenta's.

IMD's arguments prove the point. IMD argues that "Defendants' FDA 510k submission relied on the substantial equivalence of Augmenta to Penuma." IMD.Br.41-42. But the Penuma did not include the alleged secrets. Appx15408; Appx15421-15422. Neither did the FDA 510k clearance. Appx15425-15429. Thus, the supposed "substantial equivalence of Augmenta to Penuma" confirms Augmenta was not "coextensive" with the secrets.

Arst *assumed* coextensiveness based on Elist's deposition testimony that Augmenta was "based on [IMD's] trade secrets." Appx7718-7719 ¶ 106; Appx15519-15520. Even if true, that testimony does not imply that Augmenta was "coextensive" with the secrets.

Then, at trial, Arst disclaimed any opinion that Augmenta included the secrets (Appx15520), and Elist admitted it did not. (Appx15425-15429); *see also* Appx9232-9233; Appx7476-7483.

Rather than evidence of coextensivity, IMD argues the secrets were "critical" to Augmenta's expected success. IMD.Br.42. But that is a very different argument, which IMD failed to make or prove.

"A necessary condition for using 'an entire multi-component product' as the base is that [one] proves the [protected] feature is the basis for customer demand." *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 957 (Fed. Cir. 2024). But IMD never tried to prove that premise. Arst's sole basis for using Augmenta's full profits was that the secrets were "coextensive" with Augmenta, not that they *drove demand*. *See* Appx7718-7719 ¶ 106; Appx15519. The district court never made that finding (Appx10457), and this Court should not do so in the first instance.

In any event, the record lacks sufficient evidence to support such a finding. As in *Provisur*, Arst "did not conduct any market studies or consumer surveys" or "explain why the[] 'conventional' features do not provide any value or drive customer demand." 119 F.4th at 957-58. Even if the challenged features were "unique selling points," that is no evidence they drove demand. *Id.*

### 2. Royalty rate

Arst apportioned the *rate* improperly because the PTS was not comparable and the OAM Transaction (i) was not apportioned to the secrets and (ii) did not imply the royalty rate assigned. Cornell.Br.40-49.

IMD argues Defendants "did not object to the admission of either agreement." IMD.Br.43. But the issue is whether the inferences Arst drew from the agreements (and the court adopted) are clearly erroneous; that challenge requires no objection. Fed. R. Civ. P. 52(a)(5). Regardless, Defendants preserved their challenge to the PTS's comparability by moving to exclude Arst's testimony on that ground. Appx1994-1995; Appx6391; Fed. R. Evid. 103(b).

### a. The PTS

The PTS was not comparable because it was never accepted, and it did not involve the same counterparty, rights, or type of rights. Cornell.Br.42-46.

IMD rejoins that "*proposed* licenses may have some value for determining a reasonable royalty in certain situations." IMD.Br.42. But it does not cite evidence for why this is one of those "certain situations," let alone what "value" the PTS has.

IMD argues the PTS "related to cosmetic penile implant products developed by Dr. Elist." IMD.Br.44 (quoting Appx7715). But simply "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

Two licenses are not "comparable" simply because both relate to "the same general computer field," *id*., and the PTS is not "comparable" simply because it "'related to cosmetic penile implant products developed by Dr. Elist.'" IMD.Br.44.

IMD mistakenly says that Arst "accounted for the similarities and differences" by admitting the PTS was more valuable. IMD.Br.43-44. That cursory observation cannot translate the price of the PTS to that of the hypothetical license, and Arst did not even try. Instead, he averaged the PTS rate with the OAM Transaction rate. CornellBr.41; Appx7732 ¶ 130; Appx1994; Appx15559. The observation that the PTS is more valuable is "a loose or vague comparability," which "does not suffice." *LaserDynamics*, 694 F.3d at 79.

### b. The OAM Transaction

Arst erred by failing to apportion the OAM Transaction to the secrets and mistranslating it to a 12.5%-13.5% rate. Cornell.Br.46-48.

First, IMD argues the OAM Transaction need not be apportioned because Arst opined that the Transaction "reflected" IMD's secrets. IMD.Br.45. But none of IMD's citations shows Arst opining that the OAM Transaction involved only the disputed secrets. IMD.Br.45. And the OAM Transaction undeniably involved more: it involved OAM's "preliminary designs, provisional patent applications, and any other intellectual property," while IMD's secrets included no "preliminary design" or "provisional patent applications." IMD.Br.45.

Hatch's trial testimony (not the contested declaration) proves that more rights were involved: Cornell owned 60% of OAM for having contributed IMD's secrets, and Mische owned 40% for having contributed his designs. Appx15568-15569; Appx15577. Consequently, when OAM exchanged its "preliminary designs, provisional patent applications, and any other intellectual property" for a 15% stake in Augmenta, no more than 60% of that 15% was attributable to IMD's secrets. Appx15568-15569; IMD.Br.45. Arst erred by equating the secrets *alone* with 15% of Augmenta. Cornell.Br.46-47.

Second, Arst also erred by using an unrealistic operating margin to convert that 15% to a 12.5%-13.5% royalty rate. Cornell.Br.47-48. IMD relies exclusively on the clear error standard of review, IMD.Br.46-47, which is not enough.

It is clear error to find facts based "on conclusory testimony from witnesses who also failed to identify any support for their positions." *Ring Plus, Inc. v. Cingular Wireless Corp.*, 614 F.3d 1354, 1360 (Fed. Cir. 2010). Hatch pointed out that the operating margin unrealistically placed Augmenta in "the top three or four companies [in] all the U.S." Appx15556-15559. Arst conceded that the margin was "significantly higher…than the industry benchmark" and never endorsed it. Appx7731. He adopted it because it appeared in Augmenta's fundraising literature, *not* because he found it realistic. Because Arst failed to support the margin with any independent analysis, adopting it was clear error.

### 3. Bargaining positions.

It was error to assume the hypothetical license was *necessary* for Augmenta to enter the market (Cornell.Br.48-50), and IMD cites no support for that assumption (IMD.Br.47-48). IMD argues the secrets were "key to distinguishing Augmenta" and Augmenta wanted to obtain and preserve its own IP. *Id.* But neither proposition suggests Augmenta needed IMD's secrets to enter the market.

## B. The license duration was unreasonable.

The district court erred by using a five-year royalty period even though IMD planned to (and did) destroy the secrets much earlier. Cornell.Br.50-51; Appx15418.

IMD responds that Defendants argued for the five-year period (IMD.Br.48). No, they urged a "market" approach that priced the secrets with no licensing period. Appx9238-9240; Appx15572-15578. And Defendants *separately* criticized Arst's 10-year period because it outlasted the destruction of the secrets. Appx9234-9236. That argument is consistent with Defendants' contention that the royalty period cannot outlast the secrets' destruction in 2020. Cornell.Br.50-51.

## C. The lump-sum conversion was unreasonable.

Finally, the district court erred by converting the running royalty to a lump sum using a 35% discount from a textbook. Cornell.Br.51-53; Appx15490-15493.

The argument is preserved because Defendants argued below that Arst failed to adequately account for "[t]he speculative nature of how [Augmenta's] projections were generated." Appx1987-1993; Appx9237-9238; Appx9301-9302. IMD admits

Arst's model "'account[ed] for [the] risk'" in those projections using the "discount." IMD.Br.49-50. Defendants' argument that Arst inadequately accounted for the risk is therefore an attack on Arst's "discount."

IMD is also wrong that Arst's characterization of Augmenta as "high-risk" justified using a textbook discount for "high risk" ventures. IMD.Br.52-53. Even if 35% reflects the risk in reasonable projections of high-risk ventures, that does not mean it reflects the risk in *these projections*, which were *orders of magnitude larger* than the total revenues of the only competitor. Appx15555-15556.

## III. The exemplary damages are legally unsustainable.

Defendants incorporate by reference Finger's reply arguments on exemplary damages. *See* Finger.Br.6-13 (Section II.A-B).

## IV. There is legally insufficient evidence of misappropriation for Nichols, HMT, Mische, Mische LLC, and Wang.

As for misappropriation, Plaintiffs argue that certain Defendants (1) knew or should have known about Cornell signing an NDA and (2) had some conversation with Cornell about the Penuma or worked on the Penuma. IMD.Br.36-37. Plaintiffs cannot paint with such a broad brush. Instead, they had to offer evidence that each Defendant *received a trade* secret, which they knew or should have known that *Cornell obtained by breaching his NDA*. Cal. Civ. Code § 3426.1(b)(1), (b)(2)(B) . Plaintiffs' evidence falls far short of that standard.

22

Plaintiffs cite Cornell's and Mische's discussion of the location of "longitudinal edges" on the Penuma, including in an email citing a publicly available document. Appx15885-15886; Appx13875-13877; Appx14187-14188. Plaintiffs do not explain how the location of "longitudinal edges" has any connection to the trade secrets. Mische did receive the instrument list, but Plaintiffs offer no evidence that Mische knew or should have known that Cornell obtained the instrument list *by breaching his NDA*. As for Nichols and HMT, Plaintiffs cite testimony about *Mische*, not Nichols or HMT (Appx14176) and then testimony that Cornell shared notes from the March 30 training session with HMT. Appx14189. But again, Plaintiffs cite no evidence that Nichols or HMT knew or should have know that those notes embodied trade secrets that Cornell obtained by breaching his NDA. And Plaintiffs cite no evidence of Wang receiving any of the trade secrets at all. IMD.Br.37. Those liability findings cannot stand.

## V.     The district court entered an arbitrary five-year injunction.

As for Plaintiffs' effort to defend their injunctive relief, they do not substantively engage with Defendants' challenges from their opening brief.

*First,* Plaintiffs urge that the district court imposed a five-year injunction because it was the term of Cornell's NDA. Br.62. True, and that is the problem. There is no evidence that the five-year term of the NDA accurately captures the duration of any commercial advantage Defendants may have obtained. The district court just

assumed so. The five-year term of the NDA is what Cornell and Elist agreed to; they could have agreed to one year or ten years. It is arbitrary relative to any commercial advantage bestowed by the trade secrets. Plaintiffs have no evidence that five years is the proper amount of time to enjoin Defendants "to eliminate commercial advantage that otherwise would be derived from the misappropriation." Cal. Civ. Code § 3426.2(a).

*Second*, the royalty damages are duplicative of the permanent injunction, as imposed by the district court. Plaintiffs say that these remedies are in the alternative: future use is conditioned upon the payment of the royalty damages. IMD.Br.63 (citing Appx10475, ¶ 6). Thus, according to Plaintiffs, Defendants can either (1) live with the Permanent Injunction *or* (2) pay royalty damages, lift the Permanent Injunction, and then use the trade secrets.

If that is Plaintiffs' position, then the Permanent Injunction must be modified because it does not say that. Paragraph 6 of the Permanent Injunction allows the lifting of the injunction only upon payment of "the damages ordered by this Court in the Order re Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages." Appx10475. The injunction's duration is tied to awards that are divorced from royalty damages, such as counterfeiting and exemplary damages. As entered by the district court, the Permanent Injunction *does* award Plaintiffs duplicative relief because Defendants

could pay royalty damages and still be subject to the Permanent Injunction because of wholly unrelated damages for a counterfeit mark.

Under Plaintiffs' argument, the Corrected Amended Final Judgment must be modified too. If future use is conditioned on payment of royalty damages (IMD.Br. 63), then royalty damages are an *alternative* remedy if Defendants want to use the trade secrets and lift the injunction. Royalty damages *are not owed outright*—only if Defendants want to lift the injunction. Defendants could choose not to pay the royalty damages and comply with the injunction. But that is not what the district court's orders say.

*Third*, the injunction precludes the use of ideas that go beyond the trade secrets Plaintiffs tried to prove at trial, specifically as to the internal pockets, the mesh tabs, and the absorbable sutures. Cornell.Br.57. Plaintiffs' only response is that this language tracks the jury charge. IMD.Br.64. The problem is that Plaintiffs offered no evidence to support the articulation of the trade secrets in their jury charge, language that made its way into the permanent injunction. *See supra* Section I. For example, there is no evidence that a mesh tab "*embedded in or around* the distal tip" is a trade secret;[2] Plaintiffs' *evidence* was that a mesh tab "*extending from* the distal

---

[2]    Defendants preserved a legal insufficiency argument for the four alleged trade secrets as described in the jury charge both in the Rule 50 motion and their renewed Rule 50 motion. Appx7328-7330; Appx10531-10534.

tip" was the trade secret (which it cannot be). Appx9177; Appx14336; Appx14517; Cornell.Br.57.

## VI. The district court erred in invalidating the patents and awarding counterfeiting damages.

As for the district court's invalidation of the '413 and '639 Patents, Plaintiffs' description of the patent-prosecution history proves Defendants correct. Plaintiffs' singular inventorship theory was that Elist contributed the idea of incorporating internal pockets to add softness and elasticity. IMD.Br.65. But Plaintiffs acknowledge that the concept of internal pockets was in the original patent application, which was initially rejected. The novel limitation that overcame the examiner's rejection was "internal pockets *configured such that a measured property of hardness differs from the proximal end of the implant to the distal end of the implant.*" Appx16172 (emphasis added); Appx16151. The *configuration* of the internal pockets was the novelty—not internal pockets alone. Plaintiffs never alleged—let alone proved—that *configuration* of internal pockets to create gradient elasticity was Elist's trade secret.

On counterfeiting, Cornell preserved his legal insufficiency challenge in the Rule 50 motions. He argued that Plaintiffs had legally insufficient evidence that the "Penuma mark was registered on the Principal Register for use on the same goods to which Defendants applied the mark." Appx7336-3737; Appx10550. Plaintiffs lack any evidence that Cornell offered for sale the *goods* for which the Penuma mark was

registered—penile implants—as opposed to offering penile enhancement surgery *services* referred to as Penuma. This argument was preserved. *See Gonzalez-Bermudez v. Abbott Laboratories P.R. Inc.*, 990 F.3d 37, 45-46 (1st Cir. 2021); *Perez v. El Tequila, LLC*, 847 F.3d 127, 156 (10th Cir. 2017). As for the merits, Cornell stands on his opening briefing.

## Conclusion

For the foregoing reasons, this Court should reverse and render judgment against Plaintiffs based on the foregoing errors or otherwise remand for further proceedings.

October 1, 2025

Respectfully submitted,

*/s/ Kelsi Stayart White*
Kelsi Stayart White
Jason McManis
Weining Bai

**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101

*Counsel for Appellants Robert Cornell, Augmenta, LLC, Cornell Cosmetic Urology LLC, David Louis Nichols, Huck Medical Technologies INC., Hans Mische, Hans Mische LLC, Run Wang, and Robert J. Cornell, M.D., P.A.*

**Certificate of Service**

I hereby certify that on October 1, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system for filing and served the foregoing document on all counsel of record via the ECF system.

/s/ Kelsi Stayart White
Kelsi Stayart White

**Certificate of Compliance with Type-Volume Limitations**

This brief complies with the type-volume limits of FED. R. APP. P. 32(a) (7) because this brief consists of 6,660 words as determined by Microsoft Word Office 365, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This word count incorporates the sections of Finger's Brief that are adopted by reference (1,732 words).

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Times New Roman font.

*/s/ Kelsi Stayart White*
Kelsi Stayart White
