KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
Tel: +1 202 737 0500
www.kslaw.com

Jonathan Weinberg
Direct Dial: +1 202 626 5583
jweinberg@kslaw.com

October 28, 2025

**VIA CM/ECF**

Jarrett B. Perlow, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Federal Circuit
717 Madison Place NW
Washington, DC 20439

**Re: *International Medical Devices, Inc. v. Cornell*, No. 25-1580**
**Citation of Supplemental Authority, under Rule 28(j)**

Dear Mr. Perlow,

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellants advise the Court of *Rex Medical, L.P. v. Intuitive Surgical, Inc.*, Nos. 2024-1072, -1125, 2025 WL 2799030 (Fed. Cir. Oct. 2, 2025), which is pertinent precedential authority published after Appellants filed their briefs.

*Rex* supports Appellants' arguments (Cornell Br. 40-48 & Cornell Reply 18-20) that the district court erred by choosing a royalty rate based on transactions that were neither comparable nor apportioned to the value of the asserted trade secrets.

In *Rex*, the damages expert had chosen a royalty based on a broader license that included more than the asserted IP. But the expert "failed to adequately address the extent to which the [asserted IP] … contributed to the [price of that broader] license." 2025 WL 2799030, at *5. The Court held that this expert testimony was unreliable because "it fails to allocate license fees among the licensed [IP] covered by [a broader] agreement." *Id.* at *4 (quotation marks omitted). And because the

remaining record evidence was insufficient for inferring a reasonable royalty, the Court affirmed JMOL of no damages. *Id.* at *6-8.

*Rex* supports Appellants' arguments against the royalty rate applied in this case. Cornell Br. 40-48; Cornell Reply 18-20. As Appellants have explained, IMD's expert (Arst) calculated a royalty based on two transactions (the PTS and OAM), but neither was comparable and apportioned: (1) the PTS was not comparable because "there was no technology overlap between the PTS and the hypothetical license," and (2) "the OAM transaction involved more IP rights than did the hypothetical license, and Arst failed to apportion." Cornell Br. 41-43, 46-47. Thus, for *neither* license did Arst "adequately address the extent to which the [asserted IP] … contributed to the [reference] license." 2025 WL 2799030, at *5.

Under *Rex* then, Arst's royalty calculation (the sole basis for the court's award) is unreliable and should have been ignored. Because the district court's royalty calculation was based on that unreliable and patently insufficient expert testimony, discarding it would require vacatur of the royalty award and (at most) a remand for a recalculated royalty.

Respectfully submitted,

*/s/Kelsi Stayart White**
Kelsi Stayart White
AHMAD, ZAVITSANOS &
MENSING, PLLC
1221 McKinney, Suite 2500
Houston, TX 77010
(713) 655-1101
kwhite@azalaw.com

*Counsel for Appellants Robert Cornell, Augmenta, LLC, Cornell Cosmetic Urology LLC, David Louis Nichols, Huck Medical Technologies INC., Hans Mische, Hans Mische LLC, Run Wang, and Robert J. Cornell, M.D., P.A.*

*/s/Jonathan Weinberg*
Jonathan Weinberg
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
jweinberg@kslaw.com

*/s/Russell S. Post**
Russell S. Post
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700

*Counsel for Appellant Richard B. Finger*

CC: All counsel of record (via CM/ECF)

* Signed with consent of counsel for Appellants.

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the length limitations set forth in Fed. R. App. P. 28(j) because it contains 347 words, as counted by Microsoft Word, excluding the items that may be excluded.

*/s/Jonathan Weinberg*
Jonathan Weinberg

*Counsel for Appellant*
*Richard B. Finger*

# Exhibit A

2025 WL 2799030
Only the Westlaw citation is currently available.
United States Court of Appeals, Federal Circuit.

REX MEDICAL, L.P., Plaintiff-Appellant
v.
INTUITIVE SURGICAL, INC., Intuitive Surgical Operations, Inc., Intuitive Surgical Holdings, LLC, Defendants-Cross-Appellants

2024-1072, 2024-1125
|
Decided: October 2, 2025

**Synopsis**

**Background:** Owner of patents related to systems for stapling tissue during surgery sued competitor for infringement. Before trial, the district court precluded owner's damages expert from testifying about a specific license agreement for failure to apportion. After jury found asserted claims valid and infringed, the United States District Court for the District of Delaware, Maryellen Noreika, J., found that owner failed to prove its damages and thus reduced jury's award from $10 million to nominal damages of $1. Owner appealed exclusion of its damages expert's testimony and competitor cross-appealed with respect to validity and infringement.

**Holdings:** The Court of Appeals, Stoll, Circuit Judge, held that:

district court did not abuse its discretion in excluding owner's damages expert's testimony;

district court properly granted judgment as a matter of law (JMOL) of no damages;

district court did not abuse its discretion in denying owner's request for a new damages trial;

district court properly construed limitations at issue;

substantial evidence supported finding that accused products met "configured to cause" claim limitation; and

competitor failed to prove that asserted patent was invalid for lack of written description.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict; Motion to Exclude Expert Report or Testimony; Motion for New Trial.

Appeals from the United States District Court for the District of Delaware in No. 1:19-cv-00005-MN, Judge Maryellen Noreika.

**Attorneys and Law Firms**

Erik Milch, Proskauer Rose LLP, Washington, DC, argued for plaintiff-appellant Rex Medical, L.P. Also argued by John E. Roberts, Boston, MA. Also represented by Joseph Drayton, Baldassare Vinti, New York, NY; Lucas Kowalczyk, Chicago, IL; Elizabeth Shrieves, Washington, DC.

Melanie L. Bostwick, Orrick, Herrington & Sutcliffe LLP, Washington, DC, argued for defendants-cross-appellants. Also represented by Samantha Michelle Leff, E. Joshua Rosenkranz, New York, NY; Lauren Weber, Seattle, WA; Claire A. Fundakowski, Winston & Strawn LLP, Washington, DC; George C. Lombardi, Chicago, IL; Michael Rueckheim, Redwood City, CA.

Before Dyk, Prost, and Stoll, Circuit Judges.

**Opinion**

Stoll, Circuit Judge.

***1** Rex Medical, L.P. ("Rex") sued Intuitive Surgical, Inc., Intuitive Surgical Operations, Inc., and Intuitive Surgical Holdings, LLC (collectively, "Intuitive") in the U.S. District Court for the District of Delaware for patent infringement. Days before a jury trial began, the district court precluded Rex's damages expert from testifying about a specific license agreement for failure to apportion. At trial, neither party's damages expert testified. The jury found that Intuitive infringed claim 6 of U.S. Patent No. 9,439,650, which it found was not invalid, and awarded Rex $10 million. After trial and post-trial motions, the district court entered a final judgment that: (1) Intuitive directly infringed claim 6 of the '650 patent; (2) claim 6 of the '650 patent is not invalid for lack of written description; and (3) awarded nominal damages in the amount of $1 for Intuitive's infringement.

Rex appeals the district court's (1) exclusion of its damages expert's testimony and methods relying on the

aforementioned license, and (2) reduction of the jury's damages award from $10 million to $1 nominal damages. Intuitive cross-appeals with respect to infringement and invalidity. For the following reasons, we affirm.

BACKGROUND

I

Rex and Intuitive make and sell medical technology. More specifically, and relevant here, Intuitive develops and sells surgical stapling products. In January 2019, Rex sued Intuitive for infringing two related patents: U.S. Patent Nos. 9,439,650 and 10,136,892, which share a specification and claim priority from the same 2001 provisional application. The inventions of the ’650 and ’892 patents are directed to systems for stapling tissue during surgery. Intuitive's accused products include “the SureForm 60 stapler, the SureForm 45 stapler, the SureForm 45 Curved-Tip stapler, and the associated reloads.” *Rex Med., L.P. v. Intuitive Surgical, Inc.*, No. 19-005, 2023 WL 6142254, at *1 (D. Del. Sept. 20, 2023) (“*JMOL Op.*”).

After Intuitive filed a petition for inter partes review (IPR) challenging claims of the ’892 patent, Rex withdrew that patent from this case. Rex and Intuitive stipulated to dismissal of the ’892 patent infringement claims with prejudice, and the Patent Trial and Appeal Board granted the parties’ joint request to terminate the agency proceeding before reaching an institution decision. Accordingly, “the only issue left for trial was direct infringement of the ’650 patent.” *JMOL Op.* at *1.

Only claim 6 of the ’650 patent is relevant on appeal. Claim 6 depends from dependent claim 5, which depends from independent claim 4.[1] These three claims are reproduced below.

> 4. An apparatus for stapling tissue, comprising:
>
> a first jaw and a second jaw, at least one of the first jaw and the second jaw being movable with respect to the other of the first jaw and the second jaw from a first configuration in which the first jaw and the second jaw are separated from each other at a first distance to receive tissue and a second configuration in which the first jaw and the second jaw are clamped together at a second distance to hold tissue therebetween for stapling,
>
> ***2** a staple carrying portion of the first jaw defining slots through which staples are configured to pass;
>
> an anvil surface defined on the second jaw opposing the first jaw;
>
> at least one of a gear and a cable operatively coupled to at least one of the first jaw and the second jaw and configured to move at least one of the first jaw and the second jaw from the first configuration to the second configuration such that the first jaw and the second jaw are in alignment; and
>
> a staple pusher configured to cause a staple to move from a first position at least partially within the staple carrying portion to a second position entirely outside the staple carrying portion, the second distance and the alignment being maintained by a beam configured to engage the first and second jaws from within the first and second jaws while tissue is stapled from a proximal location to a distal location.
>
> 5. The apparatus of claim 4, wherein the beam is configured to engage the first and second jaws one of entirely or substantially from therewithin to maintain the second distance and the alignment.
>
> 6. The apparatus of claim 5, wherein the beam comprises an upper portion and a *lower portion* and a web coupled between the upper portion and the *lower portion*, at least one of the *lower portion* or the upper portion *configured to cause* the staple pusher to move a staple as the beam moves from a proximal location to a distal location, the upper portion and the *lower portion* configured to cooperatively engage the first jaw and the second jaw to align the slots with a staple forming portion on the anvil surface.

U.S. Patent No. 9,439,650 col. 8 ll. 4–46 (emphases added to distinguish claim terms in dispute).

Figure 15 of the ’650 patent—which depicts several elements recited above, such as the web, lower portion, and staple pusher—is reproduced below.




'650 patent Fig. 15. As described in the specification, "the I-beam member 70 includes upper and lower beam portions 82a, 82b, respectively, connected by a central web portion 84." *Id.* at col. 5 ll. 45–47. "When the I-beam member 70 is driven by the pusher 80, the sloped leading edge of the upper beam portion 82a contacts sequentially each of a plurality of staple pushers 118 to drive them through their respective staple slots to drive the staples housed therein ...." *Id.* at col. 6 ll. 26–31.

Two claim 6 limitations construed by the district court are pertinent here. The district court construed "at least one of the lower portion or the upper portion configured to cause the staple pusher to move a staple" to mean "at least one of the lower portion or the upper portion is designed, constructed or set up to cause the staple pusher to move a staple." *Rex Med., L.P. v. Intuitive Surgical, Inc.*, No. 19-005, 2020 WL 2128795, at *1, 5 (D. Del. May 5, 2020) ("*Claim Construction Order*"). The district court later construed "lower portion" to "have its plain and ordinary meaning, which may include additional material or structures that extend in a perpendicular direction beyond the lowermost section of the beam." J.A. 11057. The district judge explained that "whether the material of the Accused Products extends so far as to no longer be part of the 'lower portion' " was "an issue of fact for the jury." J.A. 115 ll. 3–6.

## II

***3** Rex's damages expert Douglas Kidder opined in his expert report that a hypothetical negotiation between Rex and Intuitive for a license to the '650 patent would have resulted in a lump sum payment of $20 million. Mr. Kidder stated that "the most comparable agreement to the hypothetical license in this case is a settlement agreement between Rex Medical and Covidien in which Covidien agreed to pay $10 million."[2] J.A. 3850 ¶ 59.

The Covidien license stems from prior litigation between Rex and Covidien, which is not a party to this litigation. In 2019, Rex separately sued Covidien, asserting infringement of the '650 and '892 patents. Before settlement negotiations, Rex dropped the '650 patent from its case against Covidien. Rex and Covidien then settled early in the litigation and entered into a $10 million license agreement that covers Rex's portfolio of surgical stapling patents, i.e., the '650 and '892 patents "along with eight other U.S. patents, seven U.S. patent applications and nineteen patents or applications from countries outside the United States." J.A. 4 ¶ 9.

Days before trial in this case, the district court partially granted Intuitive's "Motion to Preclude Certain Expert Testimony of Douglas Kidder." *Id.* (citation omitted). The district judge explained that "Mr. Kidder ... failed to adequately address the extent to which [the] '892 and the other patents contributed to the lump sum payment in the Covidien license" and thus held that "Mr. Kidder's methods in relying on the Covidien license are unreliable and must be excluded." J.A. 6 ¶ 11.

Neither party's damages expert testified at trial. Instead, Rex's president Lindsay Carter, who helped negotiate the license between Rex and Covidien, testified at trial. The jury found that Intuitive directly infringed claim 6 of the '650 patent, and that claim 6 was not invalid for lack of written description, and awarded Rex $10 million in damages.

After trial, Intuitive filed a renewed motion for judgment as a matter of law (JMOL) on infringement, invalidity, and damages, or, alternatively, "for a new trial and/or remittitur." *JMOL Op.* at *1. Three aspects of the district court's JMOL ruling are relevant on appeal. First, the district court held that substantial evidence supports the jury's finding that Intuitive infringed claim 6 of the '650 patent and thus denied Intuitive's motion for JMOL on infringement. *Id.* at *2–5. Second, the district court held that the jury had a sufficient basis for finding that Intuitive failed to prove by clear and convincing evidence that claim 6 of the '650 patent is invalid for lack of written description and thus denied Intuitive's motion for JMOL on invalidity. *Id.* at *5–7. Third, the district court agreed with Intuitive that Rex failed to prove its damages and thus reduced the damages award to nominal damages of $1 and denied a new damages trial. *Id.* at *7–12.

On appeal, Rex challenges the district court's (1) exclusion of its damages expert's testimony and methods relying on the Covidien license, and (2) reduction of the jury's damages

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

award from $10 million to nominal damages of $1. Intuitive cross-appeals with respect to infringement and invalidity. Our court has jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

***4** We begin by addressing the issues Rex raises in its appeal (related to damages). After that, we turn to those raised by Intuitive in its cross-appeal (infringement and invalidity for lack of written description).

I

A

We start with the district court's pretrial exclusion of Mr. Kidder's methods in relying on the Covidien license. "We review a district court's decision concerning the methodology for calculating damages for an abuse of discretion." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022). The Supreme Court has explained "that the trial judge plays a 'gatekeeping role,' " "through which it must 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied." *Apple*, 25 F.4th at 971.

Mr. Kidder used the hypothetical negotiation approach for calculating reasonable royalty damages under 35 U.S.C. § 284. "This approach attempts to calculate the royalty rate the parties would have agreed upon had they negotiated an agreement prior to the start of the infringement. In determining a reasonable royalty, 'parties frequently rely on comparable license agreements.' " *Apple*, 25 F.4th at 971 (quoting *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372 (Fed. Cir. 2020)). "When relying on comparable licenses to prove a reasonable royalty, we require a party to 'account for differences in the technologies and economic circumstances of the contracting parties.' " *Id.* (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)). Patent licenses often license whole patent portfolios and "expert testimony should be excluded when it fails to allocate license fees among the licensed patents covered by an agreement." *Jiaxing Super Lighting Elec. Appliance, Co. v. CH Lighting Tech. Co.*, 146 F.4th 1098, 1112 (Fed. Cir. 2025).

*Apple* is instructive here. In *Apple*, Wi-LAN's damages expert David Kennedy relied on three comparable license agreements (Vertu, Doro, and Unnecto) to estimate a reasonable royalty as damages for infringement of U.S. Patent Nos. 8,457,145 and 8,537,757. 25 F.4th at 971–72. While each comparable license agreement licensed additional patents, Mr. Kennedy opined "that the '145 and '757 patents were key patents in the three licenses for three reasons[.]" *Id.* at 972. His reasons included: (1) the '145 and '757 patents were listed in the comparable licenses; (2) they were discussed in negotiations with Apple; and (3) Apple continued to use the patented technology after a finding of infringement. *Id.* at 972–73. "To separate the value of the key patents from the rest of the licensed portfolio, he reduced the royalty rate by 25 percent. He selected this rate based on [other] testimony that, in practice, the rest of a portfolio was licensed for a 5 to 35 percent markup." *Id.* at 973 (citations omitted). We held that "Mr. Kennedy's opinion that the asserted patents were key patents [wa]s untethered to the facts of th[e] case." *Id.*

***5** We explained that none of the three licenses listed the '757 patent among the "Asserted Patents." *Id.* And neither Doro nor Unnecto listed the '145 patent as one of the "Asserted Patents." *Id.* Vertu, on the other hand, did list the '145 patent as one of the "Asserted Patents," but it also listed "five other 'Asserted Patents.' " *Id.* "Mr. Kennedy failed to address the extent to which these other patents contributed to the royalty rate in the Vertu license," and "[y]et he opined that excluding these patents (and the rest of Wi-LAN's portfolio) from the hypothetical negotiation would have netted Apple only a 25 percent discount." *Id.* We explained that "Mr. Kennedy's silence on these equally situated patents [wa]s troubling and ma[de] his opinion unreliable." *Id.* at 973–74. We thus concluded that "Mr. Kennedy's damages testimony should have been excluded" and that "the district court abused its discretion in denying Apple's motion for a new trial on damages." *Id.* at 974.

Here, the district court, citing to *Apple*, 25 F.4th 960, concluded that Mr. Kidder failed to adequately address the extent to which the '892 and other patents contributed to the Covidien license lump sum payment. JA 4–6. For the following reasons, we discern no abuse of discretion in the district court's decision.

As the district judge explained, Mr. Kidder's entire discussion of apportionment in his expert report reads:

> Most of the value to a license to Rex Medical's patent portfolio to Covidien and/or Intuitive is contained in a license to *either* the ’892 Patent *or* the ’650 Patent. The fact that Rex Medical has only asserted the ’892 Patent and the ’650 Patent against Covidien and Intuitive indicates that these two patents have the most value to these two companies. Additionally, ... the ’892 Patent and the ’650 Patent describe *different design choices* but the same stapling innovation. The Rex Medical patent portfolio thus appears to follow the extreme skew in values for most patent portfolios – most, if not all, of the value is contained in the most valuable patent or patents. Thus, the additional value obtained by Covidien for rights to patents other than the ’650 and ’892 Patents likely accounted for little-to-no value to Covidien.

J.A. 5 ¶ 11 (emphases added) (citation omitted). Mr. Kidder's opinion that nearly all the value of the Covidien license derives from either the ’892 patent or the ’650 patent is untethered to the facts of this case. The district court correctly recognized that Mr. Kidder did not allocate the Covidien lump sum payment "at all between the ’650 and ’892 patent[s]." J.A. 5–6 ¶ 11 (alteration in original) (citation omitted). Nor did he allocate any value to the other patents and patent applications. For example, as the district court correctly recognized, Mr. Kidder never "analyze[d] whether any of Rex Medical's licensed foreign patents cover the same stapling innovation as the ’650 or ’892 patents" or "whether any of Rex Medical's licensed foreign patents cover any of Covidien's products." J.A. 5–6 ¶ 11 (alterations in original) (citations omitted). That the ’650 and ’892 patents were the only ones asserted against Covidien and Intuitive proves little to nothing about the relative value of foreign patents, which cannot be asserted in the U.S. Mr. Kidder's reliance on general observations about other unrelated patent portfolios is equally unreliable and untethered to the facts of this case.

As was true for Mr. Kennedy's erroneous methodology in *Apple*, here, Mr. Kidder "failed to address the extent to which [the ’892 and] other patents contributed to the royalty rate in the [Covidien] license." 25 F.4th at 973. Mr. Kidder merely opined that most of the value in a license to Rex's patent portfolio "is contained in a license to *either* the ’892 Patent *or* the ’650 Patent." J.A. 3853 ¶ 69 (emphasis added). Because Mr. Kidder's opinion "fail[ed] to allocate license fees among the licensed patents covered by [the Covidien] agreement," we hold that the district court did not err in excluding his expert testimony. *Jiaxing*, 146 F.4th at 1112.

B

***6** We now turn to the district court's reduction of the jury's damages award from $10 million to nominal damages of $1 and its denial of Rex's request for a new damages trial. Pertinent on appeal, Rex "interpret[s] what the district judge did as effectively awarding zero damages." Oral Arg. at 4:05–4:12, https://www.cafc.uscourts.gov/oral-arguments/24-1072_09022025.mp3. At oral argument, Rex explained that there "was a JMOL motion on no damages and that's what [the district judge] granted." *Id.* at 4:18–4:30. Accordingly, although the district court said it was "remit[ting] the damages award to nominal damages of $1," we, like Rex, view the district court's decision here as a grant of JMOL of no damages, not a remittitur.[3] *JMOL Op.* at *7; *see id.* at *11–12 (denying motion for new trial); *Rex Med., L.P. v. Intuitive Surgical, Inc.*, No. 19-005, 2023 WL 7398355, at *1 (D. Del. Sept. 20, 2023) (final judgment); *see also Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1378 (Fed. Cir. 2017) ("We sit to review judgments, not opinions." (citation omitted)).

"We review a district court's rulings on post-trial motions for JMOL and a new trial under regional circuit law." *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 659 (Fed. Cir. 2017) (citation omitted). The Third Circuit reviews decisions on a motion for JMOL de novo and decisions on a motion for a new trial for abuse of discretion. *Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, 127 F.4th 348, 353, 362 (Fed. Cir. 2025) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166–67 (3d Cir. 1993)). "JMOL is proper when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Promega*, 875 F.3d at 659 (citing Fed. R. Civ. P. 50(a)).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Rex asserts that "a license to the '650 patent has *some* value" and argues that the district court erred in granting JMOL "because the evidence doesn't compel the conclusion that zero is the only reasonable royalty." Oral Arg. at 33:06–33:52 (emphasis added). We are not persuaded given the evidentiary record at trial. For the reasons that follow, we hold that the jury received insufficient evidence from which it could apportion the lump sum payment in the Covidien license or otherwise reasonably infer a reasonable royalty award for infringement of the '650 patent alone.

The amount of damages "is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence. The amount is normally provable by the facts in evidence or as a factual inference from the evidence." *Promega*, 875 F.3d at 660 (cleaned up) (citations omitted). We have not held "that a jury may only arrive at a royalty specifically articulated by the parties during trial," but "[r]ather, a jury's choice simply must be within the range encompassed by the record as a whole." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("[T]he jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate.").

But the patent damages statute, 35 U.S.C. § 284, "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020). Damages "must not be left to conjecture by the jury. They must be proved, and not guessed at." *Promega*, 875 F.3d at 660 (citation omitted). Section 284 "requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute." *Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981) (affirming an award of zero damages for lack of evidence). "[T]here must at the least be enough evidence in the record to allow the factfinder to formulate a royalty." *Id.*

***7** At trial, Rex primarily relied on the Covidien license and lay witness Mr. Carter's testimony to prove damages. But the Covidien license "covers the '650 patent and '892 patent along with eight other U.S. patents, seven U.S. patent applications and nineteen patents or applications from countries outside the United States." J.A. 4 ¶ 9. As we just explained, the district court reasonably excluded Mr. Kidder's methods in relying on the Covidien license because he failed to apportion the value of the '650 patent from the value of the other licensed patents. At trial, Rex presented no evidence that would allow the jury to overcome the deficiencies in Mr. Kidder's excluded expert opinion—i.e., to apportion the $10 million lump sum payment in the Covidien license.

Mr. Carter testified that, although Rex licensed its patent family in the Covidien agreement, the focus was on the '650 and 892 patents. But, significant here, Rex did not present any testimony from Mr. Carter (or anyone else) discussing the relationship or differences between the '650 and '892 patents. This is important because, here, Rex asserted only the '650 patent at trial. *JMOL Op.* at *1. Conversely, in its suit against Covidien, Rex had dropped the '650 patent before settlement negotiations, "leaving only the '892 patent at issue." *Id.* at *7. So, as Intuitive points out, "[i]f an asserted patent has the 'most value,' then the '892 patent, not the '650 patent, would have been most valuable to Covidien." Cross-Appellants' Br. 74. And Rex did not present testimony regarding the value of the unexpired patents in the Covidien license, including whether they concerned the same subject matter as the '650 patent. While Mr. Carter testified that he had been told that "[a]ll foreign patents [in the Covidien license had] expired or lapsed ... four years before [the Covidien license] was signed" and that "the majority of the U.S. patents were also expired," J.A. 11457 l. 22–J.A. 11458 l. 13, he was unable to support this testimony on cross-examination, he admitted he had no personal knowledge or ability to confirm that any patents had expired, and the district court held that his testimony about what he had been told was hearsay. [4]

Mr. Carter testified that the "factors" that Rex considered in licensing to Covidien were: (1) Covidien settled "very early in the litigation process," (2) Covidien was "very cooperative," (3) Covidien "wanted special language in the license," (4) Covidien did not challenge Rex's patents in the U.S. Patent and Trademark Office, and (5) Covidien "saw real value in licensing the '650 and the '892 Patents." J.A. 11449 l. 16–J.A. 11450 l. 6. But the jury heard no testimony on how to consider these five "factors" to apportion the value of the '650 patent—or whether all, some, or none were applicable. Moreover, Mr. Carter also testified that (1) there may be a royalty rate range for licensing the '650 patent, but he was not sure of an established royalty rate; (2) he did not know what Intuitive would conclude is a reasonable royalty or what Intuitive hypothetically would have paid for a license to the '650 patent; (3) he was not sure whether the Covidien license was relevant to damages; (4) Covidien did not agree to the $10

million figure based on the amount of its product sales, rather, Covidien and Rex just came to a negotiated agreement; and (5) he could not actually assign any value to the ’650 patent. JA 11452 l. 20–JA 11453 l. 3; JA 11454 ll. 14–21; JA 11455 ll. 4–6; JA 11478 l. 23–J.A. 11479 l. 1.

***8** Damages theories “relying on [comparable prior] licenses must account for ... distinguishing facts [(such as covering more patents than are at issue in the action and covering foreign intellectual property rights)] when invoking them to value the patented invention.” *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Rex did not meet this requirement. The record does not provide evidence from which the jury could find or infer a damages number for a license to the ’650 patent between ~$1 and $10 million. Nor does there appear to be any other record evidence that would allow reasonable apportionment. The jury would have to speculate as to how much of the $10 million would be allocated to the ’650 patent. But damages may “not be determined by mere speculation or guess.” *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996) (citation omitted).

For completeness, we address the other evidence in the record mentioned by Rex. *See SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (“[T]he determination of a reasonable royalty must be based upon the entirety of the evidence and the [fact-finder] is free to, indeed, must reject the royalty figures proffered by the litigants ... where the record as a whole leads the [fact-finder] to a different figure.”). But the other evidence in the record does not solve Rex's proof-of-damages problem. Although the record contains evidence about Intuitive's market opportunity and sales, these very large numbers were never broken down or explained and do not help the jury apportion the Covidien license amount or infer an appropriate damages number. Intuitive's former stapling product manager testified that bariatric procedures presented a $300 million opportunity for SureForm 60 and SureForm 45, that thoracic procedures presented a $250 million opportunity, and that colorectal procedures presented a $200 million opportunity. The parties also stipulated that, from August 2018 to January 2022, Intuitive had sales of $607,708,024 of the accused SureForm products. But the jury was given no way to use these large numbers to assign value to a license to the ’650 patent. Moreover, Mr. Carter testified that the Covidien $10 million figure was *not* based on the amount of Covidien's product sales. And, although the Boston Scientific license is part of the evidentiary record, Rex concedes that its expert did not form an opinion about a reasonable royalty based on that license.

The outcome here is fact-specific. Had Rex (or Intuitive) put forth other evidence from which a jury could reasonably determine damages for infringement of the ’650 patent without speculation, JMOL of no damages would be inappropriate and a new trial might be appropriate. But the parties did not, and it was Rex's burden to do so. Because, on this record, awarding damages between ~$1 and $10 million for a license to the ’650 patent would require improper guesswork, we affirm the JMOL of no damages.

We also discern no abuse of discretion in the district court's denial of Rex's request for a new damages trial. As the district court reasonably explained, Rex “had the opportunity to conduct discovery and to call other witnesses, such as its damages expert, [and] to offer other evidence potentially relevant to damages. Instead, [Rex] chose to hinge its damages theory on the very license that the [district court] had already precluded its expert from testifying about.” *JMOL Op.* at *11 n.11 (citation omitted).

## II

### A

Next, we address the issues raised in Intuitive's cross-appeal. We begin with infringement.

The first step of an infringement analysis is claim construction. *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1343 (Fed. Cir. 2014). Intuitive argues that “under the correct construction of ‘lower portion,’ it is undisputed that Intuitive does not infringe” claim 6. Cross-Appellants' Br. 42 (capitalization normalized). “We review a district court's claim construction de novo where, as here, it is decided only on the intrinsic evidence.” *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315 (Fed. Cir. 2023) (citation omitted).

***9** The district court construed “lower portion” in claim 6 of the ’650 patent to “have its plain and ordinary meaning, which may include additional material or structures that extend in a perpendicular direction beyond the lowermost section of the beam.” J.A. 11057. Intuitive argues that the district court erred in construing the “lower portion” of the beam to include additional structures that extend above the lowest horizontal section of the beam. According to Intuitive, claim 6's reference to the “lower portion” of the beam “must mean the lower bar of the ‘I’ shape,” i.e., “only the lowest

horizontal portion of the 'I' shape." Cross-Appellants' Br. 43–44. Intuitive thus contends that the district court erroneously "allowed the 'lower portion' to include material that is part of the vertical section running between the two horizontal bars of the 'I' shape." *Cross-Appellants' Br.* 48.

The district court explained that it saw "nothing in the intrinsic evidence to require narrowing the construction as [Intuitive] suggest[s]." J.A. 114 ll. 23–24. We agree.

"We begin [our analysis], as we must, with the claim language itself. The words of a claim are generally given their ordinary meaning, which is 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.' " *Salazar*, 64 F.4th at 1315 (citations omitted). Claim 6 recites that

> the beam comprises an upper portion and a *lower portion* and a web coupled between the upper portion and the *lower portion*, at least one of the *lower portion* or the upper portion configured to cause the staple pusher to move a staple as the beam moves from a proximal location to a distal location, the upper portion and the *lower portion* configured to cooperatively engage the first jaw and the second jaw ....

'650 patent col. 8 ll. 38–45 (emphases added).

Claim 6 thus provides that the lower portion is part of the beam—but not specifically or necessarily an I-beam. *Compare* '650 patent col. 8 l. 38 (claim 6 reciting a "beam"), *with id.* at col. 8 l. 1 (claim 3 specifying "I-beam"). And the language of claim 6 does not provide the exact bounds of the lower portion—it says only that the web is coupled between the upper portion and the lower portion. As such, the claim language itself does not support Intuitive's narrow construction requiring the "lower portion" to be only the lower bar of an "I" shape, or the lowest horizontal portion of an "I" shape.

We turn to the specification. Outside of the claim language, the specification mentions a lower beam portion once: "As shown in ... [Fig.] 15, the I-beam member 70 includes upper and lower beam portions 82a, 82b, respectively, connected by a central web portion 84." '650 patent col. 5 ll. 45–47. But Figure 15 depicts only one embodiment; and, as noted above, claim 6 is decidedly broader than that one embodiment, as it does not even recite an "I-beam." Nor does it recite a "lower *beam* portion"; it instead uses the broader phrase "lower portion." "[T]his court will not countenance the importation of claim limitations from a few specification statements or figures into the claims, particularly if those specification extracts describe only embodiments of a broader claimed invention." *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (citations omitted). And, here, the language of claim 6 is broad: "the beam comprises an upper portion and a lower portion and a web coupled between the upper portion and the lower portion." '650 patent col. 8 ll. 38–40. As such, we do not "confin[e] the claim[ ] to th[e] embodiment[ ]" of Figure 15 such that the "lower portion" of the beam must mean only the lowest horizontal portion of an "I" shape. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). We thus reject Intuitive's proposed construction of "lower portion."

***10** Intuitive's argument that it "is entitled to judgment of non-infringement" depends on our adoption of its construction of "lower portion." Cross-Appellants' Br. 51. Intuitive does not argue that, even under the district court's construction, no substantial evidence supports a finding that its product meets the "lower portion" limitation. *Compare* Cross-Appellants' Br. 42–54, *with* Cross-Appellants' Br. 54–58. Accordingly, because Intuitive's proposed construction of "lower portion" fails, so does its corresponding noninfringement argument.

B

Continuing our infringement discussion, we turn to the "configured to cause" limitation of claim 6 of the '650 patent.

The district court construed the full phrase "at least one of the lower portion or the upper portion configured to cause the staple pusher to move a staple" to mean "at least one of the lower portion or the upper portion is designed, constructed or set up to cause the staple pusher to move a staple." *Claim Construction Order* at *1, 5.[5] The district court held that, as for "whether [Rex] showed that the lower portion in fact causes the staple pusher to move the staple, the jury heard substantial evidence that in the Accused Products, the protruding part of the lower portion contacts the shuttle which

in turn causes the staple pusher to move a staple." *JMOL Op.* at *4. On appeal, Intuitive argues that no substantial evidence supports a finding that its product meets the "configured to cause" limitation.

Infringement is a question of fact that we review for substantial evidence when tried to a jury. *Steuben*, 127 F.4th at 353. "A factual finding is supported by substantial evidence if a reasonable jury could have found in favor of the prevailing party in light of the evidence presented at trial." *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 952–53 (Fed. Cir. 2024) (citation omitted). For the following reasons, we hold that substantial evidence supports the finding that Intuitive's product meets the "configured to cause" limitation.

Under Rex's theory of infringement, the "configured to cause" limitation is met by the part of the beam's lower portion within the defined black rectangle on the right in the picture below:




Appellant's Reply Br. 36; J.A. 11968. As Rex explains on appeal, "[t]he part of the beam's lower portion depicted in the black rectangle above is configured to contact the shuttle as shown in the diagrams below, which were displayed and explained to the jury":




Appellant's Reply Br. 37 ("[T]he protrusion on the beam's lower portion contacts the shuttle as indicated by the red circles, which correspond to where [Rex's technical expert Albert Juergens III] pointed with his laser pointer during trial."); J.A. 12061. The jury heard evidence regarding this theory of infringement. For example, Rex's technical expert Mr. Juergens explained to the jury:

> [The] section of the lower portion, ... that sticks up into the channel ... doesn't contact the staple pusher directly, it contacts the sled [i.e., shuttle] which then in turn contacts the staple pusher to move the staple as the beam moved from the proximal to the distal ....

J.A. 11575 ll. 18–25.

The record contains additional evidence to support the jury's finding that Intuitive's product meets the "configured to cause" limitation. Mr. Juergens testified that "the beam [in the accused device] is designed to push the shuttle, which pushes the staple pusher." J.A. 11599 ll. 10–11; *see also* J.A. 11632 l. 19–J.A. 11633 l. 1. Dr. Robert Howe, Intuitive's technical expert, testified that, in the SureForm product, a "function of the I-beam is to push the shuttle, which pushes against the staple pushers." J.A. 11732 ll. 7–14; *see also* J.A. 11714 ll. 21–22. And Matt Wixey, SureForm lead hardware designer, testified that "[i]n the configuration that the SureForm is configured, ... you need something to push ... on the shuttle [and] in this configuration [Intuitive is] utilizing the I-beam." J.A. 11685 ll. 1–13 (Mr. Wixey agreeing that "without the I-beam, the shuttle wouldn't move").

***11** Intuitive argues that the jury heard undisputed testimony from Mr. Wixey that the part of the I-beam Rex relied on to meet the "configured to cause" limitation was designed for a completely different purpose: "to interface with the lock out" and "prevent forward motion when there is not a reload." Cross-Appellants' Br. 56 (citation omitted).[6] We are unpersuaded by this argument. We agree with Rex that "[i]t is immaterial whether the designers of the accused devices *intended* for the lower portion of the beam to cause the staple pusher to move a staple. What matters is that the lower portion of the beam *actually does* cause the staple pusher to move a staple." Appellant's Reply Br. 34–35; *see Trim-Lok*, 869 F.3d at 1377–78 ("[D]irect infringement is a strict-liability offense that does not require ... intent to infringe ....").

We also agree with Rex that nothing in the language of claim 6, which includes the word "comprising" due to its

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

dependence from claims 4 and 5, "requires the lower portion of the beam to contact the staple pusher directly." Appellant's Reply Br. 38. "In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). As such, claim 6 does not exclude additional elements, like a shuttle. Claim 6 here does not, for example, state that the lower portion *directly* causes the staple pusher to move a staple. *Cf. AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1251 (Fed. Cir. 2001) ("Notably, the claim does not state that each layer is 'formed directly on' the preceding layer. Accordingly, we determine that 'formed on' does not mean 'directly in contact with.' ").

For these reasons, we conclude that substantial evidence supports the finding that Intuitive's accused products meet the "configured to cause" limitation.

C

Finally, we address Intuitive's written description challenge.

The jury found that Intuitive failed to prove by clear and convincing evidence that claim 6 of the '650 patent is invalid for lack of written description. Although compliance with the written description requirement is a question of fact, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335–36 (Fed. Cir. 2021), Intuitive argues that "claim 6 is invalid as a matter of law under [35 U.S.C.] § 112(a)." Cross-Appellants' Br. 58 (capitalization normalized).

"The specification shall contain a written description of the invention ...." 35 U.S.C. § 112(a). "In determining whether the written description requirement is met, we consider 'whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.' " *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1340 (Fed. Cir. 2016) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)).

Intuitive argues that, "[i]f claim 6 is broad enough to cover a beam-and-shuttle configuration, then the specification must provide written-description support for such a configuration," and "[n]o reasonable jury could find that it does." Cross-Appellants' Br. 59. Intuitive contends that, although persons of ordinary skill in the art "might have understood that one could incorporate a separate shuttle into Rex's disclosed invention, they would not have understood that Rex was disclosing a 'beam plus shuttle' configuration as part of that invention." Cross-Appellants' Br. 64. We are not persuaded.

***12** Our case law is instructive here. In *Moba, B.V. v. Diamond Automation, Inc.*, we explained:

> The '505 patent specification *describes every element of claim 24 in sufficient detail* so that one of ordinary skill in the art would recognize that the inventor possessed *the invention* at the time of filing. [The] contention that the '505 patent does not adequately disclose lifting eggs from a moving conveyor *merely revives its non-infringement argument in the cloak of a validity challenge*.

325 F.3d 1306, 1321 (Fed. Cir. 2003) (emphases added). Likewise, here, Intuitive's contention that the '650 patent does not adequately disclose a beam-and-shuttle configuration "merely revives its non-infringement argument in the cloak of a validity challenge." *Id.*

And, in *Crystal Semiconductor*, we explained the following:

> Because claim 4 uses "comprising," it encompasses more than one clock unless the written description or the prosecution history clearly limits claim 4 to its recited elements.... [N]either the written description nor the prosecution history precludes more than one clock or clock signal.... The district court, therefore, did not err in granting summary judgment that claim 4 reads on the accused [product], which uses four clocks.

246 F.3d at 1350–51. Likewise, here, nothing in the intrinsic evidence of the '650 patent precludes a shuttle from being used in a product covered by claim 6, which, as discussed

above, uses "comprising" language. And, in any event, Intuitive does not appear to make that argument here —instead, it argues that the specification must provide written description support for an infringing beam-and-shuttle configuration. *See* Cross-Appellants' Br. 58–68. This argument misses the mark. The written description question before the jury was not whether the '650 patent describes the accused shuttle configuration—it was whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the subject matter claimed in claim 6.

The district court thus did not err in explaining that "[t]he question[ ] ... is not whether the specification provides an adequate description of the Accused Products, but whether the specification provides an adequate description of the claimed invention." *JMOL Op.* at *6; *see Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) ("Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention."). We thus reject Intuitive's written description challenge and decline to disturb the district court's judgment with respect to invalidity.

CONCLUSION

We have considered the parties' remaining arguments and are unpersuaded. For the foregoing reasons, we affirm the district court's grant of JMOL of no damages, its denial of a new damages trial, and its denial of JMOL with respect to infringement and invalidity.

**AFFIRMED**

COSTS

No costs.

**All Citations**

--- F.4th ----, 2025 WL 2799030

## Footnotes

1 In an IPR final written decision, the Board concluded that Intuitive proved claims 4 and 5 of the '650 patent unpatentable.

2 Although both parties' damages experts here "used the Covidien license as a starting point to assess the result of the hypothetical negotiation between the parties and estimate a reasonably royalty," J.A. 4 ¶ 9, Mr. Kidder "also analyzed a license between Rex Medical and Boston Scientific to provide an additional data point." Appellants' Br. 8 n.1.

3 This is important, of course, as "a court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence. These reductions are frequently referred to as conditional remittiturs." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010) (discussing *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998) (per curiam)).

4 In our analysis here, we do not consider whether any expired patents in the Covidien license should have been apportioned any value. We leave for another day questions regarding the role of expired patents in an apportionment analysis.

5 Intuitive does not challenge this construction on appeal. Cross-Appellants' Br. 54 n.3.

6 The lock out mechanism can prevent uncontrolled bleeding. When "the lock-out is out of the way," part of "the beam contacts the shuttle, which in turn drives the staple pushers." Cross-Appellants' Br. 55.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.