# United States Court of Appeals for the Federal Circuit

---

**INTERNATIONAL MEDICAL DEVICES, INC., MENOVA INTERNATIONAL, INC., JAMES ELIST,**
*Plaintiffs-Appellees*

**v.**

**ROBERT CORNELL, AUGMENTA, LLC, CORNELL COSMETIC UROLOGY LLC, DAVID LOUIS NICHOLS, HUCK MEDICAL TECHNOLOGIES INC., HANS MISCHE, HANS MISCHE LLC, RUN WANG, ROBERT J. CORNELL, M.D., P.A., RICHARD B. FINGER,**
*Defendants-Appellants*

**DOES, 1 THROUGH 10, INCLUSIVE,**
*Defendant*

---

2025-1580, 2025-1605

---

Appeals from the United States District Court for the Central District of California in No. 2:20-cv-03503-CBM-RAO, Senior Judge Consuelo Bland Marshall.

---

Decided: April 17, 2026

---

NATHAN S. MAMMEN, Reichman Jorgensen Lehman & Feldberg LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by COLE THOMAS TIPTON;

RYAN G. BAKER, MAY CHAN, Waymaker LLP, Los Angeles, CA.

KELSI STAYART WHITE, Ahmad, Zavitsanos & Mensing PLLC, Houston, TX, argued for defendants-appellants Augmenta, LLC, Cornell Cosmetic Urology LLC, Robert Cornell, Hans Mische, Hans Mische LLC, Huck Medical Technologies Inc., David Louis, Nichols, Robert J. Cornell, M.D., P.A. and Run Wang. Also represented by WEINING BAI, JASON S. MCMANIS.

RUSSELL STANLEY POST, Beck Redden LLP, Houston, TX, argued for defendant-appellant Richard B. Finger. Also represented by JONATHAN WEINBERG, King & Spalding LLP, Washington, DC.

---

Before DYK, REYNA, and TARANTO, *Circuit Judges*.

DYK, *Circuit Judge*.

Plaintiffs International Medical Devices, Inc. (“IMD”), Menova International, Inc., and Dr. James Elist (collectively “plaintiffs”) manufacture and sell the Penuma® cosmetic penile implant. Plaintiffs sued Dr. Robert Cornell, Mr. Richard Finger, Dr. Run Wang, and a number of other individuals and entities (collectively “defendants”) in the Central District of California, asserting misappropriation of four trade secrets, counterfeiting, and breach of contract. Plaintiffs further sought to invalidate two cosmetic-implant patents issued to several defendants for failing to name one of the plaintiffs, Dr. Elist, as an inventor. A jury found that defendants misappropriated each of the trade secrets and found for the plaintiffs on other claims. After a bench trial on damages, the district court awarded a reasonable royalty and exemplary damages for the trade-secret claims based on a finding of willful and malicious misappropriation and awarded damages against the defendants found liable for the

counterfeiting claim. The court also entered a permanent injunction enjoining defendants from using the four trade secrets. Defendants filed a motion for judgment as a matter of law ("JMOL") on all claims. The district court denied JMOL, and defendants appeal.[1]

We hold that there was no legally sufficient evidentiary basis to support the jury's finding that plaintiffs had met their burden to show that each of the asserted trade secrets was a protectable trade secret under California law and reverse the district court's denial of JMOL on the trade-secret claims. Because the plaintiffs do not allege that the confidential information subject to the non-disclosure agreement ("NDA") asserted in the breach-of-contract claim extended farther than the four trade secrets, we also reverse the denial of JMOL on the breach-of-contract claim. We vacate the district court's finding of willful and malicious misappropriation, award of a reasonable royalty, award of exemplary damages, and the permanent injunction.

On the counterfeiting claim, which stems from Dr. Cornell's unauthorized use of the Penuma® mark, we conclude that there was sufficient evidence to sustain a verdict of liability for counterfeiting and affirm the denial

---

[1] Plaintiffs also asserted that the named inventors of two patent applications infringed their copyright by reproducing copyrighted images originating from a video authored by Dr. Elist, that Dr. Cornell infringed the Penuma® trademark, and that Dr. Wang breached a consulting-agreement contract with IMD. The jury found liability on each of these claims. The jury awarded $1,650 for copyright infringement and nominal damages for Dr. Wang's breach of contract, and the district court denied disgorgement damages for trademark infringement. Defendants do not appeal these determinations, and we do not discuss them further.

of JMOL on the counterfeiting claim and the award of damages.

On the patent-invalidity claim, the basis of the jury's finding that Dr. Elist was the true inventor was his contribution of the same ideas we now determine (in connection with the trade-secret claims) were generally known and thus cannot constitute an inventive contribution. We thus reverse the denial of JMOL on patent invalidity.

Accordingly, we affirm-in-part, vacate-in-part, and reverse-in-part. We also decide in a separate opinion today a companion case, No. 2025-1843, related to the costs and fees for the district-court proceedings.

## BACKGROUND

We recite the facts in the manner most favorable to the position of the plaintiffs since they were the verdict winners. *See Top Brand LLC v. Cozy Comfort Co.*, 143 F.4th 1349, 1355 (Fed. Cir. 2025). Plaintiff Dr. Elist is a urologist and owner of International Medical Devices, Inc., the maker of the Penuma® cosmetic penile implant. In 2018, the Penuma® was the only commercially available cosmetic penile implant.

On March 30, 2018, defendant Dr. Cornell attended a Penuma® surgical training session hosted by Dr. Elist and signed a non-disclosure agreement ("NDA"). In the NDA, Dr. Cornell agreed not to disclose or use confidential information supplied to him. This did not include information that "was or becomes generally available to the public other than as a result by disclosure by" Dr. Cornell. J.A. 15860.[2] At the training, Dr. Cornell watched Dr. Elist perform several surgical implantations

[2] Citations to the "J.A." refer to the joint appendix filed by the parties in this case. Dkt. No. 35.

of IMD's Penuma® cosmetic penile implant. Dr. Elist disclosed to Dr. Cornell several ideas for improving the Penuma® during the training, including incorporating internal cavities within the implant to create more flexibility, placing mesh tabs near the distal tip of the implant to allow the implant to be anchored by tissue ingrowth, and suturing the mesh tabs with absorbable sutures to create a temporary anchor as the ingrowth takes place. Shortly after attending the training, Dr. Cornell requested and received the list of surgical instruments and supplies (the "instrument list") needed to perform the Penuma® surgery.

According to plaintiffs, the information shared with Dr. Cornell regarding Dr. Elist's planned improvements and the instrument list were trade secrets and confidential information subject to the NDA. Plaintiffs alleged that defendants misappropriated the trade secrets and used information in breach of the NDA to develop a competing cosmetic implant named Augmenta. Plaintiffs also alleged that Dr. Cornell and two of his associates filed provisional patent applications for cosmetic implants in July and December of 2018, which resulted in U.S. Patent Nos. 10,413,413 ("'413 patent") and 10,980,639 ("'639 patent"), claiming the trade secrets that Dr. Elist shared with Dr. Cornell without naming Dr. Elist as an inventor. Plaintiffs further alleged that Dr. Cornell and his medical practice advertised that he was a Penuma®-certified surgeon, thus using a counterfeit mark.

Plaintiffs brought suit in the Central District of California, alleging misappropriation of trade secrets, breach of contract, and counterfeiting. Plaintiffs also sought invalidation of the '413 and '639 patents based on their allegation that Dr. Elist was the true inventor and was not named in the patent. The case proceeded to a jury trial on liability and a jointly stipulated post-verdict bench trial on reasonable royalty and damages.

The trial court without objection defined the four asserted trade secrets in accordance with plaintiffs' request as: (1) "[t]he incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity" (the "internal-pockets trade secret"); (2) "[t]he incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth" (the "mesh-tabs trade secret"); (3) "[t]he use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant" (the "absorbable-sutures trade secret"); and (4) "[a] particular list of instruments and materials used to perform the surgical method associated with the placement of a cosmetic penile implant referred to as the Penuma Instrument and Supply List" (the "instrument list trade secret"). J.A. 7368.

The jury returned a verdict finding that each trade secret was protectable and misappropriated, that Dr. Cornell breached the NDA, that Dr. Cornell and his medical practice were liable for use of a counterfeit mark, and that the '413 and '639 patents were invalid for improper inventorship. After the verdict, the district court held proceedings to assess damages, awarding $5,772,044 in reasonable royalties for trade-secret misappropriation, $11,544,088 in exemplary damages, and $1,000,000 in statutory damages for use of a counterfeit mark. The court also entered a permanent injunction enjoining defendants from using the trade secrets for five years.

Defendants filed a renewed motion for judgment as a matter of law ("JMOL"), arguing that there was no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiffs. The district court denied JMOL, and defendants appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I

The first question is whether the claimed trade secrets qualify as trade secrets under the California Uniform Trade Secrets Act ("UTSA"). The statute provides:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives <u>independent economic value, actual or potential, from not being generally known to the public</u> or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is <u>the subject of efforts that are reasonable under the circumstances to maintain its secrecy</u>.

Cal. Civ. Code § 3426.1(d) (emphases added).

In light of the statutory "purpose to make uniform the law with respect to the subject of this title among states enacting it," California courts look to other states' UTSA caselaw as well as their own caselaw as relevant authority. Cal. Civ. Code § 3426.8; *see* Unif. Trade Secrets Act § 8 (Unif. L. Comm'n 1985); *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 258–59 (Cal. Ct. App. 2009). Additionally, because California's UTSA "codifies the basic principles of common law trade secret protection," common-law authority predating California's enactment of the UTSA remains relevant. *See MAI Sys. Corp v. Peak Comput., Inc.*, 991 F.2d 511, 520–21 (9th Cir. 1993); *see also Am. Paper & Packaging Prods., Inc. v. Kirgan*, 228 Cal. Rptr. 713, 716 (Cal. Ct. App. 1986) (concluding that common-law

trade-secret principles were "engrossed by the UTSA" where they were not in conflict with the UTSA).

A

As to the first three of the alleged trade secrets, the question is whether the jury's finding that the asserted trade secrets were not generally known is supported by substantial evidence. As a California Court of Appeal held in *In re Providian Credit Card Cases*, 116 Cal. Rptr. 2d 833 (Cal. Ct. App. 2002), "[p]ublic disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret." 116 Cal. Rptr. 2d at 842. The plaintiff bears the burden of proof to establish that an alleged trade secret derives value from being not generally known. *See Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 171 Cal. Rptr. 3d 714, 743 (Cal. Ct. App. 2014).

Defendants argue that three of the plaintiffs' asserted trade secrets are concepts disclosed in publicly available patents—U.S. Patent No. 5,088,477, issued on February 18, 1992, to Subrini ("Subrini"), and U.S. Patent No. 4,204,530 issued on May 27, 1980, to Finney ("Finney")—making them generally known and ineligible for trade-secret protection. Plaintiffs respond that "[n]one of the prior art patents on which Defendants relied had been embodied in actual products," Appellees' Br. 32, relying on their experts' testimony that the concepts disclosed in the patents had never been implemented as real-world products, *e.g.*, J.A. 14334, 14636–37. It follows, plaintiffs say, that the trade secrets were not generally known. Plaintiffs' position in this respect is unsupported and incorrect.

The Supreme Court has held that patent law and trade-secret law can co-exist without conflict. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 491–93 (1974). But "[t]he Court has also articulated another policy of the patent law: that which is in the public domain cannot be removed therefrom by action of the States. '[F]ederal law requires that all ideas in general

circulation be dedicated to the common good unless they are protected by a valid patent.'" *Id.* at 481 (quoting *Lear, Inc. v. Adkins*, 395 U.S. 653, 668 (1969)). We have accordingly held that what is disclosed in a patent is "generally known to the public" and cannot be a trade secret. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355–56 (Fed. Cir. 2009) (applying the California UTSA). "A trade secret is secret. A patent is not. That which is disclosed in a patent cannot be a trade secret." *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) (citing *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004)). "Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished . . . ." *Ultimax*, 587 F.3d at 1355 (quoting *Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995)).

The California cases are to the same effect. A California Court of Appeal has held that "once a trade secret is publicly disclosed in a patent, the information contained in the trade secret is placed in the public domain and the trade secret is subsequently extinguished." *Glob. Protein Prods., Inc. v. Le*, 255 Cal. Rptr. 3d 310, 321 (Cal. Ct. App. 2019) (collecting cases); *see also* Restatement (Third) of Unfair Competition § 39 cmt. f (A.L.I. 1995) ("[I]nformation that is disclosed in a patent or contained in published materials reasonably accessible to competitors does not qualify for [trade-secret] protection . . . ."). The patent disclosures make the alleged trade secrets generally known whether or not they were ever made into real-world products.

Our inquiry thus focuses on what the prior-art patents disclose. Each alleged trade secret was defined by the district court's jury instructions. The court instructed the jury that a trade secret "must not have been generally known to the public or to people who could obtain value from knowing it," and that plaintiffs bore the burden of

proof. Jury Instructions at 17–18, *Int'l Med. Devices, Inc. v. Cornell*, No. 2:20-cv-3503 (C.D. Cal. June 16, 2023), Dkt. No. 639 ("Jury Instructions").[3] As to three of plaintiffs' alleged trade secrets, the question is whether the trade secrets had been disclosed in the Subrini and Finney patents.

1. The alleged internal-pockets trade secret

The first of these alleged trade secrets was defined to the jury as (1) "[t]he incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity." J.A. 7368.

Defendants argue that the alleged internal-pockets trade secret was generally known because it was disclosed in Subrini. Subrini is directed to a "penile filling implant," J.A. 16597, made of "any appropriate material . . . and in particular silicone," J.A. 16599, col. 2 ll. 19–21. Subrini discloses "internal cavities" that "make[] it possible to give [the implant] a hardness less than that which it would have if it were formed of a solid and homogeneous body." J.A. 16600, col. 3 l. 43, col. 4 ll. 4–7."[4] Plaintiffs admit that Subrini discloses enclosed cavities. Oral argument at 34:12–34:26.

Plaintiffs nonetheless contend that Subrini does not disclose the internal-pockets trade secret, relying on their technical expert, Dr. Drewry, who testified that, based on

---

[3] The jury was also instructed that it was plaintiffs' burden to prove that "the concepts and/or instrument list were secret; . . . had actual or potential independent economic value because each was secret; and . . . [t]hat Plaintiff made reasonable efforts to keep the concepts and/or instrument list secret." Jury Instructions at 17.

[4] Defendants' expert, Dr. Mulcahy, at trial agreed that Subrini discloses "internal voids of space for making a silicone penile implant softer." J.A. 14988.

his review of Subrini and other references, "that concept [alleged internal-pockets trade secret] was not generally known or provided in the prior art references." J.A. 14558. But this testimony was unsupported by any analysis of Subrini and did not explain how his testimony was consistent with the explicit disclosure of Subrini. Quite the contrary, Dr. Drewry agreed that Subrini's internal cavities make Subrini's implant softer. J.A. 14534. Dr. Drewry's conclusory contrary testimony cannot support the verdict. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425–26 (9th Cir. 1994) (quoting *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). "[E]xpert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight." *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1018 (Fed. Cir. 2022) (alteration in original) (quoting *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997)). As IMD identifies no other evidence that Subrini fails to disclose internal pockets, no reasonable jury could find that Subrini does not make generally known the "incorporation of internal pockets or voids of space within the body of a . . . penile silicone implant to add softness and elasticity." J.A. 7368.

Plaintiffs nonetheless argue that Subrini is directed to a *therapeutic* penile implant (designed to address erectile dysfunction), while their trade secret concerns *cosmetic* penile implants (designed to increase penile size). On this record, this distinction does not make a meaningful difference in relation to the design of the internal pockets, nor was there any testimony that it does.

To be sure, the test is not whether the trade secret is novel or obvious in the patent-law sense. *Altavion*, 171 Cal. Rptr. 3d at 736. The patent-law obviousness standard may require a close examination of prior art, motivation to combine, and secondary considerations to determine patent validity. The "generally known" stand-

ard of California trade-secret law requires a less granular inquiry, taking account of the purpose of California's trade secret law "to promote and reward innovation and technological development and maintain commercial ethics." *DVD Copy Control Ass'n, Inc. v. Bunner*, 75 P.3d 1, 12 (Cal. 2003). In light of this purpose, California courts have recognized that "self-evident variants of the known art" cannot be protected. *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 66 Cal. Rptr. 3d 1, 16 (Cal. Ct. App. 2007) (quoting Restatement (Third) of Unfair Competition § 39 cmt. f). "Self-evident variations or modifications of known processes, procedures, or methods . . . lack the secrecy necessary for protection as a trade secret." Restatement (Third) of Unfair Competition § 39 cmt. f. "Information that is readily ascertainable by a business competitor derives no independent value from not being generally known." *Altavion*, 171 Cal. Rptr. 3d at 743 (quoting *Syngenta Crop Prot., Inc. v. Helliker*, 42 Cal. Rptr. 3d 191, 218 (Cal. Ct. App. 2006)). Similarly, federal courts interpreting California law have held "common" concepts in the relevant industry to be unprotectable. *Princess Cruises, Inc. v. Amrigon Enters., Inc.*, 51 F. App'x 626, 628 (9th Cir. 2002) (nonprecedential); *Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*, No. C08-4166, 2009 WL 3837270, at *4 (N.D. Cal. Nov. 16, 2009) (citing *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998)).

For example, the Ninth Circuit, applying California law, held that a generally known concept in boats was not a protectable trade secret when applied to jet skis. *Gusler v. Kawasaki Motors Corp.*, No. 99-55161, 2000 WL 491703, at *1 (9th Cir. 2000) (nonprecedential). In *Gusler*, the question was whether drag-reducing air bubbles under the hull of a jet ski could be a trade secret when it was generally known to use drag-reducing air bubbles under the hull of boats in general. *Id.* Concluding that a jet ski was "simply a type of boat" and that the

same principles dictated the air-bubble solution for the jet ski as for the boat, the court held that applying the air-bubble concept to jet skis was not protectable as a trade secret. *See id.*

In another case predating the Uniform Trade Secrets Act, the Ninth Circuit rejected an asserted trade secret to improve the time accuracy of a tape recorder that was "dictated by well known principles of physics." *Winston Rsch. Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134, 139 (9th Cir. 1965). The rejected secret was the "general approach of reducing the inertia of rotating parts and utilizing a wide band servo system" to reduce error; in other words, using lighter components and faster motors. *Id.* This approach "consisted essentially of general engineering principles in the public domain and part of the intellectual equipment of technical employees." *Id.* By contrast, the plaintiff could claim trade-secret protection of "the specifications of these basic mechanical elements and their relationship to each other embodied in the [plaintiff's tape recorder]," *id.*, which included other optimizations such as mechanical means for eliminating interfering resonances, *id.* at 137. These features were not publicly known and were the fruits of "painstaking research and extensive trial and error." *Id.* at 139.

Cases from other UTSA jurisdictions are similar. For example, in *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250 (10th Cir. 2022), the Tenth Circuit (applying the Utah UTSA) considered several alleged trade secrets relating to commercially producing "granny-style" breads, including the use of a range of percentages of potato flour, the use of dry yeast, and unusually low-temperature and long-duration proofing and baking processes. 39 F.4th at 1259–60. Noting that commercial bakers of conventional white bread could readily ascertain the purported secrets of the non-conventional bread at issue, the court held that all of the asserted trade secrets

were generally known or readily ascertainable. *See id.* at 1262–64.

In *Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 66 S.W.3d 620 (Ark. 2002), the Supreme Court of Arkansas considered an alleged trade secret involving the concept of an intermediary receiving purchase orders, fulfilling the customers' orders based on favorable bulk pricing available to the intermediary, and realizing a profit from the difference in the customer's purchase price and the intermediary's more favorable pricing. 66 S.W.3d at 623. The court concluded that the idea amounted to wholesaling and that "any person reasonably well versed in the economics of wholesaling and credit purchasing could have put together the . . . concept." *Id.* at 634. Noting that the alleged trade secret was "known in the industry but had not been applied to" the particular retail environment in question, the court held that the alleged trade secret did not qualify for protection under the Arkansas UTSA. *Id.* at 634–35.

These cases confirm that no protectable trade secret results from translating a generally known concept from one environment to another environment where both environments present the same problem that is solved by the same solution. There was no testimony here that cosmetic and therapeutic implants present different problems or require different solutions as to this trade secret. While therapeutic and cosmetic implants are implanted for different medical indications and are placed in different anatomical locations within the penis, Appellees' Br. 5, these differences are not germane to whether common principles dictate a common solution to the problems presented by silicone softness requirements. Translating the generally known internal-pockets concept from the environment of a therapeutic implant to the adjacent environment of a cosmetic implant cannot sustain trade-secret protection under California trade-secret law.

We conclude therefore that no reasonable jury could find plaintiffs met their burden to establish that the internal-pockets trade secret was protectable.

2. The alleged mesh-tabs trade secret

The second alleged trade secret was defined to the jury as "[t]he incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth." J.A. 7368.

Defendants argued that Finney, like plaintiffs' alleged trade secret, discloses the mesh tabs in the context of a cosmetic implant. (There is no issue here of translating a feature from therapeutic to cosmetic implants.) Finney discloses an "implantable sleeve which increases the penile diameter" made from "silicone elastomer." J.A. 16609, col. 1 ll. 26–29. Finney teaches "Dacron [mesh] fabric suturing strips" that may be arranged as continuous strips or in patches.[5] J.A. 16610, col. 3 ll. 11–25.

Plaintiffs do not contend that mesh and mesh tabs, on their own, are trade secrets. Dr. Elist conceded that using mesh that allows for tissue ingrowth was not new, Trial Transcript Day 2 at 387:8–20, and plaintiffs' expert, Dr. Drewry, acknowledged at trial that Finney discloses

---

[5] Dr. Elist testified on cross examination that Finney disclosed mesh tabs. Reporter's Transcript of Trial Day 2 at 449:9–15; 450:14–22, *Int'l Med. Devices, Inc. v. Cornell*, No. 2:20-cv-3503 (C.D. Cal. July 5, 2023), Dkt. No. 653 ("Trial Transcript Day 2"). He then contradicted that testimony on redirect to state that while Finney disclosed tabs, he believed those tabs were not mesh. J.A. 13518. But Finney explicitly discloses suturing strips or patches of "Dacron fabric," J.A. 16610 col. 3 l. 11, and both sides' experts agree that Dacron is a mesh. J.A. 14653, 14995.

"patches of mesh that are available for suturing to the anatomy," J.A. 14335.[6]

Nonetheless, plaintiffs argued that Finney's mesh patches were "dissimilar" from the mesh-tab trade secrets because "the trade secrets are mesh tabs extending from the distal tip of the implant." J.A. 14335–36. But this testimony is mismatched to the scope of the mesh-tabs trade secret, which specifies tabs "in or around the distal tip," not necessarily "extending from" the tip. *Contrast* J.A. 7368, *with* J.A. 14336. There was no expert testimony that Finney did not disclose mesh in or around the distal tip; indeed, plaintiffs' medical expert, Dr. Carson, agreed that Finney discloses "mesh tabs" that "are not in the same location as the Penuma® but at the distal end, yes." J.A. 14654.[7]

Plaintiffs protest that Finney's tabs were also placed at locations other than the distal tip. Appellees' Br. 29–30 (citing testimony that Finney's mesh patches are "all along the entire length of the cylinder" and "run the length of the inside of the sleeve"). But whether Finney discloses patches along the "entire length" of an implant

---

[6] Plaintiffs' other expert's testimony was to the same effect. Dr. Carson testified that using mesh and mesh tabs to attach implants by promoting fibrous ingrowth was known for testicular and transvaginal applications. J.A. 14622–23. Defendants' expert, Dr. Mulcahy, also testified that "[e]verybody knows about mesh tabs," and that he had personally implanted testicular implants using mesh tabs "many times." Reporter's Transcript of Trial Day 8 at 2016:4–7, *Int'l Med. Devices, Inc. v. Cornell*, No. 2:20-cv-3503 (C.D. Cal. July 5, 2023), Dkt. No. 660.

[7] Defendants' expert, Dr. Mulcahy, testified without contradiction that Finney discloses Dacron mesh patches that support tissue ingrowth, and that Finney discloses the mesh-tabs trade secret. J.A. 14995–96.

is irrelevant; the mesh-tab trade secret specifies tabs "in or around the distal tip" of an implant without requiring the absence of tabs elsewhere. J.A. 7368. We need only determine whether the undisputed testimony established that Finney discloses distal tabs, not whether it also discloses non-distal tabs. The undisputed testimony established that Finney's patches satisfy the "mesh," "tissue ingrowth," and "cosmetic penile implant" properties of the mesh-tabs trade secret; both sides' experts agreed that Finney's tabs were made of mesh for promoting tissue ingrowth and that Finney's tabs are disclosed for a cosmetic penile implant.

We thus conclude that no reasonable jury could find that Finney failed to make generally known the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth.

3. The alleged absorbable-sutures trade secret

The third alleged trade secret was defined to the jury as "[t]he use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant." J.A. 7368.

As we have just discussed, the mesh-tab trade secret was disclosed by Finney. Finney's specification also discloses "Dacron fabric suturing strips," J.A. 16610, col. 3 l. 11, and discloses suturing mesh tabs to tissue, as recognized by plaintiffs' expert, Dr. Drewry, J.A. 14335 ("Q: And where does the suturing occur in [Finney's] device? . . . [Dr. Drewry]: Again, I believe it's patches, and I think they are referred to as figures 14."). This testimony is consistent with Finney's specification, which discloses "Dacron fabric suturing strips" that may be configured as "continuous suturing strips" or as "patches." J.A. 16610, col. 3 ll. 11, 22–23.

However, Finney itself is silent as to whether sutures would be absorbable. Both sides' experts agreed that absorbable sutures were long known. J.A. 14670–71, 14996–97. Both sides' experts also agreed that, between the two options of nonabsorbable (permanent) sutures and absorbable sutures, absorbable sutures were generally preferred for penile surgery. J.A. 14671–72, 14998. The undisputed evidence established that the concept of using absorbable sutures with mesh tabs was well known.

In this respect, this case is similar to *Bimbo Bakeries*, where the Tenth Circuit considered whether the "use of dry yeast" in a homemade-style bread product, as opposed to wet yeast, was a cognizable trade secret under the Utah UTSA. 39 F.4th at 1262–63. The court recognized that the packaging for the bread products would disclose the use of some kind of yeast but may not specify wet or dry. *Id.* Concluding that "dry yeast is a common baking ingredient, and the only feasible option" in the context of the application, the court held that a "reasonable jury could not have concluded that [plaintiff's] use of dry yeast was not generally known or readily ascertainable." *Id.* Using Finney's disclosure of sutures to embrace absorbable sutures requires no greater creativity than reading an ingredient list's disclosure of yeast to embrace dry yeast.

The testimony here thus established that Finney, while not explicitly specifying absorbable or nonabsorbable sutures, when coupled with the general knowledge in the art, discloses the use of absorbable sutures with mesh tabs. There was no contrary testimony. Thus, there was not sufficient evidence from which a reasonable jury could find that the absorbable-sutures trade secret was not generally known.

B

The fourth alleged trade secret was defined to the jury as "[a] particular list of instruments and materials used to perform the surgical method associated with the place-

ment of a cosmetic penile implant referred to as the Penuma Instrument and Supply List." J.A. 7368.

Defendants again argued that this alleged trade secret was well known. Plaintiffs responded that the Penuma® implant procedure, while not requiring specialized instruments, calls for instruments that are not typically at the bedside for other types of penile surgery. Appellees' Br. 33 ("[T]he Penuma surgery requires some instruments that are not often used in urology and would not have been available to a surgeon doing a functional penile prosthesis."). We need not resolve this dispute because we agree with defendants that the instrument-list trade secret is not protectable, as plaintiffs did not preserve the secrecy of the list contents.

Disclosure of information to those who are not obligated to maintain its confidentiality extinguishes any claim to trade secret protection. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *Amgen Inc. v. Cal. Corr. Health Care Servs.*, 260 Cal. Rptr. 3d 873, 887 (Cal. Ct. App. 2020); *see also Altavion*, 171 Cal. Rptr. 3d at 739–40 (emailing a presentation regarding a trade secret without the protection of an NDA was one of several disclosures that eliminated secrecy); 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.03[2] (2025) ("[D]isclosure of information to third parties without adequate confidentiality arrangements[] extinguishes the trade secret."). To establish the "independent economic value" of information claimed as a trade secret, it is a plaintiff's burden to establish that confidentiality requirements were imposed on those to whom it disclosed the information. Cal. Civ. Code § 3426.1(d)(1); *Amgen*, 260 Cal. Rptr. 3d at 888.

At trial, defendants introduced evidence that the instrument list was emailed to defendant Dr. Cornell with-

out any explicit indications of confidentiality.[8] IMD's president, Dr. Elist, also conceded that IMD's sales representative had emailed the list to another third party, SCA Surgery, in April 2018 without marking it confidential. Plaintiffs presented no evidence that there was any other agreement with SCA Surgery that preserved the secrecy of the list. Mr. Jonathan Elist, CEO of IMD, testified that the implant procedure itself is not a trade secret and that IMD permits the implant procedure to be disclosed to third parties to build more patient awareness for Penuma®. J.A. 14948–49.

There is thus insufficient evidence from which a reasonable jury could find that plaintiffs met their burden to show the instrument list derived independent economic value from secrecy.

There was no substantial evidence that the four alleged trade secrets qualified as trade secrets under California law.

II

The jury found Dr. Cornell liable for breach of contract in connection with violating the NDA between IMD and Dr. Cornell. Under the NDA, Dr. Cornell agreed to protect and not disclose "Confidential Information," which excludes information that "was or becomes generally available to the public," to others without written consent

---

[8] The email to Dr. Cornell contained only boilerplate language stating that the message "may contain confidential, privileged and/or proprietary information" but did not designate the attached instrument list to be confidential. J.A. 15864. The operative NDA contains no provision generally designating all communications between the parties as confidential or specifically designating the instrument list as confidential. *See* J.A. 15860–62.

and to not use such information for his own benefit. J.A. 15860. Plaintiffs do not identify any alleged Confidential Information other than the asserted trade secrets. Because we hold that the undisputed evidence showed each alleged trade secret did not qualify as a trade secret under California law, we also hold that there was not sufficient evidence for a reasonable jury to find liability for breach of contract.

## III

We next turn to the counterfeiting claim against Dr. Cornell and his medical practice, Robert J. Cornell, M.D., P.A. (the "Cornell defendants"), in connection with their unauthorized use of the Penuma® mark to suggest Dr. Cornell was an authorized Penuma® surgeon. The jury found the Cornell defendants liable for counterfeiting, and the court assessed statutory damages of $1 million.

The Cornell defendants argue that the Penuma® mark is registered only for *goods* while the evidence supports only that the Cornell defendants offered *services*; that is, Penuma® implantation surgeries. They argue that the district court improperly instructed the jury, over their objection, that plaintiffs could meet an element of counterfeiting by proving defendants' use of the counterfeit mark in connection with the "sale, offering for sale, or distribution of goods *or services*," where there was no evidence plaintiffs' mark extended to services. J.A. 7381 (emphasis added).

The district court's instruction was proper. The objected-to instruction is a general one that quotes the statutory definition of a counterfeit mark. *Compare* J.A. 7381 ("To prove a claim for counterfeiting, Plaintiffs must prove . . . Defendants used the counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services . . . ."), *with* 15 U.S.C. § 1117(b)(1) ("[A] violation consists of . . . using . . . a counterfeit

mark . . . in connection with the sale, offering for sale, or distribution of goods or services . . . .").

Significantly, the district court also more specifically instructed the jury that it was plaintiffs' burden to prove that "Plaintiffs' Penuma mark was registered on the Principal Register for use on the same goods to which Defendants applied the mark." J.A. 7382 (emphasis added). Thus, the district court did not instruct the jury that it could find that a mark for goods could be counterfeited by an offer for services; it instructed the jury that liability could only arise from "the same goods" matching plaintiffs' registration. *Id.* The jury could not have read the instructions as permitting a finding that the mark extended to services as well as to goods.

In denying defendants' posttrial JMOL motion on this issue, the district court concluded that "the evidence indicated that Cornell and his medical practice did 'offer for sale' the Penuma implant (even if no actual sale or distribution occurred), as Penuma was advertised on the website." J.A. 40–41. The district court correctly recognized trial evidence supporting a jury finding that the Cornell defendants offered the Penuma® implant as a good. J.A. 40 n.18 (observing that Dr. Cornell testified his website advertising Penuma® surgeries "was in anticipation of being credentialed to provide this product" (emphasis added) (quoting J.A. 14079)). This assessment of the evidence is consistent with the trial record.

We thus affirm the district court's denial of JMOL on counterfeiting.

## IV

We finally turn to the invalidation of the '413 and '639 patents. The jury was instructed that, to find the patents invalid, plaintiffs were required to show clear and convincing evidence that the patents fail to name "all of the actual inventors." J.A. 7388. The jury was also

instructed that, to be an inventor, "one must make a significant contribution to the conception of at least one of the claims of the patent," and that "[i]f someone only explains to the actual inventors well-known concepts or the current state of the art, he or she is not an inventor." *Id.*

Inventorship is a question of law, which we review de novo; we review underlying questions of fact for substantial evidence. *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1373 (Fed. Cir. 2003). "[E]ach joint inventor must contribute in some significant manner to the conception of the invention." *Id.* A person who contributes only what is already known in the prior art does not contribute to conception and is not an inventor. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004).

Dr. Elist's claimed contributions to the '413 and '639 patents are the same three ideas for improving the Penuma® that were also asserted as trade secrets: internal pockets to soften the silicone, distal mesh tabs for tissue ingrowth, and absorbable sutures in conjunction with the mesh tabs. We have already decided that the trial record established that these ideas were generally known, which means that these ideas cannot sustain an inventorship claim by Dr. Elist.

It is also relevant to consider whether a putative inventor's alleged contribution is considered patentable by the patent office. *See Board of Educ. ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1338 (Fed. Cir. 2003). In *American Bioscience*, a group of putative inventors from Florida State University ("FSU inventors") alleged that they were co-inventors of a patent claiming three anti-cancer chemical compounds. *Id.* at 1336. The FSU inventors alleged that they contributed the structure of the chemical "PNIP," which was very similar to the claimed compounds. *Id.* at 1338–39. But

PNIP was in the prior art. *Id.* at 1341–42. The patent office, after rejecting several claims as obvious over the FSU inventors' patents, withdrew the rejections upon argument that the prior art did not disclose or suggest the claimed compounds but only compounds having a particular functional group in PNIP. *Id.* at 1335. The patent office then allowed the claims. *Id.* at 1338. Because the patent office's determination showed that what the putative inventors contributed was no more than was known in the prior art (PNIP), we held that the FSU inventors had not met their burden to show inventorship. *Id.* at 1340–42.

Here, the prosecution histories of the '413 and '639 patents follow a similar trajectory to the patent in *American Bioscience*. Claims incorporating internal pockets, mesh tabs, and absorbable sutures were rejected as unpatentable over prior art. To overcome the rejections, the applicants amended the independent claims in each application to recite limitations that include a "measured property of hardness" difference between two locations on the implant. J.A. 15912, claim 1; J.A. 15998, claim 1. The examiner allowed the patents upon entry of the amendments.

Even if Dr. Elist contributed the general concept of internal pockets, there was no evidence to suggest that Dr. Elist mentioned configuring the internal pockets to create differential hardness along the implant. To the patent office, this feature was critical to patentability. As in *American Bioscience*, the patent office's determination that Dr. Elist's contribution alone was not patentable precludes a finding that he contributed to the claimed invention.

We thus reverse the district court's denial of JMOL on the invalidity of the '413 and '639 patents.

## CONCLUSION

We conclude that the jury's trade-secret and breach-of-contract determinations were not supported by substantial evidence because each of the four asserted trade secrets was not protectable under California law and not confidential information under the NDA. Accordingly, we reverse the district court's denial of JMOL on trade-secret misappropriation and breach of contract. In light of our holding that no trade secrets were misappropriated, we vacate the district court's finding of willful and malicious misappropriation, the reasonable royalty award, the exemplary damages award, and the permanent injunction. We affirm the denial of JMOL as to liability for use of a counterfeit mark. We reverse the denial of JMOL on patent invalidity. In light of our disposition, we need not consider the other arguments made by defendants on appeal.

**AFFIRMED-IN-PART, VACATED-IN-PART, REVERSED-IN-PART.**

## COSTS

No costs.