REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP

Nathan S. Mammen
1909 K Street, NW, Suite 800
Washington, DC 20006
Direct Dial: (202) 988-2827
nmammen@reichmanjorgensen.com

July 15, 2026

VIA CM/ECF

Jarrett B. Perlow
Clerk of Court
717 Madison Place, NW
Washington, DC 20439

Re: *International Medical Devices, Inc. v. Cornell*., No. 25-1580

Dear Mr. Perlow:

Under Rule 28(j), IMD submits that *Comet Technologies USA, Inc. v. XP Power, LLC*, Nos. 23-15601, 23-15709, 25-745 (9th Cir. July 14, 2026) (precedential), decided after briefing on the pending petition, is relevant to the issues raised.

*Comet* reversed a trade-secret judgment under the DTSA because the jury was instructed that the defendant bore the burden of proving the secrets were "readily ascertainable by proper means." The Ninth Circuit explained that allocation is correct under California's UTSA but erroneous under the DTSA, which makes lack of ready ascertainability part of the plaintiff's case. Slip Op. 10-11; 18 U.S.C. §1839(3)(B). The court emphasized that California law differs from DTSA because under the CUTSA, ready ascertainability is an affirmative defense, and it "is only a defense insofar as the defendant actually gained knowledge of the trade secret by use of those materials which make the trade secret readily ascertainable." Slip Op. 13 n.4 (quoting *Masimo Corp. v. True Wearables, Inc*., 2021 WL 2548690, at *3 (C.D. Cal. Apr. 28, 2021)) (citing CACI No. 4420; *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 n.9 (1991)). CUTSA "requires the defendant actually to have obtained the information lawfully." Slip Op. 19 n.6.

*Comet* confirms Point II of the petition (Pet. 11-15): "generally known" and "readily ascertainable" are distinct concepts, and California deliberately excluded the latter from the plaintiff's burden. The panel's holding that no trade secret "results from translating a generally known concept from one environment to another," Op. 14, asks what could be derived from Subrini—an ascertainability inquiry assigned by California law to a defense Defendants never pleaded, requested (CACI 4420), or proved. Pet. 12 n.2. Nor was there evidence Defendants actually derived anything from Subrini or Finney. Pet. 10.

*Comet* also supports Point I (Pet. 6-11), observing that "weighing conflicting expert testimony falls outside the wheelhouse of a federal court of appeals." Slip Op. 18.

Respectfully submitted,

/s/ Nathan S. Mammen

Nathan S. Mammen

*Counsel for Plaintiffs-Appellees International Medical Devices, Inc., Menova International, Inc., and James Elist*

Cc: Counsel of Record, via CM/ECF

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

COMET TECHNOLOGIES USA, INC., a Delaware corporation; COMET, AG, a Swiss corporation; YXLON INTERNATIONAL, GMBH, a German corporation,

*Plaintiffs – Appellees/ Cross-Appellants*,

v.

XP POWER, LLC, a California Limited Liability Company,

*Defendant – Appellant/ Cross-Appellee.*

Nos. 23-15601, 23-15709, 25-745

D.C. No. 5:20-cv-06408-NC

OPINION

Appeals from the United States District Court
for the Northern District of California
Nathanael M. Cousins, Magistrate Judge, Presiding

Argued and Submitted September 19, 2025
San Francisco, California

Filed July 14, 2026

Before: David F. Hamilton, Ryan D. Nelson, and Patrick J. Bumatay, Circuit Judges.*

Opinion by Judge Hamilton;
Concurrence by Judge Hamilton;
Dissent by Judge Bumatay

## SUMMARY**


### Trade Secret Misappropriation

The panel (1) reversed the district court's judgment after a jury trial in favor Comet Technologies USA, Inc., and affiliates on their claims against XP Power, LLC, for misappropriating trade secrets and (2) remanded for a new trial.

Comet alleged that XP, a fellow manufacturer of components used in fabricating computer chips, misappropriated Comet's trade secrets in violation of the Defend Trade Secrets Act. The jury awarded Comet $40 million in compensatory and punitive damages, a permanent injunction against any further use of the alleged trade secrets by XP, and over $17 million in attorney fees.

The panel held that the district court erred by instructing the jury that XP bore the burden of disproving an essential


* The Honorable David F. Hamilton, United States Circuit Judge for the Court of Appeals, Seventh Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

element of Comet's DTSA claims, namely, that its trade secrets were not readily ascertainable by proper means. The panel concluded that XP did not invite the error because it made a timely and correct objection on the burden of proof. The panel further concluded that the error was not harmless because the jury instructions were not accurate as a whole, and conflicting evidence on many issues of ready ascertainability and the ensuing damage calculations presented the sorts of disputes that a properly instructed jury must decide.

The panel addressed an evidentiary issue in a separate memorandum disposition.

Concurring, Judge Hamilton wrote that he would address a challenge to the relief awarded and would join the Third and Seventh Circuits in holding that awarding both damages for unjust enrichment based on avoided costs and injunctive relief under the DTSA does not create an impermissible double recovery.

Dissenting, Judge Bumatay agreed with the majority that the district court used an erroneous jury instruction, but he would hold that the error was harmless because the wealth of undisputed evidence introduced at trial easily established that it was more probable than not that the jury would have reached the same verdict had it been properly instructed.

## COUNSEL

Jason M. Wilcox (argued), Joseph M. Capobianco, and John C. O'Quinn, Kirkland & Ellis LLP, Washington, D.C.; Adam R. Alper, Kirkland & Ellis LLP, San Francisco, California; Michael W. De Vries and Sharre Lotfollahi, Kirkland & Ellis LLP, Los Angeles, California; Elizabeth Nielson, Kirkland & Ellis LLP, Salt Lake City, Utah; Steven J. Lindsay, Kirkland & Ellis LLP, Chicago, Illinois; for Plaintiffs-Appellees.

Michael E. Bern (argued), Uriel Hinberg, and Christine C. Smith, Latham & Watkins LLP, Washington, D.C.; Patricia Young, Latham & Watkins LLP, Menlo Park, California; for Defendant-Appellant.

Robert J. Gunther Jr., Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, for Intervenor.

# OPINION

HAMILTON, Circuit Judge:

These appeals arise from a dispute between two manufacturers of components used in fabricating computer chips. Comet Technologies USA, Inc. and affiliates sued XP Power, LLC under federal and state law for misappropriating trade secrets. Comet won a $40 million verdict for compensatory and punitive damages, a permanent injunction against any further use of the alleged trade secrets by XP, and over $17 million in attorney fees.

We reverse the judgment and remand for a new trial. The district court erroneously instructed the jury that XP bore the burden of disproving an essential element of Comet's claims, namely, that its trade secrets were not readily ascertainable by proper means. Because we vacate the judgment below, we do not reach XP's challenges to the awarded relief in this opinion.[1]

## I. *Factual and Procedural Background*

### A. *The Theft*

Christopher Mason and two other senior engineers left their jobs at Comet in February 2018 to work for XP on developing new product lines in the radio frequency power generator and impedance matching market. They brought with them not only years of industry experience but also

---

[1] In a separate non-precedential memorandum, we also reject XP's argument that the district court abused its discretion in excluding certain evidence under Federal Rule of Evidence 403. Judge Bumatay dissents from this opinion's order of a new trial based on the jury instruction issue. In a separate concurring opinion, Judge Hamilton addresses XP's challenges to the relief awarded.

thousands of confidential documents and files detailing Comet's products, research and development strategy, and the underlying technologies. Stolen documents in hand, they delivered complete designs and a development plan for XP's new product lines in just nine days.

Comet quickly discovered the theft and filed suit, alleging violations of both the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 et seq., and the California Uniform Trade Secrets Act (UTSA), Cal. Civ. Code § 3426 et seq. The DTSA, enacted in 2016, applies to misappropriation of trade secrets used in interstate or foreign commerce. It provides federal remedies that supplement, but do not replace, state trade secret laws. *See* 18 U.S.C. § 1838; *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1088 (9th Cir. 2025); *Attia v. Google LLC*, 983 F.3d 420, 424–25 (9th Cir. 2020).

The parties and the district court narrowed the issues before and during trial. Comet originally alleged misappropriation of twenty alleged trade secrets. At the district court's sensible urging, Comet agreed to pursue only five at trial, designated as follows:

- Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software.
- Trade Secret E: Next Generation RF Matching Network.
- Trade Secret L: Kiyo Matching Network.
- Trade Secret S: AMAT Matching Network.

- Trade Secret T: Comet's Manufacturing, Sales, and Pricing.[2]

During trial, Comet also voluntarily dismissed its California UTSA claims to streamline the case, leaving only those brought under the federal DTSA. That was a significant change that led to the reversible instructional error that we explain in Section III.

B. *The Trial*

The jury heard from numerous fact witnesses, including a video deposition of Mason, and technical and damages experts from both parties. The evidence included one proverbial smoking gun: a call between Mason and a headhunter for XP, a call in which Mason—still employed at Comet—offered a "crew" to provide a "turnkey" (meaning "already done") product design. In what one Comet expert, Dr. Stanley Shanfield, aptly called a "remarkable" move, the headhunter recorded the call and immediately forwarded it to XP's chief executive officer and

---

[2] In Comet's words:

> These valuable RF technologies are used in the semiconductor industry to manufacture silicon computer chips, which are used around the world. An RF generator generates radio frequency power, and an RF matching network (sometimes called a "match" or "matchbox") receives the generated RF power, and conditions it so it can be used to control plasma, which is in turn used to carve a silicon wafer into a semiconductor.

For an introduction to semiconductor manufacturing, see Corey Richard, Understanding Semiconductors: A Technical Guide for Non-Technical People 57–80 (2023).

other senior executives, telling them "please keep this recording strictly confidential. You will see why."

On damages, Comet asked the jury to award the full research and development costs that XP avoided having to spend by stealing the alleged trade secrets instead of developing them independently. Comet relied on this theory of unjust enrichment, rather than seeking its own lost profits or XP's ill-gotten gains. By the time of trial, XP had not yet released any new products using the Comet secrets.

The district court instructed the jury that Comet had the burden of showing that: (1) it owned the alleged trade secrets, (2) XP misappropriated them, and (3) they were in fact trade secrets at the time of the misappropriation. Over XP's objection, however, the district court also instructed the jury that XP bore the burden of proving its so-called "affirmative defense" that the alleged trade secrets were "readily ascertainable by proper means."

C. *The Verdict and Judgment*

In a special verdict, the jury found that Trade Secrets D, E, L, and S were owned by Comet and protected as trade secrets under the DTSA, and that XP had misappropriated Trade Secrets D, E, and L, but not Trade Secret S. The district court had already granted XP judgment as a matter of law on Trade Secret T.[3]

The jury awarded $5 million in damages for misappropriation of Trade Secret D and $15 million for misappropriation of Trade Secret E, but nothing for Trade Secret L, for a total of $20 million in compensatory damages.

[3] The district court wrote regarding Trade Secret S that the jury "appears to have credited XP's argument that . . . the information was available in non-secret forums or had previously been disclosed outside Comet."

It also found that XP "willfully and maliciously" misappropriated at least one of the trade secrets and awarded a further $20 million in punitive damages for a total award of $40 million.

After trial, the district court granted Comet's motion for a permanent injunction requiring XP to: refrain from using, disclosing, selling, or distributing Trade Secrets D, E, and L; remove and quarantine the stolen information; and allow third-party audits to ensure compliance. Later, the district court awarded Comet over $17 million in attorney fees.

XP appealed, raising several issues with the trial and judgment. Comet conditionally cross-appealed regarding only the award of zero damages for Trade Secret L. We consolidated the cross-appeals on the merits and XP's later appeal of the fee award.

II. *Appellate Jurisdiction*

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). We have appellate jurisdiction under 28 U.S.C. § 1291.

XP's opening brief on appeal questioned our appellate jurisdiction on the basis that, when XP filed its original notice of appeal, there was no final judgment because the district court had not yet ruled on Comet's motion for prejudgment interest. Any potential jurisdictional defect was cured when XP filed an amended notice of appeal after the district court decided the motion for prejudgment interest in January 2025. *See* Fed. R. App. P. 4(a)(4)(B)(i); *In re Jack Raley Construction, Inc.*, 17 F.3d 291, 294 (9th Cir. 1994) ("[T]he prudent course of action is merely to file a fresh appeal after entry of final judgment."); *see also Martinez v. Barr*, 941 F.3d 907, 916 (9th Cir. 2019) ("We

prioritize substantive rights of parties over procedural defects in appeals, allowing premature appeals to ripen absent any prejudice to the appellee.”). The parties correctly agreed that this course would establish jurisdiction, and neither argues prejudice from the fact that some briefing had been filed before then. We have jurisdiction and proceed to the merits.

## III. *The Erroneous Jury Instruction*

Jury instructions in civil trials focus the jury on the questions they must decide and how they should go about deciding them. Trial judges enjoy wide latitude in crafting jury instructions, but they must get the substance correct.

Here, we must reverse and remand for a new trial. We agree with both plaintiffs and defendants that the district court improperly instructed the jury on the burden of proof for lack of ready ascertainability, an essential element of Comet’s DTSA claims. XP did not invite the error, and Comet has not convinced us that the error was harmless.

### A. *How It Happened*

Instruction 20 told the jury that XP was not liable for misappropriation if XP proved by a preponderance of the evidence that the alleged trade secrets were readily ascertainable by proper means, meaning they could be lawfully “obtained, discovered, developed, reverse-engineered, or compiled without significant difficulty, effort, or expense.” This instruction was erroneous because the DTSA instead puts the burden of proof on the *plaintiff* to show that its alleged trade secrets were *not* readily ascertainable by proper means. *See* 18 U.S.C. § 1839(3)(B). Instruction 20 thus erroneously flipped the burden of proof on an essential element of Comet’s claim.

Some states, including California, put the burden of proof on the defendant by making ready ascertainability an affirmative defense to a trade secret claim. California Civil Jury Instructions No. 4420 (2025). Indeed, to avoid confusing the jury, XP had originally proposed Instruction 20 at a time when Comet was still asserting claims under both the federal DTSA and California's UTSA.

Several days into trial, however, Comet voluntarily dropped its California UTSA claims to streamline the issues for the jury. The district court asked the parties to explain how this change would affect the jury instructions and verdict form. In response, XP said correctly that Instruction 20 should be amended to shift the burden of proof on lack of ready ascertainability to Comet, in line with the federal DTSA. Comet objected and argued that Instruction 20 should be removed entirely, claiming quite erroneously that the "DTSA does not permit a defendant to avoid liability for misappropriation by showing that it *could* have found the information some other way." The district court rejected both requests without an on-the-record explanation.

At the final charging conference the next day, the district court asked if there were "any other suggestions from either side as to the verdict form as to the issues not previously objected to in your writings?" Comet asked the district court to remove the "not readily ascertainable" question from the verdict form, repeating in substance its written objection to Instruction 20. XP responded that "I believe we've raised all our concerns already and they're preserved," plainly referring to the previous day's motion and denial. Then, responding to Comet's request, XP argued that Instruction 20 and the corresponding verdict question were "appropriate under the DTSA." The district court agreed and left them in.

We review a district court's formulation of civil jury instructions for abuse of discretion, but we review de novo whether instructions substantively misstate the law. *Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015). The parties agree that Instruction 20 erroneously reversed the burden of proof. Comet raises two arguments to save the verdict from the error: (1) that XP invited the error, and (2) that the error was harmless. We reject both arguments.

B. *No Invited Error*

Comet argues that XP invited the instructional error when it told the district court in the final charging conference that Instruction 20 should be given. A party waives appellate review by inviting an error when it is aware of the applicable law but nonetheless "intentionally relinquishe[s] or abandon[s] a known right" by advancing the error or failing to object. *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc). Proposing a flawed jury instruction is a "paradigmatic example" of invited error. *United States v. Magdaleno*, 43 F.4th 1215, 1220 (9th Cir. 2022).

The requisite intent to invite an error can be inferred when a party insists on a faulty instruction despite the court or the other side pointing out the problem. *See United States v. Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991) ("Here, the district court offered to instruct the jury on what it could infer . . . . Guthrie declined the offer, however, and proposed instead that the court simply reread its more general instruction on the element of knowledge. The court complied with Guthrie's request, so he cannot now complain of what he received."); *United States v. Baldwin*, 987 F.2d 1432, 1437 (9th Cir. 1993) (finding invited error where criminal defendant opposed government's request to give the erroneously missing jury instruction); *see also* Fed. R. Civ.

P. 51(d)(1)(A) ("A party may assign as error . . . an error in an instruction actually given, if that party properly objected . . . .").

XP did not invite this error. Far from acquiescing, XP objected immediately when Comet dismissed its state law claims and thereby made Instruction 20 erroneous. XP specifically drew the district court's attention to the different burdens of proof. In response, Comet muddled the issue by asking the district court to remove the instruction entirely on the erroneous theory that XP did not claim to have actually reverse-engineered the information, an argument that Comet has wisely abandoned. The district court's failure to correct the error as XP requested was not XP's fault.[4]

XP's statements at the charging conference the next day also do not show invited error. The district court asked the parties for objections to the verdict form that were not previously raised in writing; XP's objection to Instruction 20 was neither. Even so, XP did not remain silent. It reminded the judge of its previous objection and noted that the issue

[4] Ninth Circuit precedent and at least one California state court case support Comet's argument as to the California UTSA claims. *See* California Civil Jury Instructions No. 4420 (2025), citing *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 n.9 (1991). The same is not true of the DTSA, which defines a "trade secret" to exclude information that is not "readily ascertainable through proper means." 18 U.S.C. § 1839(3)(B); *e.g.*, *Masimo Corp. v. True Wearables Inc.*, No. 18-cv-2001, 2021 WL 2548690, at *3 (C.D. Cal. Apr. 28, 2021) ("[T]here is one key difference between the [California UTSA] and the DTSA . . . . [U]nder the [California UTSA], ready ascertainability is only a defense insofar as the defendant actually gained knowledge of the trade secret by use of those materials which make the trade secret readily ascertainable."), *aff'd*, No. 21-2146, 2022 WL 205485 (Fed. Cir. Jan. 24, 2022), citing *IMAX Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1168 n.10 (9th Cir. 1998).

was preserved. More fundamental, the district court's erroneous ruling the day before and Comet's proposal to remove Instruction 20 entirely forced XP into a Hobson's choice between either a flawed instruction on ready ascertainability or no instruction at all. Having made a timely and correct objection on the burden of proof the day before, XP's argument in the alternative—to keep an imperfect instruction on an element important to XP's defense—did not amount to invited error. *See United States v. Laurienti*, 611 F.3d 530, 544 (9th Cir. 2010) ("[N]othing prevents a party from arguing in the alternative.").[5]

C. *No Harmless Error*

An instructional error in a civil case does not require reversal if the party defending the judgment shows that the error was "more probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009), quoting *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005); *see also BladeRoom Group Ltd. v. Emerson Electric Co.*, 20 F.4th 1231, 1243–44 (9th Cir. 2021) (rejecting a universal "tie-to-the-verdict" rule). We have explained that prejudice is likely where the error adds an element to a party's burden of proof and where "nothing about th[e jury's] verdict indicates that the result would have been the same without the error." *Clem*, 566 F.3d at 1182–83 (alteration in original), quoting *Caballero v. City of Concord*, 956 F.2d 204, 207 (9th Cir. 1992). This is the general rule because "the burden of proof affects all aspects of the jury's verdict," and an error can make it "impossible to determine whether the erroneous

[5] This is a case where "counsel shifted his position as advocate precisely *because*" of an erroneous ruling. *See United States v. Espinoza-Bazaldua*, 711 F. App'x 737, 741 (5th Cir. 2017) (non-precedential) (rejecting argument that defendant invited the error he argued on appeal).

burden of proof was outcome determinative." *Carvalho v. Raybestos-Manhattan, Inc.*, 794 F.2d 454, 455 (9th Cir. 1986).

Comet offers two grounds for finding this instructional error harmless: (1) that the instructions were accurate as a whole; and (2) that Comet's evidence was so strong that the jury probably would have ruled the same way even if it had been properly instructed. We reject both contentions.

1. *Accuracy as a Whole*

A single mistaken instruction may be deemed harmless if the instructions, taken as a whole, fairly and correctly cover the substance of the applicable law. *Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001). Comet points out that Instruction 18, a separate instruction, correctly told the jury that Comet bore the burden of proof on another element of its claims: that the alleged trade secrets gave Comet "independent economic value" through providing a "business advantage." Comet contends that by satisfying its burden on this element under Instruction 18, it necessarily proved that its alleged trade secrets were not readily ascertainable by proper means.

On this subject, the instructions were not accurate as a whole. Instruction 20 flipped the burden of proof on lack of ready ascertainability. Instruction 18 addressed utility in terms of "independent economic value," while "ready ascertainability" addresses secrecy. Information can be secret without being useful or useful without being secret. The two may often go together, but neither feature necessarily implies the other.

For three reasons, we reject Comet's argument, which the dissent seems to adopt, that by proving a trade secret

provides independent economic value, it proved "as a matter of logic" that the information was not readily ascertainable. First, that position is undermined by Comet's admission in the district court that "Instruction No. 18 . . . omits [the lack of ready ascertainability] aspect of the trade-secret definition under the DTSA," a point it made when arguing to remove Instruction 20 altogether. Second, and more fundamental, Comet's theory would effectively rewrite the DTSA, which defines a trade secret to require both independent economic value and lack of ready ascertainability as related but distinct statutory elements. *See* 18 U.S.C. § 1839(3)(B) ("[T]he information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."). Third, a reasonable juror would easily conclude that, because Instructions 18 and 20 were separate and tied to separate questions on the verdict form, the two required independent consideration.

2. *Likely Result*

The party defending the judgment bears the burden of showing that the jury more likely than not would have reached the same result if it had been properly instructed. *Clem*, 566 F.3d at 1182. Comet must either: (1) point to something about the jury's verdict from which we can infer how it would have ruled absent the mistake; or (2) convince us that its evidence was so strong that we can step confidently into the jury's shoes to make that determination ourselves. *See Mockler v. Multnomah County*, 140 F.3d 808, 812–14 (9th Cir. 1998) (making inferences from jury's verdict and reviewing weight of evidence in addressing harmlessness). Comet has done neither.

Nothing in the jury's complete verdict sheds light on how it would have ruled if properly instructed on lack of ready ascertainability. To be sure, the jury found that XP misappropriated some of the alleged trade secrets and did so willfully and maliciously, and the jury awarded compensatory and punitive damages. Those findings were all supported by sufficient evidence, but sufficiency is not enough to show an instructional error was harmless. Lack of ready ascertainability under the DTSA has nothing to do with the defendant's real-world conduct. The jury had to decide whether XP or others *could have* reverse-engineered the alleged trade secrets, not whether XP had actually done so. On the ability to reverse-engineer, the jury heard sharply conflicting evidence, which we review below. As to whether XP could have reverse-engineered the alleged trade secrets, the jury's finding about what actually happened does not tell us what the jury would have decided—under a correct instruction on the burden of proof—about what XP could have theoretically done to reverse-engineer any of the information. These two aspects of the jury's verdict are distinct. One asks what XP *did* and the other what XP and others *could have done*.

The award of compensatory damages for "the value of XP's benefit that would not have been achieved except for their misappropriation," as required by Instruction 23, is a red herring on the harmless-error question. XP did not argue that it would have reverse-engineered the alleged trade secrets if not for acquiring them through Mr. Mason, merely that it could have done so, at least in part. Likewise, the jury's award of punitive damages does not support harmlessness on lack of ready ascertainability, as the dissent asserts. In past cases noting a punitive damages award as a significant factor in finding harmlessness, the aspect of the

case on which the jury was improperly instructed bore a direct logical relationship to the findings required to award punitive damages. *See Larez v. Holcomb*, 16 F.3d 1513, 1518 (9th Cir. 1994) (jury's finding that police officer engaged in "extraordinary misconduct" warranting punitive damages was "highly significant" in gauging how a properly instructed jury likely would have ruled on a consent-to-arrest defense); *Lambert v. Ackerley*, 180 F.3d 997, 1008–10 (9th Cir. 1999) (en banc) (failure to give instruction on affirmative defense of economic restructuring was harmless where jury awarded punitive damages and therefore must have found defendants acted with a culpable mens rea).

Here, however, ready ascertainability or its absence did not depend on whether XP engaged in egregious misconduct, of which there was ample evidence. Instead, the jury had to weigh conflicting testimony from experts on what XP or others could have reverse-engineered. In general, weighing conflicting expert testimony falls outside the wheelhouse of a federal court of appeals. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192, 1196 (9th Cir. 2000) (reversing summary judgment in case of dueling experts because neither side's theory was barred as a matter of law). This is not a case where we could simply apply familiar legal standards to undisputed facts about who said and did what when. *See Mockler*, 140 F.3d at 812–14 (affirming jury verdict despite instructional error in employment discrimination case; panel could conclude remedial action was inadequate from unrebutted factual testimony). Rather, we must review highly technical expert testimony and do so mostly without the benefit of access to the many exhibits those witnesses used to illustrate and explain their testimony.

We do not agree with Comet that its evidence on lack of ready ascertainability was so overwhelming that we should

deem the error harmless. The first major obstacle to a finding of harmless error here is Comet's attempt to rebut the testimony of XP's key expert witness, Dr. Joshua Phinney. It was a study in changing the subject. In cross-examination of Dr. Phinney, Comet understandably emphasized the defendants' bad acts in taking and using confidential information from Comet. But the cross-examination does not seem to have laid a glove on Dr. Phinney's points about significant aspects of the alleged trade secrets actually consisting of information that could have been reverse-engineered or was otherwise publicly disclosed. Similarly, Comet's closing argument on lack of ready ascertainability amounted only to pointing out that "XP kept going back to the Comet documents. There's no evidence that XP went out and looked publicly for this stuff."[6]

At the risk of some repetition, lack of ready ascertainability does not depend on what the defendants actually did. Ready ascertainability or its absence, as here, depends on an evaluation of what another expert in the field could have learned by proper means. Comet's failure to defang Dr. Phinney's testimony on this subject weighs against a finding of harmless error.

Even if we could say with some confidence that some of Comet's alleged trade secrets were genuinely protected, meaning that the information was not readily ascertainable with legitimate methods, there are further obstacles to finding harmless error. The jury found in favor of XP on

---

[6] Perhaps Comet focused on XP's conduct when cross-examining Dr. Phinney because at the time it was still asserting claims under the California UTSA, for which ready ascertainability is an affirmative defense. It requires the defendant actually to have obtained the information lawfully. *Supra* n.4.

Trade Secret S, and it found that Trade Secret L was misappropriated but that Comet did not prove damages for Trade Secret L. Further, the compensatory damage award was $5 million for Trade Secret D and $15 million for Trade Secret E. The combination of verdict answers makes it impossible to tease out how a failure to prove lack of ready ascertainability as to some elements of the claimed trade secrets would affect the compensatory damage award.

Even if we assume for the sake of argument that some of the documents and computer files identified by Comet and our dissenting colleague contained at least some information that was not readily ascertainable, we could not find the error was harmless. Comet's damages were based on its own *total* research and development expenses. In particular, Comet's damages expert used internal cost codes to calculate development costs for each alleged trade secret—a common method of intellectual property valuation—and "assume[d] that every bit of confidential information included in Comet's prior generation product codes . . . was valuable to XP." He relied on other witnesses to identify these cost codes and lacked the technical expertise to opine that they reflected only protected elements of the alleged trade secrets. On appeal, Comet provides no basis for identifying which of those expenses were implicated by various sorts of information that may have been readily ascertainable by proper means, such as through reverse-engineering, by XP or others. At an absolute minimum, XP correctly identifies, the jury would have had to award a smaller amount in compensatory damages if it concluded that certain aspects of the alleged trade secrets were readily ascertainable and thus not protected by the DTSA. Given the conflicting testimony on the question of lack of ready ascertainability, which we review below, we cannot be confident that the instructional

error was harmless as to all of the stolen information. Comet all but conceded as such when it wrote that "Trade Secrets D and E encompassed a vast library of information, *much of which* could not be obtained from reverse engineering." Appellee's Br. at 32–33 (emphasis added).

Comet characterized Dr. Phinney's testimony as being that the "dimensions and configuration" of similar components in competitors' products could be replicated by opening them up and that public patents disclosed certain "concept[s]" used in the alleged trade secrets. *Id*. at 35–36. Indeed, XP introduced testimony intended to show that the alleged trade secrets were readily ascertainable "through various means, including by opening a match box and reviewing public patents." Appellant's Br. at 25. For example, Dr. Phinney testified that significant aspects of Comet's alleged trade secrets were disclosed in other companies' public patents and product bulletins. Anyone wishing to replicate the physical dimensions of a product could easily measure them, Dr. Phinney testified, and in his opinion certain components used a "standard format or form factor" and were derived from "off-the-shelf" parts.

In response to Dr. Phinney's testimony, Comet contends that "other vital aspects" of its trade secrets, such as "manufacturing variation and material properties," could not have been learned through reverse-engineering. Appellees' Br. at 35–36. Comet also argues that the patents Dr. Phinney relied upon did not reveal the "strategy behind design choices, or how to implement the technology." *Id.* at 36. For example, Dr. Shanfield testified that proprietary performance test data the engineers brought from Comet to XP was "the key" to choosing the right components. Comet also noted that its products containing Trade Secrets D and

E were not yet available for purchase at the time of the theft, making reverse-engineering anything from them impossible.

However, Dr. Phinney's testimony largely concerned public information about *other* companies' products already on the market. By his account, skilled electrical engineers would easily have understood Comet's design strategy. For example, Dr. Phinney identified one aspect of Trade Secret E as "a component that has been used for a long time in this industry," one that "everyone knew" was needed. He also criticized Comet's expert, Dr. Shanfield, for failing to address what was known generally in the industry and for failing to engage on many of the details of the alleged trade secrets so as not to "bore the jury."

Critical too, Trade Secret L was already on the market. Comet itself wrote in another section of its brief that the "award of $0 in damages for Trade Secret L was given in tandem with an award for Trade Secret E that incorporated development costs for Trade Secret L, reflecting an effort to avoid double counting." Appellees' Br. at 21–22. That is, Comet had asked for $6 million for Trade Secret E and $11.1 million for Trade Secret L, and eventually won a $15 million award for Trade Secret E. Accordingly, on Comet's own theory of the case, the development costs for Trade Secret L must have been the majority of the award for Trade Secret E, and close to (if not a majority) of the *entire* compensatory damages award of $20 million. In Comet's own words: "The jury's damages awards for Trade Secrets E and L are thus intertwined and cannot fairly be reconsidered separately." *Id*. at 22.

We simply cannot say on this record how much the jury would likely have awarded for research and development costs going into "manufacturing variation," "material

properties," and "strategy behind design choices," after excluding costs going into the potentially readily ascertainable categories of "dimensions" and "configuration," as well as certain "concepts." *See BladeRoom*, 20 F.4th at 1246 (vacating damages award and noting court has "no way to know how much damages the jury intended to allocate for each claim" and "cannot tell whether the damages findings would be the same"). Moreover, even if we were to ignore the patents as offered at trial solely for secrecy and not ready ascertainability, as Comet and the dissent insist, some significant portion of the design files Mason stole must reflect "dimensions" and "configuration." One Comet witness described the "documents that you create as part of your design process" as starting with "specification and concepts" and then moving on to "schematics, to layouts; for example, for PCB boards, 3-D drawings."

Comet chose to propose a bottom-line damages figure for each alleged trade secret rather than risk boring or confusing the jury with a more detailed component-by-component or document-by-document breakdown. With the benefit of hindsight, that understandable strategic choice created obstacles to a finding of harmless error. If the jury had arrived at the same verdict after being properly instructed, we would have applied much more forgiving standards of review on appeal. *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (per curiam) (liability); *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (remittitur).

The conflicting evidence on the many issues of ready ascertainability and the ensuing damage calculations presented the sorts of disputes a properly instructed jury must decide, so we cannot overlook the instructional error as

harmless. We therefore vacate the district court's amended final judgment in its entirety, including the permanent injunction, though the jury's verdict that XP did not misappropriate Trade Secret S and the grant of judgment as a matter of law for XP on Trade Secret T are unchallenged on appeal and thus remain undisturbed. We remand for a new trial on liability and damages for Trade Secrets D, E, and L, each of which the jury found XP misappropriated. We include Trade Secret L, even though the jury awarded no damages specifically for it, because the jury could have credited Comet's iterative theory of damages but tried to avoid double-counting, a danger the jury was properly warned against. *See Floyd v. Laws*, 929 F.2d 1390, 1396–97 (9th Cir. 1991) (noting Seventh Amendment requires court attempt to "reconcile" or "harmonize" apparently inconsistent responses in a special verdict), citing *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963). Comet will be entitled to ask the jury to award those research and development costs on remand.

## IV. *Conclusion*

For the foregoing reasons, we **REVERSE** the judgment of the district court, including the damage awards, the permanent injunction, and the award of attorney fees and costs, and we **REMAND** the case for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

HAMILTON, Circuit Judge, concurring:

I write separately to address a remedial issue that is likely to arise on remand and again on appeal if Comet prevails at a new trial. XP argues that the district court's award of damages and injunctive relief to Comet constitutes a double recovery, and it seeks to force Comet to choose between those two remedies. If XP is correct, then Comet would need to make that either-or choice immediately after trial, when it decides whether to ask the court for a permanent injunction. Because Comet deserves clarity on this strategic question and because this issue is properly before us, I would decide it now. I would hold that awarding damages for unjust enrichment based on avoided costs and injunctive relief under the DTSA does not create a double recovery so that Comet faces no such dilemma.

Comet prevailed at trial and won three remedies justified by three distinct harms: (1) compensatory damages for unjust enrichment measured by XP's avoided costs; (2) a permanent injunction against XP's further use of Trade Secrets D, E, and L to harm Comet's business interests going forward; and (3) punitive damages for XP's willful and malicious misappropriation. Also, Comet was awarded attorney fees under the DTSA as a prevailing party whose trade secret was misappropriated willfully and maliciously. 18 U.S.C. § 1836(b)(3)(D).

XP does not challenge the district court's decision to allow the jury to award unjust enrichment damages for avoided costs, as defendants have sometimes done in other cases. *E.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, 68 F.4th 792, 806–07 (2d Cir. 2023) (applying DTSA). XP has also not asked this court to shorten the duration of the permanent injunction, as

defendants have also sometimes done in other cases. *E.g.*, *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 972, 974–75 (9th Cir. 1991) (applying Oregon UTSA).

Instead, XP argues that the district court's permanent injunction to prevent XP from releasing products incorporating the misappropriated trade secrets should mean that Comet cannot recover any compensatory or punitive damages, as the injunction would destroy any head-start XP had gained on product development. Rather than anchoring its argument in any provision of the DTSA, XP invokes the general principle against double recovery, such that a federal court may not grant equitable relief that "overlap[s] with the damages granted by the jury and so provide[s] the plaintiff a windfall." *Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016); *see also General Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery . . . .").

XP's argument flies in the face of the DTSA's statutory scheme, ignores the distinction between retrospective and prospective relief, and contravenes fundamental principles of trade secrets law. XP is arguing, in essence, that a defendant who pays a damage award under the DTSA can thereby purchase a license to use the stolen trade secrets as long as it likes. I reject that unusual view of trade secret law and would conclude that awarding damages and a permanent injunction in favor of Comet did not create a double recovery.

A district court's choice of remedies is reviewed for an abuse of discretion, *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020), but awarding a truly "double recovery" would be reversible error. *Teutscher*, 835 F.3d at 953–56.

I. *The DTSA's Remedies*

Start with the statutory text:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—
>
> (A) grant an injunction—
>
> (i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—
>
> (I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or
>
> (II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;
>
> (ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and
>
> (iii) in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty

for no longer than the period of time for which such use could have been prohibited;

(B) award—

(i)

(I) damages for actual loss caused by the misappropriation of the trade secret; and

(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

(ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C) if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); *and*

(D) if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret

> was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

18 U.S.C. § 1836(b)(3) (emphasis added).

Nothing in this statutory language prohibits a court from awarding both damages for unjust enrichment and injunctive relief. Quite the opposite. The DTSA offers trade secret plaintiffs several forms of relief to protect their intellectual property and to punish thieves, namely those listed in the statutory text above—injunctive relief, compensatory damages for actual loss, awards for unjust enrichment, reasonable royalties, punitive damages, and attorney fees—as well as orders under a different paragraph for civil seizure, encryption, and protection from publication. § 1836(b)(2); *accord*, *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 707–08 (6th Cir. 2015) (noting "myriad possible remedies" under Ohio UTSA). When Congress wanted to make these forms of relief mutually exclusive, it did so. *See* § 1836(b)(3)(B)(ii) (authorizing award of a reasonable royalty only "in lieu of damages measured by any other methods"). I conclude that the word "and" carries its ordinary meaning and that an award of one remedy generally does not implicitly preclude another.

II. *Retrospective and Prospective Relief*

Awarding avoided costs as unjust enrichment and an injunction protecting a plaintiff's future profits does not present a double recovery problem. The two remedies look at different parties and distinct time periods. The unjust enrichment award undoes a benefit *already gained by the defendant*, whereas the injunction prevents potential

business harms (including lost profits) *not yet suffered by the plaintiff*.

The Third and Seventh Circuits have relied on this logic to reject the same argument that XP advances here. *PPG Industries Inc. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156, 159, 163–64 (3d Cir. 2022) (applying Pennsylvania UTSA: "The damages and permanent injunction covered entirely separate periods of past and potential future use of misappropriated trade secrets."); *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595, 607–08 (7th Cir. 2001) (applying Wisconsin UTSA: "Cost of development damages assessed against a defendant do not address the future harm caused by continued use of misappropriated trade secrets. . . . [T]he jury's cost of development award does not render the granting of a permanent injunction against use in this instance as a duplicative remedy."; nonetheless affirming denial of injunction on other grounds); *see also Epic Systems Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1127, 1145 (7th Cir. 2020) (applying Wisconsin UTSA: affirming award of unjust enrichment damages for avoided costs and entry of permanent injunction without discussion); *ClearOne Communications, Inc. v. Bowers*, 643 F.3d 735, 752–54 (10th Cir. 2011) (applying Utah UTSA: rejecting defendant's argument that large monetary awards constituted an adequate remedy at law to vitiate need for permanent injunction, though without using term "double recovery"); *Insulet Corp. v. EOFlow Co.*, 779 F. Supp. 3d 124, 132, 136–38 (D. Mass. 2025) (applying DTSA: distinguishing avoided costs as retrospective, as compared to other potentially prospective types of unjust enrichment awards), *rev'd on other grounds*, 176 F.4th 1347 (Fed. Cir. 2026) (concluding statute of limitations barred DTSA claims without addressing double recovery issues), *separate*

*appeals stayed*, Nos. 25-1497 & 25-1507 (1st Cir.); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 16-cv-545, 2018 WL 2172502, at *10 (E.D. Va. May 10, 2018) (applying DTSA and Texas UTSA: "[P]articularly because JELD-WEN 'never intended its trade secrets to be licensed, sold, or otherwise used by a third party,' injunctive relief is not duplicative of the [unjust enrichment and reasonable royalty] damages sought because those two forms of relief will remedy different types of harm here." (alterations and internal citations omitted)), quoting *TMRJ Holdings, Inc. v. Inhance Technologies, LLC*, 540 S.W.3d 202, 210 (Tex. App. 2018); James Pooley, Trade Secrets § 7.03[1][a] n.6 (ALM 2025) ("[C]ost-of-development damages . . . are not considered as compensation for future harm, and may be awarded together with an injunction.").

To be sure, a monetary award could take into account future lost profits, in which case an injunction for an overlapping time period might in theory produce an impermissible double recovery. *See DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 325, 328 (5th Cir. 1997) (applying Texas common law: affirming denial of permanent injunction because damage award included future lost profits); *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 777, 784 (Neb. 2001) (applying Nebraska UTSA: reversing damage award for "value of future sales" due to injunction); Uniform Trade Secrets Act (UTSA) § 3 cmt. para. 1 (Unif. L. Comm'n 1985) ("A claim for actual damages and net profits can be combined with a claim for injunctive relief, but, if both claims are granted, the injunctive relief ordinarily will preclude a monetary award for a period in which the injunction is effective."); Pooley, Trade Secrets § 7.03[1][a] (ALM 2025) ("[W]hile it is entirely proper to award damages for accumulated misuse

and at the same time to enjoin future use of the trade secret, it would be inappropriate to enter both an injunction and a money judgment that included compensation for both past *and future* losses.") (footnotes omitted; emphasis added); *see also Winston Research Corp. v. Minnesota Mining & Mfg. Co.*, 350 F.2d 134, 139 n.3, 144 (9th Cir. 1965) (applying pre-UTSA California common law: "To enjoin future sales and at the same time make an award based on future profits from the prohibited sales would result in duplicating and inconsistent relief ….").

But that is not what happened here. As the district court explained, neither damages expert urged the jury to consider future harm in awarding unjust enrichment damages. Rather, Comet asked the jury to award avoided costs—the amount of money XP avoided spending by stealing Comet's alleged trade secrets instead of conducting that research and development itself.

Contrary to XP's assertions, unjust enrichment damages for avoided costs and injunctive relief are not "predicated on preventing or compensating for *the same harm*—XP's accelerated launch of products using Comet's trade secrets." Appellant's Br. at 57–58. Unjust enrichment is intended not to compensate for a harm suffered by the plaintiff but instead to force the defendant to forgo a benefit unlawfully obtained. *See Univ. of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1309 (Fed. Cir. 2003) (discussing Colorado tort law), citing Restatement (First) of Restitution § 1 cmt. a (A.L.I. 1937). In a trade secret case, an unjust enrichment award for avoided costs forces the defendant to forgo the benefit of avoided research and development costs, a benefit it would have received regardless of whether it ever brings a product to market, regardless of any profit gained from that product, and

regardless of any effects of that product on the profits, goodwill, competitive advantage, and business opportunities of the trade secret's rightful owner. On the other hand, the permanent injunction prevents the defendant from harming those latter interests by bringing such a product to market.

XP's opening brief relies on language in a leading treatise, *Milgrim on Trade Secrets*, in arguing that "measuring an unjust enrichment award 'by the value of the misappropriated trade secret . . . may preclude an award of injunctive relief on the theory that having received the full value of its trade secret, the owner is not entitled to further relief.'" Appellant's Br. at 53–54 (alteration in original), quoting 4 Milgrim on Trade Secrets § 15.02 (2023); *see also* 4 Milgrim on Trade Secrets § 15.02[3][c][ii] (May 2026 update) (same language). This statement may be true, but avoided costs are not synonymous with "value." The secret Coca-Cola recipe, for example, is the lynchpin of a huge company, and yet its inventor, John Pemberton, took just a few months tinkering with the formula after pivoting away from his previous endeavor—an alcohol-based medicinal concoction—to perfect his new soda drink. Mark Pendergrast, For God, Country & Coca-Cola 25–33 (1994).

Moreover, the case on which that passage of *Milgrim on Trade Secrets* relies itself recognized the distinction drawn here. The Sixth Circuit affirmed dismissal of a plaintiff's second suit for misappropriation on claim preclusion grounds because in the first case it had won a monetary award after asking the jury to consider three unjust enrichment theories: (1) "what a reasonably prudent investor would pay for the trade secrets;" (2) the defendant's savings from increased productivity due to using the trade secret; and (3) avoided costs. *Allied Erecting & Dismantling*, 805 F.3d at 707–09; *see also id.* at 709 (White, J., concurring) (noting

that award of "what a reasonably prudent investor would pay" meant that defendant "effectively paid for what it had misappropriated" and therefore incurred no further liability from its "later use of the same trade secrets in the next generation of its product").

Here, the jury awarded avoided costs, not an abstract "value" of the trade secrets. If one believes Comet's damages expert, that value, which might be inferred from the profits internal documents show XP expected to gain from the new product lines, was well over $100 million. The district court then enjoined XP from using the stolen information to harm Comet's business going forward. This did not create a double recovery.

III. *Syntel and Computer Sciences*

On this double-recovery issue, XP relies heavily on *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, a Second Circuit decision reversing an unjust enrichment award under the DTSA. 68 F.4th 792 (2d Cir. 2023). In *Syntel*, the jury found that Syntel misappropriated TriZetto's trade secrets and awarded unjust enrichment damages for Syntel avoided costs under the DTSA. The district court then entered a permanent injunction, which Syntel did not challenge on appeal. Citing the same passage from *Milgrim on Trade Secrets* on which XP relies, the Second Circuit reversed the unjust enrichment award because TriZetto did not suffer a "compensable harm" beyond its lost profits. *Id.* at 811. In particular, the "permanent injunction ended Syntel's use of TriZetto's trade secrets, and, therefore, its ability to profit from any avoided costs." *Id.* The upshot: the court wiped away a DTSA jury award of $285 million for unjust enrichment. *Id.* at 799, 806–07, 814. Following the briefing of this case, the Fifth

Circuit relied on double recovery concerns to modify an injunction under the DTSA in *Computer Sciences Corp. v. Tata Consultancy Services Ltd.*, 159 F.4th 429 (5th Cir. 2025).[1]

XP asks this court to adopt and extend *Syntel* to preclude the combination of the unjust enrichment damages and the permanent injunction here. I agree more broadly with the Third and Seventh Circuits in concluding there is generally no double recovery bar to trade secret plaintiffs winning both permanent injunctive relief and damage awards for unjust enrichment for avoided costs. *See PPG Industries*, 47 F.4th at 163; *Pribyl*, 259 F.3d at 608. I reach this conclusion for several reasons.

First, *Syntel* is distinguishable on the facts. Syntel competed with TriZetto in the market for installation, upgrade, and customization services for TriZetto's healthcare insurance administration platform, for which TriZetto allowed users to choose third-party service providers. Syntel gained access to TriZetto's trade secrets because it also served as TriZetto's subcontractor for servicing contracts held by TriZetto. After Syntel terminated their commercial relationship, it began "actively creating a repository of TriZetto's trade secrets on its own or of its own to be used in future work." 68 F.4th at 796–97. The only such "work" proved at trial was a single service contract that

---

[1] After reversing the unjust enrichment award, the *Syntel* court remanded for the district court to consider the jury's findings that Syntel was liable for over $142 million as a reasonable royalty under New York trade secrets law and over $59 million for copyright infringement. Those findings could not yet be addressed on appeal "since the jury, to avoid double counting, did not factor them into their total compensatory damages award, instead relying exclusively on the $284,855,192 damages in avoided costs for the DTSA claim." 68 F.4th at 814.

gave Syntel less than $1 million in unjust profits at the expense of a $8.5 million profit opportunity for TriZetto—not the creation of a competing software platform. *Id.* at 798, 811. The court viewed lost profits and a permanent injunction as sufficient relief because "Syntel's misappropriation did not diminish, much less destroy, the secrets' continued commercial value to TriZetto," contrasting cases where a defendant developed a competing product. *Id.* at 811–12. On those "unusual[]" facts—no destruction of value, an effective injunction, *and* no development of a competing product—the "modest profits" were incommensurate with an avoided costs award in the hundreds of millions. *See id.* at 812. Yet developing a competing product is exactly what XP tried to do here. It failed only because Comet responded so quickly. *See Insulet*, 779 F. Supp. 3d at 137–38 (similarly distinguishing *Syntel*).

*Computer Sciences* is distinguishable on the facts too, as well as on the remedy for what that court considered the double recovery. There, Tata Consultancy misappropriated trade secrets consisting of the source code and technical manuals for financial services software produced by Computer Sciences by exploiting a service contract with a user of that software. Then, Tata Consultancy used the trade secrets to redevelop its own competing software platform, which was not yet on the market in the United States. 159 F.4th at 434–37. The district court awarded unjust enrichment damages measured by avoided costs and enjoined Tata Consultancy from future use or possession of Computer Science's trade secrets and from future use of its redeveloped software, essentially forcing it to revert to a prior version. *Id.* at 447, 450–51. The Fifth Circuit vacated the injunction in part, reasoning that because the unjust

enrichment award was an estimate of what Tata Consultancy would have spent to redevelop its software lawfully, the award overlapped with the part of the injunction preventing Tata from using its redeveloped software. However, the court approved of the part of the injunction preventing Tata Consultancy from continuing to use or possess Computer Science's trade secrets, calling it "not duplicative as it prevents *further* use of the trade secrets, while the unjust enrichment damages measure only . . . *past* use." *Id.* at 451 (emphasis added). Here, by contrast, XP has not identified any way to modify the injunction while still preventing it from using or possessing Comet's trade secrets going forward.

Third, the discussion in *Syntel* on which XP relies is primarily about another proposition: that unjust enrichment awards are available under the DTSA only when the plaintiff suffers some additional "compensable harm" beyond lost profits. *Syntel*, 68 F.4th at 811. XP has not made that argument here, and like the Fifth Circuit in *Computer Sciences*, I find the contention unpersuasive. *See* 159 F.4th at 448 (calling the compensable harm standard "divorced from the text of the DTSA and from traditional understandings of the 'unjust enrichment' remedy"). While *Syntel* quoted *Milgrim on Trade Secrets*, a subsequent update to the treatise criticized *Syntel* on exactly this issue.

The treatise said *Syntel* focused unduly on identifying compensable harms, gave too much weight to the permanent injunction, and was inconsistent with the history of trade secret law and with case law in other circuits:

> [T]he [*Syntel*] court explained that focusing solely on a defendant's gains would mean that "avoided costs would be available as

> unjust enrichment damages in any case of misappropriation, even where a trade secret owner suffers no compensable harm beyond its lost profits or profit opportunities." That is a puzzling conclusion given that a trade secret owner's ability to recover for unjust enrichment beyond its actual loss is plainly contemplated by the DTSA ....
>
> The *Syntel* panel offered little in the way of direct support for its conclusion. . . . [A] trade secret claimant may recover for either its loss or defendant's unjust enrichment, "whichever is greater." [Citing Restatement (3d) of Unfair Competition § 45(1) (1995)] . . . . [T]he court never explained why a trade secret owner's recovery of a defendant's ill-gotten gain . . . would be properly viewed as "punitive" as that term is traditionally understood. The court also appeared influenced by the fact that the lower court had granted a permanent injunction, but, fundamentally, a permanent injunction is prospective relief, not a substitute for a monetary recovery that accrues prior to the issuance of the injunction.
>
> . . . . [B]arring further developments, the court's holding will likely result in DTSA unjust enrichment awards in the Second Circuit being considered very differently than they are elsewhere.

4 Milgrim on Trade Secrets § 15.02[3][c][ii] (May 2026 update) (footnotes omitted).

Fourth, if the *Syntel* rule were extended beyond the facts of that unusual case, it would have unfortunate implications for litigation strategy. A large unjust enrichment award could invite post-trial gamesmanship. Suppose a defendant estimates that complying with a permanent injunction would be less expensive than paying the unjust enrichment award. This incentive would be strongest, perversely, for defendants who act willfully and maliciously because an injunction would wipe away not just compensatory damages but also punitive damages. *See* 18 U.S.C. § 1836(b)(3)(C) (capping punitive damages at twice compensatory damages).

In its briefing on appeal, XP at first resisted and then wholeheartedly embraced that troubling conclusion. While XP vigorously opposed injunctive relief in the district court, on appeal it has argued in the alternative in only the most oblique terms for dissolving the injunction. It also has not put before us a dollar figure on the "substantial and unrecoverable resources" it claims to have already spent in complying with the injunction. Appellant's Br. at 51.

A defendant facing a ruinous monetary judgment might even bait such a request by signaling an intention to continue using the stolen trade secret after an unfavorable verdict. Or perhaps technological developments or changes in market conditions, especially over years of litigation, leave the defendant with little or no business interest in using the trade secret anymore. In such circumstances, accepting the injunction while vacating a damages award could effectively become a windfall for bad actors, even the worst actors. To be clear, I do not think that XP baited such a request here, but the holding it proposes would invite that kind of behavior.

The implicit assumption underlying *Syntel*'s discussion of injunctive relief is that once a defendant pays an unjust enrichment award for avoided costs, the defendant is entitled to sell the products it developed by using the stolen information.[2] In other words, payment of unjust enrichment damages would in effect buy a license to continue using the stolen trade secrets. That assumption is wrong. The only remedies that entitle a defendant to continue using a misappropriated trade secret are a damages award that compensates a plaintiff for future harms, *see* UTSA § 3 cmt. para. 1, or a royalty injunction that "conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited." 18 U.S.C. § 1836(b)(3)(A)(iii); *see also* UTSA § 2(b) (same). A district court may issue a royalty injunction under the DTSA only "in exceptional circumstances that render [a prohibitory] injunction inequitable." 18 U.S.C. § 1836(b)(3)(A)(iii). Per the Uniform Trade Secrets Act, such circumstances "include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation." UTSA § 2(b).

XP has not asked this court to impose a royalty injunction in lieu of the retrospective-only monetary award Comet received—and for good reason. To start, the evidence was strong that senior executives at XP knew of the misappropriation even before it happened. This also is not the rare case where the public interest makes an injunction

---

[2] XP argued similarly when it opposed the permanent injunction based on the damage award: "[W]hen a plaintiff seeks (and receives) damages premised on the claim that the defendant used its trade secrets to design a competing product further injunctive relief is unavailable to remedy that harm." ECF 429 at 5.

inequitable, such as *Republic Aviation Corp. v. Schenk*, 152 U.S.P.Q. 830, 834–35, 1967 WL 7717, at *6–7 (N.Y. Sup. Ct. 1967) (pre-UTSA New York common law: refusing injunction against selling useful aircraft weapons control system to United States military), cited with approval in UTSA § 2 cmt. para. 5. Otherwise, even the mere possession of misappropriated trade secrets remains subject to both civil and criminal penalties, the latter being up to ten years in prison for an individual or, for an organizational defendant, a fine of up to three times the "value of the stolen trade secret to the organization," including "expenses for research and design . . . that the organization has thereby avoided." 18 U.S.C. § 1832(a)(3), (b). Nor would a hypothetical thief of the Coca-Cola recipe get the recipe back with his watch and other belongings on his way out of prison. Pre-DTSA federal criminal penalties expressly authorize criminal forfeiture and destruction of property "*in addition to* any other similar remedies provided by law." 18 U.S.C. § 1834 (emphasis added).

Accepting XP's double recovery theory would condone the continued use of misappropriated trade secrets after the defendant pays an unjust enrichment award for avoided costs. That would mean treating trade secret theft as something analogous to an "efficient breach" in contract law: the defendant pays what it would have cost to obtain the information honestly, the public benefits from increased competition, and everyone goes on their merry ways. *Cf.* Gregory Klass, "Efficient Breach," in *The Philosophical Foundations of Contract Law* (2014), 362, 362 (Gregory Klass et al. eds., 2014) ("A contractual duty is a duty to perform or pay damages because, having priced breach correctly, the law wants the promisor sometimes to choose breach."). Under such a contract-law-like regime, a

competitor might rationally choose to steal a trade secret and pay the subsequent judgment to obtain guaranteed access to a trade secret rather than go through the risky and time-consuming process of performing that research and development itself, or else negotiating with the owner for a voluntary license.

Importing that kind of cost-benefit decision-making from contract law into the trade secret realm would be inconsistent with the civil *and criminal* remedies in the DTSA. Congress crafted those remedies to deter misappropriation and to punish commercial thieves. Other than through a royalty injunction in "exceptional circumstances," the DTSA does not allow a defendant to obtain what amounts to a forced sale or license of a competitor's trade secret. *See Pribyl*, 259 F.3d at 608 n.7 ("Such a system would encourage parties to bypass the market and misappropriate trade secrets, knowing that if caught, the party would merely have to pay the amount it would have had to negotiate for in the first instance."); *see also id.* at 609 ("Oftentimes . . . the greatest loss that results from a misappropriation is the loss of the right not to divulge a trade secret, regardless of price."). Nor must a plaintiff who discovers a theft too quickly for the defendant to release its illicit product choose between surrendering a license or obtaining no monetary award at all.

For these reasons, I would decline to extend the rules of *Syntel* or *Computer Sciences* to these facts. I would instead join the Third and Seventh Circuits in concluding that granting both an unjust enrichment award for avoided costs and a permanent injunction against further use of a misappropriated trade secret in these circumstances does not

create a double recovery. *PPG Industries*, 47 F.4th at 163; *Pribyl*, 259 F.3d at 608.

---

BUMATAY, Circuit Judge, dissenting:

Comet Technologies USA, Inc., alleged that several of its former employees stole its trade secrets and brought them to a competitor, XP Power, LLC. A jury sided with Comet and awarded the company $40 million, including $20 million in punitive damages based on XP's willful and malicious misappropriation. Like the majority, I conclude the district court used an erroneous jury instruction, which improperly placed the burden of establishing whether the trade secrets were "readily ascertainable" on XP Power. *See* 18 U.S.C. § 1839(3)(B). But the wealth of undisputed evidence introduced at trial easily establishes that "it [was] more probable than not that the jury would have reached the same verdict had it been properly instructed." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021) (simplified). In other words, the error was harmless. A retrial is unwarranted.

As both parties concede, the district court ought to have instructed the jury that Comet—as the plaintiff—bore the burden of proving the alleged stolen material was not "readily ascertainable through proper means." 18 U.S.C. § 1839(3)(B). To do this under the district court's instructions, Comet needed to show that the material couldn't be "obtained, discovered, developed, reverse-engineered, or compiled without significant difficulty, effort, or expense." Comet more than met its burden through overwhelming and undisputed evidence.

Because this is such a fact-bound question (with little precedential value for future cases), I only briefly run through the evidence supporting the harmlessness of the jury verdict. But even this overview shows that Comet presented overwhelming—and largely uncontested—evidence that these trade secrets were sophisticated and composed of voluminous data files filled with highly technical schematics and confidential testing results. In the end, the only reasonable inference the jury could draw was that these trade secrets were not readily ascertainable.

As background, the jury found that XP misappropriated three trade secrets, which were called Trade Secrets D, E, and L.

For Trade Secret D, Comet offered uncontroverted evidence that the trade secret included:

- "[T]thousands of pages and files" including "everything related to [the] technology development" of Trade Secret D. This included "the design process," "the concept," "the system architecture, layouts, schematics, test results, simulation; the complete [vendor list]; [and] the assembling instructions";
- Documents from Comet's R&D system, including the various control concepts explored for Trade Secret D and comparisons between them;
- Information on prototype design and testing; and
- Hardware design improvement ideas incorporating the results of product

testing and proposals for further advancements.

For Trade Secret E, Comet's experts testified that the trade secret included:

- Instructions for "how to calibrate [Comet's] sensors" using Comet's "custom equipment," the "data that's used for calibration," and spreadsheets containing the equations and results for calibration;
- Data providing the possible variation of parameters, which tells "not only how [the final product] is configured" but also "what different things [Comet] can configure," allowing quick "adapt[ation] to a new application";
- Calibration data, including the calibration data for multiple units, which reveals "what kind of manufacturing variation . . . there is going to be between units";
- Test code and "performance test information"; and
- Computer aided design ("CAD") files showing all the parts of the sensors and their material, which contained "more information . . . than one could get from opening up Comet's matches."

Now turn to Trade Secret L. Even though this trade secret underpinned publicly available units, Comet presented evidence that it contained:

- "[I]nput and output sensors, the pulsing performance, CAD design files, [Comet's] motor drive system, and [Comet's] sensor calibration and custom equipment [that Comet] design[s]";
- "[D]esign requirements" for "this platform of sensors";
- Mechanical schematics of the product's assembly containing "every file, every piece part, even every screw" that is "part of this model";
- The code included in the sensor to detect input variances and alter performance;
- Fabrication drawings specifying the "exact details," including the materials used and their precise thicknesses;
- Data showing "what [the trade secret's] design margin is, what it was capable of doing"; and
- Details of custom calibration equipment for the output sensors.

And Comet's experts testified that this information, including these hyper-detailed schematics, is different from a mere picture of the match box.

In contrast, XP provided no direct evidence that the trade secrets were readily ascertainable. Instead, XP's experts raised only the ability to identify the general physical architecture and functionality of the units. But XP's experts

did not contest that the detailed data sources and drawings brought over by Comet's former employees provided information that would not have been otherwise available to a competitor.

Take XP's technical expert, Dr. Joshua Phinney. He testified that it was possible to open the match box of a competitor—Advanced Energy—and find a sensor that "looked like" one represented on a stolen document. But he only represented that this physical deconstruction would enable the construction of a similarly dimensioned match box. He didn't testify that such physical reconstruction would enable XP or another competitor to replicate the materials, testing, or systems architecture data stolen by Comet's former employees. Likewise, in his discussion of Comet's patent applications, Dr. Phinney did not assert that the misappropriated testing, materials, or systems-architecture data was readily ascertainable from the applications. Instead, Dr. Phinney primarily addressed other elements of a trade secrets case—XP's knowledge of the theft and the secrecy of the material—not whether the material was readily ascertainable.

So the unrebutted evidence makes clear that the trade secrets were not readily ascertainable. And the improper burden shift would only have been significant in the rare event that the jury found it equally probable that the trade secrets were or were not readily ascertainable. *See Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373 (9th Cir. 1996); *see also Bristow v. Drake St. Inc.*, 41 F.3d 345, 353 (7th Cir. 1994) ("Burdens of persuasion are, in other words, tie-breakers."). The weight of evidence shows that it is "more likely than not" that the jury was not in equipoise.

And the jury verdict as a whole suggests the same. *See Lambert v. Ackerly*, 180 F.3d 997, 1010 (9th Cir. 1999) (concluding instructional error "more likely than not" harmless when separate jury findings suggest outcome). For example, the jury was asked whether each trade secret had "independent economic value because it was secret." *See* 18 U.S.C. § 1839(3)(B). The jury said "yes." Under the statute's text, the "independent economic value" and "readily ascertainable" inquiry are joined. Section 1839(3)(B) asks whether the information at issue "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person . . . ." That makes sense. After all, if information is valuable because it is secret, it logically follows that the secret information is difficult for competitors to independently replicate. Otherwise, the secrecy itself would have little or no value. That the jury answered "yes" to both questions thus strongly suggests that, with a proper instruction, the jury would still have found that XP could not have easily developed this technology on its own.

The jury's award of compensatory and punitive damages makes the jury's views even clearer. *See Lambert*, 180 F.3d at 1010. The jury awarded Comet $20 million in compensatory damages and $20 million in punitive damages. Start with the compensatory damages. In seeking compensatory damages, Comet had to prove, by a preponderance of the evidence, "the value of XP's benefit that would not have been achieved *except for their misappropriation.*" In other words, the jury had to conclude that XP could not have obtained the stolen information *without misappropriation*—or, stated in terms of the jury instructions' definition of ready ascertainability, the

"information" could not have been "obtained . . . without significant difficulty, effort, or expense." And the jury was convinced. It awarded a total of $20 million in compensatory damages—$5 million for Trade Secret D and $15 million for Trade Secret E.

And the additional $20 million punitive-damages award against XP for willful and malicious misappropriation suggests that the question was not close. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 805–06 (9th Cir. 2001) (upholding a jury verdict despite instructional error based on the "overwhelming and undisputed evidence" and the return of "a large punitive damages award"). In finding maliciousness, the jury found that XP was motivated by "ill will or spite" or intended to injure Comet. At the very least, this signals that the jury found that XP meant to harm Comet—which itself suggests the jury believed the activity was economically harmful. And Comet would only be economically harmed if the information underpinning the trade secrets couldn't have been easily discovered without the theft.

The majority, though, incorrectly reads the jury's damages award to support retrial. Maj. Op. at 20–21. Comet's damages expert based his compensatory-damages calculation on the amount Comet spent to develop the trade secrets. He compiled internal cost codes related to the trade secrets and added a proportionate share of the company's overhead. But the majority argues that the expert's failure to explain to the jury precisely how each cost-code entry was related to a given component or development activity makes a finding of harmlessness impossible. Maj. Op. at 23–24. That's because the majority believes we cannot determine whether the jury would likely have assigned the same damages amount if the judge had properly assigned the

burden of proving that the trade secrets were not readily ascertainable. *Id*. But that's wrong. In fact, the award of compensatory damages serves as a compelling proxy for whether the jury would consider the trade secrets readily ascertainable. As discussed, the jury independently determined "the value of XP's benefit that would not have been achieved *except for their misappropriation*." And this is closely tied to the question of whether the secrets could have been readily ascertained through honest means.

So this situation isn't like *BladeRoom*, in which I joined a panel overturning a jury verdict based on an instructional error. In that case, the timing of the breach at issue was "murky" and evidence supported a finding of a breach during two different time periods. *BladeRoom Grp. Ltd*., 20 F.4th at 1245. That resolved the case. *Id.* at 1246. In such a context, "no party can demonstrate what the jury found as to when breach occurred." *Id.* Here, the weight of evidence and the jury's findings point in one direction—that the stolen materials were not readily ascertainable. Thus, we should have held the district court's instructional error was harmless.

Because the majority orders a retrial, it is unnecessary to reach the other issues in the majority opinion.

I respectfully dissent.